# EXHIBIT "5"

EXHIBIT "5"

Department of Anesthesia and
Perioperative Care
University of California, San Francisco



University of California
San Francisco

## THE CHANGING PRACTICE OF
# Anesthesia

**HOTEL NIKKO • SAN FRANCISCO, CALIFORNIA**

**FRIDAY - SUNDAY**
# September 21-23, 2012



## Pre-Conference Workshops:
## September 20, 2012

- Anesthesia Simulator Workshop
- Hands-On Difficult Airway Management Workshop
- Ultrasound for Regional Anesthesia Workshop
- Hands-on Ultrasound for the Anesthesia Provider: Vascular Access and Intravascular Volume Assessment

# THE CHANGING PRACTICE OF
# Anesthesia

**HOTEL NIKKO · SAN FRANCISCO, CALIFORNIA**

## September 21-23, 2012

The Changing Practice of Anesthesia is designed to update the clinician on some of the most significant advances in the field of anesthesia. These changes include new developments in general and specialized areas of perioperative medicine, anesthesia, and critical care. We have also included case-based discussions, and four optional, interactive workshops to be conducted on September 20, 2012:

- Anesthesia Simulator Training
- Hands-On Difficult Airway Training Workshop
- Ultrasound for Regional Anesthesia Workshop, and
- Hands-On Ultrasound for the Anesthesia Provider: Vascular Access and Intravascular Volume Assessment.

**EDUCATIONAL OBJECTIVES**

Upon completion of the educational activity participants should be able to:

- Review the guidelines for practice and performance measures for anesthesia providers;
- Understand the agents available for spinal anesthesia in the ambulatory patient;
- Review the deaths and their causes during ambulatory surgery in the Los Angeles area;
- Discuss techniques to prolong local anesthetic blocks for ambulatory surgery patients;
- How to effectively intervene with disruptive behavior or aging issues in your practice;
- Review positions and safe movements while delivering anesthesia care;
- Review the hazards and protections against radiation and trace gas exposure;
- Understand the alternatives to opioids that are available for perioperative pain management;
- Discuss the problems associated with pain control in the opioid tolerant patient and treatment options;
- Understand the mechanisms of how acute pain becomes chronic and how to prevent it;
- Discuss the many challenges of anesthesia for labor and delivery in the cardiac patient;
- Discuss problems with bleeding in obstetrics;
- Review the different options for labor analgesia;
- Discuss the emerging structure of ACO's;
- Discuss Health Care Reform and the effect on anesthesia providers;
- Discuss the costs of anesthesia care in the United States;
- Review the emerging use of smart intravenous pumps for delivery of anesthetic medications;
- Discuss the pharmacokinetics of intravenous propofol;
- Review strategies for ventilation without endotracheal intubation;
- Discuss the options for assisted ventilation by new ventilators;
- Review the use of monitoring to accurately guide fluid therapy during surgery and in the ICU;
- Discuss the incidence and prevention of peri-operative stroke;
- Review the incidence and causes of cognitive decline after anesthesia and surgery;
- Review new options for pediatric pain control;
- Review new and old devices for the pediatric patient;
- Review the choice of drugs and anesthetic techniques for spine surgery with neuromonitoring;
- Discussion of recent studies on blindness after surgery with emphasis on spine surgery;
- Review the new anticoagulants as they relate to the practice of anesthesia.

**ACCREDITATION**

**Physicians:**
The University of California, San Francisco School of Medicine UCSF) is accredited by the Accreditation Council for Continuing Medical Education to provide continuing medical education for physicians. UCSF designates this live activity for a maximum of **18** *AMA PRA Category 1 Credits™*, the **Anesthesia Simulator Workshops** (MAN1301A/B) for a maximum of **2** *AMA PRA Category 1 Credits™*, the **Hands-On Difficult Airway Management Workshop** (MAN1201C), for a maximum of **8** *AMA PRA Category 1 Credits™*, the **Ultrasound for Regional Anesthesia Workshop** (MAN1301D/E), for a maximum of **4** *AMA PRA Category 1 Credits™* and the **Ultrasound for Diagnosis and Intravascular Access** (MAN1301F/G) for a maximum of **4** *AMA PRA Category 1 Credits™*. Physicians should only claim credit commensurate with the extent of their participation in each of these activities.
This CME activity meets the requirements under California Assembly Bill 1195, continuing education and cultural and linguistic competency.
For the purpose of recertification, the American Nurses Credentialing Center accepts *AMA PRA Category 1 Credit™* issued by organizations accredited by the ACCME.



**PROGRAM CHAIRS**

**Merlin D. Larson, MD**
Professor Emeritus, Department of
Anesthesia and Perioperative Care

**John M. Taylor, MD**
Associate Professor
Medical Director, Department of
Anesthesia and Perioperative Care,
Moffitt-Long Post Anesthesia Care
Unit and Perioperative Support
Services

**Susan S. Yoo, MD**
Assistant Professor, Department of
Anesthesia and Perioperative Care

**C. Spencer Yost, MD**
Professor, Department of
Anesthesia and Perioperative Care
Director, ICU at Mount Zion
Hospital

**DEPARTMENT CHAIR**

**Mervyn Maze, MB, ChB**
William K. Hamilton Distinguished
Professor in Anesthesia
Chair, Department of Anesthesia
and Perioperative Care

**VISITING FACULTY**

**Selma Calmes, MD**
Consultant in Anesthesiology
for the Los Angeles County
Coroner-Medical Examiner Clinical,
Los Angeles, CA

**Lee A. Fleisher, MD**
Robert D. Dripps Professor
and Chair, Department of
Anesthesiology and Critical Care
Professor of Medicine
Perelman School of Medicine
University of Pennsylvania Health
System; Philadelphia, Pennsylvania

**Sean Mackey, MD, PhD**
Chief, Division of Pain
Management; Associate Professor,
Department of Anesthesia
Neurosciences and (by courtesy)
Neurology, Stanford University
School of Medicine, Palo Alto, CA

**Steven L. Shafer, MD**
Professor of Anesthesia,
Stanford University; Adjunct
Professor of Bioengineering and
Therapeutic Sciences, University
of California at San Francisco
Editor-in-Chief, Anesthesia &
Analgesia

**UCSF COURSE FACULTY**
(Department of Anesthesia and
Perioperative Care unless otherwise
noted)

**J. Matthew Aldrich, MD**
Assistant Professor

**Pedram Aleshi, MD**
Assistant Professor

**Matthias Behrends, MD**
Assistant Professor

**Philip E. Bickler, MD, PhD**
Professor

**Matthias R. Braehler, MD**
Assistant Professor

**Daniel H. Burkhardt, MD**
Associate Professor

**Lundy Campbell, MD**
Associate Professor

**Lydia Cassorla, MD, MBA**
Professor

**Christopher C. Choukalas, MD**
Assistant Professor

**Adam B. Collins, MD**
Associate Professor

**Scott Dingeman, MD**
Assistant Professor

**Kenneth Drasner, MD**
Professor

**Maria B. Ferschl, MD**
Assistant Professor

**Pamela D. Flood, MD**
Professor

**Pedro L. Gambus, MD, PhD**
Visiting Associate Professor

**Adrian Gelb, MBChB**
Professor

**Jay Harris, BA**
Associate Director
UCSF Medical Center
Administration

**Andrew J. Infosino, MD**
Professor

**Ravi V. Joshi, MD**
Assistant Professor

**Jeffrey Katz, MD**
Emeritus Professor

**Sakura Kinjo, MD**
Associate Professor

**UCSF COURSE FACULTY (CONT'D)**

**Rondall K. Lane, MD**
Assistant Professor

**Mark L. Latronica, MD**
Assistant Professor

**Jacqueline M. Leung, MD, MPH**
Professor

**Jeremy A. Lieberman, MD**
Professor

**Linda L. Liu, MD**
Professor

**Jennifer M. Lucero, MD**
Clinical Instructor

**Margaret C. Martin, JD**
Executive Director, Managed Care
and Strategic Planning
UCSF Medical Group

**Ramana K. Naidu, MD**
Assistant Professor

**Dorre Nicholau, MD, PhD**
Professor

**Victor Ng, MD**
Assistant Professor

**David Robinowitz, MD, MHD, MS**
Assistant Professor

**Mark D. Rollins, MD, PhD**
Associate Professor

**Patrica A. Roth, MD**
Professor

**Mark Schumacher, MD, PhD**
Associate Professor

**Mohammed Shaikh, MD, PhD**
Assistant Professor

**Laura Sledman, MD**
Professor

**Kristina Sullivan, MD**
Associate Professor

**Donald M. Taylor, MD, PhD**
Assistant Professor

**J. Matthew Taylor, MD, PhD**
Assistant Professor

**Kevin C. Thornton, MD**
Assistant Professor

**Frank van der Heusen, MD**
Assistant Professor

**Maurice Zwass, MD**
Professor



145

THE CHANGING PRACTICE OF **Anesthesia**

## THURSDAY, SEPTEMBER 20, 2012

### Anesthesia Simulator Workshop
**MAN1301A/B**

**Department of Anesthesia Center for Health Care Simulation at San Francisco General Hospital (SFGH)**

**Session A** 8:00 – 10:00 am / **Session B** 10:30 am – 12:30 pm
**Workshop Sessions are limited to 4 participants per session**
**Registration Fee: $250** MD/CRNA
Registration is ONLY available online at **https://www.cme.ucsf.edu**
**Directors:** Manuel C. Pardo Jr., MD • Adam B. Collins, MD
**COURSE DESCRIPTION**
This program is designed to provide the practitioner with an opportunity to apply baseline knowledge and skills in the management of perioperative medical crises in an immersive learning environment. The participants then undergo guided reflection to improve future practice performance. Details of medical management will be discussed, as well as proper crisis management behaviors. The course includes a brief introduction, followed by several realistic OR-based patient simulations.  Scenarios will be recorded and reviewed immediately afterwards in a debriefing conference.

For educational objectives and course schedule please see **https://www.cme.ucsf.edu**

### Hands-On Difficult Airway Management Workshop
**MAN1301C**
**Hotel Nikko, San Francisco**

**Session C is limited to 40 participants.** Faculty to registrant ratio = 1:4
**Registration Fee $395** • Time 8:00 am – 5:00 pm
Registration is ONLY available online at **https://www.cme.ucsf.edu**
**Directors:** Patricia A. Roth, MD • Robin Stackhouse, MD

This workshop is designed to update practitioners on the latest airway data, equipment, and techniques. It will begin with a series of talks and demonstrations that detail various situations in which an airway cannot be established through conventional means, including a discussion of appropriate methods and tools that can be used in difficult airway management. This will be immediately followed by a hands-on training workshop where participants will practice these techniques using many types of airway management equipment on mannequins to further sharpen and freshen their skills.

For educational objectives and course schedule please see **https://www.cme.ucsf.edu**

### Ultrasound for Regional Anesthesia Workshop
**MAN1301D/E**
**Hotel Nikko, San Francisco**

**Workshop Sessions are limited to 24 participants • Registration Fee: $325**
**Session D** 8:00 am – 12:00 pm / **Session E** 1:00 pm – 5:00 pm
Registration is ONLY available online at **https://www.cme.ucsf.edu**
**Director:** Andrew T. Gray, MD, PhD  **Special Guest Instructor:** Jens Kessler, MD

The purpose of this activity is to provide the practitioner with the necessary skills to successfully use ultrasound guidance to administer regional blocks. Instruction includes both didactic and hands-on sessions and covers basic and advanced uses of ultrasound imaging. Each student will use ultrasound equipment to scan live and phantom models.

For educational objectives and course schedule please see **https://www.cme.ucsf.edu**

### Hands-on Ultrasound for the Anesthesia Provider: Vascular Access and Intravascular Volume Assessment
**MAN1301F/G**
**Hotel Nikko, San Francisco**

**Workshop Sessions are limited to 16 participants per session • Registration Fee: $200**
**Session F** 8:00 am-12:00 pm / **Session G** 1:00 pm – 5:00 pm
Registration is ONLY available online at **https://www.cme.ucsf.edu**
**Director:** John M. Taylor, MD

The purpose of this activity is to provide the practitioner with the necessary skills to successfully use ultrasound guidance for vascular access and as an aid to evaluate intravascular volume status and for the presence of pneumothorax. Instruction includes both didactic and hands-on sessions and covers basic and advanced uses for ultrasound imaging. Each student will use ultrasound equipment for scanning using live and phantom models.

For educational objectives and course schedule please see **https://www.cme.ucsf.edu**

## September 21-23, 2012

### FRIDAY, SEPTEMBER 21, 2012

| | | |
|---|---|---|
| 7:00 am | *Registration and Continental Breakfast* | |
| 8:00 - 8:10 | **Welcome** | |
| | **Announcements and Introduction of Guest Speaker** | Mervyn Maze, MB, ChB |
| 8:10 - 8:55 | **Guidelines and Performance Measures: How Do You Apply the Evidence** | Lee A. Fleisher, MD |
| 8:55 - 9:10 | **Discussion** | |

#### AMBULATORY SURGERY • Moderator: Andrew Infosino, MD

| | | |
|---|---|---|
| 9:10 - 9:35 | **Spinal Anesthesia for Outpatient Surgery** | Kenneth Drasner, MD |
| 9:35 - 10:00 | **Ambulatory Surgery Disasters** | Selma Calmes, MD |
| 10:00 - 10:20 | **Prolonging Peripheral Nerve Blocks for Ambulatory Surgery** | Matthias Behrends, MD |
| 10:20 - 10:35 | **Discussion** | |
| 10:35 - 10:50 | *Break* | |

#### PROVIDER SAFETY • Moderator: Spencer Yost, MD

| | | |
|---|---|---|
| 10:50 - 11:15 | **"Over-the-Top" or "Over-the-Hill" Practitioners: Legal and Practical Issues** | Dorre Nicholau, MD, PhD |
| 11:15 - 11:35 | **Body Mechanics in the OR** | Donald M. Taylor, MD, PhD |
| 11:35 - 11:55 | **Minimizing Risks from Radiation and Trace Gases** | Kristina Sullivan, MD |
| 11:55 - 12:10 pm | **Discussion** | |
| 12:10 - 1:30 | *Lunch (on your own)* | |

#### ACUTE PAIN • Moderator: Mark Latronica, MD

| | | |
|---|---|---|
| 1:30 - 1:55 | **Strategies to Decrease Perioperative Opioid Complications** | Ramana K. Naidu, MD |
| 1:55 - 2:25 | **Perioperative Management of the Opioid Tolerant Patient** | Mark Schumacher, MD, PhD |
| 2:25 - 2:55 | **When Acute Pain Becomes Chronic: What Do We Know and How Can We Prevent it?** | Sean Mackey, MD, PhD |
| 2:55 - 3:10 | **Discussion** | |
| 3:10 - 3:25 | *Break* | |

#### OBSTETRICAL ANESTHESIA • Moderator: Jennifer Lucero, MD

| | | |
|---|---|---|
| 3:25 - 3:55 | **Parturient with Cardiac Disease** | Pamela D. Flood, MD |
| 3:55 - 4:20 | **Management of Coagulopathy in Obstetrics** | Mark D. Rollins, MD, PhD |
| 4:20 - 4:45 | **Labor Epidurals: Local Anesthetics and Beyond** | Pedram Aleshi, MD |
| 4:45 - 5:00 | **Discussion** | |
| 5:00 | *Adjourn* | |
| 5:00 pm | *Wine Tasting Reception* | |

### SATURDAY, SEPTEMBER 22, 2012

| | | |
|---|---|---|
| 7:00 am | *Continental Breakfast* | |
| 8:00 - 8:05 | **Announcements** | |

#### HEALTH CARE REFORM • Moderator: Mervyn Maze, MB, ChB

| | | |
|---|---|---|
| 8:05 - 8:30 | **Accountable Care Organizations** | Jay Harris, BA |
| 8:30 - 8:55 | **Legislative Reform: Effects on Payers** | Margaret Martin, JD |
| 8:55 - 9:20 | **Value from Anesthesia Care: Where Do We Influence the Outcome/ Cost Equation in Medicine?** | Lee A. Fleisher, MD |
| 9:20 - 9:35 | **Discussion** | |

#### PERI-OPERATIVE PHARMACOLOGY • Moderator: Mohammed Shaikh, MD, PhD

| | | |
|---|---|---|
| 9:35 - 9:50 | **New Anticoagulants** | Linda L. Liu, MD |
| 9:50 - 10:10 | **TIVA and Smart Pumps** | Pedro L. Gambus, MD, PhD |
| 10:10 - 10:40 | **Pharmacokinetics in the Trial of Conrad Murray, MD** | Steven L. Shafer, MD |
| 10:40 - 10:55 | **Discussion** | |
| 10:55 - 11:10 | *Break* | |

Hotel Nikko • San Francisco, California

# SATURDAY, SEPTEMBER 22, 2012 (CONT'D)

**CRITICAL CARE • Moderator: John Taylor, MD**

| | | |
|---|---|---|
| 11:10 - 11:35 | **Peri-operative Use of Non-invasive Ventilation** | J. Matthew Aldrich, MD |
| 11:35 - 11:50 | **Review of Ventilators with Emphasis on New Modes** | Kevin C. Thornton, MD |
| 11:50 - 12:15 pm | **Goal Directed Fluid Therapy** | Christopher C. Choukalas, MD |
| 12:15 - 12:30 | **Discussion** | |
| 12:30 - 2:00 | *Lunch* | |

**PROTECTION OF THE BRAIN • Moderator: Jacqueline Leung, MD**

| | | |
|---|---|---|
| 2:00 - 2:25 | **Perioperative Stroke** | Adrian Gelb, MBChB |
| 2:25 - 2:50 | **Cognitive Decline after Surgery** | Mervyn Maze, MB, ChB |
| 2:50 - 3:05 | **Discussion** | |

**PEDIATRICS • Moderator: Maurice Zwass, MD**

| | | |
|---|---|---|
| 3:0 - 3:30 | **New Modalities for Treating Perioperative Pediatric Pain** | Scott Dingeman, MD |
| 3:30 - 3:55 | **Airway Devices for Pediatrics** | Laura Sledman, MD |
| 3:55 - 4:10 | **Discussion** | |
| 4:10 - 4:25 | *Break* | |

**ANESTHESIA FOR ORTHOPEDIC SURGERY • Moderator: Sakura Kinjo, MD**

| | | |
|---|---|---|
| 4:25 - 4:50 | **Anesthesia for Spine Surgery, Neuromonitoring** | Jeremy A. Lieberman, MD |
| 4:50 - 5:15 | **Optic Neuropathy and Blindness after Surgery** | Rondall K. Lane, MD |
| 5:15 - 5:30 | **Discussion** | |
| 5:30 pm | *Adjourn* | |

# SUNDAY, SEPTEMBER 23, 2012

| | | |
|---|---|---|
| 7:00 am | *Continental Breakfast* | |
| 8:00 - 9:45 | Participants may attend one workshop: | |
| | **Difficult Cases in Regional Anesthesia** | Philip E. Bickler, MD, PhD<br>Adam B. Collins, MD<br>Matthias R. Braehler, MD |
| | **Difficult Airway Cases and Equipment** | Patricia A. Roth, MD |
| | **Perioperative Issues for the Cardiac Patient Undergoing Non-cardiac Surgery** | Ravi V. Joshi, MD<br>Frank van der Heusen, MD<br>Victor Ng, MD<br>Lundy Campbell, MD |
| | **Thoracic Epidural – Acute Pain, Teaching Models, Anatomy, Case Discussions** | Merlin D. Larson, MD<br>Mark L. Latronica, MD<br>Daniel H. Burkhardt, MD |
| | **Unusually Difficult Pediatric Cases** | Maurice Zwass, MD<br>Marla B. Ferschl, MD<br>David Robinowitz, MD, MHD, MS |
| 9:45 - 10:15 | *Break* | |
| 10:15 - 12:00 pm | Participants may attend one workshop: | |
| | **Difficult Cases in Regional Anesthesia** | Phillip E. Bickler, MD, PhD<br>Adam B. Collins, MD<br>Matthias Braehler, MD |
| | **Difficult Airway Cases and Equipment** | Patricia A. Roth, MD |
| | **Anesthesia for Thoracic Surgery: Challenges, Techniques for Lung Isolation, and Difficult Cases** | Lundy Campbell, MD<br>Lydia Cassorla, MD, MBA<br>Jeffrey Katz, MD |
| | **Thoracic Epidural - Acute Pain, Teaching Models, Anatomy, Case Discussions** | Merlin D. Larson, MD<br>Mark L. Latronica, MD<br>Daniel H. Burkhardt, MD |
| | **Unusually Difficult Pediatric Cases** | Maurice Zwass, MD<br>Marla B. Ferschl, MD<br>David Robinowitz, MD, MHD, MS |
| 12:00 pm | *Evaluations and Adjourn* | |

148



♻ Printed on Recycled Paper

For more information or to register online visit our website at **www.cme.ucsf.edu.** You may also reach us by calling the Office of CME at (415) 476-4251 or email info@cme.ucsf.edu.

0569
University of California,
San Francisco
Office of Continuing
Medical Education
UCSF Box 0742
San Francisco, CA
94143-0742

## GENERAL INFORMATION
Pre-registration is preferred.

## HOW TO ENROLL
Tuition: **$525**  Physician
**$450**  CRNAs *(include AANA#)*
**$225**  Residents, Interns, Student CRNAs

**Additional Workshop Fees** – Registration is ONLY available on-line at http://www.cme.ucsf.edu

**Anesthesia Simulator: MAN1301A/B**
Each Workshop session is limited to 4 people
**$250**  Physician/CRNA

**Hands On Difficult Airway Management:**
**MAN1301C** Workshop session is limited to 40 people.
**$395**  Physician/CRNA

**Ultrasound for Regional Anesthesia Workshop:**
**MAN1301D/E** Registration is limited to 24 people
**$325**  Physician/CRNA

**Hands-on Ultrasound for the Anesthesia Provider: Vascular Access and Intravascular Volume Assessment: MAN1301F/G** Workshop Session is limited to 16 people
**$200**  Physician/CRNA

Payment may be made by Visa, MasterCard, AmEx or check.

## REGISTER VIA:
**Online:**  www.cme.ucsf.edu
**Mail:**  Complete course registration form and send with payment to:
UCSF Office of CME
P.O. Box 45368
San Francisco, CA
94145-0368
**Fax:**  Fax completed registration form to: (415) 502-1795 (be sure to include your credit card number)
**Phone:**  To register by phone or to inquire about registration status, please call UCSF's CME Registration Office at (415) 476-5808. Please check our website for up-to-date information on the course: www.cme.ucsf.edu

**On-Site Registration:**  Generally we are able to accommodate on-site registration at our courses at our courses however pre-registration is preferred.

## REFUNDS
Cancellations received in writing before the first day of the course and each course workshop will be refunded, less a $75 administrative fee. No refunds will be made on cancellations received after that date.

## CONFERENCE LOCATION
Enjoy San Francisco's renowned attractions such as the historic cable cars, shopping in Union Square, or visit San Francisco's culinary hub at the Ferry Building. The **Hotel Nikko** is just steps from Union Square and the Theatre District.

A block of guestrooms has been reserved at the hotel a special UCSF discounted conference rate of **$259.** The contracted cut off date is August 29, 2012, or until the group room block is filled, whichever comes first. After this date, rooms will be provided on a space-available basis only. If you prefer to phone in your reservation, please identify yourself as a member of this conference, UCSF Anesthesia 2012 to receive the special rate. To make hotel reservations on-line, go to **www.hotelnikkosf.com** use the booking code: **SSFFMM.** If you prefer to telephone in your reservation, call 415-394-1111 to receive the special rate. By staying at the host hotel, you help the University of California meet its contractual obligations and keep future registration fees reasonable. Please take this into consideration when making your accommodation decisions.

**\*\*Hotel Policies:** Reservations must be cancelled at least 24 hours in advance or a one-night's stay (and applicable taxes) will be charged. A credit card number is required to confirm your reservation. Check-in is 3:00 pm; Check-out is 12:00 noon. Reservation requests made after August 29, 2012 will be honored at the conference room rates on a space-available basis. Room rates are subject to all state and local taxes (currently 15.565%, subject to change without notice).

## RENTAL CAR
Hertz is offering special rates for participants of this conference; simply call **(800) 654-2240** and refer to identification number 03BW0131, or call your travel agent. You may also make reservations at www.Hertz.com. Advance reservations are recommended.

## AIR TRANSPORTATION
UCSF has negotiated special fares with American and United Airlines for our course attendees. You may use the following tour codes to book on your own:

American (800) 433-1790 code: **1310SS**
United (800) 521-4041 code: **510CF**

## GOT PAPER?... NOT
We will no longer be distributing a printed syllabus for this course – printing one consumes nearly 400,000 pieces of paper! Registrants will have access to all presentations on a conference website pre- and post-conference.

149

**The Changing Practice Of Anesthesia**
September 21-23, 2012
Hotel Nikko • San Francisco, California

MAN13001

Mail to :   UCSF Office of CME
            P.O. Box 45368
            San Francisco, CA  94145-0368
            Fax: (415) 502-1795

Online registration: **www.cme.ucsf.edu**
Registration Information: (415) 476-5808
Course Information: (415) 476-4251

☐ Dr.   ☐ Mr.   ☐ Mrs.   ☐ Ms.

Last Name _____  First _____  M.I. _____

Degree _____  Specialty _____

Address _____

City _____  State _____  Zip _____

Daytime Phone _____  Fax _____

Email _____

**Address Label Code Letter (see address label: example, A, B, C, D, etc.)** _____

Would you like to be on our priority email list?   ☐ Yes   ☐ No

Date of birth to be used as OCME registrant number: __ __ / __ __ / X X
                                                     Month      Day

♿ Please indicate if you have any special needs: _____

**Registration Fees**
  ☐ **$525  Physicians**            AANA # _____
  ☐ **$450  CRNAs**
  ☐ **$450  AHP, Nurses**
  ☐ **$225  Residents, interns, Student CRNAs** *(include a letter from the Program Director)*

**Additional Workshop Fees** – Registration is **only** online at **www.cme.ucsf.edu**

Make checks payable to *UC Regents*

Please charge my credit card:  ☐ Visa   ☐ MasterCard   ☐ AmEx for  $ _____

_____ |_____ / _____
Card #                                                    Expiration date

_____ |_____
Name on Card (Please Print)                      Authorized Signature

Refund Policy: Cancellations received in writing before the first day of the course and each course workshop will be refunded, less a $75 administrative fee. No refunds will be made on cancellations received after that date.

Please check our website for up to date information on the course: **www.cme.ucsf.edu.**

**ON-SITE REGISTRATION**
Time:   7:00am - 8:00am
Date:   September 21, 2012
Place:  **Hotel Nikko**
        222 Mason Street
        San Francisco, CA  94102



www.cme.ucsf.edu

Course Registration Form



## ALL THE PATIENTS

- 46 total Jan 2007-Dec 2011
- Eliminated 3 cases:
  - Anesthesiologist suicide
  - Arrest during colonography
  - Michael Jackson

## AMBULATORY SURGERY DISASTERS

Selma Harrison Calmes MD
Consultant in Anesthesiology
Los Angeles County Coroner/Medical Examiner

## OBJECTIVES

- Present data and cases of OP surgery patients who died in Los Angeles County, 2009-2011
- Point out common areas leading to trouble

151

















## EMBOLIC EVENTS

- Air: 1
- Venous: 2
- Fat: 2

  ■ Obstruct cardiac output
  ■ Travel to vital organs such as brain and kidney
  ■ Initiate release of proinflammatory cytokines in the lung[1]

  *1 Kao SJ et al. Clinical Science 2007;113:279-285*

## CASE

- Paramedics called: No BP, HR 35, junctional rhythm, GCS 3
- Transported to a hospital: no EKG, no BP, GCS 3. Died in ER
- DIC had been activated:
  – Preop Hgb 13.5 → 7.1
  – Platelets 262K → 22K
  – PT 10.4 → 81.6



CAUSES OF DEATH IN OPs

## CASE

- 57 yo female for tumescent liposuction of abdomen & flanks, plus "buttock lift"
- 64", 150 lbs, BMI 25.7
- Done w LMA, desflurane, $N_2O$, $O_2$
- Tumescent fluid 5.8 L, fat 4.4 L
- 500 cc processed fat injected per buttock
- $SpO_2$ and $ETCO_2$ drop suddenly







## HOW DO YOU FIX IT?

- Emphasize need to do a preop airway exam:
  - Only 2/43 cases had a complete preop airway exam
  - Most put Mallampatti Score, which is not very specific
- Teach the preop airway exam
- Know the Difficult Airway Algorithm
- Plan appropriately for intubation and/or change anesthesia plan
- Plan for the end of the case!

## THE SURGEONS' ROLE



- "Cosmetic" surgery attracts problem MDs
- Ease of starting a "cosmetic" surgery practice
- "Training" is totally inadequate
- No realization of need for monitors, need to call 911, etc



WHAT'S AN ANESTHESIOLOGIST DOING IN THE MORGUE?









# EXHIBIT "6"

# TO BE FILED UNDER SEAL

# EXHIBIT "7"

# EXHIBIT "7"

## Konrad L. Trope

| | |
|---|---|
| **From:** | Konrad L. Trope <ktrope@centurionlawgroup.com> |
| **Sent:** | Thursday, January 24, 2013 1:55 PM |
| **To:** | 'Edward Winter' |
| **Cc:** | 'Lakshmanan Sathyavagiswaran'; 'Craig Harvey'; 'Christopher Rogers'; 'Raffi Djabourian'; 'Kreindler Charles L.'; oxman2008@aol.com; 'Douglas S. deHeras' (ddeheras@prindlelaw.com); 'catkinson@centurionlawgroup.com'; jkades@coroner.lacounty.gov |
| **Subject:** | RE: Investigation into the COD of Paula Rojeski |
| **Attachments:** | 13-1-24 Letter to Cororner.pdf |

Dear Mr. Winter:

Attached please find the preliminary response of one of our retained experts, Dr. Michael Sedrak, who is a board certified bariatric surgeon.  Among Dr. Sedrak's findings you will note the following:

1. Ms. Rojeski's entire surgical procedure lasted  only 30-35 minutes and was noted as such in the medical records provided to you months ago. Yet your Anesthesiologist Consult erroneously and repeatedly states that Ms. Rojeski's surgical procedure lasted 90-120 minutes. By virtue of the procedure lasting only 30-35 minutes it is thus understandable why Dr. Gee would not have seen any blood or fluid build up as Dr. Gee had already completed the closing of the surgical procedure before any adverse medical complications would have been detected.  This undisputable factual error by the Anesthesiologist Consult has led to several erroneous conclusions in your current draft report.
2. Therefore, it is absurd and grossly inaccurate to state that the patient was awake during surgery when the surgery had long since ended.
3. Furthermore, in light of the above, it is impossible for any objective determination of gross negligence by the clinical providers to be sustained.

I reiterate that your office's failure to amend your draft report to correct the factual errors identified in our attached response will compel my office to pursue immediate and direct legal action against the Coroner's Office for complete dereliction of duty and abuse of executive discretion.

I also remind you that hundreds of pages of documents were provided to you that demonstrate that Ms. Rojeski actively and affirmatively concealed her prior Phen-fen usage and resulting cardiac damage from the medical providers.  Had her medical providers been timely and fully informed of her prior medical condition, she never would have been cleared for any such surgical procedure at my client's facility. It is incredible that you are repeatedly citing to an anonymous letter regarding my client but refusing to fully disclose in your report the active concealment activities by the decedent which inevitably and materially contributed to her death.

We expect the above response to be incorporated into your draft before it is released to the public.

Warmest Regards

Konrad L. Trope, Esq.
**CENTURION LAW GROUP, P.C.**
9107 Wilshire Blvd., Ste. 450
Beverly Hills, CA  90210
Tel: (888) 942-9997
Fax: (888) 942-9997

**From:** Konrad L. Trope [mailto:ktrope@centurionlawgroup.com]
**Sent:** Thursday, January 24, 2013 12:59 PM
**To:** 'Edward Winter'
**Cc:** 'Lakshmanan Sathyavagiswaran'; 'Craig Harvey'; 'Christopher Rogers'; 'Raffi Djabourian'; 'Kreindler Charles L.'; oxman2008@aol.com; 'Douglas S. deHeras' (ddeheras@prindlelaw.com); 'catkinson@centurionlawgroup.com'; jkades@coroner.lacounty.gov
**Subject:** RE: Investigation into the COD of Paula Rojeski

Dear Mr. Winter:

This follows up my e-mail to you of below. You promised us a meeting today to receive our response. I asked for an extension or alternatively for a definite time today. We are ready to meet with you today, even now if you so wish. We will have our response in tow along with our consultant. Please advise as to deny us this opportunity will inflict a serious injustice on the process and force my office to take appropriate legal action.

As I have said before, our consultants have found serious factual errors in the basic reading of the surgical documents which are resulting in materially and grossly erroneous conclusions in the report.  You assured us of receiving and reviewing and carefully considering our response.  Please honor your commitment to us and to the integrity of the investigation process.

Warmest Regards,

Konrad L. Trope, Esq.
**CENTURION LAW GROUP, P.C.**
9107 Wilshire Blvd., Ste. 450
Beverly Hills, CA  90210
Tel: (888) 942-9997
Fax: (888) 942-9997

---

**From:** Konrad L. Trope [mailto:ktrope@centurionlawgroup.com]
**Sent:** Thursday, January 24, 2013 12:43 PM
**To:** 'Edward Winter'
**Cc:** 'Lakshmanan Sathyavagiswaran'; 'Craig Harvey'; 'Christopher Rogers'; 'Raffi Djabourian'; 'Kreindler Charles L.'; oxman2008@aol.com; 'Douglas S. deHeras' (ddeheras@prindlelaw.com); 'catkinson@centurionlawgroup.com'
**Subject:** RE: Investigation into the COD of Paula Rojeski

Mr. Winter:

I've been asking for several days this week for an extension of time in which to respond to the draft report. Captain Kades assured me yesterday that the report would not be released this week. Your draft report has serious factual errors in it even without a tissue sample review being performed by Dr. Fishbein.

Furthermore, you assured us of having a meeting today to review our response before your report was released. However, last night, Captain Kades informed me at approximately 4:30 p.m. that no meeting was to take place for the foreseeable future.

We will have our response report to you by 2 p.m. today addressing the factual errors based on the four corners of the draft document. After 17 months, it is not too much to ask that you hold off a few more hours or even one more day to receive and review our response.  It's an injustice to everyone, for the factual errors to go uncorrected.

It's an abuse of your agency's discretion in carrying out its investigative duties to change the tables on us and release the report without receiving and reviewing our response. I respectfully reserve all of my clients rights and remedies, both legal and equitable, if your current draft is issued to the public without full and complete review of our response.

Guide yourself accordingly.


Konrad L. Trope, Esq.
**CENTURION LAW GROUP, P.C.**
9107 Wilshire Blvd., Ste. 450
Beverly Hills, CA 90210
Tel: (888) 942-9997
Fax: (888) 942-9997

---

**From:** Edward Winter [mailto:EWinter@coroner.lacounty.gov]
**Sent:** Thursday, January 24, 2013 12:24 PM
**To:** 'Konrad L. Trope'
**Cc:** Lakshmanan Sathyavagiswaran; Craig Harvey; Christopher Rogers; Raffi Djabourian
**Subject:** RE: Investigation into the COD of Paula Rojeski

Mr. Trope,

Per Dr. Lakshmanan, we are going to make the report available to the family and other interested parties this afternoon. We will also make the tissues samples available to Dr. Fishbein once the case is taken off Security Hold this afternoon. If and when you or one of your consultants provides additional information it can be considered and a supplemental report can be added to the case. If you recall our agreement was that we were going to release the report as of today and you advised us that would be enough time. Yes you did send two additional e-mails requesting additional time but we have to make the report available to the other parties and cannot keep it from them.

Ed Winter, Asst. Chief
Los Angeles County Department of Coroner
1104 N. Mission Rd.
Los Angeles, CA 90033

---

**From:** Konrad L. Trope [mailto:ktrope@centurionlawgroup.com]
**Sent:** Thursday, January 24, 2013 12:15 PM
**To:** John Kades; Edward Winter; Lakshmanan Sathyavagiswaran; Christopher Rogers
**Cc:** 'Kreindler Charles L.'; 'Douglas S. deHeras'; 'Cathleen R. Atkinson'; oxman2008@aol.com
**Subject:** Investigation into the COD of Paula Rojeski

Gentlemen:

This e-mail follows up my e-mails and phone calls to your offices this week. Last week you graciously meet with us and released to us a draft copy concerning the COD of Paula Rojeski. We promised to keep this draft confidential and you granted us a period of time to review the report and provide a response. It was also indicated at last week's meeting that you

would be meeting with us one more time to receive and discuss our response to the draft report.

In carefully reviewing the report it appears that consultants retained by the Coroner's Office have made significant objective errors in reading the underlying interoperative charting. This misreading of the underlying surgical charts has led to serious erroneous conclusions by the Coroner's Consultants. Thus, part of our response will address these objective errors .

I spoke with Captain Kades yesterday who assured me that the draft report would not be made public until next week at the earliest. In the interim, we have retained a consultant, Dr. Michael Fishbein, Chief of the Autopsy Service in the Department of Pathology and laboratory Medicine at the UCLA School of Medicine. Dr. Fishbein needs access to the wet tissue samples, slides and photographs which are referenced in the draft report in order to fully respond to the draft report. We believe it would be in everyone's interests if Dr. Fishbein were granted such limited access strictly for the purposes of assisting us with our response to the draft report.

We appreciate that the report is on hold. However, allowing our retained consultant access to these materials in no way causes any public disclosure of the report and in no way prejudices any party or any investigation.

We believe Dr. Fishbein, if granted access today, could have his report/response back to your office by Monday or Tuesday at the latest. After 17 months, this additional delay is neither substantial nor harmful to the interests of all concerned.

I look forward to hearing from your office as soon as possible.

Warmest Regards,

Konrad Trope

Konrad L. Trope, Esq.
**CENTURION LAW GROUP, P.C.**
9107 Wilshire Blvd., Ste. 450
Beverly Hills, CA  90210
Tel: (888) 942-9997
Fax: (888) 942-9997

163

DR. MICHAEL SEDRAK
900 West Olympic Blvd 31J
Los Angeles CA 90015
310-728-0494


January 24, 2013

Dr. Lakshmanan Sathyavagiswaran
Dr. Raffi Djabourian
Los Angeles County Coroner
1104 North Mission Road
Los Angeles, California 90033

Captain John Kades
Office of the Coroner
1104 North Mission Road
Los Angeles, California 90033

Re:   Paula Marie Rojeski
Date of Death:  September 8, 2011
Coroner Case No. 2011-05916

Dear Drs. Sathyavagiswaran and Djabourian and Capt. Kades:

I have reviewed the medical records for Paula Rojeski who died on September 8, 2011, the Letters to the Coroner's Office from Valley Surgical Center, the proposed Coroner's Report, and the anonymous letter sent to the Coroner in October, 2011.  I have also met and discussed the case with the forensic pathologist who performed the autopsy, Dr. Raffi Djabourian, LA Coroner Office Captain John Kades, and Mr. Ed Winter of the Coroner's Office.   Based upon my review of this matter, I have reached the following conclusions:

(1)  The Anesthesiologist Consult contains a significant and obvious error assuming the surgery continued for 1 ½ hours following 9:45 a.m., when the medical records demonstrate the surgery ended at 9:45 a.m., and that the patient recovered for until 10:48 a.m., when the patient coded, and then was transported to the hospital at 11:15 a.m.;

(2)  The Anesthesiologist Consult's error is both an extreme departure from the standard of practice for autopsy reports and an obvious misstatement of the facts which has infected and affected both the pathologists and the Surgical Consult creating an intolerable assumption of facts which have no place in an autopsy report;

(3)  The Autopsy Report materials which violate the standard of practice for autopsy reports and which should be removed from the report, including the anonymous letter which will subject the Coroner's Office to extraordinary criticism for the use of unverified and nonsensical accusations which could not be verified in 17 months of investigation;

1

164

(4) The conclusions made by the Coroner as to the standard of practice of the providers rendering medical care to Paula Rojeski is faulty, and the manner of death is clearly an accident without gross negligence.

(5) There are numerous reasonable explanations that account for the providers not appreciating an aortic injury from the time it occurred, to the time that the operation concluded at 9:45am, and are consistent with the patient not displaying any sign or symptom of bleeding or distress as she recovered for over one hour under the care of the anesthesiologist until the time of her acute decompensation at 10:48am. This clearly demonstrates the medical providers were not negligent in that there was no obvious bleeding occurring that was ignored as is alleged by the Coroners report.

## A. The Anesthesia Consult

The proposed Coroner's Report states in the Anesthesia Consul of Dr. Selma Calmes on page 2 starting at line 5:

> "The inhalation anesthetic isoflurane was stopped at 0945, and circuit gas flow was increased, to remove isoflurane from the system. No further anesthetic drugs appear to have been given for the remaining 1 1/2 hrs of surgery, on review of the anesthesia record."

This statement constitutes a significant and material error in the Coroner's Report because the surgery actually ended at 9:45 and did not continue for the next 1 ½ hours as the patient recovered in the operating room. It forms the erroneous foundation of the conclusions reached throughout the entire Coroner's Report regarding violations of the standards of care. This statement is an inappropriate direct misstatement of the undisputed facts contained in the records, and a substantial deviation from the standards of practice for Coroner's Reports.

The medical records show that the anesthesia was started at 8:55 a.m. The surgery commenced at 9:15 a.m., and that the surgery was concluded at 9:45 a.m. After the surgery, which lasted only 30-minutes, the patient recovered from the anesthesia without further surgery. There were no surgical procedures of any kind applied during this period of time after 9:45 a.m. The Anesthesia Consultant's conclusion that there was 1 ½ hours of surgery following 9:45 a.m. is erroneous, contrary to the obvious evidence, and demonstrates a lack of knowledge of both basic medical records and surgical charting, including the start and end of surgery.

The Anesthesiology Consult complains that she is unable to read the records and that "The hand-written anesthesia record is nearly unreadable, even using a magnifying glass." However, the records supplied to the LA Coroner's Office were in no manner illegible and are reproduced in perfect clarity as shown below. The records unquestionably and legibly indicate the times of the surgery and anesthesia which the consultant has ignored by creating facts and claims which defy explanation.

2

## 1. **FIGURE 1**

The Anesthesia Record specifies the start time of the surgery as 9:15 a.m. and end time of the surgery as 9:45 a.m., and the writing is both clear and legible in direct contravention of the unsupported claim from the consultant.



Anesthesia Record

## 2. **FIGURE 2**

The Operating Room Record completed by the nurse also clearly specifies the start and end time of surgery:



OPERATING ROOM RECORD

Given the unambiguous medical records, the statements from the Anesthesia Consult are not supported. The statements have permeated and colored the entire report, and the review from the entire Coroner's Office has committed the same unforgivable error. The failure to detect this error after multiple reviews by multiple individuals in the Coroner's Office (or the commission of this error intentionally) brings into question the lack of veracity of the Consultant, extreme deviation from the standard of practice, and the lack of competence of the LA Coroner's Office. The conclusions of the Coroner's Report mischaracterize the conduct of the medical providers and are wholly incorrect.

3

### 3.   The erroneous statement was repeated numerous times in the Report.

The erroneous misstatement regarding surgery taking place following 9:45 a.m. was repeated multiple times through the entire Coroner's Report.  The Anesthesiology Consult continues by stating:

> "If there was cerebral perfusion during this time (we can anticipate that cerebral flow was present for at least some part of the next 1 1/2 hrs even though she was in a steep head-up position, which works against adequate cerebral blood flow when BP is low), she had to be feeling pain and was conscious but paralyzed as she probably bled to death.  If the patient could not tolerate inhaled anesthetics, ketamine (which supports circulation and gives analgesia and amnesia) could have been used."

This statement is without factual substantiation.  It demonstrates an animus to create facts which do not exist.

In repeated efforts to use the erroneous misstatement, the Report continues:

> "Strangely the anesthesiologist realized the patient could not tolerate the anesthetic agent (it was turned off at 0945) but told the surgeon all was well.  This patient was probably awake and feeling pain as she proceeded along the path to her death over the next 1 ½ hours."

This supposition is based on the Anesthesia Consult's erroneous misreading of the surgical records.   After 17-months of review by numerous officials in the Coroner's Office, the fact is that the event did not happen in the manner the Coroner's Report depicts.  The records demonstrate the surgery concluded at 9:45 a.m. and the patient was not awake and paralyzed for 1 ½ hours of surgery as the Anesthesia Consult erroneously alleges.

The gravity of the situation and the serious accusations lodged by the Coroner's experts based on a false interpretation of the chart will subject the Coroner's Office to substantial criticism in the medical community and loss of public credibility.

### 4.   FIGURE 3

This Figure is from the Anesthesia Record of Valley Surgical Center and shows that Isofluorane gas was initiated 8:55 a.m., with a surgery start time of 9:15 a.m.  The figure also states that Isofluorane gas was stopped at 9:45 a.m., which was the surgery end time.



4

There is no justification for the Coroner's Report to contain these erroneous statements claiming 1 ½ hours of surgery on a paralyzed and awake patient. The entire Coroner's Office staff failed to accurately review the records and the beginning and end time of the surgery. This is a gross deviation from the standard of practice for reviewing a peer's quality of care.

The Anesthesiology Consult states that her conclusion has not changed after 3 reviews of the records over 17-months. This indicates a deliberate indifference to an accurately review of the surgical charts.

## B. The Pathologists Blindly Adopted the Anesthesiologist Consult

### 1. The Coroner failed to detect the obvious Anesthesia Consult's error regarding surgery.

The report from the pathologists performing the autopsy, Dr. Adrian Marinovich and Dr. Raffi Djabourian, demonstrates a blind acceptance of unverifiable facts in the Anesthesia Consult. The accuracy of the conclusions of Drs. Marinovich and Djabourian has been severely compromised as they are premised on erroneous misstatements by the Anesthesiologist Consultant. As a result, it is not possible to accept any statement from them as being accurate.

They state at page 12-13 of their Report:

"The anesthesiology consultant report indicates that there was gross negligence on the part of the anesthesiologist, in that he failed to meet basic standards of anesthesia care, in particular: failure to adequately assess the patient's condition **during surgery,** to communicate the patient's deteriorating condition to the surgeon, and to provide pain relief and amnesia while the patient was paralyzed during surgery." (Emphasis added).

It is irresponsible for the pathologists to have based their findings on the inaccurate assessment of the Anesthesia Consultant. The pathologists commit the same inappropriate error without so much as a cursory review of the surgical chart. The pathologists had a duty to verify these highly inflammatory and false statements and they filed to do so. This kind of reckless disregard for the facts and substantial inaccuracy has no place in a Coroner's Autopsy Report.

### 2. The failure to classify the case as "accidental" is severely flawed

The Report from Drs. Marinovich and Djabourian states:

"Certifying the manner of death as homicide vs. accident would require knowledge of whether or not this death resulted from a conscious disregard for the patient's safety. The currently available information does not allow for a conclusion that the surgeon or anesthesiologist intentionally disregarded the patient's safety. The manner of death thus could not be determined."

The statement is internally inconsistent and illogical. Because there is no evidence of intentional disregard of the patient's safety or any "knowledge" that would indicate a homicide,

5

the only possible explanation for the patient's death is "accident." The Surgical Consult, Dr. Dennis Astarita states "the likely manner of Death will be Accident." To ignore this obvious fact that even the Surgical Consult realizes and to classify this death as "undetermined" ignores the admitted facts in the statement above. It avoids the obvious appropriate conclusion that the manner of death was an "accident."

The surgical records demonstrate no one in the operating room, including the surgeon, assistant surgeon, anesthesiologist, or any of the nurses or technicians, observed blood in the surgical field at any time during the operation. Because the surgery lasted only 30 minutes, not 30 minuts plus 1 ½ hours as the entire autopsy assumes, there was no opportunity to observe such bleeding. The bleeding was likely retroperitoneal and could not be observed. Not even the anonymous letter allegations, as noted by Dr. Calmes, make claims of ignoring bleeding.

There are no facts to suggest the surgeon or anesthesiologist engaged in an intentional disregard for the patient's safety, and after 17-months of investigation, there is not one witness, document, or other evidence to support the claim the surgeon or anesthesiologist intentionally or recklessly disregarded the patient's safety. The Surgical Consult recognizes this fact and states the cause of death should be "accident," and there is no factual basis to conclude otherwise.

### 3. The Coroner failed to detect several obvious anatomical defects.

The Autopsy Report states that "the cardiac valve leaflets are delicate and pliable." However, two (2) prior echocardiograms found both aortic valve calcification and regurgitation. The first was on December 30, 2002, by Dr. Marcus Brann and the second was done by Dr. Arshia Noori on July 18, 2011, only 51 days prior to the patient's death on September 8, 2011. The Coroner missed the aortic valve calcification and regurgitation, and the failure to detect these findings is of significant concern.

Records that have been provided to the Coroner clearly indicate that the decedent had previously filed a lawsuit against the manufacturer of the drug Fen Phen as she has developed cardiac valve damage with "moderate aortic regurgitation" as demonstrated by echocardiogram after use of the drug. Missing this significant pathology shows a lack of a diligent autopsy examination of by the pathologist and is very concerning because it casts a shadow of doubt regarding the pathologists' other findings.

The Autopsy report found a "small defect of right anterior liver edge" where the surgeon took a 4mm biopsy. The surgeon took the biopsy because he observed a fatty liver. Further, the Hoag Hospital CT Scan of July 19, 2012, detected "mild low attenuation throughout the liver suggests diffuse fatty infiltration." In fact, the pathology report from the intraoperative surgical biopsy showed "severe fat metamorphosis of liver".

## C.  The Break in the Chain of Custody.

The Coroner's Report states that skin and bones were harvested from the patient's body before autopsy.  In fact, the organ procurement was so extensive that the pathologist wrote: "rigor mortis cannot be assessed due to prior organ procurement."  An examination of the records from West Hills Medical Center demonstrate the patient's sister gave an authorization to harvest the heart, skin, and bones from the deceased at 7:55 a.m. on September 9, 2011, which was prior to the autopsy.  The harvesting occurred without Coroner participation in direct contravention to LA Coroner Office policies and procedures.

The hospital records from West Hills Medical Center show the Coroner's Office was informed of the death at 12:17 p.m. on September 8, 2011.  The case was accepted by Hiath with the Coroner's Reference No. 2011-05916.  The Coroner's Office, however, did not request the body to be sequestered and at 12:49 p.m. on September 8, 2011, OneLegacy was notified by the hospital for organ procurement with tracking number 8201151.  The organ donation phone consent by the patient's sister on 07:26 a.m. on September 9, 2011, even allows for the procurement of "Heart for Valves/Pericardium," along with skin and bones.

Even though the Coroner's office accepted the case, it allowed the organ procurement to proceed and broke the chain of the deceased's body chain of custody.  The Coroner's representative finally took possession of the body after organ procurement at 19:20 on 9/9/11.

Government Code Section § 27491.45 states:

> "(b)The coroner may, in his or her discretion, allow removal of parts of the body by a licensed physician and surgeon or trained transplant technician for transplant, or therapeutic, or scientific purposes pursuant to Chapter 3.5 (commencing with Section 7150) of Part 1 of Division 7 of the Health and Safety Code, only if the following conditions are met:

> (1)The provision of the part will not unnecessarily mutilate the body or interfere with the autopsy."

There is no evidence in the Coroner's investigative report that any direction was given to OneLegacy organ procurement to not "interfere with the autopsy" as required by statute.  Further, California Code Health and Safety Code §7151.20 (Facilitation of anatomical gift from decedent whose body is under jurisdiction of coroner) states:

> "(c) If an autopsy is required and the county coroner determines that the removal of the organs will not interfere with the subsequent course of an investigation or autopsy, the organs may be released for removal. The autopsy shall be performed following the removal of the organs.

> (d) If a county coroner is considering withholding one or more organs of a potential donor for any reason, the county coroner, or his or her designee, upon request from a qualified organ procurement organization, shall be present during the procedure to

7

170

remove the organs. The county coroner, or his or her designee, may request a biopsy of those organs or deny removal of the organs if necessary. If the county coroner, or his or her designee, denies removal of the organs, the county coroner may do any of the following:

(1) In the investigative report, explain in writing the reasons for the denial.

(2) Provide the explanation to the qualified organ procurement organization.

(e) If the county coroner, or his or her designee, is present during the removal of the organs, the qualified procurement organization requesting the removal of the organ shall reimburse the county of the coroner, or his or her designee, for the actual costs incurred in performing the duty specified in subdivision (d), if reimbursement is requested by the county coroner. The payment shall be applied to the additional costs incurred by the county coroner's office in performing the duty specified in subdivision (d)."

Again, there is no evidence in the Coroner's investigative report of any limitations placed on organ procurement as would be reasonably expected and required by statute.  It was clear in the medical records that the patient experienced PEA (Pulseless Electrical Activity).  One of the most common causes of PEA is pulmonary embolism from an embolus in the lower extremity.  Thus, reasonably one would expect the Coroner to deny harvesting of tissue from the lower extremities and thoracic cavity.

However, from the autopsy report it is clear that bones from the lower extremities were harvested for organ donation.  Further, heart valve and pericardium procurement authorization was given by the next of kin but there is no denial of this authorization in the Coroner's investigative report as required by statute and would be reasonably expected.  From the record, the Coroner made no determination whatsoever that "the removal of the organs will not interfere with the subsequent course of an investigation or autopsy" as required by law.

This is an extreme deviation from the standard of care.  At a minimum, the Coroner or Coroner's designee should have been present during the tissue procurement to ensure integrity of the body for autopsy purposes.  Statute even allows for "the actual costs incurred in performing the duty".  There is no excuse for not having done this.

In fact, in Dr. Sathyavagiswaran's 2010 report from the 24th Annual Productivity and Quality Awards Program - Coroner's Organ and Tissue Donation Program, states "This program has resulted in an average annual reimbursement to the County of $80,100 for cost recovery of supplies and staff time."  The report goes on to say:

"The Chief Medical Examiner-Coroner and staff allow organ procurement on all Coroner cases as long as there is no compromise to cause/manner of death determination, injury interpretation, or evidence collection.

Coroner employees discuss each donation with OneLegacy beforehand so the circumstances of each case are taken into account when procuring organs and tissues.

8

171

A forensic pathologist is available at all times for consultation.

In some cases a forensic pathologist witnesses procurement of organs or tissues to record any pertinent abnormalities. This procedure serves the Coroner's legal mandate while helping address the needs and concerns of law enforcement. The visitation process also facilitates the release of organs and tissue for the living that might not otherwise be authorized.

Coroner procedures have been updated to accommodate changes in California law. For example, in 2007 a change in California Health & Safety Code Sections 7150-7151.40 resulted in more stringent requirements for the Coroner in organ donation cases. In response, the Coroner's current organ donation protocols allow for a forensic pathologist to visit the operating room and observe organ procurements from Coroner's cases."

According to the Coroner's own report, the Coroner has violated its "legal mandate" as it made no determination of what organ procurement may compromise "cause/manner of death determination, injury interpretation, or evidence collection." If the Coroner's office appropriately discussed the "donation with OneLegacy beforehand so the circumstances of each case are taken into account when procuring organs and tissues", then, of course, limitations would have been placed on the organ procurement and, by law, such denial would be charted in the investigative report. The investigative report is devoid of any such information and the Coroner has grossly failed in its legal obligations.

There is a break in the chain of custody for the deceased's body. It is unknown what mischief and inadvertent injury took place to the body without the Coroner's knowledge. The break in the chain of custody is of great concern as "blood" must be obtained from a deceased, which is particularly difficult when a deceased body is 20 hours old, as in this case, before the harvesting commences, which in this case was at an unknown hour. How the body was treated, what trauma was inflicted, and what injuries identified in the autopsy were actually from the harvesting is all both unknown and unknowable.

Per the "COUNTY OF LOS ANGELES DEPARTMENT OF CORONER Law and Science Serving the Community INFORMATION BOOKLET FOR HOSPITAL AND NURSING HOME FACILITIES JANUARY 2006":

"If the decedent's death is under the jurisdiction of the Coroner, the legal next of cannot authorize organ or tissue donation without the consent of the Coroner."

The Coroner's Office failed in its duty to preserve a chain of custody and to protect the decedent's body from alteration. This is a serious breach of procedure and protocol. It brings into substantial question all of the Coroner's findings including the cause of death regarding the aorta.

This combined with the other significant and material errors committed in the autopsy as outlined above, destroys any validity in this report regarding the cause of death.

9

The Coroner's pathologist report states: "Post-mortem procurement of bone and skin did not involve incision into the thoracic or abdominal cavities." However, per the Coroner's investigative report, the Coroner's pathologist was NOT present during the organ procurement and his statement cannot be substantiated.

### D. **Anonymous Letter**

#### 1. **Anonymous unverified letters have no place in a Coroner's Report.**

The findings from Drs. Marinovich and Djabourian are also based on the receipt of the Coroner's Office of an anonymous letter which the Anesthesia Consult recites in detail and leads the Coroner's Office to conclude there was gross negligence in the case. However, use of an anonymous letter to establish unverifiable facts in the case is so extraordinary as to raise extreme questions of undue prejudice and selective bias of the Coroner's Report. After 17 months of investigation, per the report, there is not one supporting witness, documents, or other evidence to substantiate the nonsensical claims in the anonymous letter.

The process of a Coroner's Report is to base medical conclusions on the fact of observed scientific inquiry, and the unverified statements in an anonymous letter which are contrary to reality should have no place in a Coroner's Report. It is a violation of the standards of practice for Coroners in the United States to base their conclusions upon an anonymous letter which contains facts which have not been and cannot be verified. Such conduct will cause the LA Coroner's Office to lose credibility in the medical community.

The Anesthesiology Consult states on page 1 that she has reviewed "a 1 ½ page anonymous letter to the coroner by staff who were apparently present during the procedure. The letter reports numerous violations of anesthesia practice, which will be discuss later." However, per the report, there is not one witness who was actually present at time that has confirmed or substantiated the claims in this letter.

Again, after 17 months of investigation, there is no evidence that any of the accusations in the letter are valid. To the contrary, there is irrefutable evidence and documents which demonstrate the letter's claims are false.

#### 2. **The use of unverified anonymous letters violates the standard of practice.**

The anonymous letter describes five (5) alleged problems with the anesthesia: (1) empty oxygen tanks; (2) selective vital sign recording; (3) alarm malfunction; (4) fluids on the floor; and (5) ignoring the patient's code. The Consultant says "it appears to be written by people familiar with the OR and anesthesia routines."

However, per the report, the Consultant never verified anything about the letter, its author, or its accuracy. It is important to note that none of these anesthesia alleged problems have anything to do with the aortic injury at the site of the mesenteric artery, and nothing in the

10

173

letter changes or affects the existence or non-existence of this injury. Engaging in this type of speculation based on "appearances" is improper and irresponsible.

The Consultant states that the five (5) items are "very serious deviations from the standard of care," yet she never once confirms the existence of any of the claims. It is clear from the content of the letter that it is made by an individual who has a personal animus and seeks to use the Coroner's Office to further their own financial interests by making baseless claim. Otherwise, the person would not be anonymous.

Further, any witness has every opportunity to report a crime and request his/her identity to be withheld. If even one unverifiable anonymous letter to the Coroner's Office is given credit in this manner, the Coroner's Office would lose credibility and invite the attention of all those with mal-intent.

It is not the standard of practice to base the findings of a Coroner Report upon an anonymous letter.

Government Code Section § 27491.5 states:

"The cause of death appearing on a certificate of death signed by the coroner shall be in conformity with facts ascertained from inquiry, autopsy and other scientific findings."

The standard of practice requires that each fact be verified independently. The standard of practice for an expert opinion is that an expert based their opinion on:

1. Sufficient medical facts or data required to render a conclusion;
2. Application of principles and methods that are standard in the expert's field;
3. Reliable application of facts and data to the method used; and
4. The conclusion is reached with a reasonable degree of certainty.

None of these standards are met or satisfied in the Anesthesia Consultant's Report or the Surgery Consultant's Report. Further, the Coroner's report reliance on the Anonymous letter violates Government Code Section § 27491.5.

To a reasonable degree of medical certainty anonymous letters which cannot be verified should not be included in a Coroner's Report. It is clear that none of these principles were adhered to when relying upon an "anonymous letter." The Surgical Consultant does not even describe any of the elements of the medical records. His findings have no medical basis.

The Surgical Consultant states:

"I have discussed the case and autopsy findings with Drs. Djabourian and Marinovich. The pending cause of death is hemorrhage (from laparoscopic surgery) and the likely manner of Death will be Accident. I also reviewed an anonymous letter sent here which outlines various shortcomings of the "1-800-get-thin" surgery centers.... My opinion

11

174

agree [sic] with reporting this case to the California Medical Board for gross negligence with incompetence.  I suggest that the anonymous letter to be submitted to the Board."

The Autopsy Report does not indicate any effort to verify the contents of the anonymous letter.  Neither the Surgical Consult nor the Anesthesia Consult demanded or required such verification.  If there was such an effort, the results must be placed in the Report.  The absence of verification creates an extreme departure from the standards of practice in autopsy findings.

### 3.  The anonymous Letter makes five (5) baseless claims.

#### a.  The Oxygen Tanks

The Anesthesiologist Consult cites the anonymous letter as claiming the O2 tanks were not turn on before the case started, and the machine was not checked before starting the case, resulting in concern that other serious machine issues "could have been missed, such as vaporizer leaks."  This type of blatant speculation is inappropriate in a Coroner's Report, and there is not one witness, document, or other evidence that such an event ever happened.  Clearly contradicting the anonymous letter, the Coroner's Office inspected the facility and equipment in this case and found no leaks or problems whatsoever.

The records from Airgas West, which is an outside maintenance service, for August 31, 2011, and September 30, 2011, demonstrate there was no leak in the equipment, no absence of oxygen, and no failure to maintain the equipment.  The Anesthesia Consult ignored the records presented when the Coroner's Office inspected the facility, and the Consultant has engaged in speculation without any credible factual foundation.

Further contradicting the Anesthesia Consult, two additional surgeries were performed in the same room with the same equipment on the same day right after the incident.  In fact, the next case was performed 45 minutes after the conclusion of this incident.

#### b.  Selective recording of Vital Signs.

The Anesthesia Consult stated the anonymous letter stated:

"The anesthesiologist was selecting the best vital signs to record. (COMMENT: He appears to not be paying attention to the patient's actual status, which was deteriorating markedly.)"

However, this statement is both speculation and contrary to the facts.  There is no evidence the anesthesiologist was doing any such thing.  The medical records demonstrate the contrary.  The Anesthesia Consult's citing of such speculation from an extremely dubious source with no factual support is also an extreme departure from the standard of practice.  It appears that the Anesthesia Consult is attempting to "prove" the anonymous letter correct without any evidentiary support.

12

175

The patient was hypertensive at the beginning of the case.  The anesthesiologist was correcting the hypertension which is often normal at the initiation of surgery because of stimulation of the patient (intubation, increasing stimulation from the surgery).  The anesthesiologist's reaction was to control the blood pressure as he did by administrating Metopolol (a beta blocker used to maintain tachycardia and hypertension, both of which the patient had).   In addition, the anesthesiologist treated the patient with anesthesia gas isofluorane, fentanyl, and propofol.

The medical chart directly contradicts the claims of the Anesthesiology Consult.  The chart shows the following blood pressure readings:

Pre-anesthesia blood pressure was 198/92 at 8:54 a.m.  This was followed by
195/98 at 9:00 a.m.
185/85 at 9:05 a.m.
140/70 at 9:10 a.m.
132/70 at 9:15 a.m., surgery started,
105/65 at 9:20 a.m.
80/55 at 9:25 a.m.

At this point the anesthesiologist decided that the hypertension has been appropriately addressed and started backing off on the medications so the blood pressure did not descend below 80/55, which was a very reasonable and not alarming blood pressure during anesthesia in light of use of anti-hypertensive and anesthesia medications.  The patient responded well as follows:

95/55 at 9:30 a.m.
110/62 at 9:35 a.m.
100/60 at 9:40 a.m.
110/60 at 9:45 a.m., where the surgery ended

The records demonstrate the patient's blood pressure was addressed in an appropriate manner throughout the case, and there in nothing in the chart, interviews of witnesses, documents, or any other evidence which indicates otherwise.

The Anesthesia Consult then inappropriately faults the anesthesiologist for using metoprolol, which is a standard medication in the treatment of hypertension.  The metoprolol was appropriately given at induction by the anesthesiologist.

The transient hypotension of 80/55 at 9:25 a.m. was not indicative of any problems, and it was an anticipated and appropriate response to induction medications and anesthesia gas/paralytic.  The anesthesiologist appropriately treated the transient hypotension by reduction of isofluorane from 1.0 to 0.4, and he later augmented the pressure with a small amount of epinephrine and neosynephrine.  There were no indications of any problems with the patient according to the records throughout surgery until the patient coded at 10:48 a.m.

13

### c. **Alarm Malfunction**.

The Anesthesia Consult then quotes the anonymous letter and then adds a COMMENT as follows:

> "The surgeon expressed concern about the patient at several points and asked the anesthesiologist if the patient was OK. Also, monitor alarms kept going off, but the anesthesiologist reassured the surgeon and stated the machines were malfunctioning 'as they always do.' (COMMENT: The monitor problem most likely was the result of the patient's deteriorating status as she bled into the abdomen. The alarms were probably due to the patient's low blood pressure.)"

Again, the Anonymous letter and Anesthesia Consult's COMMENT and interpretation are not supported by the record. The records from Airgas West demonstrate there was no malfunction of the equipment. There is no witness, document, or evidence to substantiate the claim in the Anonymous letter.

If, as the letter claims, the surgeon was inquiring into the patient's status, such conduct showed that the surgeon had unquestioned concern for the patient's safety. The records clearly show that the surgeon's concern was satisfied and that the patient was stable.

There is no record or evidence of false alarms, failure to monitor, or any obvious bleeding. The assistant surgeon saw no such thing, the surgeon saw no such thing, and no one in the room was aware of any such alleged bleeding into the abdomen. There is no mention in the anonymous letter of the physicians ignoring an obvious bleed, and such an extreme event, a traumatic tear in the aorta with bleeding into the abdomen as the Anesthesia Consult alleges, would have been noticed by everyone in the room.

### d. **Fluids on the Floor**

The Anesthesia Consult then quotes the anonymous letter and then adds a COMMENT as follows:

> "IV fluids were running onto the floor instead of into the patient; this was found by the surgeon at the end of the case. (COMMENT: This does not help the patient, who was bleeding out from the aortic injury.)"

There is no record of evidence of this inflammatory claim. In 17 months of investigation the Coroner has not confirmed any such accusation. Clearly, the IV was in-place and when IV medications were administered, and she received the IV medications, per the record, responded appropriately. The surgeon's operative report clearly states "that a second IV was placed in a different extremity".

Of course, with the starting of a second IV, some fluid can fall to the ground which is of no consequence. The record shows that the patient had inhaled anesthetic through the breathing

14

177

tube and was stable during the surgery.  Autopsy Reports should stick to scientific and verifiable facts, not the baseless wandering speculations of unfounded biased anonymous letters.

### e.  Operating Room Personnel Ignored the Patient's Code.

The Anesthesiologist Consult Report states the anonymous letter claims:

> "The time of the code was inaccurate, implying it took place earlier, and it took the surgeon to start CPR and call 911, not the anesthesiologist."

The anonymous letter in effect claims that every person in the operating room ignored a coding patient because the code took place earlier.  This claim is so fantastic as to be unbelievable.  If this claim had any remote validity, then each individual in the operating room committed a heinous act of criminal conspiracy.

However, no such event ever occurred.  The Coroner's failure to recommend prosecution of a dozen conspirators is mute testimony to the fact the Coroner knows the anonymous letter's claims are false and absurd.  The Anesthesia Consult's repeated reliance on such baseless allegations in the Anonymous letter, which are proven false by the record, is an extreme deviation from the standard of medical practice.

The Anesthesia Consult's statement that she believes there is "merit to these written allegations" of the Anonymous letter even though the record does not support and/or refutes them, seriously questions the validity of the Anesthesia Consult's report.

### E.  The Anesthesiologist Consult Suffers from Allegations Not Supported by Fact.

#### 1.  The hypotension after surgery was appropriately addressed

The Anesthesia Consult states at page 2:

> "At the end of the case, muscle relaxants were reversed.  She was breathing on her own and NM [neuromuscular] transmission was normal, but she appeared weak.  PEA [pulseless electrical activity] was recorded at the end of the case.  A code record began at 1055. The hand-writing appears to be the anesthesiologist's; this is an unusual practice as nursing staff should do charting while the anesthesiologist manages the code. This raises the concern that the record was filled out after-the-fact."

Once again the Anesthesia Consult makes the obvious error that the surgery ended at 10:55 a.m., when in fact the surgery ended at 9:45 a.m.  The patient was recovering and no surgery was taking place.  The first indication of hypotension was at 10:55-11:00 a.m., when pressures were documented to rapidly diminish from 97/44 to 72/40.  The surgeon entered the room at approximately that time and could not assess a pulse.

The records show that the surgeon was ACLS certified (Advanced Cardiovascular Life Support), and qualified to run the code. There was no violation of the standard of care for the surgeon to manage the code.

With respect to records being filled out after the fact, the standard of care requires that records be accurate, and whether they are filled out concurrently or immediately after the procedure in no manner violates any standard of care. The fact the anesthesiologist recorded the information immediately as displayed on the "functioning equipment" (contrary to the claim the equipment malfunctioned) is both appropriate and reasonable.

## 2. **The Consult's conclusion the surgeon should have seen blood lacks merit**

The Anesthesia Consult states:

"Strangely, the anesthesiologist realized the patient could not tolerate the anesthetic agent (it was turned off at 0945) but yet told the surgeon all was well. This patient was probably awake and feeling pain as she proceeded along the path to her death over the next 1 1/2 hours. The surgeon had some responsibility in that, somehow, the large volume of intraperitoneal blood was missed. It appears he was suspicious that all was not well because he kept asking if the patient was OK."

The Anesthesia Consult again makes the same gross mistake that surgery was taking place at 10:48 a.m., when the patient coded. It was not. It had ended at 9:45 a.m., over an hour before and the Anesthesia Consult's complete lack of understanding of the basics of this case after 17 months of review are highly suspect, and thus substantially below the standard of care.

Per, the record, the patient had been closed for more than an hour at the time of Code. No one, including the surgeon, assistant surgeon, anesthesiologist, nurse, or technicians, saw bleeding prior to the close at the end of surgery at 9:45 a.m. **It would not be possible to see blood in the abdomen as the Anesthesiologist Consult claims at 10:48 a.m. because there was no surgery taking place.**

If, as the Anesthesia Consult states, the bleed was "missed", there is no basis to conclude that the incident was reckless, intentional, or anything other than an accident. It was not an extreme departure from the standard of care. If an injury to the aorta occurred during surgery, this is a known risk of laparoscopic surgery. The injury, if it happened as the pathologists states, was the product of an ordinary accident and nothing more.

There is not one word in the pathology report or consultant reports as to "when" during the procedure the injury occurred. If an aortic injury did occur during surgery, this injury would have occurred at the conclusion of the surgery at 9:45 a.m. when the procedure was ending. Aortic bleed may have been retroperitoneal or even a contained hematoma initially; thus this type of injury would easily not have been seen during the surgery.

The size and nature of the injury as a 4 mm aortic tear suggests an instrument injury and not a trocar, thus the injury occurred later in the case. The patient's condition did not deteriorate

16

during the surgery, and it was only after the surgery was concluded and she was recovering from the anesthesia at 10:48 a.m. that she deteriorated with a sudden drop in blood pressure.

### 3. The Consult's statement about the patient's hydration is unfounded

The Anesthesia Consult states: "There was no obvious medical reason for her to be dehydrated preop." However, dehydration is an extremely common problem for all patients preop because of the NPO (nothing by mouth) status. It is an age-old problem that is constantly discussed in anesthesia and surgical literature. In fact, the anesthesiologist appreciated this and noted clearly and legibly in the Anesthesia Record "Patient is dry (dehydrated) pre-op before op." This statement brings significant concern to the anesthesia consultant's judgment and experience, not only regarding anesthesiology, but also regarding basic facts of surgery. Further, there is no indication the patient's dehydration posed any problem in this case, and the Anesthesiologist Consultant's statement is suspect, without foundation and wrong.

### 4. The Consult engaged in excessive and improper speculation.

The Anesthesia Consult states:

"A list of failed standards related to anesthesia care follows:
"1. Failed to check the anesthesia machine preinduction to insure that the patient would receive O2 while anesthetized. The O2 tanks could have been empty, not just turned off. Other machine defects could have been missed."

However, there is no evidence in the chart to indicate that this was not done. The speculation as that the O2 take "could have been empty" is just plain unsubstantiated speculation. The records from AirGas West demonstrate to the contrary as noted above. Further contradicting the Anesthesia Consult, two additional surgeries were performed in the same room with the same equipment on the same day right after the incident. In fact, the next case was performed 45 minutes after the conclusion of this incident.

The Anesthesiologist Consult states the anesthesiologist:

"2. Failed to believe monitor data and to confirm, using other means (observation of skin perfusion, feeling for a pulse, listening to intensity of heart sounds, checking HgbfABGs), what was going on with the patient. If a monitor was the problem, these other methods could confirm the patient was at least alive, and then the monitor problem could be solved, after continuing that the patient was OK."

There is no evidence of this in the record, and the Consult's speculation is unacceptable. The Consult both creates and assumes unverifiable and fictitious facts. The entire Autopsy Report is permeated with this same type of speculation which is an extreme deviation from the standard of practice for Coroner's Reports.

17

The Anesthesiologist Consult states the anesthesiologist:

"3. Failed to understand and able to troubleshoot standard monitors."

However, there is no evidence of this conclusion in the records. The AirGas West records demonstrate to the contrary. The claim is without medical or evidentiary support.

The Anesthesiologist Consult states the anesthesiologist:

"4. Failed to communicate the patient's deteriorating condition to the surgeon."

However, as described above, the anesthesiologist consultant has an inaccurate assessment of the whole situation as she has the wrong surgery end time. Further, the surgeon inquired of the anesthesiologist during the 30-minuts of surgery if all was appropriate, and the anesthesiologist stated that it was. The Consult's statements are without basis in fact.

The Anesthesiologist Consult states the anesthesiologist:

"5. Failure to provide an adequate route for IV fluids (the IV line was not intact and fluid administered was going on to the floor and not reaching the patient). The op note by the surgeon reported that a second IV was started and, as I have noted above, when a new IV is started, it is normal for some of the fluid to fall to the ground. Although 5 or 6 L NS was recorded as given IV (the surgical op note said 3 L IV fluids were given), most probably did not go to the patient. She only made 300 cc UO during surgery, a very small amount for the IV fluid given and an Estimated Blood Loss (EBL) of 50 cc."

However, the surgeon documented the intraoperative IV transfusion which was 3 Liters, and the anesthesiologist documented 6 Liters for the whole duration of the anesthesia. These findings are consistent with the inaccurate assessment of surgical/anesthesia end time: 3 Liters was given during the surgery and 3 Liters after during after while the patient was being recovered.

The Anesthesia Consult's conclusion is unsubstantiated and, in fact, contradicted by the records. Further, it is unquestioned that anesthesia was reaching the patient. The output of 300 cc's of urine during the surgery is neither small nor unusual, and the conclusions from the Consult are inappropriate.

The Anesthesiologist Consult states the anesthesiologist:

"6. Failure to take action to resuscitate promptly."

However, there is no evidence in the records to support this conclusion. The patient was resuscitated immediately with the drop in pressure at when she coded at 10:48 a.m., with 911 called at 10:54 a.m., and when her blood pressure dropped at 10:55 a.m. The Consult's statement is without medical basis and is contradicted by the record.

18

The anesthesiologist Consult states the anesthesiologist:

"7. Failure to provide pain relief and amnesia during surgery. This is a most egregious error."

However, the "egregious" error was for the Anesthesiologist Consult to report the surgery lasted until 10:48 a.m., when it is obvious from the records it ended at 9:45 a.m. The multitude of statements not supported and/or contradicted by the records, failure to review the records, and animus to create facts in the Anesthesiologist Consult are extreme.

### 5. Anesthesiologist Consultant's multiple errors during the site visit

The Anesthesiologist Consult, together with other members of the Coroner's Office, visited Valley Surgical Center and was show the entire facility, all of the equipment, and the facilities records. Despite receiving full information, the Anesthesiologist Consult has engaged in serious misstatement of the records demonstrating a lack of knowledge and understanding of surgical facilities. The Consult states:

"The pipeline gas source was from E tanks in a nearby tank room, where extra D tanks are also stored. Connections for the pipeline source were from the OR ceiling, to the anesthesiologist's left (head of OR table toward the window, away from the door). These were not connected to the machine at the time we visited. A panel for monitoring pipeline gas pressure is located at the central desk, as the main OR area is entered. All pipeline pressures were appropriate (48 psi) although no cases were going on. Note this pressure monitor does not measure how much gas is left in the tank; this is done by a separate pressure gauge on each tank and the tanks are remote from the anesthesiologist. The secondary gas supply at the anesthesia machine had 2 backup D cylinders of 02 and 1 N2O D tank, as usual. The machine had standard pressure gauges for both. A service tag by "Gary Hull Anesthesia" was dated 12/41 11. Photos were taken by Captain Kades of the front and back of the machine and the monitors."

"Given the presence of standard safety features in this model of an anesthesia machine, how could failure after a case starts occur? Possible scenarios follow:

"1. If pipeline gas tanks were not turned on and the backup tanks on the machine were off, the machine should have alarmed before the case started, and the anesthesiologist should have recognized lack of 02.

"2. One pipeline E tank might have been open but was nearly empty. Anesthesiologist did not <u>think</u> to turn on a backup tank at the machine after the E tank ran out. Machine should have alarmed.

"3. Anesthesiologist was working from a machine backup tank with a low pressure and it ran out. Pipeline tanks were not turned on. That could explain 10-20 mins of O2 flow as the case began.

"The machine should have alarmed in all these situations, warning the anesthesiologist that the O2 supply was low/absent. There is no evidence that the patient was harmed by this episode.

19

182

"This could have happened and was not documented in this case. Whether or not harm occurred, an anesthesiologist is responsible to check the anesthesia machine and gas system before starting a case."

The forensic pathologists and surgical consultants all ignore the statement in the Anesthesia Consult that "**There is no evidence that the patient was harmed by this episode.**" The reality is that there is no evidence that the episode ever occurred and the patient had normal oxygen saturation during the entire procedure. No harm came to the patient in this fictitious incident created by the Anesthesia Consult.

The absence of harm indicates the event didn't occur. If such an event happened there reasonably would have been an adverse consequence. The absence of any adverse consequence demonstrates the falsity of the claim.

**Findings:**

The Anesthesia Consult incorrectly identifies H tanks, large tanks in the central storage as "Etanks". The Anesthesia Consult also incorrectly identifies the E-tank, smaller backup tanks behind the anesthesia machine and on oxygen transport carts/crash carts, as "D tanks." Records indicate that H and E tanks were present.

The Anesthesia Consult goes through multiple fictional scenarios of no oxygen being present. There are no findings in the records to support this allegation. The Anesthesia Consult later stated that the lack of oxygen did not harm the patient. But she then adds inexplicably that the anesthesiologist is responsible to check the anesthesia machines.

**Conclusion:**

There is no evidence that there was any lack of oxygen. Furthermore, anesthesiologists should be well versed in equipment delivering oxygen in a surgical suite. The Anesthesia Consult's multiple errors in identification of oxygen cylinders indicates her lack of experience in this matter and that she is not an appropriate person to conduct a site visit nor make any conclusions thereof.

There is no evidence to show that the anesthesiologist did not check the functioning of equipment.

Respectfully submitted
Very truly yours,

Michael Sedrak, M.D

20

## Michael F. Sedrak, M.D.
Division of Minimally Invasive Surgery
UC San Diego Department of Surgery
200 West Arbor Dr #8401
San Diego, Ca 92103-8401
mfsedrak@ucsd.edu

**Board Certification**
Diplomate of the American Board of Surgery

**Employment**
Division of Minimally Invasive Surgery
UC San Diego Department of Surgery
San Diego, California
July 2009 to Present

Medical Director, OneLegacy Physician Group
Los Angeles, California
November 2006 to June 2008

**Postgraduate Education**
Minimally Invasive Surgery
University of California at San Diego
San Diego, California
July 2009 to June 2010

Fellowship
Regenerative Bioengineering and Repair Laboratory
UCLA School of Medicine
Los Angeles, California
July 2006 to June 2008

Residency
Department of Surgery
New York University School of Medicine
New York, New York
April 2004 to June 2006

Residency
Department of Surgery
Charles R. Drew University of Medicine and Science
Martin Luther King, Jr. / Charles R. Drew Medical Center
Los Angeles, California
July 2003 to March 2004

Internship
Department of Surgery
Cedars-Sinai Medical Center
Los Angeles, California
June 2001 to June 2003

**Medical Education**
University of South Alabama College of Medicine
Mobile, Alabama
M.D. May 2001

**Undergraduate Education**
University of California at Riverside
Degrees earned on June 1997
BS, Biochemistry with emphasis in Molecular Biology
Minor, Philosophy with emphasis in Ethics

**Research Experience**
Center for the Future of Surgery
University of California at San Diego
San Diego, California
July 2009 to Present
- Clinical and Laboratory trials of Natural Orifice Transluminal Endoscopic Surgery (NOTES)
- Clinical and Laboratory trials of Endoluminal Surgical techniques and applications

UCLA School of Medicine
Regenerative Bioengineering and Repair (REBAR) Laboratory
Los Angeles, California
July 2006 to June 2008
- Microdistraction of Adipose Stem cells (ASCs) for Bone Tissue Engineering
  This unique microdistraction model allows us to transmit linear force to cells in a 3-D collagen gel such that we can mechanically condition the cells towards bone lineage
- BMP-2 and ASC osteogenesis
  Some groups have shown healing of critical-sized defects using ASCs + BMP-2, however, they have failed to use the proper controls, simply comparing ASCs + BMP-2 to ASCs alone.  No positive control (BMP-2) alone was used.  In our lab, BMP-2 alone heals critical-sized femoral defects as good as, if not better than ASCs + BMP-2.  This suggests the result is due only to the BMP-2 and not the cells
- ASCs in soft tissue augmentation
  Using an *in vivo* rat model, we are comparing the viability and long-term graft survival of ASCs as used for soft tissue augmentation

New York University School of Medicine

Microvascular Research and Vascular Tissue Engineering Laboratory and Division of
Surgical Oncology
New York, New York
April 2004 to June 2006

- Pilot study of Areola-Sparing Mastectomy with immediate reconstruction in women
  with early breast cancer.
- Pilot study developing and evaluating treatment options of breast and extremity
  lymphedema following breast surgery, including lymphatic reconstruction models.
- Understanding decision making in women undergoing mastectomy.
- Development of computer-based models for predicting breast form and function
  following breast surgery and breast reconstruction.
- Pathogenesis and treatment of lymphedema and lymphatic diseases, emphasis on the
  development of methods to image and quantitate lymph flow to provide useful
  endpoints for clinical evaluations.
- Development of interdisciplinary program for the evaluation, management and
  treatment of recalcitrant lymphedema.

Florida Agricultural and Mechanical University
Research Assistant

- Basic science neuroendocrinology research at Florida A & M University Department
  of Pharmaceutical Sciences in Tallahassee, Florida studying treatments for cocaine
  and heroin addictions

## Publications
### *Textbooks*
Horgan S, Sedrak MF. "Robotic Surgery". In: Fischer JE, Bland KI, eds. *Mastery of Surgery*, 6th
edition.  Philadelphia, PA. Wolters Kluwer Health, Lippincott, Williams & Wilkins.

### *Journal articles*
Sedrak, MF, Holewijn RA, Chang D, Katagiri T, Sandler BJ, Jacobsen GR, Talamini M,
Horgan S. "A retrospective study of prospective bariatric surgery results: laparoscopic
adjustable gastric banding vs. laparoscopic sleeve gastrectomy". Submitted to *Surgery for
Obesity and Related Diseases.*

Sicklick, JK, Sedrak MF, McLemore EC, Lowy AM, Ramamoorthy SL, Hemming AW,
Horgan S, Talamini MA.  "Laparo-Endoscopic Single Site Oncologic (LESSOnc) Liver
Resection: Taking Single Access Laparoscopic Surgery to the Next Level". In progress

S Nijhawan, S Majid, T Katagiri, T Dotai, M Sedrak, B Sandler, G Jacobsen, M Talamini, A
Wittgrove, S Horgan .  "First Clinical Experience with Trans Oral Remnant Extraction
(TORE) in Sleeve Gastrectomy".  Submitted to Surgical Endoscopy

Mathew A, Meireles O, Jacobsen G, Katagiri T, Paleari J, Dotai T, Majid S, Nijhawan S,
Sedrak M, Sandler B, Talamini M, Horgan S.  "Trans Esophageal Endoscopic Myotomy
(TEEM) for Achalasia". In progress

Belkind N, Thompson K, Paleari J, Meireles OR, Sedrak MF, Jacobsen GR, Sandler BJ,

Talamini MA, Horgan S. "Laparoscopic Placement of a Novel Anti-Reflux Device". *Gastroenterology*. May 2010. Vol. 138, Issue 5, Supplement 1, Page S-858.

Hagen ME, Sedrak M, Wagner OJ, Jacobsen G, Talamini M, Horgan S. "Morbid obesity with achalasia: a surgical challenge." *Obes Surg*. 2010 Oct;20(10):1456-8.

Crisera C, Teng E, Wasson K, Heller J, Gabbay JS, Sedrak MF, Bradley JP, Longaker MT. "Formation of *In Vitro* Murine Cleft Palate by Abrogation of Fibroblast Growth Factor signaling." *Plastic and Reconstructive Surgery* Vol. 121, Issue 1, January 2008 pages 218-224

Kawamoto HK, Desrosiers AE, Jarrahy R, Sedrak MF, Ashley RK, Bradley JP. " 'Stuffy Nose' Rhinoplasty: Diced Cartilage Grafts for Correction of Cleft Nasal Tip Deformities". *Plastic and Reconstructive Surgery*. 122(4): 1138-1143, October 2008

Sedrak, MF, Major K, Wilson M. "Simple Fluid-column Manometry to Monitor for the Development of Abdominal Compartment Syndrome." [cover article] *Contemporary Surgery* Vol.58 No 5. May 2002 pages 227-232

Sedrak MF. "Two Compelling Facts About Manometry for Abdominal Compartment Syndrome" [Comment] *Contemporary Surgery* Vol.58 No 8. August 2002 page 384

Sedrak MF, Kwan D., Wilson M.  Case report:  Solitary Papillary Thyroid Carcinoma Within the Presacral Cavity. *Surgical Rounds*. April 2004.

Martinez Jose, Sedrak MF.  Case Report: 2 year old patient with 12p deletion syndrome. University of South Alabama Department of Genetics, Grand Rounds for Department of Pediatrics April 2001.

### Abstracts and Videos

Broad Clinical Utilization of NOTES. Is it Safe?
S Horgan, O Meireles, G Jacobsen, B Sandler, T Katagiri, S Ramamoorthy, M Sedrak, T Savides, A Ferreres, S Majid, S Nijhawan, T Dotai
SAGES 2011, March 30-April 2 2011

The Steps and Outcomes of Trans-Esophageal Endoscopic Myotomy
T Dotai, T Katagiri, S Nijhawan, S Majid, O Meirieles, M Sedrak, A Mathew, G Jacobsen, B Sandler, M Talamini, S Horgan
SAGES 2011, March 30-April 2 2011

First NOTES TEEM (Trans-Esophageal Endoscopic Myotomy) for the Treatment of Achalasia in the U.S.
S Horgan, T Katagiri, N Belkind, G Jacobsen, O Meireles, , T Savides, J Paleari, K Thompson, M Sedrak, M Talamini
American College of Surgeons 96th Clinical Congress, October 2010

Robotic Heller myotomy with Gastric Sleeve Resection for the Simultaneous  Tratment of Achalasia and Morbid Obesity.

Paleari J, Hagen M, Sedrak M, Thompson K, Belkind N, Jacobsen G, Talamini M, Horgan S.
Annual Meeting of the Japan Society for Endoscopic Surgery, Yokohama October 2010.

Robotic Heller Myotomy with Sleeve Gastrectomy for the Simultaneous Treatment of
Achalasia and Morbid Obesity
J Paleari, M Hagen, M Sedrak, K Thompson, N Belkind, G Jacobsen, M Talamini, S Horgan
Minimally Invasive Robotic Association 5th International Congress, January 2010

Single Center Experience with a Novel Purely Endoluminal Fundoplication Device
Ozanan R Meireles, MD, Julietta Paleari, MD, Noam Belkind, MD, Kari Thompson, MD,
Michael Sedrak, MD, Garth Jacobsen, MD, Mark A Talamini, MD, Santiago Horgan, MD
SAGES Emerging Technology, April 2010

Laparoscopic Placement of a Novel Anti-Reflux Device
N Belkind, K Thompson, J Paleari, O Meireles, M Sedrak, G Jacobsen, B Sandler, M
Talamini, S Horgan
Society for Surgery of the Alimentary Tract 51st Annual Meeting at Digestive Disease Week,
Emerging Technologies in Minimal Access GI Surgery, May 2010

Gastrotomy closure in NOTES: Literature review and description of the UCSD clinical
NOTES gastrotomy closure technique
M Sedrak K Thompson, N Belkind, J Paleari, G Jacobsen, B Sandler, Y Mintz, M Talamini,
S Horgan
Digestive Disease Week, Clinical/Stomach, Poster Session, May 2010

Posterior Repair of Hiatal Hernia with Mesh and Concurrent Laparoscopic Adjustable
Gastric Banding
Paleari J, Sedrak M, Horgan S, Talamini M.
Argentine Congress of Surgery, Video Presentation, November 2010.

Laparoscopic Resection of Retroperitoneal Bronchogenic Cyst
J Paleari, M Sedrak, S Horgan, M Talamini
Argentine Congress of Surgery, Video Presentation, November 2010.

Robotic Heller Myotomy with Gastric Sleeve Resection for the Simultaneous Treatment of
Achalasia and Morbid Obesity.
Paleari J, Hagen M, Sedrak M, Thompson K, Belkind N, Jacobsen G, Talamini M, Horgan S.
Argentine Congress of Surgery, Video Presentation, November 2010.

A review of bariatric surgery results: laparoscopic adjustable gastric banding vs. laparoscopic
sleeve gastrectomy
Sedrak, MF, Holewijn RA, Chang D, Katagiri T, Sandler BJ, Jacobsen GR, Talamini M,
Horgan S
Accepted Poster SAGES 2011

Review of efficacy and performance of laparoscopic adjustable gastric banding in female
patients with Polycystic Ovarian Syndrome
Sedrak MF, Majid S, Nijhawan S, Sandler BJ, Jacobsen GR, Talamini M, Horgan S

188

Accepted Poster ASMBS 28th Annual Meeting, June 2011

Laparoscopic Gastric Bypass for the Adolescent Patient:  Long Term Results
S Nijhawan, S Majid, T Martinez, G Jacobsen, M Sedrak, B Sandler, M Talamini, S Horgan
Submitted American College of Surgeons 2011

Inguinal Hernia Repair with Robotic Prostatectomy: A New Approach to an Old Problem
G Jacobsen, S Nijhawan, S Marjid, K Palazzi-Churas, M Sedrak, B Sandler, C Kane
Submitted American College of Surgeons 2011

Hybrid Transgastric Cholecystectomy – Our Institutional Experience
S Nijhawan, S Majid, T Dotai, T Katagiri, M Sedrak, B Sandler, A Wittgrove, G Jacobsen, M Talamini, S Horgan
Submitted DDW 2011

Transesophageal Endoscopic Myotomy (TEEM) for the Treatment of Achalasia – The United States Human Experience
O Meireles, G Jacobsen, T Katagiri, K Thompson, A Mathew, N Belkind, M Sedrak, B Sandler, T Dotai, T Savides, S Majid, S Nijhawan, M Talamini, S Horgan
Submitted DDW 2011

NOTES Transoral Remnant Extraction (TORE) for Sleeve Gastrectomy
S Nijhawan, S Majid, T Katagiri, T Dotai, M Sedrak, B Sandler, G Jacobsen, M Talamini, A Wittgrove, S Horgan
Submitted DDW 2011

First Human NOTES Experience for Sleeve Gastrectomy at University of California at San Diego (UCSD)
S Nijhawan, S Majid, M Sedrak, B Sandler, G Jacobsen, M Talamini, A Wittgrove, S Horgan
Submitted DDW 2011

Lower Esophageal Sphincter Pressure Six Months after Transesophageal Totally Endoscopic Myotomy for Achalasia
A Mathew, O Meireles, S Nijhawan, S Majid, T Dotai, T Katagiri, M Sedrak, M Talamini, S Horgan
Submitted DDW 2011

Barium Swallow Findings after a Transesophageal Endoscopic Myotomy (TEEM) for Treatment of Achalasia
A Mathew, S Nijhawan, O Meireles, T Dotai, S Majid, T Katagiri, M Sedrak, M Talamini, S Horgan
Submitted DDW 2011

SRS Endoscopic Stapling – An Alternative to Nissen Fundoplication?
S Majid, S Nijhawan, M Sedrak, B Sandler, G Jacobsen, A Mathew, A Wittgrove, M Talamini, S Horgan
Submitted DDW 2011

189

**Academic Didactics**
University of California at San Diego
School of Medicine
Surgery 401

**Presentations**
"Paraesophageal Hernias: When to Use a Mesh"
34th Annual San Diego Postgraduate Assembly in Surgery
March 17-19, 2011

"Hernia Meshes Unraveled: A Review of Current Technology"
34th Annual San Diego Postgraduate Assembly in Surgery
March 17-19, 2011

"Single Incision Cholecystectomy"
4th Annual UCSD Hands-On NOTES & Single Site Surgery Symposium
November 11-13, 2010, San Diego, CA

Advanced Practice – Donor Management
Advanced Practice – Intensivist Involvement
Celebrating Our Partners – Donation and Transplantation Conference and Awards
Ceremony
June 6, 2007
Los Angeles, California

Academic presentations
Medical and Surgical Management of Hypercalcemia and Hyperparathyroidism
Minimally Invasive Parathyroidectomy
Use of Oral Hypoglycemic Agents During Pregnancy
Screening and Management of Hyperlipidemia and Hypercholesterolemia
Etiology and Management of Endometriosis
Management of the Infertile Couple
Management of Hirsutism
Etiology and Management of Gastrointestinal Hemorrhage

**Licensure**
California State Physician and Surgeon License
New York State Physician License
DEA License
USMLE Step 1 June 1999
USMLE Step 2 August 2000
USMLE Step 3 November 2002

**Certifications**
Expert Reviewer
Medical Board of California

November 2010 through November 2012

Radiography and Fluoroscopy
X-ray Supervisor and Operator
Department of Public Health of the State of California
August 2009 through August 2011

**Academic Awards**
Minority Academic Achievement Scholarship from UC Riverside
Minority Merit Award and Scholarship from Morehouse School of Medicine
Award for Academic and Cultural Excellence from UC Riverside African Student Programs
University of California Dean's List Recognition

**Academic Society Membership**
University of California Honors Program

# EXHIBIT "8"

EXHIBIT "8"

**Konrad L. Trope**

| | |
|---|---|
| **From:** | Konrad L. Trope <ktrope@centurionlawgroup.com> |
| **Sent:** | Monday, January 28, 2013 10:55 PM |
| **To:** | lsathyavagiswaran@coroner.lacounty.gov; ewinter@coroner.lacounty.gov; jkades@coroner.lacounty.gov; Christopher Rogers (CRogers@coroner.lacounty.gov); 'Charles Kreindler'; Raffi Djabourian (RDjabourian@coroner.lacounty.gov) |
| **Cc:** | 'Cathleen R. Atkinson'; 'Charles Kreindler'; oxman2008@aol.com; tkollars@yahoo.com; Michael Sedrak (mike_sedrak@sbcglobal.net) |
| **Subject:** | Investigation into and the Report on the Cause of Death of Paula Rojeski |
| **Attachments:** | ivan hronek, md report 012813.pdf |

Gentlemen:

This e-mail follows up my prior e-mail to you of earlier today regarding the above referenced matter.  Let me start by reminding that when we initially met with you on January 17, 2012, your office promised us a follow up meeting to occur prior to the release of the autopsy report to the public.  Please immediately inform us of the time and place for this meeting as previously promised.  We believe such a follow up meeting would be beneficial in the interests of justice in light of numerous factual errors and deficiencies in the autopsy report that have so far been related to you.

Attached to this e-mail is the assessment of our third retained consultant, Dr. Ivan Hronek, who is a board certified anesthesiologist who trained at Columbia-Presbyterian Medical Center in New York City.  Dr. Hronek concludes that:
1. The standard of care was met in the treatment of Paula Rojeski;
2. That the cause of death was an accident;
3. That Dr. Calmes consult report is replete with multiple fundamental errors;
4. From #3, therefore, the Coroner's Report in relying upon those erroneous conclusions by Dr. Calmes, has consequently drafted a report and conclusion on the Cause of Death which is scientifically and factually erroneous.

This is now the third board certified, highly credentialed physician who has reviewed your current draft on the Cause of Death of Paula Rojeski, and who has concluded, independently of Drs. Sedrak and Fishbein, that your draft report is erroneous in its factual foundations and erroneous in its conclusions and findings. In light of this third independent assessment, it would be irresponsible for your office to release the current version of your report on the Cause of Death of Ms. Rojeski. Indeed, these three board certified physicians span the range of specialties involved in your investigation: bariatric surgery, anesthesiology and pathology.  From the viewpoint of each specialty, your current draft report is consistently defective in its factual documentation, factual observations, and medical conclusions.

Your office needs to substantially revise the report to correct the numerous factual errors and specious conclusions.  To ensure the interest of justice is served and there are no additional errors in the autopsy report, it is crucial to have the meeting promised us and conclusively clarify the errors in the current form of the report.

As I have stated in my prior e-mails, issuing the report in its current version despite being fully notified of its deficiencies, would be arbitrary, capricious, an abuse of discretion and contrary to law. Accordingly, we reserve all rights and remedies, both legal and equitable, should your office refuse to take appropriate action to remedy the undisputable errors contained in the current draft of your report.  In light of the consistent and independent findings of Drs. Sedrak, Fishbein, and Hronek, along with previously documented errors concerning illegal reliance on an unverified anonymous letter and a documented break in the chain of custody over the body of Paula Rojeski, we request that your office recuse itself from this investigation and appoint an independent group to review your findings.

Should your office refuse to correct the above noted errors, then pursuant to *Cal. Gov't Code §27491.6,* we will request that the District Attorney or the Los Angeles City Attorney require the holding of a public inquest concerning the cause

of death of Ms. Rojeski. The current course of conduct being charted by your office leaves me no choice in order to protect my client from the irresponsible manner in which this investigation has so far been conducted.

Guide Yourself Accordingly,


Konrad L. Trope, Esq.
**CENTURION LAW GROUP, P.C.**
9107 Wilshire Blvd., Ste. 450
Beverly Hills, CA  90210
Tel: (888) 942-9997
Fax: (888) 942-9997

IVAN HRONEK, M.D.
17181 Escalon Dr.
Encino, California 91436
(310) 487-3288

January 28, 2013

Paula Marie Rojeski
Coroner Case No. 2011-05916

TO WHOM IT MAY CONCERN:

I am a Board Certified Anesthesiologist and have been in practice for 33 years. I have
worked in many different areas of anesthesia, cardiac anesthesia, trauma and critical care
and I completed a Cardiothoracic Anesthesia Fellowship and a Critical Care Medicine
Fellowship at Columbia-Presbyterian Medical Center as part of my training.  I have
reviewed the medical records for Paula Rojeski who died on September 8,
2011, the Autopsy Report from the Coroner's Office for Paula Rojeski and the anesthesia
and surgical consults.  My conclusions are as follows:

1.  Standard of care was met in the management of the anesthesiologist
2.  Cause of death was accident
3.  Fundamental errors exist in the anesthesia consult
4.  The Coroner's and the Surgical Consultant's Reports were seriously negatively
influenced by these errors

Anesthesia Administration.  The anesthesia care was appropriate and met the standard of
care.  Both the anesthesiologist and the surgeon were fully aware of the brief
initial hypotension that resolved by therapy.  This fact was acknowledged in the
notes.  The anesthesiologist addressed the hypotension appropriately.

Hypotension is very common during general anesthesia, and it would be a long stretch to
consider every episode of transient hypotension to be severe internal bleeding. In this
case there was transient hypotension at the beginning of the case.  The
anesthesiologist recognized the event and administered medications at 9:25 a.m., which
was appropriate.  The patient also responded appropriately to these IV medications,
demonstrating functional IV access.  There are references in the Anesthesia consultant's
report to the IV fluid spilling on the ground and not going into the patient.  This would be
impossible as the record indicates that the patient responded to IV medications.  Thus the
allegation in the Anesthesia consultant's report regarding the IV cannot be substantiated.
Furthermore, I cannot validate this "event" as noted by the Anesthesia consultant as there
are no references anywhere for it in the nursing, surgical or anesthesia records.

The patient's blood pressure which started at 198/92 at 8:55 a.m. and
had transiently dropped to 80/55 at 9:25 a.m., then responded immediately to 95/55 at
9:30 a.m. and rose to 110/60 at 9:45 a.m., the conclusion of the surgery.  Surgery ended

1

at 9:45 a.m. (incorrectly stated by anesthesia consultant to be "1 ½ hours later"). The pulseless electrical activity (PEA) was noted around 10:48 a.m. The systolic blood pressure was never below 100 following the surgery. During the recovery period of over one hour (9:45 a.m. to 10:48 a.m.), the patient's blood pressure was stable and there were no signs or indications of distress or complications.

In this case, the patient's blood pressure was addressed in an appropriate manner throughout the case. The Anesthesiology consultant inappropriately faults the anesthesiologist for using 2 mg of metoprolol - the anesthesiologist was likely titrating an appropriate individual dose as to the reaction of the patient. The transient hypotension of 80/55 at 9:25 a.m. was not indicative of any problems, and it was a common response to induction of general anesthesia, given its transient nature and quick resolution.

The administration of the anesthetic was appropriate as per the anesthesia record - the anesthetic (Isoflurane, Iso) was being given during the surgery and stopped at the conclusion of surgery (9:45 a.m.). There is no reason to suspect the patient was awake and/or in pain during surgery after 9:45 a.m., since that is when the surgery was concluded and no surgery was occurring after 9:45 a.m. Additionally there was not only local anesthetic injected in the abdominal wounds at the start of the procedure but the anesthesiologist also gave Fentanyl, as noted in the anesthesia record.

Anesthesiology Consultant. The anesthesiology consultant is incorrect in believing that the surgery continued for 1 ½ hours following 9:45 a.m. The records demonstrate surgery lasted for 30 minutes from 9:15 a.m. until 9:45 a.m. A grossly misleading statement by the anesthesia consultant exists when the consult claims that the patient was awake and feeling pain during the surgery after the inhaled anesthetic was discontinued at 9:45 a.m. There is no reason to suspect the patient was either awake or in pain during the surgery, because surgery didn't continue after 9:45 a.m. These facts are an obvious error by the consultant.

At the conclusion of surgery at 9:45 am, the blood pressure was normal (110/60). Pulseless Electrical Activity (PEA) occurred after one hour of recovery after 10:45 a.m. The surgeon was present and cardio-pulmonary resuscitation (CPR) was performed. The Paramedics were promptly notified and continued CPR.

Anonymous Letter: I am surprised to see that an anonymous letter which has not been verified was taken into consideration by the anesthesia consultant. Unfortunately, the unverified anonymous letter influenced the Coroner's conclusions as well. An anonymous letter may play in the interests of anyone. The anesthesiology consultant's description uses this information as a springboard for speculation that things went differently than described in the record. Further, the consultant doesn't actually attempt to construct a complete story of how these assumed shortcomings led to any harm to the patient. We only see suggestions and then a conclusion that is not reflected or supported by the written documentation. Speculations can vary and there are an endless number of possible scenarios one can come up with. Frankly, it just appears as if someone is deliberately looking for anything that may denigrate the anesthesiologist. Further, the

points raised by anesthesiologist consultant's reference to the anonymous letter are not valid points anyway. Assuming for the sake of argument that some of it was true, there is no way to validate it, and so we have to go by what is written and available to us in the medical records as recorded by the surgeon, the anesthesiologist, and the nurses. Either way, any anesthesiology shortcomings mentioned in the anonymous letter would have not played any causative role in the patient's death. The aortic injury was not caused or contributed to by the anesthesiologist or anything the anesthesiologist did or did not do. The anesthesiologist's resuscitation was clearly intensive. Incidentally, the anesthesia record is well filled out and accompanied by a progress note which contains most of the information from anesthesia record as well.

There are many references in the anesthesiologist consultant's opinion that are unverified and meritless. These include statements about lack of oxygen, fluid on the floor, anesthesiologist not having access to oxygen tanks, etc. I spent much time reviewing the nursing, anesthesia, and surgical records to identify any reference to any of these contentions, only to realize that they do not exist. In my experience, this is the first time I have seen so many unsupported assertions in an expert opinion. As such, I do not believe they should be part of the opinion.

Conclusions:  Cause and modality of death:

Accident: to a reasonable degree of medical certainty, the patient's cause of death was an accident.

Standard of care:  The anesthesiologist exhibited an intensive attempt to save this patient who sustained a known surgical complication. There is no basis to believe there was gross negligence or an extreme departure from the standard of care for the anesthesiologist.

Propagation of False Conclusions:

The anesthesiologist consultant's conclusions came from an erroneous assessment of the time of surgery and from undue reliance on the unverified accusations in the anonymous letter. Unfortunately, these conclusions were taken as reality by the Coroner and the surgical consultant. Realizing that the erroneous conclusions have propagated from one consult to another is key to understanding why there appears to be unity in all these three reports. Based on my education, training, and experience, to a reasonable degree of medical certainty the anesthesiologist approach was in line with what the majority of anesthesiologists would do in this situation, and as such, did not deviate from the standard of care.

Ivan Hronek MD