# EXHIBIT "9"

# EXHIBIT "9"

## Konrad L. Trope

| | |
|---|---|
| **From:** | Konrad L. Trope <ktrope@centurionlawgroup.com> |
| **Sent:** | Monday, January 28, 2013 12:37 PM |
| **To:** | lsathyavagiswaran@coroner.lacounty.gov; ewinter@coroner.lacounty.gov; jkades@coroner.lacounty.gov; Christopher Rogers (CRogers@coroner.lacounty.gov); 'Craig Harvey'; 'Raffi Djabourian' |
| **Cc:** | 'Cathleen R. Atkinson'; 'Charles Kreindler'; oxman2008@aol.com; tkollars@yahoo.com; Michael Sedrak (mike_sedrak@sbcglobal.net) |
| **Subject:** | Investigation into COD of Paula Rojeski |
| **Attachments:** | mcfFinalReport1-28-13.pdf |

Gentlemen:

This letter follows up my discussions with Mr. Winter, as well as the previously sent letter from Dr. Michael Sedrak, which we presented to you last Thursday, January 24, 2013, concerning the COD of Paula Rojeski. Attached is another report from one of our retained consultants, Dr. Michael C. Fishbein, who is board certified in Anatomic and Clinical Pathology. Moreover, he is the Chief of the Autopsy Service in the Department of Pathology and Laboratory Medicine at the Geffen School of Medicine at UCLA. Indeed, Mr. Winter acknowledged in our conversation last Thursday, that Dr. Fishbein is a highly esteemed outside consultant regularly retained by the Coroner's Office.

Dr. Fishbein makes the same observation previously noted by Dr. Sedrak: there is no evidence in the medical record that the surgical procedure lasted beyond 30-35 minutes. Yet the Coroner's Consultant, Dr. Selma Calmes, insists that the procedure lasted 90-120 minutes. This divergence in reading the uncontroverted underlying surgery notes, creates two very different conclusions for assessing the COD of Paula Rojeski.

Dr. Calmes, relying on her patently erroneous reading of the underlying medical records, mistakenly concludes that the attending surgeon and anesthesiologist were guilty of gross negligence.

In contrast, both Dr. Sedrak, and Dr. Fishbein, after carefully and dilgently reviewing the medical records and confirming that the surgical procedure lasted only 35 minutes, correctly conclude that Ms. Rojeski's death was an accident.

This divergence of opinion is not based on interpreting "shades of gray". Rather it is based on a clearly erroneously reading of the underlying medical records by Dr. Calmes. Unfortunately, Dr. Calmes's erroneous reading of the underlying medical record has become the faulty premise of everyone else from the Coroner's Office who has opined on the COD of Ms. Rojeski. The uncontroverted facts indicate an accidental cause of death with no evidence of any negligence.

On behalf of my client, we hereby demand that the draft of the coroner's report currently scheduled to be released, be pulled back and substantially revised to accurately reflect the unconverted facts contained in the underlying medical reports.

Moreover, as previously discussed in Dr. Sedrak's report, the reliance on an unverified anonymous letter, while completely ignoring Ms. Rojeski's active concealment of her Phen-Fen use and subsequent cardiac damage, also creates numerous professional errors in the report that must be remedied. It defies any legal principle of evidence to base any opinion on this unverified anonymous letter. The misplaced reliance upon the anonymous letter does not reflect "facts ascertained from inquiry, autopsy and other scientific findings." *Cal. Gov't Code § 27491.5.*

Furthermore, the chain of custody of Ms. Rojeski's body was broken by the Coroner's Office, thereby tainting any investigative integrity. Without knowing or having any basis for suspecting the cause of death of Ms. Rojeski, the

Coroner's Office allowed OneLegacy to harvest organs and tissue from Ms. Rojeski's body without any supervision by the Coroner's Office. This is a clear violation of *Cal. Health & Safety Code § § 7150-7151.40.* Documents provided by your office to us unmistakably demonstrate that the Coroner's Office provided no guidance or direction to OneLegacy to ensure that the harvesting did not "unnecessarily mutilate the body or interfere with the autopsy" in direct violation of *Cal. Gov't Code § 27491.45.*

Any failure by your office to correct the numerous and substantial errors in the draft report, would be action that any judicial body would hold as arbitrary, capricious, an abuse of agency discretion, and quite frankly, contrary to law. Accordingly, you must revise the current draft before public dissemination or otherwise your office would cause irreparable harm to my client, forcing this office to pursue all remedies, both legal and equitable.

Guide yourself accordingly,

Konrad Trope

Konrad L. Trope, Esq.
**CENTURION LAW GROUP, P.C.**
9107 Wilshire Blvd., Ste. 450
Beverly Hills, CA  90210
Tel: (888) 942-9997
Fax: (888) 942-9997

UNIVERSITY OF CALIFORNIA, LOS ANGELES                                    **UCLA**

BERKELEY • DAVIS • IRVINE • LOS ANGELES • MERCED • RIVERSIDE • SAN DIEGO • SAN FRANCISCO          SANTA BARBARA • SANTA CRUZ



DEPARTMENT OF PATHOLOGY & LABORATORY MEDICINE
DAVID GEFFEN SCHOOL OF MEDICINE AT UCLA
CENTER FOR HEALTH SCIENCES
10833 LE CONTE AVENUE
LOS ANGELES, CALIFORNIA 90095-1722

### Report Regarding Paula Rojeski, deceased

**Qualifications:**

I am a licensed physician in the state of California since 1971. I am board certified in anatomic and clinical pathology since 1975. I am the Piansky Professor of Pathology and Medicine at the David Geffen School of Medicine at UCLA where I am also chief of the autopsy service and cardiovascular pathology. I was chief of Pulmonary Pathology from 1997-2009. I am also a voluntary deputy medical examiner for the Los Angeles County Medical Examiner's Office and a consultant to all of the Medical Examiners' Offices in the Commonwealth of Virginia.

**Materials reviewed:**

In preparation of this report I have reviewed the County of Los Angeles Medical Examiner's report No. 2011-05916, various medical records of Paula Rojeski, and Los Angeles County Fire Department records. I have been asked to provide my opinions regarding the cause of death, the pathology present, and the sequence of events leading to the death of Paula Rojeski. I have not reviewed actual tissue samples, microscopic slides, or photographs. **I reserve the right to modify my report as necessary if and when I have the opportunity to review additional materials.**

**Brief summary of events:**

Paula Rojeski was a 55 year old female who underwent laparascopic surgery for placement of an adjustable gastric band for medical complications related to her obesity that did not respond to other forms of weight loss therapy. A liver biopsy was also performed. After the completion of the procedure, Ms. Rojeski suffered cardiorespiratory arrest from which she could not be resuscitated. At autopsy, there was hemoperitoneum (fluid with clots in the abdomen), measured at 1400cc with a 0.4 cm tear of the aorta near the origin of the inferior mesenteric artery. Other findings included 80% stenosis of the right coronary artery, cardiac hypertrophy (400gms), thyroid cancer metastatic to regional lymph nodes, and injuries associated with resuscitation attempts.

**Opinion:**

Based on the materials available to me I have formed the following opinions. In my opinion, the defect in the aortic wall was followed by a period of bleeding confined to the retroperitoneum, i.e. a retroperitoneal hematoma, with bleeding into and confined by the soft tissues surrounding the aorta. Only after the conclusion of the procedure, when Ms. Rojeski arrested did the free bleeding into the peritoneal cavity occur.

1

UNIVERSITY OF CALIFORNIA, LOS ANGELES                    UCLA

BERKELEY • DAVIS • IRVINE • LOS ANGELES • MERCED • RIVERSIDE • SAN DIEGO • SAN FRANCISCO          SANTA BARBARA • SANTA CRUZ



Bases of opinion:

According to the record, the surgery ended around 9:45 am and the precipitous drop in blood pressure did not occur until around 10:55, more than one hour later. During the actual laparoscopic procedure, no blood was observed in the peritoneal cavity by the surgeons or their assistants. In addition, according to the anesthesia record, blood pressure was relatively stable during, and after the completion of the procedure. Comments in the Coroner's report indicate that the surgery continued from 9:45 am to the time of decompensation. I find no evidence in the medical record that any form of surgery occurred after 9:45 am. In my opinion, the correct timing of the events that occurred is crucial for interpretation of and explanation of the findings of this case. Accordingly, it is inconceivable that a bleed into the peritoneal cavity from a defect in a high pressure artery like the aorta would not have been seen by the surgeons and would not have resulted in a precipitous drop in blood pressure. The most likely explanation for the bleeding not being visible to the surgeons was that the hematoma was contained in the retroperitoneal cavity intraoperatively and only ruptured into the peritoneal cavity following the conclusion of the surgery, most likely about 1 hour later. In my opinion, 1) injury to major blood vessels such as the aorta is a known complication of laparoscopic surgery; 2) intraperitoneal bleeding did not occur until after surgery was completed; and 3) therefore, the manner of death is accident. Based on the information I have to date, and my education, training, and experience, I hold these opinions to a degree of medical certainty, that is, more likely than not. In addition, these opinions are supported by the medical literature that: 1) documents aortic injury as a complication of laparoscopic procedures (ref 1); and 2) documents that retroperitoneal hematoma may proceed intraperitoneal hemorrhage after perforation of the abdominal aorta (refs 2 & 3). Please let me know if I can provide addition information or details concerning my opinions.

References:

1. Deziel DJ et al. Complications of laparoscopic cholecystectomy: A national survey of 4,292 hospitals and an analysis of 77,604 cases. Am J Surg 1993;165:9-14.
2. Lopez-Viego MA et al. Penetrating abdominal aortic trauma: A report of 129 cases. J Vasc Surg 1992;16:332-336.
3. Mattox KL et al. Retroperitoneal vascular injury. Surg Clin North Amer 1990;70:635-653.

*Michael C. Fishbein, MD*                              1/28/13

Michael C. Fishbein, M.D.                                date

2

# EXHIBIT "10"

# EXHIBIT "10"

**Konrad L. Trope**

| | |
|---|---|
| **From:** | Konrad L. Trope <ktrope@centurionlawgroup.com> |
| **Sent:** | Thursday, January 31, 2013 11:44 AM |
| **To:** | ewinter@coroner.lacounty.gov; jkades@coroner.lacounty.gov; Christopher Rogers (CRogers@coroner.lacounty.gov); lsathyavagiswaran@coroner.lacounty.gov; Raffi Djabourian (RDjabourian@coroner.lacounty.gov) |
| **Cc:** | 'catkinson@centurionlawgroup.com'; 'Charles Kreindler'; tkollars@yahoo.com; Michael Sedrak (mike_sedrak@sbcglobal.net) |
| **Subject:** | Another Forensic Pathologist Disputes Coroner's Draft on COD of Paula Rojeski |
| **Attachments:** | 13 01-31-13 Cyril Wecht Rojesky Autopsy Letter (Signed  Scanned).pdf |

Gentlemen:

This e-mail follows up my 4 prior e-mails regarding the current draft of the Coroner's Office Report on the Cause of Death of Paula Rojeski.  Attached is the report of our 4th Medical Consultant, the esteemed Dr. Cyril Wecht.  Dr. Wecht is the Past President of the American Academy of Forensic Science and the American College of Legal Medicine. Dr. Wecht has consulted on many high profile deaths including Robert F. Kennedy, Sharon Tate, Brian Jones, and Elvis Presley.

Consistent with the findings of our other three consultants, Drs. Sedrak, Hronek, and Fishbein, Dr. Wecht concludes, *inter alia,* that the mode of death was an "accident."  He says there is no basis to find "gross negligence" or "extreme departure from the standard of care," let alone "homicide."  He is highly critical of the Coroner's Office mistake in erroneously stating the timing of the surgery, basing its conclusions on that mistake, and its use of an "anonymous letter."  He states that unverified anonymous letters have no place in an Autopsy Report.

All four of our consultants independently reviewed your draft report and the materials you provided to us on January 17, 2013. Each of our consultants relied only on his own review of the records provided.

This is serious matter where "extreme" conclusions have been proposed by the Coroner's Office without factual basis. The medical community will view the process regarding the Coroner's conclusions as not only suspect, but also without scientific merit.   This process has been disturbing and need to be corrected.

Frankly, we are baffled as to why your office is refusing to meet with us, <u>after promising to do so during the last meeting</u>, to discuss our findings and our response to your draft report.  Your silence in the face of being presented with four independent reports from four highly credentialed physicians about the numerous and glaring errors in your draft report is quite disconcerting.   We request that we be given the opportunity you promised to us on January 17, 2013, that we meet with you and discuss this matter.

Konrad L. Trope, Esq.
**CENTURION LAW GROUP, P.C.**
9107 Wilshire Blvd., Ste. 450
Beverly Hills, CA  90210
Tel: (888) 942-9997
Fax: (888) 942-9997

CYRIL H. WECHT, M.D., J.D.
1110 PENN AVENUE
SUITE 404
PITTSBURGH, PENNSYLVANIA 15222
(412) 281-9090
FAX (412) 281-3650
EMAIL chwecht@fyi.net

FORENSIC PATHOLOGY
LEGAL MEDICINE

January 31, 2013

Re:    Paula Rojeski, Deceased

To Whom It May Concern:

I have reviewed various medical reports and hospital records provided to me thus far in this case.

## CLINICAL SUMMARY

Ms. Paula Rojeski was 55 years old when she arrested at the end of a laparoscopic band placement procedure on September 8, 2011at Valley Surgical Center. An incidental hiatal hernia found during surgery was repaired, and a liver biopsy was also performed. Paramedics arrived to find her apneic and asystolic. She was taken to West Hills Medical Center where resuscitative efforts were continued until she was pronounced dead the same day at 11:41.

The autopsy report No. 2011-05916, completed on 12/31/12 and signed out by Senior Deputy Medical Examiner Raffi Djabourian, M.D., and Forensic Pathology Fellow Dr. Adrian Marinovich, listed the following findings:

1. 0.4 cm penetrating defect of (anterior) aorta inferior to the origin of the inferior mesenteric artery, 4.3 cm superior to the bifurcation of the common iliac arteries
   - Corresponding overlying 2 cm defect of posterior peritoneum with adjacent soft tissue hemorrhage
   - Hemoperitoneum (1400 cc liquid and clotted blood)

2. Prosthetic band around proximal stomach
   - Abdominal incisions consistent with recent laparoscopy (4: left upper quadrant-2, left of umbilicus and right upper quadrant)
   - Suture in diaphragm near esophageal hiatus

205

January 31, 2013
Page 2

- Small defect of right anterior liver edge (biopsy site: steatohepatitis)
- No esophageal, gastric or intestinal perforation

3. Resuscitative changes, including hemorrhage into mediastinum, bilateral lung hila, right pleural (100 cc) and left lung parenchyma (200 cc)
   - Anterolateral fractures of left rib 3, right ribs 2, 3, 4, 6, and 7
   - Abrasion of midline anterior chest

4. Pulmonary edema
   - Right lung 640 grams (N=360-570)
   - Left lung 550 grams (N= 325-480)
   - Bilateral pleural effusions (right 100 cc, left 250 cc)

5. Coronary artery disease
   - Focal 80% stenosis of "dominant right coronary artery" ("severe coronary artery disease"); mild myocardial fibrosis

6. Left ventricular hypertrophy
   - Heart 400 grams (normal for height: 161-382)
   - Right ventricle =0.5 cm, left = 1.7 cm and IVS = 1.7 cm

7. Obesity

8. Right thyroid nodule, 1.8 cm (papillary carcinoma metastatic to a regional lymph node)

9. Calcified splenic nodule, 2.5 cm

10. Absent uterus

11. Postmortem tissue procurement (bones and skin)


Toxicology: non-toxic blood levels of bupivacaine, lidocaine and diphenhydramine.


The anesthesia record showed that anesthesia started at 8:55 and ended at 11:15, although surgery started at 9:15 and ended at 9:45. The code blue/medical emergency flow sheet was timed at 10:55 when CPR was initiated.

January 31, 2013
Page 3

Consultations were obtained from the Coroner and from surgery and anesthesiology experts. The surgery consultant report expressed the opinion that there was "gross negligence with incompetence" involved in Ms. Paula Rojeski's death. The anesthesiology consultant report indicated that there was gross negligence on the part of the anesthesiologist, in that he failed to meet basic standards of anesthesia care; in particular, failure to adequately assess the patient's condition during surgery, failure to communicate the patient's deteriorating condition to the surgeon, and failure to provide pain relief and anesthesia while the patient was paralyzed during surgery."

"Prompt recognition of the problem may have prevented this death. The injury itself, together with the failure to detect the resulting hemorrhage and respond appropriately, constitute an extreme deviation from the standard of care on the part of both the surgeon and the anesthesiologist." "Certifying the manner of death as homicide vs. accident would require knowledge of whether or not this death resulted from a conscious disregard for the patient's safety".

An initial preoperative evaluation was performed on June 4, 2011. Ms. Rojeski's hypertension of 205/119 found on May 20 had been treated with Lisinopril and hydrochlorothiazide. Ms. Rojeski had 3 ECG's, one showing possible left ventricular hypertrophy and another that raised the possibility of ischemia with minor ST-T changes on September 6. A sleep study showed moderate obstructive sleep apnea. An abdominal ultrasound showed hepatomegaly (20 cm) with fatty infiltration. The abdominal aorta appeared normal (2.2 cm). Past surgeries listed an abdominal hysterectomy (in 2007) and a tonsillectomy/adenoidectomy.

The operation performed by Dr. Julius W. Gee, D.O., consisted of placement of an adjustable gastric restrictive device, partial anterior fundoplication, laparoscopic hiatal hernia, adhesiolysis, laparoscopic liver biopsy and implantation of the prosthetic mesh.

Dr. Gee's operative report noted that after the hernia repair, he observed that the anesthesiologist, Dr. Chau, "was having difficulty getting a blood pressure even though the EKG tracing showed sinus rhythm. I asked if we needed to stop the surgery, Dr. Chau said he would take care of the problem and for surgery to proceed". Following completion of surgery, Dr. Gee deemed his patient to have tolerated the procedure well.

Following this surgery, during the post-operative recovery period, Ms. Rojeski was "in the process of awakening from general anesthesia" when Dr. Chau again encountered difficulty in obtaining a blood pressure. He placed his patient in Trendelenburg position, and he "continued to administer medications." As the table was returned to neutral position, Dr. Gee stepped out to write her prescriptions. He was called back to return to the OR. Dr. Gee initiated CPR and continued until the Los Angeles Fire Department paramedics arrived. Ms. Rojeski was immediately transferred to West Hills Medical Center.

January 31, 2013
Page 4

The progress note (p. 140) by anesthesiologist Deming Chau, M.D., stated: "Pt tolerated OP initially then starts blood pressure decreasing/saturation decreasing/add iv fluid/placed 2nd iv line in other (right) arm, ephedrine – followed by epinephrine – to maintain blood pressure and sat (>95%)". He observed that Ms. Rojeski awoke, and was breathing on her own, but he decided to leave her intubated.

During the recovery period, Ms. Rojeski suddenly developed pulseless electrical activity. Although still with sinus rhythm, her blood pressure and saturation went down. A code was called, and 911 was notified to transfer the patient to West Hill Medical Center via ambulance.

Anesthesia consultant Selma Calmes, M.D., rendered an opinion for the Coroner that "anesthesia care was an extreme departure from the accepted standard of care, and, is most likely, directly responsible for this patient's death". She opined that injury to major blood vessels is a known risk in laparoscopic surgery, most commonly from placement of trocars. Had the anesthesiologist been suspicious of bleeding, and had the surgeon been promptly informed, the complication would likely have been addressed in a timely fashion and her death could have been avoided.

## MEDICOLEGAL QUESTIONS

1. **Was the Coroner's consultant-anesthesiologist correct about the one-and-a half hour duration of the surgery instead of what was documented on the anesthesia record?**

The anesthesiologist who attended to the laparoscopic surgery documented anesthesia to have started at 8:55 a.m. and surgery at 9:15 a.m. ending at 9:45 a.m. The surgical procedure lasted actually only 30 minutes. The nurse's notes also list the surgical time from 9:15 a.m. to 9:45 a.m. The anesthesiologist continued to observe the patient after surgery.  The anesthesia report shows the anesthesia end time of 11:15 a.m. which included the recovery period after 9:45 a.m., the start of the code at 10:55 a.m., and the period of time until she was transported to West Hills Medical Center at 11:15 a.m.

208

January 31, 2013
Page 5

**2. Was it proper for the authorities to undertake and accept charges set forth in an anonymous letter?**

The Coroner's anesthesiology consultant discussed some allegations made in an anonymous letter written by an apparently knowledgeable witness citing five problems with the anesthesia care. "It appears to be written by people familiar with OR and anesthesia routines, such as scrub nurses or OR techs." Dr. Selma Calmes cited illegible and undecipherable entries on the anesthesia record. The anonymous letter alleged the following:

a. The O2 tanks were not turned on before the case started and there was no oxygen flow at one point for about 10 to 20 minutes.
b. The anesthesiologist was recording only the best vital signs.
c. The surgeon was repeatedly reassured by the anesthesiologist even as the monitor alarms kept going off.
d. IV fluids were running off the floor instead of into the patient.
e. The time of the code was inaccurate and it was the surgeon who started the CPR and not the anesthesiologist.

All of these allegations are not substantiated by the medical record or any other independent investigation by the Coroner's Office or the Coroner's consultants.

**3. What was the exact cause of the bleeding?**

The source of the hemoperitoneum was the 0.4 cm penetrating defect of the anterior aorta, inferior to the origin of the inferior mesenteric artery and 4.3 cm superior to the bifurcation of the common iliac arteries. It had a corresponding overlying 2 cm defect of the posterior peritoneum with adjacent soft tissue hemorrhage. This is a known complication of laparoscopic surgery.

In general, Lap band surgery has minor complications ranging from annoyances to complete failure and removal of the band. Lap band surgery does have fewer serious complications than other bariatric surgeries.

Around 0.1 % of lap band surgery accounts for the extremely low mortality rate as opposed to a much higher rate of minor complications, as high as 26%. These minor complications are usually easily repaired with a typical worst case of having another operation for removal of the band.

January 31, 2013
Page 6

### 4.  What was the exact cause of the aortic tear?

As supported by the study noted below (references) mortality is very rare as a complication of laparoscopic surgery.Ms. Rojeski's postoperative death was the result of an accidental injury to the aorta distal to the inferior mesenteric artery origin. Although a more prompt recognition of the complication might have prevented death.  However, such a retrospective opinion cannot be made with a reasonable degree of medical certainty in a case like this. The injury was obviously not intended, nor was it an indication of reckless behavior, either by the anesthesiologist and even less so on the part of the surgeon.

### 5.  What medico-legal significance should an anonymous letter submitted to a Coroner/M.E. pertaining to a complex, controversial death be afforded?

In my opinion, such an anonymous letter should not be given any credibility or be referred to in any way in a death case being reviewed by the official governmental medico-legal investigative office.  No Court would ever allow such "testimony", and neither should an M.E. or Coroner (except in matters such as identification of an unknown body, a possible unsuspected murder, etc.)

## OPINION

Following the review of all submitted documents including the autopsy findings, based upon reasonable degree of medical certainty, it is my professional opinion that Ms. Paula Rojeski died from an acute hemorrhage following accidental penetration of the aorta.

After the surgery was completed, the patient's systolic blood pressure was stable.

Perforation of the aorta, whether from natural disease or trauma, is most often a fatal event.

Accordingly, there is no valid medico-legal basis to characterize the manner of death in this matter as a "homicide", "reckless", or an "extreme deviation from the standard of care. The manner of death is "accident" and should not be characterized as "undetermined".

January 31, 2013
Page 7


     I reserve the right to amend or revise this preliminary report, pending my examination and review of photographs, microscopic autopsy tissue slides, and any other directly related materials relating to the investigation of Paula Rojeski's death.


     Very truly yours,

*Cyril H. Wecht*

Cyril H. Wecht, M.D., J.D.


CHW/srw

# EXHIBIT "11"

# EXHIBIT "11"

PARTNERS

KENNETH A. MARANGA
ROBERT A. MORGENSTERN
JOHN F. PETERSON *
CHRISTOPHER F. JOHNSON
PAUL A. ELKORT
NINOS SAROUKHANIOFF
JEFFREY N. LEADER
PATRICIA E. ELLYATT ****

ASSOCIATES

PHILLIP T. S. TUKIA
RICHARD M. OZOWSKI **
NEIL D. JOSEPH
DENNIS S. NEWITT
CARRIE A. McQUAID
JUDY LIAO ***
MORGAN A. METZGER
LILIA C. SANDOVAL
REID L. DWORKIN
EMILY WEISSENBERGER
CATHERINE E. KOSS
SANDOR K. CARRASCO
P. MOLLY FORD

   *    Also Admitted in Colorado
  **   Also Admitted in Texas
 ***  Also Admitted in New York
****  Also Admitted in Georgia



**M**ARANGA
**M**ORGENSTERN

A PROFESSIONAL LAW CORPORATION

5850 CANOGA AVENUE, SUITE 600
WOODLAND HILLS, CA 91367
(818) 587-9146  FAX (818) 587-9147

NORTHERN CALIFORNIA OFFICE
350 SANSOME STREET, SUITE 630
SAN FRANCISCO, CALIFORNIA 94104
(415) 248-5315  FAX (415) 248-5314

PARALEGALS

DANA LELAND KERN
BEVERLY BENSON
KENYA DURHAM
CATHY BACH-ABRIL
VICTORIA BARRY

AUTHOR'S EMAIL:
Ken.maranga@marmorlaw.com

January 31, 2013

**_Via U.S. Mail & Facsimile (888) 942-9997_**

Konrad L. Trope, Esq.
CENTURION LAW GROUP P.C.
9107 Wilshire Blvd. – Suite 450
Beverly Hills, CA  90210

Re:    **In Re:  Death of Paula Rojeski**

Dear Mr. Trope:

This letter confirms the substance of our conversation today, during which I advised you that this firm had been retained to represent the interests of the County of Los Angeles, including but not limited to, the Los Angeles County Coroner's Office regarding its investigation of and reporting about the death of Paula Rojeski.  Going forward, we ask that you refrain from contact or communications with the now represented agents, representatives and employees of the County of Los Angeles.  Those communications should be channeled through my law firm.

It is my understanding that you had forwarded to the Coroner additional documents, including records and consultant's reports for consideration.  If there are any additional documents you would like the Coroner to consider, kindly provide me with that information at this time.

The Coroner is in the process of reviewing and considering the data you supplied, and reserves the _right to supplement or not supplement_ prior reports and opinions at the conclusion of this deliberative process.  They will do so as soon as reasonably possible under the circumstances.

If at any time you have any question about the status of this matter, feel free to contact me.  If you would like to meet face-to-face, we can do so, however, perhaps that should be deferred until I have reviewed the relevant records.

Konrad Trope, Esq.
Re:  In Re:  Death of Paula Rojeski
January 31, 2013
Page 2

Your courtesy and cooperation in this matter is most appreciated.

Very truly yours,

MARANGA • MORGENSTERN
A Professional Law Corporation

KENNETH A. MARANGA

KAM:cb

F:\ADMIN\MATTERS - ACTIVE\Rojeski (COLA)\Correspondence\Atty.Trope.001.doc

214

# EXHIBIT "12"

EXHIBIT "12"

## Konrad L. Trope

**From:**        Konrad L. Trope <ktrope@centurionlawgroup.com>
**Sent:**        Wednesday, March 20, 2013 1:59 PM
**To:**          ktrope@centurionlawgroup.com
**Subject:**     FW: Coroner's Investigation into the COD of Paula Rojeski: another bariatric surgeon
                 confirms "accidental death".
**Attachments:** 13 02-08-13 Simpson Rojeski Autopsy Letter.pdf

**Importance:**  High

Konrad L. Trope, Esq.
Centurion Law Group, P.C.
9107 Wilshire Boulevard, Suite 450
Beverly Hills, California  90210
888-942-9997
ktrope@centurionlawgroup.com

---

**From:** Konrad L. Trope [mailto:ktrope@centurionlawgroup.com]
**Sent:** Friday, February 08, 2013 10:39 AM
**To:** 'Kenneth Maranga'
**Cc:** catkinson@centurionlawgroup.com; 'Monica Porter'; 'mfaulkner@centurionlawgroup.com';
bwhitman@centurionlawgroup.com; Charles Kreindler (CKreindler@sheppardmullin.com)
**Subject:** Coroner's Investigation into the COD of Paula Rojeski: another bariatric surgeon confirms "accidental death".
**Importance:** High

Dear Ken:

This letter is written on behalf of my client, Valley Surgical Center, the facility where Ms. Rojeski had her lap band procedure, I present to you the attached expert report, for immediate forwarding to your client, the Office of the Coroner for the County of Los Angeles. This report prepared by Dr. Terry Simpson, who has performed over 3,000 lap band procedures.

This report concurs with the findings of our previously submitted four expert reports:
1. Ms. Rojeski's death was an accident;
2. There was no negligence or gross negligence in the way the attending surgeon and anesthesiologist performed their duties during the procedure;
3. Ms. Rojeski's undisclosed prior cardiac damage from previous Phen-fen usage was the likely probative factor in contributing to her death.
4. With Ms. Rojeski affirmatively concealing her Phen-fen cardiac damage, it is incomprehensible to assess any blame against the bariatric surgeon and anesthesiologist;
5. The Consulting Anesthesiologist and Consulting Pathologist retained by the Coroner's Office completely misread the medical records concerning the start/stop times for the surgical procedure, which foundational error led to multiple erroneous conclusions regarding Ms. Rojeski's cause of death;
6. Any citation to or reliance upon the "anonymous" letter is wholly unwarranted and not within the standard of due care when chronicling the cause of death for a patient.

In short, the current draft of the report on the Cause of Death of Ms. Rojeski as prepared by the Coroner's Office needs to be completely revised.  Failing that, then my client demands that the Coroner's Office pursue one of two options:

1

216

    a.   Recuse itself from this investigation and bring in an independent investigation team; or

    b.   Conduct a public inquest, in accordance with the mandates of the California Government Code Section 27491.6.

It boggles the imagination, that in the face of four reports from top rated medical experts, all independently confirming the same conclusions, that the Coroner's Office still wishes to proceed down the road toward issuing a grossly flawed report.  Such a decision neither serves the interests of the public nor the interests of those directly affected by Ms. Rojeski's death.

Lastly, I still await to hear from your client about our request for our experts, prior to the issuance of the Report, to have access to tissue samples, slides, and photographs that are referenced in the current draft.

I look forward to hearing from you.

Regards,

Konrad L. Trope

Konrad L. Trope, Esq.
Centurion Law Group, P.C.
9107 Wilshire Boulevard, Suite 450
Beverly Hills, California  90210
888-942-9997
ktrope@centurionlawgroup.com

**TERRY SIMPSON, MD, FACS**
**1840 West Maryland Avenue**
**Suite A**
**Phoenix, Arizona 85015**
**(602) 234-8995**

February 7, 2013

**Autopsy Review Regarding Paula Rojeski, Deceased**

### A. Background:

I am a licensed physician in the States of Arizona and Washington.  I am board certified in General Surgery.  I graduated from the University of Chicago Pritzker School of Medicine in 1986.  I completed my internship in 1987 and residency in 1991 at Virginia Mason Medical Center in Seattle, Washington.  I have extensive additional training and experience in bariatric surgery.

### B. Materials reviewed:

In preparation of this report I have reviewed the County of Los Angeles Medical Examiner's Report No. 201 1-05916, and various medical records of Paula Rojeski.  I have been asked to provide my opinions regarding the cause of death, the surgical standard of care, and an evaluation of the events leading to the death of Paula Rojeski.

I have not reviewed actual tissue samples, microscopic slides, or photographs.  I reserve the right to modify my report as necessary if and when I have the opportunity to review additional materials.

### C. Statement of Events:

Paula Rojeski was a 55 year old female who underwent laparoscopic surgery for placement of an adjustable gastric band to treat her longstanding obesity which was did not respond to other therapies, including multiple and extended treatments since 2001 with the use of Fen Phen.  The patient has a prior history of Fen Phen related heart injury, including abnormal echocardiography showing aortic regurgitation.  During the surgery, a liver biopsy was also performed.  After the procedure was completed, Ms. Rojeski suffered cardiorespiratory arrest from which she could not be resuscitated.

At autopsy, there was reported a 0.4 cm tear of the aorta near the origin of the inferior mesenteric artery and 1400cc with fluid and blood clots in the abdominal cavity.  Other significant findings included 80% stenosis of the right coronary artery, cardiac hypertrophy (400gms), thyroid cancer metastatic to regional lymph nodes, and major injuries associated with resuscitation attempts, including hemorrhage into the mediastium, bilateral lung hila,

1

and left lung parenchyma (non-fatal). There were resuscitative trauma and injuries resulting in anterolateral fractures of the left rib 3, and right ribs 2, 3, 4, 5, 6, and 7. There were also resuscitative injuries resulting in abrasions of the midline anterior chest. In addition there was extensive post-mortem tissue and bone procurement prior to autopsy. This included removal skin and also bones from the arms and leg. There is no indication in the records that the Coroner's Office observed the harvesting or limited it in any way. Maintaining the integrity of the body so that appropriate autopsy can be done without harm or mutilation is mandatory. Thus, since the integrity of the body was not maintained, the coroner's findings cannot be validated.

### D  Opinion:

#### 1.  The patient's compromised heart.

Unknown to her doctors, the patient had a pre-surgery compromised heart. Post-anesthesia she had a sudden cardiac arrest at 10:55 a.m. The reason for the sudden cardiac arrest likely was the result of (a) the stress of surgery, and/or (b) the anesthetic drugs that cause mild depression of the heart. The 4 mm injury to her aorta identified at autopsy occurred at an unknown time and was probably a result of CPR.

What is known is that the surgeon did not report intra-abdominal bleeding. There is no evidence of intra-abdominal bleeding during the surgery, and no such record of an abdominal bleed is present from the review of the records. As a laparoscopic surgeon who has performed over 3000 lap-band operations, my experience and training shows that even small amounts of bleeding can obscure the surgical field. It is highly unlikely that there was intra-peritoneal bleeding during the operation.

In the surgical and anesthetic literature we have developed a formula for allowable blood loss. Allowable blood loss is the amount of blood loss that you can sustain before transfusion is necessary. In this patient, an 84.3 kg woman with a pre-operative Hct of 44.2% the allowable blood loss would be 1760 ml. This is based on the surgical formula of Allowable Blood Loss (EBVx (Hi-Hf) +ABL divided by Hi – where Hi is the initial Hct and Hf is the final lowest acceptable Hct. Thus a 1400 cc blood loss, is below the level at which a patient would require a transfusion, and highly unlikely to cause a cardiac arrest.

To a reasonable degree of medical certainty the 1400 cc's of blood identified at autopsy would not have been sufficient to have caused the patient's arrest or death. It is most likely that the blood found at autopsy occurred not during surgery, or immediately after surgery, but occurred as a result of the CPR.

The site of aortic injury was reported as near the takeoff of the inferior mesenteric artery (IMA), and that anatomical area is unlikely to be caused from an iatrogenic injury by the surgeon. The instruments of the surgeon for a Lap-Band are nowhere near this part of the aorta.

Trocars, placed in patients have been cause iatrogenic injury to the aorta, however, the trocar sites for the Lap-Band procedure are well above the level of the IMA.  Further, if this injury had been from the trocar placement, this injury would have resulted in immediate and massive blood loss dealt with immediately, and not found post-mortem.  The laparoscope provides vision 30x that of the eye, thus small amounts of bleeding look massive.  Blood loss from trocar injuries are documented in the literature, and when they occur require immediate and urgent open surgery to repair.

Finally, if there was an injury to the aorta, by whatever mechanism one must conclude that the injury did not cause bleeding during the operation then what caused it to bleed later?  The only explanation is that the CPR forced the blood out of the aorta, into the peritoneal cavity.

What is more likely is that CPR caused the aortic injury near the IMA, and the force of CPR caused the blood to be forced into the peritoneum.  CPR has been reported to cause aortic injuries.  The CPR that the pathologist stated caused fractures to multiple ribs and hemorrhage into the mediastium, bilateral lung hila, and left lung parenchyma, provided enough force to both cause injury to the aorta, as well as force the blood out of the aorta at the time of her CPR.

What is improbable is that the intra-peritoneal blood found at autopsy caused the patient's cardiac arrest and death.  Hypovolemic shock as a result of a bleed is unlikely (see notes above about allowable blood loss).  Calculating crystalloid replacement for the blood noted at autopsy, the patient was not volume depleted during the case, or after the case.  The patient's record notes that she was given over six liters of crystalloid (iv fluids).  The ratio of crystalloid fluid for blood is 3:1.  Had this patient lost 1.4 liters during surgery, to replace that with crystalloid would have only required 4.2 liters (she had 6 liters).

Based upon my training, experience, and education, and to a reasonable degree of medical certainty, the patient would have been revived and maintained for a sufficient period to have received medical attention at the emergency room except for the prior compromise and injury to her heart.

It is most likely that this patient had a sudden cardiac arrest in the recovery room, and in spite of heroic efforts by the staff, was unable to be revived. The aortic injury and the intra-peritoneal blood were most likely secondary to the CPR, and not from an iatrogenic injury during surgery.

### 2. Inaccuracy of Autopsy Report opinions.

According to the record, the surgery commenced at 9:15 a.m. and concluded at 9:45 a.m.  The PEA and subsequent code did not occur until around 10:55, more than one hour later.  During the actual laparoscopic procedure, no blood was observed in the peritoneal cavity by the surgeons or the assistants.  According to the anesthesia record, blood pressure was relatively stable after the completion of the procedure in the recovery period.

Yet, the Autopsy Report and Anesthesiology Consult state that the surgery continued for 1 ½ hours following 9:45 a.m. The Consult incorrectly states that blood pressure was not stable. These conclusions are without support in the medical records. These are major errors resulting in incorrect conclusions throughout the Autopsy Report.

The incorrect observation of the timing of the documented start and end times of the surgery by the anesthesia consultant is crucial in explaining the incorrect findings in the autopsy report. There is no basis for the anesthesiologist consult to state that the patient was undergoing surgery without the benefit of pain medications after 9:45 a.m. The surgery ended at 9:45 a.m., and such a statement which can result in significant undue public outrage and detriment to the professional career of the anesthesiologist should have been carefully verified prior to inclusion in the autopsy report.   Both the anesthesia and nurse's notes clearly show 9:45 a.m. as the surgical end time.

If intra-abdominal bleeding had been present, it is inconceivable that the surgeon and his assistants would have failed to see bleeding into the peritoneal cavity from a defect of a high-pressure artery like the aorta. Continuation and completion of the surgery would not have been possible had such bleeding been present. To a reasonable degree of medical certainty, the bleeding into the peritoneal space did not occur until the surgery was completed, and it did not likely occur until the vigorous CPR took place with its accompanying major trauma to the patient.

### 3. **Improper reliance on an anonymous letter.**

The Anesthesiology Consult makes reference to an anonymous letter which makes claims regarding the oxygen tanks not being turned on, the anesthesiologist selecting the best vital signs, the anesthesia monitoring equipment malfunctioning, spilled anesthesia fluids, and inaccurate timing of the Code. None of these alleged facts have been independently verified by the Coroner's Office or the Anesthesia Consult. Further, I could find no substantiation of these allegations in the chart.

It is not proper for an Autopsy Report to make reference to, let alone rely upon, unverified and speculative claims form an anonymous letter. None of the claimed events in the anonymous letter played any role in the patient's death. Even if the claimed events are taken to be true, the Anesthesiology Consult admits the anonymous letter's claims did not cause or contribute to the patient's death. It is a major violation of the standard of practice for an Autopsy Report to include such speculation and unverified claims from an anonymous letter. This sort of speculation unduly prejudices and harms the professional career of the anesthesiologist and others involved.

### 4. **The patient's death was an accident.**

Based on my training, education, and experience, and to a reasonable degree of medical certainty: (a) injury to major blood vessels such as the aorta is a known complication

of laparoscopic surgery and a known complication of CPR; (b) the intraperitoneal bleeding did not occur until after surgery was completed; and (c) the manner of death is accident.  The surgeon did not and could not have observed bleeding into the peritoneal space because completion of the surgery would not have been possible in such a circumstance.  The patient's prior compromised heart condition and injuries, including heart damage from long term use of Fen Phen, were a major and substantial factor in the patient's arrest and subsequent death, which precluded resuscitative efforts.

The patient's loss of 1400 cc's of blood was insufficient to have caused her death absent the prior compromised heart condition and injuries especially because of significant infusion of fluids prior to the code.  There is no evidence of gross negligence or an extreme departure from the standard of care.  Further, there are no facts that would permit a finding of "homicide."  The finding that the mode of death was "undetermined" in the Autopsy Report is not supported by the facts, and this case should be classified as "accident."

-electronic signature for Terry Simpson MD FACS

Thursday, February 7, 2013