# EXHIBIT "13"

EXHIBIT "13"

## Konrad L. Trope

| | |
|---|---|
| **From:** | Konrad L. Trope <ktrope@centurionlawgroup.com> |
| **Sent:** | Wednesday, February 13, 2013 4:46 PM |
| **To:** | ken.maranga@marmorlaw.com |
| **Cc:** | tkollars@yahoo.com; 'Charles Kreindler'; Michael Sedrak (mike_sedrak@sbcglobal.net); 'catkinson@centurionlawgroup.com' |
| **Subject:** | Investigation by LA County Coroner's Office into Cause of Death of Paula Rojeski, Medical Examiners Report No. 2011-05916 |
| **Attachments:** | Chandler Rojeski reference 2.pdf; Sharp reference Rojeski 1.pdf; PDF Rojeski report Feb 12 2013.pdf |
| | |
| **Importance:** | High |
| | |
| **Tracking:** | **Recipient**        **Read** |
| | ken.maranga@marmorlaw.com |
| | tkollars@yahoo.com |
| | 'Charles Kreindler' |
| | Michael Sedrak (mike_sedrak@sbcglobal.net) |
| | 'catkinson@centurionlawgroup.com'      Read: 2/14/2013 1:07 PM |

Dr. Ken:

This letter is written on behalf of my client, Valley Surgical Center, the facility where Ms. Rojeski had her lap band procedure, I present to you the attached expert report, for immediate forwarding to your client, the Office of the Coroner for the County of Los Angeles. This report was prepared by Dr. Juan Felix, Chief of Anatomic Pathology at the Keck School of Medicine at the University of Southern California. He is also a volunteer Deputy Medical Examiner for the Los Angeles County Coroner's Office, just like our previously submitted expert, Dr. Michael Fishbein.

This report concurs with the findings of our previously submitted five expert reports:

1.   Ms. Rojeski's death was an accident;
2.   There was no negligence or gross negligence in the way the attending surgeon and anesthesiologist performed their duties during the procedure;
3.   The Consulting Anesthesiologist and Consulting Pathologist retained by the Coroner's Office completely misread the medical records concerning the start/stop times for the surgical procedure, which foundational error led to multiple erroneous conclusions regarding Ms. Rojeski's cause of death;

Therefore, in light of the consistent findings which unequivocally contradict the findings of the Coroner's Office, we demand that the Coroner's Office recuse itself from this investigation and bring in an independent investigation team to conduct a public inquest in accordance with the mandates of the California Government Code Section 27491.6.

It boggles the imagination, that in the face of six reports from top rated medical experts, all independently confirming the same conclusions, that the Coroner's Office has produced such a scientifically invalid and grossly flawed report. Such a decision, reflects, in light of our six expert reports, that the Coroner's Office is hell bent on trying to implicate my client with some form of civil or criminal liability. The fact that the Coroner's Office over the past 18 months, in September 2011 and again in April 2012, admitted to the LA Times and other media outlets that it was singularly focused on Valley and its medical staff as the grossly negligent actor in Ms. Rojeski's death is further substantiation that the Coroner's Office needs to immediately recuse itself from this investigation.

Moreover, in light of the fact that Coroner's Office allowed Ms. Rojeski's body to be harvested for organs and other body parts, prior to ever taking possession and commencing its investigation, along with the Coroner's Office failing to embalm the body before burial, we believe that the Coroner's Office has essentially engaged in spoliation of evidence. *See Cal. Health & Safety Code § 7151.20; Gov't Code § 27471; People v. Farnam,* 28 Cal. 4th 107, 166 *citing with approval California v. Trombetta,* 467 U.S. 479. 488, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *accord, People v. Beeler,* 9 Cal.4th 953, 976 (1995).

We anticipate that the Coroner's Office, as a law enforcement agency, will not engage in any further destruction or mishandling of any gross tissue samples, photographs or glass slides resultant of the autopsy, as well as any and all forms of communication by and among the Coroner's employees, staff and consultants or any other party who have participated thus far in the investigation of Paula Rojeski's death.  Indeed, we would request that you communicate and reiterate this obligation to any and all staff, employees, professionals or consultants of the Coroner's Office, or any other party, who are involved in the investigation of Paula Rojeski's unfortunate and tragic demise.

In sum, we believe we have made a compelling case for referring this investigation over to an independent panel for conducting a public inquest in accordance with California Government Code Section 27491.6.

Very truly yours,


Konrad L. Trope, Esq.
**CENTURION LAW GROUP, P.C.**
9107 Wilshire Blvd., Ste. 450
Beverly Hills, CA  90210
Tel: (888) 942-9997
Fax: (888) 942-9997



UNIVERSITY
OF SOUTHERN
CALIFORNIA

**Keck School of Medicine**
University of Southern California

February 12, 2013

Re: Paula Rojeski, Deceased

Department of Pathology
and Laboratory Medicine

Juan C. Felix, M.D.
Chief
Anatomic Pathology

To whom it may concern:

Qualifications:

  I am a licensed physician in the State of California since 1992 and in the State of New York since 1986. I am board certified in Anatomic Pathology since 1988 and received added qualification in Cytopathlogy in 1993. I am a Professor of Clinical Pathology and Obstetrics and Gynecology in the Keck School of Medicine of the University of Southern California where I serve as Chief of Anatomic Pathology. I am also a volunteer Deputy Medical Examiner for the Los Angeles County Medical Examiner's Office.

Material Reviewed:

  In preparation for this statement, I reviewed the County of Los Angeles Medical Examiner's report No. 2011-05916 and appended consultation letter from Dr. Selma H. Calmes and Dr. Dennis Astarita. I also reviewed Ms. Paula Rojeski's medical records associated with the lap band procedure including but not limited to preoperative test results, preoperative notes and the operative report. I did not review any photographs, gross tissue samples, or glass slides resultant of the autopsy. I reserve the right to modify this opinion as necessary if and when I have the opportunity to review additional materials.

Factual Summary:

  Ms. Paula Rojeski was a 55 year old woman who underwent laparoscopic gastric banding for a diagnosis of obesity that was refractory to other forms of therapy. During the surgical procedure, a hiatal hernia was identified and repaired by means of a partial fundal plication. A LapBand was placed around the proximal portion of the stomach and secured with sutures. A liver biopsy was then obtained to evaluate preoperative suspicions of a fatty liver. After securing the placement of the gastric band, the tubing of the LapBand was brought out to the umbilical port. All laparoscopic trocars were then removed and the incisions inspected for bleeding. The LapBand tubing was then attached to a port that was secured with mesh to the

University Hospital
1500 San Pablo Street
Room 212
Los Angeles,
California  90089-9281
Tel: 323 442 9622
Fax: 323 442 9993
felix@usc.edu

umbilical port site. The incisions from the laparoscopic procedure were then inspected and sutured closed. At the conclusion of the case, the surgeon left the room leaving the patient under the care of the anesthesiologist. Around one hour after surgery had concluded, the patient became hypotensive and underwent cardiac arrest. Despite cardiopulmonary resuscitative efforts at the surgery center by the anesthesiologist and surgeon and by EMT personnel, the patient arrived at West Hills Medical Center in asystole and was pronounced dead. Pertinent autopsy findings included a 0.4 cm penetrating defect of the abdominal aorta above the level of the inferior mesenteric artery, an overlying defect of the posterior peritoneum and 1400 cc of blood and clots. Other significant findings included 80% stenosis of the right coronary artery, cardiac hypertrophy (400 gms), thyroid cancer metastatic to regional lymph nodes, and major injuries associated with resuscitation attempts, including hemorrhage into the mediastinum, bilateral lung hila, and left lung parenchyma (non-fatal). There were resuscitative trauma and injuries resulting in anterolateral fractures of the left rib 3, and right ribs 2, 3, 4, 5, 6, and 7. There were also resuscitative injuries resulting in abrasions of the midline anterior chest. In addition there was extensive post-mortem tissue and bone procurement prior to autopsy. This included removal skin and also bones from the arms and leg.

Opinion:

  Based on the records examined by me up to this date, I have formed the following opinions. The patient died from a delayed intra-abdominal hemorrhage from a puncture wound to her lower abdominal aorta. This type of injury is one of the most common complications of laparoscopic procedures that result in death and is thought to be the result of a puncture injury upon the introduction of an insufflating needle or a laparoscopic trocar. The fatal hemorrhage occurred after the abdomen was closed and resulted in the patient's cardiac arrest and eventual demise. The findings in this case indicate that the cause of Ms. Rojeski's death was accidental.

Basis of Opinion:

  The rationale for my opinion is based on the following facts. The injury to the aorta was distant to the site of the surgical procedures other than the initial insertion of the laparoscopic port. Had the injury caused immediate hemorrhage, the surgeon would not have been able to complete the procedure due to the presence of blood in the operative field. The injury must have therefore been either delayed, caused by a severe weakening of the aortic wall that remained intact for approximately an hour after surgery and then ruptured and bled, or the initial injury remained in the

retroperitoneum where the surrounding soft tissues slowed the egress of blood and the hemorrhage remained "tamponaded" in the retroperitoneum only to become intraperitoneal sometime postoperatively. Either way, the surgeon remained unaware of this complication of his procedure until after he had concluded the operation. The cause of death was, by definition, accidental as this type of injury is the most common complication of the procedure and was not evidenced until after surgery had concluded. I find that the opinions expressed by Drs. Calmes and Astarita suggesting negligence and incompetence were based on incorrect facts, misrepresent the findings in this case, and reach unsubstantiated conclusions.

Based on the information that I have to date and my education and training I hold the above opinions true to a degree of medical certainty that is more likely than not. Supporting medical literature to my opinion is listed below.

1) Sharp HT, Dodson MK, Draper ML, Watts DA, Doucette RC, Hurd WW. Complications associated with optical-access laparoscopic trocars.Obstet Gynecol. 2002 Apr;99(4):553-5.
2) Chandler JG, Corson SL, Way LW. Three spectra of laparoscopic entry access injuries. J Am Coll Surg. 2001 Apr;192(4):478-90; discussion 490-1.

Juan C. Felix, MD

228

Vol. 1!

# Three Spectra of Laparoscopic Entry Access Injuries

James G Chandler, MD, FACS, Stephen L Corson, MD, FACOG, Lawrence W Way, MD, FACS

|  |  |
|---|---|
| **BACKGROUND:** | Procedure-based surveys of laparoscopic entry access injuries show a reassuringly low incidence, varying from 5 per 10,000 to 3 per 1,000, and, consequently, can provide only limited specific injury data. The current study uses existing injury-based reporting systems to access a uniquely large number of entry injuries to define the nature and outcomes of such events. |
| **STUDY DESIGN:** | Claims arising from US and non-US entry access injuries, between 1980 and 1999, reported to the Physicians Insurers Association of America by their member and affiliate companies and entry-injury medical device reports to the US FDA, from 1995 through October 1997, were analyzed to determine operative procedures, physician specialties, entry devices, and techniques associated with specific injuries. Individual injuries were analyzed for their relative incidence and potential to cause disability and death. |
| **RESULTS:** | Five hundred ninety-four structures or organs were injured in 506 patients, resulting in 65 deaths (13%). General surgical procedures made up at least 67% of combined medical device reports and US Physicians Insurers Association of America cases, and gynecologic procedures accounted for 63% of non-US claims. Bowel and retroperitoneal vascular injuries comprised 76% of all injuries incurred in the process of establishing a primary port. Nearly 50% of both small and large bowel injuries were unrecognized for 24 hours or longer. Delayed recognition, along with age greater than 59 years and major visceral vascular injuries, were each independent significant predictors of death. |
| **CONCLUSIONS:** | No entry technique or device is absolutely safe. Avoidance of entry injuries depends on patient-specific anatomic orientation and control of entry axial force. Certain entry devices can be facilitating in controlling axial force. Overall, this large aggregate of entry access injuries shows them to be more serious and, along with other data, implies that they might be more common than reported in procedure-based studies. (J Am Coll Surg 2001;192:478–491. © 2001 by the American College of Surgeons) |

Laparoscopic entry access injuries have been surveyed in three relatively recent, retrospective studies, encompassing more than 280,000 procedures.[1-3] They report reassuringly low injury rates, varying from 5 per 10,000 to 3 per 1,000 and, as a consequence, provide only limited

**Competing Interests: Drs Chandler and Way are paid consultants to Inner-Dyne, Inc, and Drs Corson and Way are paid consultants to United States Surgical Corp, which have both become part of the Health Care Division of Tyco, Ltd. Dr Corson is also a paid consultant to Circon Corp and has royalty interests in its ACMI division's fluid monitoring device used for hysteroscopic procedures.**

Presented at the American College of Surgeons 86th Annual Clinical Congress, Chicago, IL, October 2000.

Received October 25, 2000; Revised December 28, 2000; Accepted December 28, 2000.
From the Department of Surgery, University of Colorado, Denver, CO (Chandler), the Division of Reproductive Endocrinology, Department of Obstetrics and Gynecology, Thomas Jefferson University, Philadelphia, PA (Corson), and the Department of Surgery, University of California, San Francisco, San Francisco, CA (Way).
Correspondence address: James G Chandler, MD, FACS, 3721 Mountain Laurel Pl, Boulder, CO 80304.

data about specific entry injuries. This study examines data from existing reporting systems that compile information for insurance risk management and medical device regulation. These databases are injury-based, rather than procedure-based like the foregoing, and provide access to a uniquely large number of entry injuries to define the nature and outcomes of such events. They cannot, however, provide direct information about injury incidence or relative safety of one entry technique or another because the denominator case numbers are not known, and the databases are subject to confounding reporting biases.

Two data sources were provided by the Physician Insurers Association of America (PIAA), involving US laparoscopic injuries in one instance and events reported to PIAA by its non-US affiliates in the other. PIAA is a trade association of physician- and dentist-owned professional liability insurers, with more than 60 member companies that together insure approximately 60% of all US private practice physicians. PIAA's affiliate mem-

ber cc
ble 1)
ity in
coveri
A t
vice R
istrati
impor
events
Act, p
ing of
regula
Decer
to rep
manu
injuri
the m
must
incluc
involv
ate rep
ries, d
5, or
ceived

**METI**
PIAA
withou
scribir
from
occurr
been s
Nation
(NAIC
claims

© 2001 by the American College of Surgeons
Published by Elsevier Science Inc.

ISSN 1072-7515/01/$21.00
PII S1072-7515(01)00820-1

Case 2:13-cv-02265-DDP-AGR   Document 1-4   Filed 03/29/13   Page 8 of 60   Page ID #:232

**Table 1.** Physician Insurers Association of America Non-US Affiliate Member Companies

| Company | Location |
|---|---|
| Le Sou Médical | France |
| AMMA Assurances | Belgium |
| VVAA Groep bv. | The Netherlands |
| Medical & Dental Defense Union of Scotland | United Kingdom (Glasgow) |
| The Medical Defense Union, Ltd. | United Kingdom (London) |
| The Medical Protection Society, Ltd. | United Kingdom (Leeds) |
| Australasian Medical Insurance, Ltd. | Australia (North Sydney) |
| United Medical Defense | Australia (North Sydney) |
| Professional Indemnity Insurance Co, Australia, Pty, Ltd | Australia (Carlton, Victoria) |
| Canadian Medical Protective Association | Canada |

ber companies are in Europe, Australia, and Canada (Table 1) and are typically the dominant professional liability insurers in their respective countries, collectively covering more than 400,000 healthcare providers.

A third source of data was derived from Medical Device Reports (MDRs) to the US Food and Drug Administration (FDA). FDA first required manufacturers and importers of medical devices to report certain adverse events in December 1984.[4] The Safe Medical Devices Act, passed by Congress in 1990, extended this reporting obligation to include device-user facilities, but the regulations affecting users were not fully developed until December 1995.[5] Since then, user facilities are obliged to report device-related deaths to both FDA and the manufacturer. They must report device-related serious injuries to the manufacturer, or to FDA, if the identity of the manufacturer is not known. Device-user reports must be submitted within 10 working days and are to include events that harmed employees as well as those involving patients. Manufacturers are required to evaluate reports from device users and to report serious injuries, deaths, and device malfunctions to the FDA within 5, or more commonly, 30 days, depending on the perceived risk of substantial harm occurring to others.

## METHODS

PIAA provided abstracts of laparoscopic injury claims, without patient or member company identifiers, describing 364 US claims relative to procedures performed from 1980 to 1999 and 137 non-US claims for events occurring from 1986 through early 1999. Each case had been scored for severity and outcomes in accord with the National Association of Insurance Commissioners (NAIC) severity index coding, shown in Table 2.[6] US claims were biased toward cholecystectomies because

this procedure has been a focus of both the PIAA and the US plaintiff's bar.[7,8] Preliminary assessment of the files excluded 182 abstracts describing dissection injuries or clip impingements of the biliary tract and related arteries, and 39 nonbiliary dissection injuries, 1 remote electrocautery skin burn, and 16 cases with insufficient information to assign cause or determine the nature of the injury. The remaining 141 US claims and 122 non-US claims were then examined for possible duplications. Eight claim pairs were identified, representing allegations against two insured defendants originating from a single event. These dual claims were collapsed into single abstracts, combining any indemnity payments that were involved, leaving 136 US cases and 119 non-US cases for analysis.

Abstracts of MDRs submitted to FDA from January 1995 through October 1997, redacted of personal and institutional identifiers, were obtained from two sources. The first was FDA's web site (www.fda.gov/cdrh/mdrfile) and the second was from a commercial abstracting source (FOI Services Inc, Bethesda, MD) that provided data for months not available from the web site. Because *device-related* was generally interpreted to mean a suspected malfunction that may have contrib-

**Table 2.** National Association of Insurance Commissioners (NAIC) Severity Index Code

| Code | Injury and outcomes severity |
|---|---|
| 1 | Emotional injury only |
| 2 | Insignificant injury |
| 3 | Minor temporary |
| 4 | Major temporary |
| 5 | Minor permanent |
| 6 | Significant permanent |
| 7 | Major permanent |
| 8 | Quadriplegic, brain damage, lifelong care |
| 9 | Death |

J Am Coll Surg

**Table 3.** Operative Procedures

| Procedure | MDR (n) | PIAA (n) | | Total* | |
|---|---|---|---|---|---|
| | | US | EAC | n | % |
| Cholecystectomy | 57 | 69 | 22 | 148 | 32.5 |
| Diagnostic laparoscopy | 43 | 16 | 56 | 115 | 25.3 |
| Hysterectomy | 32 | 9 | 4 | 45 | 9.9 |
| Tubal ligation | 18 | 14 | 13 | 45 | 9.9 |
| Oophorectomy | 13 | 6 | 7 | 26 | 5.7 |
| Appendectomy | 17 | 4 | 3 | 24 | 5.3 |
| Inguinal herniorrhaphy | 11 | 3 | 7 | 21 | 4.6 |
| Adhesiolysis or endometriosis ablation | 1 | 11 | 2 | 14 | 3.1 |
| Other | 8 | 4 | 5 | 17 | 3.7 |
| Total | 200* | 136 | 119 | 455 | 100.0 |

*Excludes 51 MDR cases in which the nature of the procedure was not identified.
EAC, claims from Europe, Australia, and Canada; MDR, Medical Device Reports; PIAA, Physicians Insurers Association of America.

uted to an injury or death, entry access injury MDRs were biased toward devices with a putative safety function and tended to neglect injuries caused by simple reusable trocars.

Although injuries and the devices associated with them were well described, MDR abstracts often contained minimal information about patient demographics, diagnosis, and even the specific procedure that was performed. Both databases were searched for "troca," Veress needle, and all known US trade names for entry access devices. Reports describing alleged device malfunctions without injury were deselected, leaving 265 reports of entry device-related injuries. Nine duplicate reports of the same event (including three deaths) were eliminated by examining for identical features in abstracts with dates within 30 days of each other. All information relevant to an individual event in the duplicate reports was combined, and an NAIC severity score was assigned to each case in accord with the short-term outcomes available in the abstracts.

MDR abstracts and 64 US PIAA claims for events between December 1, 1994, and September 30, 1997, were examined for potential duplication by assessing the nature of the injuries, immediacy of recognition, and clinical outcomes for all MDRs with report dates within 42 days after a US PIAA incident date. Five MDRs were identified with identical injuries, management, and outcomes described in respective PIAA claims. All had been reported 1 to 8 days after the event and were deleted, leaving 251 MDR entry access events for evaluation. Analyses were done using the Statistical Analysis System (SAS, Cary, NC). Chi-square was used to compare proportions, and covariates were modeled using linear lo-

gistic regression.[9] NAIC score distributions were analyzed using the Wilcoxon rank sum test,[10] and their relation to indemnity payments was assessed by analysis of variance based on ranks.[11]

## RESULTS

Across all three spectra, 594 structures or organs were injured in 506 patients, ranging in age from 9 to 86 years. Mean age was 41.6 years, and 86% of the patients were women. Two organs or structures were injured in 64 patients, and 3 or more structures were damaged in 11 individuals. The significantly different (p < 0.001) spectra of operative procedures among the three data sources are shown in Table 3. Cholecystectomies comprised 51% of US PIAA claims; whereas, diagnostic laparoscopies, which were more frequently performed by gynecologists, accounted for 47% of non-US claims. General surgical procedures made up at least 67% of combined MDR and US PIAA cases (US cases) and at least 44% of all cases. Gynecologic procedures of all types accounted for 63% of claims outside of the US and at least 47% of the total cases.

### Organs and structures injured

The organs and structures injured in establishing a primary access port are listed in descending order of frequency in Table 4. In accord with its ventral predominance and the total space occupied by it within the abdomen, small bowel was the most commonly injured individual organ. The most frequent injury combinations were iliac artery with iliac vein (n = 23), iliac artery with bowel (n = 9), and aorta with bowel (n = 9). Both small and large bowel punctures were significantly (p =

**Table 4. Organs and Structures Injured in Establishing Primary Entry Access**

| Organ or structure | MDR (n) | PIAA (n) | | Total | |
|---|---|---|---|---|---|
| | | US | EAC | n | % |
| Small bowel | 57 | 38 | 51 | 146 | 25.4 |
| Iliac artery | 59 | 35 | 12 | 106 | 18.4 |
| Colon | 13 | 28 | 29 | 70 | 12.2 |
| Iliac or other retroperitoneal vein | 13 | 28 | 29 | 70 | 12.2 |
| Mesenteric vessel secondary branches and tributaries | 28 | 13 | 10 | 51 | 8.9 |
| Aorta | 36 | 6 | 0 | 42 | 7.3 |
| Inferior vena cava | 30 | 5 | 2 | 37 | 6.4 |
| Abdominal wall vessels | 15 | 6 | 3 | 25 | 4.4 |
| Urinary bladder | 7 | 6 | 9 | 22 | 3.8 |
| Liver | 7 | 6 | 6 | 19 | 3.3 |
| Major visceral vessel | 7 | 4 | 2 | 13 | 2.3 |
| Stomach | 4 | 1 | 4 | 10 | 1.7 |
| Other | 4 | 2 | 3 | 9 | 1.6 |
| Total | 282 | 163 | 129 | 574 | 100.0 |

EAC, claims from Europe, Australia, and Canada; MDR, Medical Device Report; PIAA, Physicians Insurers Association of America.

was performed in the US or elsewhere. Retroperitoneal vascular injuries were significantly more likely among US cases (odds ratio 3.4, 95% confidence interval [CI] 2.0 to 5.5, p = 0.0001), and small bowel injuries were significantly more common in non-US cases (odds ratio 2.3, CI 1.5 to 3.6, p = 0.0002).

Twenty organs or structures were injured in 18 patients during secondary port placements after having established a primary visualization port. As shown in Table 5, these were not limited to abdominal wall vessels and bowel; eight, or 40%, were injuries to retroperitoneal vessels, all in US cases, and, in one instance, after having taken the precaution of using the Hasson[1,2] open incision technique for insertion of the primary port.

0.0001) more likely than other injuries to go unrecognized in 24 hours to several days, with delayed diagnosis occurring in almost half of all bowel injuries (47% for small bowel and 49% for colon). Bowel injuries accounted for 76% of injuries with 24-hour or greater delayed recognition. Retroperitoneal vascular injuries totaled 38%, and, in combination with those of the large and small bowel, accounted for three-fourths of all injuries incurred in the process of establishing a primary port.

Biliary-gastrointestinal procedures tended to have more retroperitoneal vascular injuries, and gynecologic procedures appeared to have a greater proportion of small bowel punctures, but logistic regression showed that the dominant predictor was whether the procedure

**Table 5. Organs and Structures Injured in Establishing Secondary Ports**

| Organ or structure | MDR (n) | PIAA (n) | | Total | |
|---|---|---|---|---|---|
| | | US | EAC | n | % |
| Abdominal wall vessels | 2 | 0 | 5 | 7 | 35 |
| Iliac artery | 3 | 1 | 0 | 4 | 20 |
| Aorta | 1 | 1 | 0 | 2 | 10 |
| Small bowel | 1 | 1 | 0 | 2 | 10 |
| Stomach | 2 | 0 | 0 | 2 | 10 |
| Inferior vena cava | 1 | 0 | 0 | 1 | 5 |
| Iliac or other retroperitoneal vein | 0 | 1 | 0 | 1 | 5 |
| Mesenteric vessel | 0 | 0 | 1 | 1 | 5 |
| Total | 10 | 4 | 6 | 20 | 100 |

EAC, claims from Europe, Australia, and Canada; MDR, Medical Device Report; PIAA, Physicians Insurers Association of America.

**Table 6.** Medical Device Reports Primary Entry Injury Associated Devices

| Device | n* | % |
|---|---|---|
| Shielded pyramidal | 187 (3) | 77.2 |
| Shielded blade | 21 (2) | 8.7 |
| Optical | | |
| Short-stroke knife | 6 (1) | 2.5 |
| Winged cone | 10 (2) | 4.1 |
| Veress needle | 5 | 2.1 |
| Unspecified trocar | 4 | 1.7 |
| Radially expandable sheath | 4 (4) | 1.7 |
| Open blunt (Hasson type) | 2 | 0.8 |
| Multiple-use pyramidal | 2 | 0.8 |
| Conical | 1 | 0.4 |
| Total | 242 (12) | 100.0 |

*Numbers in parentheses indicate use of 12 of 235 (5%) devices other than a Veress needle or an open blunt cannula without prior insufflation.



**Figure 1.** Device categories used in analysis.

*Labels: Shielded pyramidal, Hasson-type open blunt, Shielded blade, Short-stroke knife, Winged cone (Optical), Veress, Conical, Radial expandable*

### Injury associated devices

The classification of entry access devices other than simple pyramidal trocars is shown in Figure 1, and the devices associated with primary entry injuries are listed in Table 6 for the MDRs and for PIAA cases in Table 7. In contrast to only 2% of MDRs, 80% of PIAA claims did not identify a specific entry device, making absence of a particular device in the PIAA lists meaningless. Reusable trocars were not differentiated in the PIAA databases and were largely outside of the MDR purview. The relative frequencies of single-use devices in the MDRs reflect a combination of relative usage and involvement in entry access injuries that cannot be parsed, and no conclusion regarding the relative safety of a particular device should be inferred from the data in Table 6.

All categories of contemporary entry access devices were represented. The Veress needle[14] was implicated in only 2% of MDR primary entry injury reports, but it appeared to be associated with 18% of PIAA injuries, which is probably a more representative figure.[1,15,16] Overall, Hasson-type, open-incision, blunt cannulas

were used to obtain primary access in 18 instances, associated with small bowel injuries in 4 patients, 2 with delayed recognition and death, and retroperitoneal vascular injuries in 4 patients, with 1 death. The remaining 10 patients had colon injuries in 4 instances and abdominal-wall vessel lacerations in another 3, with 1 patient each having a liver, urinary bladder, or mesenteric vessel tributary injury. As noted in the tables, other devices were used for direct primary entry without prior insufflation 13 times, resulting in small bowel injuries in 6 patients, retroperitoneal vascular injuries in 4, colon perforations in 2, and a liver laceration in 1, with no deaths.

There were nine MDR secondary entry injury cases: five were associated with shielded pyramidal trocars, three with shielded blade devices, and one was a small bowel puncture by the radial expansion device. There were also nine PIAA secondary entry claims (three in the US and six outside the US); all were associated with unspecified trocars.

### Injury severity

The frequency distributions of NAIC injury severity codes are shown in Figure 2. No patient was coded as having just emotional injury, or at the other extreme, as

**Table 7.** Physicians Insurers Association of America Primary Entry Injury Associated Devices

| Device | US (n)* | % | Non-US (n) | % |
|---|---|---|---|---|
| Unspecified trocar | 85 | 64 | 91 | 80 |
| Veress needle | 18 | 13 | 21 | 19 |
| Open blunt (Hasson type) | 16 | 12 | — | — |
| Shielded pyramidal | 12 (1) | 9 | 1 | 1 |
| Optical with short-stroke knife | 2 | 2 | — | — |
| Total | 133 (1) | 100 | 113 | 100 |

*Numbers in parentheses indicate use of 1 of 100 (1%) devices other than a Veress needle or an open blunt cannula without prior insufflation.

Vol. 192, No. 4, April 2001     Chandler et al     Laparoscopic Entry Access Injuries     **483**

needing lifelong care. The distribution of codes 2 through 7 indicating progressive severity, short of death, varied significantly (p < 0001) among the three cohorts, reflecting the shorter MDR followup and a greater number of US PIAA claims with permanent impairment. More than half of all survivors (51% of 238 MDRs, 59% of 202 PIAA claims, and 55% overall) were scored 4, indicating temporary major impairment or disability. Only 2 MDRs were scored higher than 4, but 45, or 22% of PIAA claims of surviving patients were categorized as having varying degrees of longterm impairment.

## Mortality

Sixty-five deaths occurred. All followed primary access injuries except one, which was a secondary-entry trocar injury of the duodenum. The injury was recognized and closed at the original procedure, but the closure compromised the blood supply of the transverse colon, eventuating in death from sepsis and multiple organ failure. Mortality was significantly lower in USA cases than that reported among non-US claims (11% versus 22%, p = 0.0008), which had a greater burden of bowel injuries and a significantly greater proportion of patients with delayed diagnoses (60% versus 17% for USA patients, p<.001). Table 8 lists the factors that showed univariate significance as predictors of fatality, excepting the greater mortality observed in non-US claims as a confounding selection bias. Logistic regression showed that age greater than 59 years was the sole significant predictor in the PIAA data, where age was uniformly available. Across all three databases, excluding age, injury to a major visceral vessel, and 24-hour or greater delay in diagnosis were the significant variables. The fatal major visceral vessel injuries included two portal-vein trocar injuries, with one also involving the hepatic artery, one overlooked duodenal puncture that lacerated the gastroduodenal artery, and one injury of the superior mesenteric artery at the base of the mesentery.



**Figure 2.** Medical Device Reports (MDRs), US Physicians Insurers Association of America (PIAA), and European, Australian and Canadian (EAC) PIAA claims by National Association of Insurance Commissioners (NAIC) severity index scores.

## Indemnity payments

Table 9 shows the significant difference (p = 0.0001) in being able to bring claims to closure in the US compared with the experience with non-US claims at similar intervals after the operative event. Closed US claims tended to be more likely to involve indemnity payment than was the case for closed claims outside of the US, but the difference was not significant (p = 0.065). US payments that were made involved greater median payments than those paid for non-US claims (p = 0.016). The distribution of payments with respect to NAIC severity codes was significantly different (p = 0.033) between the two cohorts, as was the relationship of dollars paid to NAIC codes (p = 0.044). US payments were higher for progressively higher NAIC scores among surviving claimants. The mean payment for NAIC severity and outcome codes 2 to 5 was $118,000; for codes 6 and 7 ("significant" and major permanent, respectively), it was $654,000, compared with $351,000 for fatal outcomes.

**Table 8.** Factors Influencing Mortality

| Factors showing p < 0.05 univariate significance | PIAA | | | All cases | | | |
|---|---|---|---|---|---|---|---|
| | MDR | US | EAC | Mortality (%) | Odds ratio* | 95% CI* | p* |
| Deaths | 13 (5%) | 26 (19%) | 26 (22%) | 65/506 (13) | — | — | |
| Age >59 y | | 6/19 | 6/7 | 12/26 (46) | 4.7 | 1.9–13 | 0.0008 |
| Major visceral vessel | 3/5 | 0/1 | 1/3 | 4/9 (44) | 9.4 | 2.3–38 | 0.0016 |
| ≥ 24 h delay in diagnosis | 2/16 | 12/48 | 21/71 | 35/135 (26) | 3.7 | 2.1–6.5 | 0.0001 |
| Small bowel injury | 4/58 | 11/39 | 15/51 | 30/148 (20) | 1.7 | 0.9–3.1 | 0.068 |

*Logistic regression.
CI, confidence interval; EAC, Claims from Europe, Australia, and Canada; MDR, Medical Device Reports; PIAA, Physicians Insurers Association of America.

**Table 9.** Claim Outcomes (Indemnity Payments in US Dollars)

| Outcomes | US | Non-US |
|---|---|---|
| Years after event (± SD) | 5.4 ± 3.0 | 5.7 ± 2.2 |
| Open without resolution (n) | 37 (27%) | 83 (70%) |
| Closed (n) | 98 (73%) | 36 (30%) |
| With payment | 53 (54%) | 13 (36%) |
| Median payment ($) | 127,500 | 55,000 |
| Payment range ($) | 7,500 to 4,980,086 | 1,500 to 315,955 |
| Principal payment correlate | Incremental disability | Death |

In contrast, higher payments in non-US cases were linked to death and did not appear to correlate with NAIC scores among survivors.

## DISCUSSION

### Laparoscopic entry access injuries in perspective

This analysis of 594 injured organs and structures described in PIAA claims and MDRs is the largest collection of laparoscopic access injuries to be reported (Table 10). The injuries most commonly resulted in major temporary impairment, but caused variable permanent disability in 22% of patients with followup beyond several weeks and resulted in 65 deaths. Punctures of bowel and retroperitoneal vessels accounted for 75% of the injuries. Nearly half of the bowel injuries were undiagnosed for 24 hours or longer. Delayed recognition had a profound effect on the outcomes of bowel injuries because delayed diagnosis, along with age greater than 59 years, and injuries to major visceral vessels were each independent, significant predictors of fatal outcomes. Neglected bowel injuries were more likely to cause death than were more dramatic injuries to major retroperitoneal vessels (26% versus 11%, p = 0.001) and should be a major focus of preventative efforts.

The incidence of entry access injuries has generally been derived from oversight surveys of laparoscopic complications that have been performed repeatedly in the US, Europe, and Canada, beginning in the early 1970s, led primarily by gynecologists.[15,17,18] The larger, more recent surveys, devoted entirely, or in part, to entry access injuries are listed in Table 10. The incidence figures in the eight procedure-based studies require some interpretation because of variable capture rates and, in

**Table 10.** Entry Access Injuries Surveys

| Study type lead author (discipline) | Cases | | Injuries | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | n | y | Bowel | Major vessel | Smaller vessel* | Liver | Stomach | Urinary bladder | Uterus | Other | Total (% incidence) |
| Procedure-based retrospective | | | | | | | | | | | |
| Fahlenkamp (Urol)[22] | 2,407 | 1992–98 | — | — | — | — | — | — | — | — | 6 (0.25)[†] |
| Härkki-Sirén (Gyn)[1] | 102,812 | 1990–96 | 29 | 6 | 5 | 0 | 0 | 3 | 0 | 8 | 51 (0.05) |
| Hashizume (Gen)[19] | 15,422 | 1991–95 | 11 | 10 | 70 | 1 | 0 | 0 | 0 | 64[†] | 156 (1.0) |
| Hulka (Gyn)[20] | 14,911 | 1995 | 36 | 14 | 368 | 0 | 0 | 0 | 0 | 0 | 418 (2.8) |
| Champault (Gen, Gyn)[3] | 103,852 | 1988–94 | 35 | 35 | 237 | 13 | 5 | 2 | 0 | 10 | 337 (0.32)[§] |
| Deziel (Gen)[3] | 77,604 | 1989–90 | 104[‡] | 36 | 35‡ | 14 | 5 | 1 | 2 | 0 | 197 (0.25) |
| Procedure-based prospective | | | | | | | | | | | |
| Leonard (Gyn)[16] | 1,033 | 1992–98 | 2 | 1 | 6 | 0 | 0 | 3 | 1 | 4 | 17 (1.6) |
| Jansen (Gyn)[21] | 25,764 | 1994 | 21 | 9 | 38 | 0 | 3 | 3 | 0 | 9 | 83 (0.3) |
| Injury-based retrospective | | | | | | | | | | | |
| Marret (Gyn)[11] | ? | 1994–1997 | 12 | 11 | 18 | 0 | 0 | 3 | 0 | 3 | 47 (NA) |
| Yuzpe (Gyn)[15] | ? | 1985–1987 | 77 | 85[§] | | 0 | 0 | 8 | 37 | 65[‖] | 272 (NA) |
| Current (Gen, Gyn, Urol) | ? | 1989–1999 | 218 | 239 | 70 | 13 | 11 | 19 | 7 | 17 | 594 (NA) |

*Abdominal wall and unnamed mesenteric vessels.
[†]Nine wound hernias and 55 extraperitoneal insufflations.
[‡]Includes a small number of thermal and retraction injuries.
[§]Not partitioned.
[‖]20 abdominal wall and 45 unspecified injuries.
NA, not applicable.

Vol. 192, No. 4, April 2001 Chandler et al   Laparoscopic Entry Access Injuries   **485**

some instances, inclusion of unusually high proportions of abdominal-wall vessel injuries and complications that, while vexing, are not really injuries, such as wound hernias, and extraperitoneal insufflation.[3,19,20] Limiting the focus to bowel and major vascular injuries brings the studies into better alignment. Retrospective surveys indicate entry injuries to the bowel and major vessels varying by an order of magnitude from 3 per 10,000 to 3 per 1,000.[1,20] The prospective studies, with inherently better capture rates, endorse the 3 per 1,000 figure.[16,21] Entry injuries made up 6% to 57% of laparoscopic injuries, typically comprising a lesser percentage as case complexity increased.[1,16,21,22] Five studies reported no deaths among 648 entry injury cases,[1,16,19,20,22] and three studies reported 17 deaths in 617 cases of entry injury (3%), 10 attributable to vascular injuries and 7 from overlooked bowel punctures.[2,3,21]

The experience reported here contains a greater proportion of bowel and major vascular injuries: 77%, compared with a range of from 12% to 65% in the procedure-based studies ($p < 0.001$). The 13% PIAA to MDR mortality is also significantly ($p < 0.001$) higher than that noted even in the few reports in which entry-injury deaths were observed.[2,3,21] It has been previously shown that the US plaintiff's bar does not select a subset of laparoscopic injuries that differ from those reported in the medical literature, but plaintiffs' advocates everywhere are undoubtedly influenced by the regional remunerative potential of certain clinical outcomes.[7] This probably explains the greater number of protracted impairment NAIC scores in US PIAA claims and the higher incidence of fatalities among claims outside the US.

Although unable to contribute a true incidence figure, the findings suggest that considerable MDR underreporting exists because only 8% (5 of 64) of US PIAA cases were identifiable as the subjects of MDRs in the overlapping time period. Dual MDRs of deaths, in accord with reporting obligations of both the manufacturer and a device-user facility, were found for only 3 of 13 MDR fatal outcomes. In the literature, the number of operators who admit that they have personally experienced an entry access injury suggests more generalized underreporting. Yuzpe's[15] survey of Canadian gynecologists, in 1990, indicated that 25% of 407 respondents had caused at least one entry access injury. A decade later, Feste and Winkel,[13] in their report of anonymous audience electronic responses by 1,958 gynecologists at-

tending symposia unrelated to laparoscopic surgical complications, found that 46% had had experience with a bleeding trocar site. At least 4% indicated that they had injured a major vessel with a Veress needle or trocar, and at least 4% independently responded that they had punctured the large or small bowel.

## Bowel injuries and the right way to establish primary entry access

If unanimity defines the correct way to establish a primary port, there clearly is no right way. Most operators insert a Veress needle first, working through a skin and subcutaneous incision large enough to accommodate the cannula for the laparoscope. The Veress needle was designed for inducing a therapeutic pneumothorax, and, in the absence of interfering visceral-parietal adhesions, air readily entered the lower pressure thorax. The spring-loaded, hollow, blunt obturator protected the lung from subsequent laceration from its own movements and those of the needle.[14] In the abdomen, the negative pressure effect is simulated by elevating the anterior abdominal wall, usually with a towel clip placed on the fascia within the incision. At the moment of entry, as shown in Figure 3, the omentum and bowel must initially be displaced or deformed by the sharp entering tip until the obturator drops and the channel from the open stopcock can communicate with the peritoneal cavity. Bowel that is stuck directly to the anterior parietal peritoneum, particularly if it is distended, takes less force to penetrate than to be deformed or displaced by a sharp point for even a tiny distance. Such adhesions are found beneath more than 50% of surgical midline scars and are somewhat more common when the scar extends above the umbilicus, mandating primary entry at a site away from the scar.[24,25] In the 1940s, the French gynecologist Raoul Palmer advocated placing the laparoscope at a point in the left midclavicular line, 3 cm caudal to the costal margin because visceral-parietal adhesions were rarely found there, and this entry site is still favored by gynecologists when intraabdominal adhesions are likely.[25,26]

Temporary overinflation with the Veress needle to 25 mmHg to maximize the depth of the ventral, intra-peritoneal $CO_2$ bubble and to splint the abdominal wall to resist inward deformity when the first trocar is introduced has been advocated to reduce bowel and other entry injuries.[27] Dingfelder[28] urged an opposite approach, pointing out 22 years ago that $CO_2$ distention interfered with selective abdominal wall elevation. He

J Am Coll Surg



**Figure 3.** Obligate moment-of-entry viscera deformation or displacement (A), and the importance of having an open stopcock for air entry (B) to allow omentum and bowel to drop away from the elevated ventral abdominal wall.

regarded blind insertion of the needle, itself, as being fraught with complications, requiring two blind insertions, rather than one, and advocated direct trocar insertion instead. One could look and see if the cannula was free in the peritoneal cavity before introducing the pneumoperitoneum and then inflate the abdomen more rapidly and safely. Direct trocar insertion continues to have its adherents in both gynecologic and general surgery, reporting between 6 per 10,000 and 2 per 1,000 combined hollow viscera and vascular injury rates.[29,30]

The open entry technique, inserting a blunt cannula through an incision into the peritoneal cavity under direct vision was introduced by Hasson[12] in 1971. Many advocate it as the safest method of gaining laparoscopic access to the abdomen, particularly in very thin and very obese individuals, in pediatric patients, and in patients who have had previous abdominal surgical procedures.[2,13,19,31-33] In 1985, Jefferson Penfield,[14] reporting on 10,840 open laparoscopies, noted that the incidence of bowel injuries was still 6 per 10,000, and, more importantly, that 2 of the 6 bowel injuries were not recognized for several days. Our observations in this study are consistent with his findings that bowel injuries were no less common with the open technique and could still be obscure. Eighteen Hasson-type entries were associated with primary entry injuries of the small bowel in four patients, two with delayed recognition and

death, and to retroperitoneal vessels in another four patients, with one death. Although generally thought to offer safety from major vascular injuries, two aortic injuries have previously been reported with the Hasson technique.[35]

Bowel punctures can escape detection at the original operation because they may be remote from the center of interest and move about from peristalsis and from retraction. Principally, however, they are not found because they are sufficiently uncommon, and the hazard of overlooking a bowel perforation is too underappreciated to inspire routine searching for its presence. Everything that is known about these injuries argues for strict observance of entry safety measures, comprehensive inspection at the conclusion of every laparoscopic procedure, particularly when adhesions are encountered, and great sensitivity to minor abdominal complaints during the first week or two after the operation.[7,31-36]

## Anatomic orientation and retroperitoneal vascular injuries

As shown in Figure 4, a trocar, needle, or knife does not need to be far off target in the transverse plane to strike the right iliac artery and left iliac vein, but some overpenetration and considerable sagittal-plane misdirection are involved. The distance from the abdominal skin surface immediately below the umbilicus to the ventral

Vol. 192, No. 4, April 2001

Chandler et al    Laparoscopic Entry Access Injuries    487



**Figure 4.** Transverse and sagittal sections, showing the considerable sagittal plane misdirection and excessive penetration, but minimal transverse deviation involved in combined right common iliac artery-left common iliac vein injuries.

plane of the aorta over the fourth lumbar vertebra can be less than 5 cm in a thin woman, and the abdomen of a very thin individual will not accommodate a large $CO_2$ bubble. The umbilicus is at or cephalad to the aortic bifurcation in 50% of supine, nonobese women and is consistently cephalad to the midline crossover of the left common iliac vein.[37] Three-dimensional conceptualization of these spatial relationships in accord with an individual patient's body habitus is an acquired cognitive skill and a major deterrent to retroperitoneal vascular entry injuries.

Previously, the largest series of laparoscopic major vascular injuries comprised 17 patients with 21 vascular injuries.[38] Primary entry access devices were responsible for 15 retroperitoneal vascular injuries in 12 patients: 2 from a pneumoperitoneum needle and 13 from a disposable or reusable trocar introduced near the umbilicus. Our series includes 229 major vascular entry injuries in 197 patients, resulting in 25 deaths. Two hundred nineteen injuries were to major retroperitoneal vessels, resulting in 21 deaths among 188 patients (11%). Eight of these deaths were from unnoticed injuries; in four instances, they remained obscure until an autopsy was performed. Unrecognized laparoscopic major retroperitoneal vascular injuries have been reported before but are expectedly uncommon.[39-42]

The other principal deterrent to overpenetration is control of the axial force needed to drive an entry device through the fascia and peritoneum. Entry access axial force control is an acquired cognitive and motor skill, integrating anatomic conceptualization, subtle tissue-resistance clues and proprioceptive muscle control. Controlling entry axial force is easier if the force is minimal relative to the upper body strength of the operator and is said to be more frequently problematic for female surgeons.[15,41] Axial force control is degraded by positioning that requires more muscle recruitment to exert a given amount of force, by having the table too high, or reaching across the patient to put in a lateral port. The latter may have been a factor in the secondary-port retroperitoneal vascular injuries in this series.

## Axial force control and entry device designs

With due respect for the overriding importance of skill and experience, specific entry device designs play a role in axial force control, with some tradeoffs. Small diameter, surface smoothness, and a sharp point with cutting edges minimize the force needed for penetration, as exemplified by a brand new Veress needle. The needle's design even amplifies tissue-resistance perception, when the spring-loaded obturator drops, albeit a trifle late, as the heel of the sharp-edged oval aperture, proximal to the point, exits the parietal peritoneum. Scale-ups of the Veress needle's spring-loaded, sharp-to-dull conversion assure reliable sharpness, by virtue of being single-use instruments, but do not offer effective injury protection. The drop delay is substantially greater because of the scaled-up size and the fact that most of the spring-loaded shields are on the outside, rather than internal, and are retarded by friction and edge interactions with the fascia and peritoneum. Consequently, more tip point and cutting-edge length are in play before sharp-to-blunt conversion occurs. In common with the present experience, all such devices have been involved in intraabdominal and retroperitoneal vascular injuries.[2,31,38] Conical entry devices without cutting edges, on the other



**Figure 5.** Axial force control, using a blunt-edged-screw entry cannula.



**Figure 6.** Axial force neutralization converted to a radial vector by diamond-shaped, skeletal elements embedded in an expandable sheath.

hand, require more axial force for penetration but cause less tissue injury, particularly within the abdominal wall.[14]

Two entry access devices appear to offer mechanical enhancements for controlling axial force. The first of these uses the principle of Archimedes to lift the abdominal wall tissues along an inclined spiral on the cannula's external surface after engaging the most superficial layer with a blunt notched tip, as shown in Figure 5. The rotation process is monitored with a full-sized laparoscope inserted through the cannula and held so that its focus is on the cannula tip. The device is self-anchoring and the rounded edges of the spiral tend to deflect rather than lacerate vessels in the abdominal wall. Theoretically, this device should provide exquisite axial force control, but so far, published clinical experience is limited to that of its developer.[15,46]

The second device uses an expandable sheath that allows axial force to be neutralized by counter traction

on its external flange and converted to a purely radial vector by diamond-shaped skeletal elements within the substance of the sheath, as shown in Figure 6.[47-51] The expansion process involves pushing a cone-shaped dilator and rigid cannula through the sheath, while restraining forward movement of the sheath with the operator's nondominant hand. The device is self-anchoring, stretches or pushes abdominal wall vessels aside rather than cutting them, and leaves a relatively small wound when removed, because the stretched, uncut tissues contract.[52] Published clinical experience with this device encompasses almost 2,600 patients and appears to validate its enhancement of axial force control in both adult and pediatric patients.[47-50] No major vascular injuries occurred. The only intraabdominal injuries were three bare needle punctures involving the small bowel, a minor mesenteric vessel, and the liver.[48,49]

This study reports the nature and outcomes of injuries to 594 organs or structures incurred in establishing primary and secondary laparoscopic ports in 506 patients. Because half of the cases originated with patients or their families, who were provoked by the injury and care given to make a legal claim against one or more of their physicians, and the other half were device-related events thought to merit reporting to FDA, these injuries present a more severe spectrum than those described in procedure-based studies. They may also appear more serious because they comprise sufficient numbers to include uncommon events, such as overlooked retroperi-

toneal va
vascular
ondary e
the oppo
particula
thality, a
Even thou
known, t
complace
me" that
dence, wh
once by 2
many as 8

Acknowledg
drawings.

REFERENCE
1. Härkki-S
juries in I
2. Champau
laparosco
Surg Lapa
3. Deziel DJ
laparoscop
als and ar
4. Final rule,
Register 19
5. Final rule,
ing, certifi
1995;60:6.
6. Sowka MP
ton, DC: 1
1980;2:8, 5
7. Chandler J
gious cons
mishaps. J (
8. Special rep
Surgery Up
9. Hosmer DV
York: John
10. Hays WL, S
827–829.
11. Iman RL, C
regression. T
12. Hasson HM
copy. Am J O
13. Hasson HM,
parison of co
14. Sandor J, Bal
helped to cha
Surg Endosc
15. Yuzpe AA. P
laparoscopy,
vention. J Rep

Vol. 192, No. 4, April 2001

Chandler et al      Laparoscopic Entry Access Injuries      **489**

roneal vascular injuries, unrecognized bowel injuries and vascular injuries with the Hasson technique, and secondary entry injuries to the aorta and vena cava, despite the opportunity to watch them happen. The findings particularly emphasize the frequently subtle nature, lethality, and litigious attractiveness of bowel injuries.[53] Even though its denominator procedure base cannot be known, this large aggregate of entry injuries challenges complacency and the assurance that "it won't happen to me" that derives from a 3 per 1,000-procedure incidence, which appears to have been experienced at least once by 25% of 407 Canadian laparoscopists and as many as 8% of nearly 2,000 US gynecologists.[15,23]

**Acknowledgement:**   We thank Ms Molly Borman for her fine drawings.

## REFERENCES

1. Härkki-Sirén P. The incidence of entry-related laparoscopic injuries in Finland. Gynaecological Endoscopy 1999;8:335–338.
2. Champault G, Cazacu F, Taffinder N. Serious trocar accidents in laparoscopic surgery: a French survey of 103,852 operations. Surg Laparosc Endosc 1996;6:367–370.
3. Deziel DJ, Millikan KW, Economou SG, et al. Complications of laparoscopic cholecystectomy: a national survey of 4,292 hospitals and an analysis of 77,604 cases. Am J Surg 1993;165:9–14.
4. Final rule, medical device reporting (MDR) regulation. Federal Register 1984;49:36348.
5. Final rule, medical device user facility and manufacturer reporting, certification and registration requirements. Federal Register 1995;60:63597.
6. Sowka MP, ed. Malpractice claims: Final compilation. Washington, DC: National Association of Insurance Commissioners; 1980;2:8, 52–65.
7. Chandler JG, Voyles CR, Floore TL, Bartholomew LA. Litigious consequences of open and laparoscopic biliary surgical mishaps. J Gastrointest Surg 1997;1:138–145.
8. Special report on laparoscopy litigation group. Laparoscopic Surgery Update 1995;3:121–123.
9. Hosmer DW, Lemeshow S. Applied logistic regression. New York: John Wiley & Sons; 1989.
10. Hays WL. Statistics. 4th ed. New York: Harcourt Brace; 1991; 827–829.
11. Iman RL, Conover WJ. The use of the rank transformation in regression. Technometrics 1979;21:499–506.
12. Hasson HM. A modified instrument and method for laparoscopy. Am J Obstet Gynecol 1971;110:886–887.
13. Hasson HM. Open laparoscopy vs. closed laparoscopy: a comparison of complication rates. Adv Plan Parent 1978;13:41–50.
14. Sandor J, Ballagi F, Nagy A, Rákóczi I. A needle-puncture that helped to change the world of surgery. Homage to János Veres. Surg Endosc 2000;14:201–202.
15. Yuzpe AA. Pneumoperitoneum needle and trocar injuries in laparoscopy, a survey on possible contributing factors and prevention. J Reproduct Med 1990;35:485–490.
16. Leonard F, Lecuru F, Rizk E, et al. Perioperative morbidity of gynecological laparoscopy, a prospective monocenter observational study. Acta Obstet Gynecol Scand 2000;79:129–134.
17. Hulka JF, Soderstrom RM, Corson SL, Brooks PG. Complications committee of the American Association of Gynecological Laparoscopists, first annual report. J Reprod Med 1973;10:301–306.
18. Mintz M. Risks and prophylaxis in laparoscopy: a survey of 100,000 cases. J Reprod Med 1977;18:269–272.
19. Hashizume M, Sugimachi K. Study Group of Endoscopic Surgery in Kyushu, Japan. Needle and trocar injury during laparoscopic surgery in Japan. Surg Endosc 1997;11:1198–1201.
20. Hulka JF, Levy BS, Parker WH, Phillips JM. Laparoscopic-assisted vaginal hysterectomy: American Association of Gynecologic Laparoscopists' 1995 membership survey. J Am Assoc Gynecol Laparosc 1997;4:167–171.
21. Jansen FW, Kapiteyn K, Trimbos-Kemper T, et al. Complications of laparoscopy: a prospective multicentre observational study. Br J Obstet Gynaecol 1997;104:595–600.
22. Fahlenkamp D, Rassweiler J, Fornara P, et al. Complications of laparoscopic procedures in urology: experience with 2,407 procedures at 4 German centers. J Urol 1999;162:765–771.
23. Feste JR, Winkel CA. Is the standard of care what we think it is? JSLS 1999;3:331–334.
24. Brill AI, Nezhat F, Nezhat CH, Nezhat C. The incidence of adhesions after prior laparotomy: a laparoscopic appraisal. Obster Gynecol 1995;85:269–272.
25. Audebert AJM, Gomel V. Role of microlaparoscopy in the diagnosis of peritoneal and visceral adhesions and in the prevention of bowel injury associated with blind trocar insertion. Fertil Steril 2000;73:631–635.
26. Litynski GS. Raoul Palmer, World War II, and transabdominal coeli.scopy. Laparoscopy extends into gynecology. JSLS 1997; 1:289–292.
27. Phillips G, Garry R, Kumar C, Reich H. How much gas is required for initial insufflation at laparoscopy? Gynaecological Endoscopy 1999;8:369–374.
28. Dingfelder JR. Direct laparoscope trocar insertion without prior pneumoperitoneum. J Reprod Med 1978;21:45–47.
29. Woolcott R. The safety of laparoscopy performed by direct trocar insertion and carbon dioxide insufflation under vision. Aust NZ J Obstet Gynaecol 1997;37:216–219.
30. Yerdel MA, Karayalcin K, Koyuncu A, et al. Direct trocar insertion versus Veress needle insertion in laparoscopic cholecystectomy. Am J Surg 1999;177:247–249.
31. Marret H, Harchaoui Y, Chapron C, et al. Trocar injuries during laparoscopic gynaecological surgery. Report from the French Society of Gynaecological Laparoscopy. Gynaecological Endoscopy 1998;7:235–241.
32. Esposito C, Ascione G, Garipoli V, et al. Complications of pediatric laparoscopic surgery. Surg Endosc 1997;11:655–657.
33. Nuzzo G, Giuliante F, Tebala GD, et al. Routine use of open technique in laparoscopic operations. J Am Coll Surg 1997;184:58–62.
34. Penfield AJ. How to prevent complications of open laparoscopy. J Reprod Med 1985;30:660–663.
35. Hanney RM, Carmalt HL, Merrett N, Tait N. Use of the Hasson cannula producing major vascular injury at laparoscopy. Surg Endosc 1999;13:1238–1240.
36. Soderstrom RM. Bowel injury litigation after laparoscopy. J Am Assoc Gynecol Laparosc 1993;1:74–77.
37. Hurd WW, Bude RO, DeLancey JOL, Pearl ML. The relationship of the umbilicus to the aortic bifurcation: implications for laparoscopic technique. Obstet Gynecol 1992;80:48–51.

38. Chapron CM, Pierre F, Lacroix S, et al. Major vascular injuries during gynecologic laparoscopy. J Am Coll Surg 1997;185:461–465.
39. Seidman DS, Nasserbakht F, Nezhat F, et al. Delayed recognition of iliac artery injury during laparoscopic surgery. Surg Endosc 1996;1099–1101.
40. Soderstrom RM. Injuries to major blood vessels during endoscopy. J Am Assoc Gynecol Laparosc 1997;4:395–398.
41. Witz M, Lehmann JM. Major vascular injury during laparoscopy. Br J Surg 1997;84:800.
42. Leron D, Piura B, Ohana E, Mazor M. Delayed recognition of major vascular injury during laparoscopy. Eur J Obstet Gynecol Reprod Biol 1998;79:91–93.
43. Corson SL, Batzer FR, Gocial B, Maislin G. Measurement of the force necessary for laparoscopic trocar entry. J Reprod Med 1989;34:282–284.
44. Böhm B, Knigge M, Kraft M, et al. Influence of different trocar tips on abdominal wall penetration during laparoscopy. Surg Endosc 1998;12:1434–1438.
45. Ternamian AM. A trocarless, reusable, visual-access cannula for safer laparoscopy; an update. J Am Assoc Gynecol Laparosc 1998;5:197–201.
46. Ternamian AM, Deitel M. Endoscopic threaded imaging port (EndoTIP) for laparoscopy: experience with different body weights. Obes Surg 1999;9:44–47.
47. Galen DI, Jacobson A, Weckstein LN, et al. Reduction of cannula-related laparoscopic complications using a radially expanding access device. J Am Assoc Gynecol Laparosc 1999;6:79–84.
48. Feste JR, Bojahr B, Turner DJ. Randomized trial comparing a radially expandable needle system with cutting trocars. JSLS 2000;4:11–15.
49. Bhoyrul S, Payne J, Steffes B, et al. A randomized prospective study of radially expanding trocars in laparoscopic surgery. J Gastrointest Surg 2000;4:392–397.
50. Rothenberg SS, Georgeson K, Decou JM, et al. A clinical evaluation of the use of radially expandable laparoscopic access devices in the pediatric population. Pediatric Endosurgery & Innovative Techniques 2000;4:7–11.
51. Schulam PG, Hedican SP, Docimo SG. Radially dilating trocar system for open laparoscopic access. Urology 1999;54:727–729.
52. Bhoyrul S, Mori T, Way LW. Radially expanding dilatation. Surg Endosc 1996;10:775–778.
53. Kern KA. Malpractice litigation involving laparoscopic cholecystectomy, cost, cause, and consequences. Arch Surg 1997;132:392–398.

## Invited Commentary

John G Hunter, MD, FACS
Atlanta, GA

I'd like to thank the College, Drs Chandler, Corson, and Way for the opportunity to reflect upon this superb scholarly work, which states, in brief, that laparoscopic access injuries are serious injuries conferring a mortality of 13%, that 75% of those injuries finding their way into court and the FDA register are bowel and retroperitoneal vascular injuries, that unrecognized injuries are particularly lethal, and that no widely used trocar system, including open laparoscopy, has eliminated these injuries. From these data one cannot conclude that open or closed laparoscopy is safer.

In addition to framing the problem so thoroughly, this article provides relevant information on how to decrease the frequency of access injury. First, the surgeon must stay away from midline incisions, with the Veress needle (which accounted for nearly one-fifth of all injuries), and with trocars. A 5-mm incision in the left upper quadrant may be the safest access point in these cases. Second, excessive axial force is the culprit in most retroperitoneal vascular injuries and must be avoided. To these recommendations, I would add a third that should decrease the incidence of unrecognized bowel injuries: Before pulling out trocars, always visualize your primary trocar site and the bowel beneath it from a secondary puncture site.

I have several questions:

1) Why do general surgeons in the USA more frequently injure the iliac vessels than our European counterparts, and why do European gynecologists more frequently injure bowel than their North American counterparts?
2) Does rapid trocar rotation (in the vernacular—a screwing motion) lessen axial force and thereby decrease the likelihood of retroperitoneal vascular injury when a standard pyramidal or shielded knife is used?
3) If axial force is implicated in vascular injuries, and Hasson cannula placement eliminates axial force, how are surgeons injuring retroperitoneal structures with this technology?
4) Given the sensitivities of recommending a disposable device in which the authors have a financial stake, what do you consider the second most cost-effective primary access device for decreasing laparoscopic access injury?

Minimizing human error in laparoscopic surgery has long been a passion of mine. Education and training has been the familiar refrain, but a greater understanding of error in complex systems, and the lessons from the aviation industry, allow us to introduce additional ways to avoid active injury of the types discussed here: Build two types of redundancy into the system: human redundancy in the guise of an experienced assistant who is capable of criticizing and correcting dangerous access technique, and technologic redundancy that has been proved in controlled trials to correct or avoid the most usual errors of human performance.

# Complications Associated With Optical-Access Laparoscopic Trocars

Howard T. Sharp, MD, Mark K. Dodson, MD, Michael L. Draper, MD, Daren A. Watts, MD, Raymond C. Doucette, MD, and William W. Hurd, MD

**OBJECTIVE:** To investigate the number and type of serious complications associated with optical-access trocars reported by sources other than the medical literature.

**METHODS:** Optical-access trocars, first introduced in 1994, were designed to decrease the risk of injury to intra-abdominal structures by allowing the surgeon to visualize abdominal wall layers during placement. To date, very few complications with their use have been reported in the medical literature. MEDLINE, the Food and Drug Administration's Medical Device Reporting, and the Manufacturer and User Facility Device Experience databases were searched for reports of complications occurring during the use of optical-access trocars for laparoscopic access.

**RESULTS:** Only two serious complications resulting from the use of optical-access trocars (vena cava injuries) have been reported in the medical literature. However, 79 serious complications using these techniques have been cited in the Medical Device Reporting and Manufacturer and User Facility Device Experience databases since 1994. These include 37 major vascular injuries involving aorta, vena cava, or iliac vessels, 18 bowel perforations, 20 cases of significant bleeding from other sites, three liver lacerations, and one stomach perforation. Four of these complications resulted in patient deaths.

**CONCLUSION:** Optical-access trocars may be associated with significant injuries despite having the ability to visualize tissue layers during insertion.   (Obstet Gynecol 2002; 99:553–5.   © 2002 by the American College of Obstetricians and Gynecologists.)

Despite continued evolution of both laparoscopic instruments and techniques, injury to intra-abdominal structures continues to be a common, yet potentially avoidable complication of laparoscopy. Many of these injuries are related to the blind placement of the Veress needle or

sharp primary trocar into the abdomen when performing a technique referred to as "closed" laparoscopy. Although "open" laparoscopy (where the peritoneal cavity is opened before placing a blunt trocar into the abdomen) has been successful in avoiding major vessel injury, bowel injuries with this technique have not been eliminated.[1,2] In response, trocars were developed for laparoscopy, termed "optical-access trocars." These trocars were designed to decrease the risk of injury to intra-abdominal structures by allowing the surgeon to visualize abdominal wall layers during placement, and only two serious complications have been reported in the medical literature with their use.[3–5] Two "optical-access" trocar systems are available: one uses a blade that strikes the fascia and peritoneum under laparoscopic visualization (Visiport, United States Surgical, Norwalk, CT); the other system has a conical clear tip that is rotated under laparoscopic vision as it penetrates the fascia and peritoneum (Optiview, Ethicon Endo-Surgery, Cincinnati, OH).

A complication at one of our hospitals associated with an optical-access trocar demonstrated to us that the use of optical-access trocars did not always avoid injury to intra-abdominal organs. An optical-access trocar was placed in preparation for laparoscopic cholecystectomy in a 24-year-old pregnant woman at 23 weeks' gestation. During the initial port placement, the optical-access trocar penetrated the uterine fundus into the amniotic cavity. Within 1 week of this complication, the woman experienced preterm labor and underwent a vaginal delivery. Her fetus died within 1 hour of birth because of complications associated with extreme prematurity.

Because few complications while using optical-access trocars have been reported in the medical literature, we searched for alternative sources for such reports. The Food and Drug Administration (FDA) operates databases designed for the reporting of adverse outcomes associated with medical devices, called Medical Device Reporting (MDR) and Manufacturer and User Facility Device Experience (MAUDE). The following is a report

*From the Department of Obstetrics and Gynecology, University of Utah School of Medicine, Salt Lake City, Utah; Department of Obstetrics and Gynecology, University of Oklahoma School of Medicine, Oklahoma City, Oklahoma; and Department of Obstetrics and Gynecology, Wright State University School of Medicine, Dayton, Ohio.*

© 2002 by The American College of Obstetricians and Gynecologists. Published by Elsevier Science Inc.

0029-7844/02/$22.00
PII S0029-7844(02)01656-3

of the complications derived from these two databases since the introduction of optical-access trocars in 1994.

## MATERIALS AND METHODS

We reviewed the medical literature published before and after FDA approval of optical-access trocars in 1994. We searched MEDLINE from 1994 to December 2000 using PubMed (http://www.nlm.nih.gov). The following key words and subject terms were searched: "optical-access trocars," "Visiport," "Optiview," and "trocar injury." All languages and publication types were included. Bibliographies of pertinent articles and reviews were searched for additional references. Relevant textbooks and foreign-language articles were also reviewed.

When few reported complications were found using the search techniques described above, we searched MDR and MAUDE databases. These voluntary reporting systems maintained by the FDA for tracking adverse medical events can be accessed through the FDA websites http://www.fda.gov/cdrh/mdrfile.html (MDR) and http://www.fda.gov/cdrh/maude.html (MAUDE). An on-line search was performed to obtain information by using the search words "Visiport" and "Optiview."

## RESULTS

The MEDLINE search from 1966 to December 2000 revealed two small series describing the use of the Optiview trocar with a total of five minor complications in 106 cases.[3,4] In addition, we found one report of two cases of vena cava injury using the Visiport trocar in preparation for laparoscopic cholecystectomy.[5]

A review of the MDR and MAUDE databases revealed 79 additional cases involving complications associated with the use of optical-access trocars that have occurred since 1994. Of these 79 cases, 57 were reported through the MDR database and 22 were reported through MAUDE. These complications occurred when laparoscopy was performed for both general surgical and gynecologic procedures (Table 1).

Major vascular injury, defined as injury to aorta, vena cava, or the iliac vessels, was the most frequently reported major injury, occurring in 37 cases (Table 2). Six of these major vessel injuries involved simultaneous injury to bowel, and two resulted in patient deaths. Twenty cases involved injury of other vessels, and two of these resulted in death. A total of 24 cases of bowel injury occurred, including the six cases of combined major vessel/bowel injuries. The Optiview trocar was used in 26 cases, and the Visiport trocar in 53 cases.

**Table 1.** Surgical Procedures Associated With Optical-Access Trocars

| Surgical procedures | Optiview injuries | Visiport injuries |
|---|---|---|
| Cholecystectomy | 11 | 28 |
| Nissen fundoplication | 3 | 4 |
| Herniorrhaphy | 2 | 3 |
| Diagnostic laparoscopy | 1 | 3 |
| Tubal ligation | 1 | 1 |
| Laparoscopically assisted vaginal hysterectomy | 1 | 1 |
| Colon resection | 1 | 1 |
| Appendectomy | 0 | 2 |
| Adhesiolysis | 2 | 0 |
| Salpingectomy | 1 | 0 |
| Ectopic pregnancy | 0 | 1 |
| Bilateral salpingo-oophorectomy | 0 | 1 |
| Lymph node dissection | 0 | 1 |
| Unspecified | 3 | 7 |
| Total | 26 | 53 |

## DISCUSSION

The results of this study indicate that the use of optical-access trocar systems for laparoscopy is associated with a risk of injury to intra-abdominal vessels and organs despite the rarity of reports of such injuries in the medical literature. Rather than only two major complications over the last 7 years as suggested by a review of MEDLINE, at least 82 serious complications (including the case briefly presented in this paper) have occurred in the United States during this time period according to the data available in the MDR and MAUDE databases.

**Table 2.** Injury Site Associated With Optical-Access Trocars

| Injury site | Optiview | Visiport | Total |
|---|---|---|---|
| Major vessel injuries | | | |
|   Iliac vessel | 3 | 11 | 14 |
|   Vena cava | 1 | 9 | 10 |
|   Aorta | 2 | 5 | 7 |
|   Major vessel/bowel | 0 | 6* | 6 |
| Other vessel injuries | | | |
|   Mesentery | 2 | 6 | 8 |
|   Portal vein | 0 | 1† | 1 |
|   Epigastric vessel | 0 | 1 | 1 |
|   Presacral vessels | 0 | 1 | 1 |
|   Retroperitoneal bleeding | 0 | 2 | 2 |
|   Not specified | 4† | 3 | 7 |
| Laceration or perforation of other organs | | | |
|   Bowel alone | 12 | 6 | 18 |
|   Liver/stomach/pancreas | 2 | 1 | 3 |
|   Stomach | 0 | 1 | 1 |
| Total | 26 | 53 | 79 |

\* Associated with two patient deaths.
† Associated with one patient death.

Optical-Ac-

| | Visiport Injuries |
|---|---|
| | 28 |
| | 4 |
| | 3 |
| | 3 |
| | 1 |
| | 1 |
| | 1 |
| | 2 |
| | 0 |
| | 0 |
| | 1 |
| | 1 |
| | 1 |
| | 7 |
| | 53 |

of optical-
ated with a
nd organs
the medi-
mplications
review of
(including
occurred in
cording to
databases.

ess Trocars

| | ort | Total |
|---|---|---|
| | | 14 |
| | | 10 |
| | | 7 |
| | | 6 |
| | | 8 |
| | | 1 |
| | | 1 |
| | | 1 |
| | | 2 |
| | | 7 |
| | | 18 |
| | | 3 |
| | | 1 |
| | | 79 |

Unfortunately, data from these databases lack sufficient details to clearly establish a causal relationship between these injuries and use of these trocars. In addition, the relative or absolute degree of risk of these instruments is impossible to determine for two reasons. The first reason is that the number of cases performed with either of the two optical-access techniques during this time period is unknown. However, the reported rate of major vessel and bowel injury reported using a standard closed technique is approximately three in 100,000 cases and 26 in 100,000, respectively.[6] In light of the 37 major vessel injuries and 24 bowel injuries contained in the present report, a total of approximately 1,200,000 ($37 \times 100,000 \div 3$) such procedures would have had to have been performed with this technique during the reporting period for the risk to be equivalent to the standard closed technique for major vessel injury, and 92,000 ($24 \times 100,000 \div 26$) procedures respectively for bowel injury. The second reason the relative or absolute degree of risk cannot be established is that there is no way to determine if the complications have been underreported because reporting in this system is voluntary.

This type of data does not allow for an accurate comparison of injury rates between standard trocars and optical-access trocars, as the complications are reported voluntarily and the actual numerators and denominators remain unknown. Although the degree of risk or serious complication remains uncertain, it is clear that the use of optical-access trocars does not avoid serious injury to intra-abdominal structures. The actual safety of these techniques will have to be determined by large studies of their use in practice with an accurate record of the associated complications.

**REFERENCES**

1. Hasson HM, Rotman C, Rana N, Kumari NA. Open laparoscopy: 29-year experience. Obstet Gynecol 2000;96: 763–6.

2. Levy BS, Hulka JF, Peterson HB, Phillips JM. Operative laparoscopy: American Association of Gynecologic Laparoscopists, 1993 membership survey. J Am Assoc Gynecol Laparosc 1994;1:301–5.

3. Mettler L, Ibrahim M, Vihn VQ, Jonat W. Clinical experience with an optical access trocar in gynecological laparoscopy-pelviscopy. J Soc Laparoendos Surg 1997;1: 315–8.

4. Wolf JS. Laparoscopic access with a visualizing trocar. Tech Urol 1997;3:34–7.

5. Thompson JE, Bock R, Lowe DK, Moody WE. Vena cava injuries during laparoscopic cholecystectomy. Surg Laparosc Endosc 1996;6:221–3.

6. Mintz M. Risks and prophylaxis in laparoscopy: A survey of 100,000 cases. J Reprod Med 1977;18:269–72.

Address reprint requests to: Howard T. Sharp, MD, University of Utah School of Medicine, Department of Obstetrics and Gynecology, 50 North Medical Drive, Suite 2B200, Salt Lake City, UT 84132; E-mail: howard.sharp@hsc.utah.edu.

Received June 12, 2001. Received in revised form November 20, 2001. Accepted December 11, 2001.

# EXHIBIT "14"

EXHIBIT "14"

**Konrad L. Trope**

| | |
|---|---|
| **From:** | Konrad L. Trope <ktrope@centurionlawgroup.com> |
| **Sent:** | Tuesday, March 12, 2013 7:12 PM |
| **To:** | ken.maranga@marmorlaw.com |
| **Cc:** | 'catkinson@centurionlawgroup.com' |
| **Subject:** | Investigation into COD of Paula Rojeski: 7th retained expert |
| **Attachments:** | 13 03-12-13 Zarrabi Ltr to Coroner.pdf |

Dear Mr. Maranga:

As you have requested that any and all materials to be submitted to the Coroner's Office be submitted through your office, I have attached for forwarding to the Coroner's Staff investigating the cause of death of Ms. Paula Rojeski, the expert report of Dr. Mirali Zarrabi. Dr. Zarrabi has separate board certifications in the specialties of Internal Medicine, Pulmonary Diseases, and Critical Care.

As with our other six (6) retained experts, Dr. Zarrabi concludes Ms. Rojeski's death was an accident. He also, consistent with our other six (6) experts, whose reports are already on file with the Coroner's Office, concludes that the Coroner's Office committed multiple errors in the manner of which the investigation was conducted, which led to multiple errors in the scientific conclusions proffered by the Coroner's Office in its Final Report.

Please forward this report to your client as soon as possible. Thank you.

Very truly yours,

Konrad L. Trope, Esq.
**CENTURION LAW GROUP, P.C.**
9107 Wilshire Blvd., Ste. 450
Beverly Hills, CA 90210
Tel: (888) 942-9997
Fax: (888) 942-9997

### DR. MIRALI ZARRABI

I am a medical doctor licensed to practice medicine in the State of California.  I am Board Certified in Internal and Critical Care Medicine and Pulmonary Diseases.

#### A. Background.

I graduated from Freie University of Berlin, Germany in 1987, with a Medical Degree.  I completed my internship and residency at the Cabrini Medical Center-Mt. Sinai New York in 1995.  I did my fellowship for pulmonary diseases at Elemhurst Hospital at Mt. Sinai in New York which was completed in 1997.  I did a critical care fellowship at Sloan Kettering Memorial Cancer Center in New York which was completed in 1998.

I was an Assistant Professor of Medicine at Drew University Medical School and Teaching Attending for Pulmonary and Intensive Care Division from 1998 to 2003.  I am the Medical Director of Hancock Park Rehabilitation Hospital in Los Angeles since 2010.  I am the Director of Sub-acute Unit at Longwood Rehabilitation Center in Los Angeles since 2009.

I am Board Certified in Internal Medicine by the American Board of Internal Medicine since 2005.  I am Board Certified in Pulmonary Diseases by the American Board of Internal Medicine since 2007.  I am Board Certified in Critical Care Medicine since 2008 by the American Board of Internal Medicine.

I have a busy intensive care practice at Olympia Medical Center and Los Angeles Metropolitan Hospital.  I do emergency room call panels at Olympia Medical Center and Los Angeles Metropolitan Hospital where I admit the unassigned ill patients to the hospital.  I have substantial professional experience while assigned to provide emergency medical coverage in a general acute care hospital emergency department on a continuous basis since 2000.

In preparation of this report I have reviewed the County of Los Angeles Medical Examiner's Report No. 201 1-05916, and various medical records of Paula Rojeski.  I have been asked to provide my opinions regarding the cause of death, the surgical standard of care, and an evaluation of the events leading to the death of Paula Rojeski.

I am familiar with the standards of care for physicians in the area where care and treatment was rendered to Paula Rojeski.

I have not reviewed actual tissue samples, microscopic slides, or photographs.  I reserve the right to modify my report as necessary if and when I have the opportunity to review additional materials.

#### B. Events.

Paula Rojeski was a 55 year old female who underwent laparoscopic surgery for

1

placement of an adjustable gastric band to treat her longstanding obesity which was did not respond to other therapies, including multiple and extended treatments since 2001 with the use of Fen Phen. The patient has a prior history of Fen Phen related heart injury, including abnormal echocardiography showing aortic regurgitation. She also had a history of an emergency room admission on August 11, 2011, only 28 days prior to her surgery, with a malignant blood pressure of 205/150, an abnormal EKG, radiating pain from her neck and shoulders, and heart palpitations. The patient concealed all of her past cardiac injury and emergency room admission from her doctors at Valley and obtained a cardiac clearance from her own physician, thereby materially concealing her heart damage. After the procedure at Valley was completed, Ms. Rojeski suffered cardiorespiratory arrest from which she could not be resuscitated.

At autopsy, there was reported a 0.4 cm tear of the aorta near the origin of the inferior mesenteric artery and 1400cc with fluid and blood clots in the abdominal cavity. Other significant findings included 80% stenosis of the right coronary artery, cardiac hypertrophy (400gms), thyroid cancer metastatic to regional lymph nodes, and major injuries associated with resuscitation attempts, including hemorrhage into the mediastium, bilateral lung hila, and left lung parenchyma (non-fatal). There were resuscitative trauma and injuries resulting in anterolateral fractures of the left rib 3, and right ribs 2, 3, 4, 5, 6, and 7. There were also resuscitative injuries resulting in abrasions of the midline anterior chest.

In addition there was extensive post-mortem tissue and bone procurement prior to autopsy. This included removal skin and also bones from the arms and leg. There is no indication in the records that the Coroner's Office observed the harvesting or limited it in any way.

The medical records from OneLegacy indicate there were incisions made in the abdominal area for the bilateral leg bone harvesting, along with skin harvesting on the abdomen, both of which are not stated with detail in the Coroner's Report.

While the Coroner's Report indicates there was no invasion into the area of surgery, that statement is not possible to be made because of the extreme invasive nature of the procedure, which was unsupervised and involved extensive instrumentation, cutting, sawing, and prodding. Maintaining the integrity of the body so that appropriate autopsy can be done without harm or mutilation is mandatory. Since the integrity of the body was not maintained, the coroner's findings cannot be validated.

C. **Opinion:**

1. **The patient's compromised heart.**

Unknown to her doctors, the patient had a pre-surgery compromised heart. Post-anesthesia she had a sudden cardiac arrest at 10:55 a.m. To a reasonable degree of medical

certainty, the reason for the sudden cardiac arrest was the result of the stress of surgery and the anesthetic drugs which caused mild depression of the heart. The patient's prior heart injury and emergency room admission 28 days prior to surgery was a major contributing factor. The 4 mm injury to the patient's aorta identified at autopsy occurred at an unknown time during the procedure or as a result of CPR.

What is known is that the surgeon did not report intra-abdominal bleeding. There was no evidence of intra-abdominal bleeding during the surgery, and no such record of an abdominal bleed was present from the review of the records. Based on my education, training, and experience, even a small amount of bleeding would obscure the surgeon's vision. To a reasonable degree of medical certainty, completion of the surgery would not have been possible in such a circumstance, and the surgeon did not know of or detect any such bleeding.

The patient's blood loss of 1400 cc's should not have resulted in cardiac arrest or her death except for the fact that the patient had a prior hidden compromised heart. The patient had received 6 liters of fluid intra- and post-operative, which meant the 1400 cc blood loss was within acceptable limits of blood loss and would have been easily replaced with the IV fluids of over 6 liters. To a reasonable degree of medical certainty, the 1400 cc's of bleeding identified at autopsy would not have been sufficient to have caused the patient's arrest or death in the absence of the patient's prior heart condition and injuries.

Because of the patient's prior compromised heart, the resuscitation efforts failed. Based upon my training, experience, and education, and to a reasonable degree of medical certainty, the patient would have been revived and maintained for sufficient period to have received medical attention at the emergency room except for the prior concealed heart injury.

## 2. Site of the aortic injury.

The site of injury, near the takeoff of the inferior mesenteric artery (IMA), is unlikely to be caused from an iatrogenic injury by the surgeon. The instruments of the surgeon are nowhere near this part of the aorta. The OneLegacy records demonstrate the incision was made several cm left lateral to the umbilicus above the takeoff of the superior mesenteric artery. The likely place an iatrogenic injury to the aorta is above the take-off of the celiac artery, not the junction of the mesenteric artery and the aorta, and this would only occur during the retro-gastric dissection needed for placement of the band. The location of the deceased's aortic injury is not indicative of an intra-operative injury.

Trocars placed in patients can cause iatrogenic injury to the aorta. However, the trocar sites for the band are above the level of the IMA. If this injury had been from the

trocar placement, this injury would have resulted in massive blood loss that would have been noted through the laparoscope. Blood loss from trocar injuries cause immediate blood loss, and when they occur, require urgent open surgery to repair.

Whatever the source of the aortic injury, it did not cause bleeding during the operation. The only explanation is that the CPR forced the blood out of the aorta and into the peritoneal cavity. To a reasonable degree of medical certainty, the CPR caused the aortic injury near the IMA. CPR has been reported to cause aortic injuries. The CPR that the pathologist noted caused fractures to multiple ribs and hemorrhage into the mediastium, bilateral lung hila, and left lung parenchyma, provided enough force to both cause injury to the aorta, as well as force the blood out of the aorta at the time of her CPR. Because there was extensive CPR with resultant blood pressures, pulse, and circulation both at the surgical center and at the emergency room, the injury would have appeared pre-mortem and not post-mortem.

### 3. Inaccuracy of Autopsy Report opinions.

The Coroner's Report states that the surgery lasted for 11/2 hours following the cessation of anesthesia at 9:45 a.m., and makes incredulous claims that the patient felt paid and was paralyzed as she bleed to death. The medical records show the surgery commenced at 9:15 a.m. and concluded at 9:45 a.m. The Coroner's Report is incorrect and inaccurate, and this inaccuracy was shared by the pathologists who performed the autopsy. To a reasonable degree of medical certainty, this inaccuracy creates the likelihood that other observations the pathologists made are also inaccurate.

The PEA and subsequent code did not occur until around 10:55 a.m, more than one hour after the surgery stopped. No reasonable pathologist, surgeon, or anesthesiologist should have made this error regarding the matter of 1 1/2 hours. Yet, the Autopsy Report states that the surgery continued for 1 ½ hours following 9:45 a.m. The Anesthesia Consult makes the additional error of stating that blood pressure was not stable, when the record demonstrates the blood pressure was relatively stable. These conclusions are without support in the medical records. These are major errors resulting in incorrect conclusions throughout the Autopsy Report.

The incorrect observation of the timing of the documented start and end times of the surgery by the anesthesia consultant is crucial in explaining the incorrect findings in the autopsy report. The statement that the patient felt pain while surgery was performed and bled to death is calculated to falsely shock the conscience of anyone who reads the report. It should have been carefully verified prior to inclusion in the autopsy report, and the failure to do so demonstrates improper procedure, review, and supervision of the autopsy.

### 4. The anonymous letter.

The entire Coroner's Report is based on an anonymous letter which the Anesthesiology Consult makes reference to in her report and which the other consults and

Anesthesiology Consult makes reference to in her report and which the other consults and pathologists adopt. The letter makes claims regarding the oxygen tanks not being turned on, the anesthesiologist selecting the best vital signs, the anesthesia monitoring equipment malfunctioning, spilled anesthesia fluids, and inaccurate timing of the Code. The investigation into this matter is now into the 19th month, and the Coroner has verified none of these alleged facts. There is no substantiation of these allegations in the records.

It is not proper for an Autopsy Report to make reference to, let alone rely upon, unverified and speculative claims from an anonymous letter. None of the claimed events in the anonymous letter played any role in the patient's death. The Anesthesiology Consult states the anonymous letter's claims did not cause or contribute to the patient's death. It is an extreme departure from the standard of practice for an Autopsy Report to include such speculation and unverified claims from an anonymous letter, and such claims should play no part in the Coroner's Report in this matter.

### D.  Conclusion: the finding should be "accident."

Based on my training, education, and experience, and to a reasonable degree of medical certainty the manner of death is accident based on the following:

(1) The patient's prior injured heart, including heart damage from long term use of Fen Phen, was an undeniable and substantial factor in the patient's arrest and subsequent death;

(2) The patient's prior heart injury doomed all resuscitative efforts leading to her death;

(3) The surgeon did not observe bleeding into the surgical field or the peritoneal space which meant any intra-operative injury, had it existed, was an accident;

(4) The patient's aortic tear was the likely result from CPR;

(5) The patient's loss of 1400 cc's of blood was insufficient to have caused her death absent the prior compromised heart condition;

(6) There is no evidence of gross negligence or an extreme departure from the standard of care;

(7) There are no facts that would permit a finding of "homicide."

(8) The Coroner's finding that the mode of death was "undetermined" in the Autopsy Report is not supported by the facts, and this case should be classified as

"accident."

Mirali Zarrabi, M.D.

# EXHIBIT "15"

# EXHIBIT "15"



# CENTURION LAW GROUP, P.C.
9107 WILSHIRE BLVD. SUITE 450
BEVERLY HILLS, CA 90210
TEL: (888) 942-9997
FAX: (888) 942-9997

November 21, 2012

Dr. Lakshmanan Sathyavagiswaran                 Captain John Kades
Los Angeles County Coroner                      Office of the Coroner
1104 North Mission Road                         1104 North Mission Road
Los Angeles, California 90033                   Los Angeles, California 90033

Detective Dan Myers, Serial No. 25735
Los Angeles Police Department
Robbery Homicide Division,
Homicide Special Section
100 W. 1st St., 5th Floor
Mail Stop 400-1
Los Angeles, CA 90012

> Re:   Paula Marie Rojeski - Emergency Room Admission August 11, 2011
>
> Date of Death:  September 8, 2011
> Location of Death: 7300 Medical Center Dr., West Hills, California 91307
> Social Security No.: 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
> Coroner Case No. 2011-05916

Dear Dr. Sathyavagiswaran, Captain Kades and Detective Myers:

Over the past several months we have written to you on behalf of Valley Surgical Center, LLC where Ms. Paula Rojeski underwent a LapBand procedure on September 8, 2011. We now have uncovered further disturbing evidence which demonstrate that Paula Rojeski had serious heart symptoms prior to her September 8, 2011 surgery and that she concealed that information from Valley Surgical Center and her LapBand doctors. Paula Rojeski concealed her prior emergency room admission for a heart condition and an "abnormal EKG" at Mission Hospital in Mission Viejo, California, on August 11, 2011, only 28 days before her Lap Band surgery!

Our prior letters have provided you with information which was previously unknown to the Coroner's Office involving Paula Rojeski's undisclosed serious Fen Phen heart injury. We provided you with <u>conclusive</u> documentation showing the false reports made to the Coroner's Office by several individuals in an effort to obstruct justice and interfere with the Coroner's Investigation. We have demonstrated to you the fraudulent conduct by Paula Rojeski's sister, Michele Pelter, which raises serious questions about

the conduct of all of the individuals who have worked with her and given false statements to your office.

Attached as Exhibit "1" to this Letter are the subpoenaed Medical Records we received on November 19, 2012, from Mission Medical Group, 26800 Crown Valley Parkway, Mission Viejo, CA 92691, and Dr. Michael Miyamoto, who provided Ms. Rojeski with a cardiac clearance for surgery at Valley Surgical Center on September 6, 2012.

These records show that Rojeski went to Mission Hospital on August 11, 2011, at 10:00 p.m., complaining of bilateral tightness in her neck for many hours, heart palpitations, a decrease in Glomerlar Filtration Rate (eGFR) of 56 indicating kidney problems, an elevated creatine count of 1.02 showing kidney problems, and a low Anon GAP of 9 which showed possible kidney disease.  She had an absolute esinophil (ABS ESO) count of 59, which was high.  Her blood pressure was 205/100, and her pulse was tachycardic at 100.

Ms. Rojeski was evaluated in the emergency room over several hours by Dr. Kenneth Kwon.  Dr. Kwon administered an electrocardiogram (EKG) to Ms. Rojeski which he found to show <u>abnormal results</u>.  He stated in his report: "There are some flattened and inverted T waves in the lateral leads, leads V6, I and aVL.  It is an <u>abnormal EKG</u>."

Dr. Kwon's impressions were "Need to consider possible transient arrhythmia, such as PVCs [premature ventricular contractors], PACs [premature atrial contractions] or SVT [superventricular tachyarrhythmia].  Less likely would be like electrolyte abnormalities.  I doubt cardiac ischemia or acute coronary syndrome."

The fact is that none of Dr. Kwon's concerns were ever addressed.  They were never communicated to anyone at Valley Surgical Center.  Despite Ms. Rojeski going to Dr. Miyamoto on September 6, 2011, for a cardiac clearance for surgery on September 8, 2011, none of this information was ever communicated to Valley Surgical Center or any of the physicians.

Dr. Kwon instructed Ms. Rojeski to follow up with her primary care doctor regarding her heart problems within two days.  Ms. Rojeski never did so.  She concealed her heart condition, emergency heart palpitations, her emergency room admission, and her "abnormal EKG" from all of the doctors at Valley Surgical Center.

We are disturbed beyond words about this situation.  Apparently, the California Medical Board has known about this report since April 9, 2012, when Mission Medical Group sent the Board a copy of the medical records.  We believe that you are unaware of this information.

The Mission Medical Records show that Dr. Miyamoto examined Ms. Rojeski on September 6, 2011, to provide her with a cardiac clearance for her LapBand surgery

scheduled for September 8, 2011.  In that examination, Dr. Miyamoto noted her emergency room visit of August 11, 2011, only 26 days earlier.  He said she had "2 episodes of palpitations" on August 11, 2011, and that she went to the emergency room. When he asked Ms. Rojeski about her heart problem, she denied any heart injury history. Dr. Miyamoto's records say "no known heart dz."

Ms. Rojeski's statements to Dr. Miyamoto were false.  She concealed from him her Fen Phen heart injury and her lawsuit against the Wyeth Laboratories, the makers of Fen Phen, for significant heart injury.  Ms. Rojeski concealed from every physician her heart disease history.

Dr. Miyamoto provided Ms. Rojeski with a cardiac clearance for surgery at Valley Surgical Center on September 6, 2011. (Exhibit "1").  In that written clearance, Dr. Miyamoto says nothing about Ms. Rojeski's emergency room admission on August 11, 2011.  He says nothing about her abnormal EKG.  He says nothing about Dr. Kwon suspecting PVCs, PACs or SVT.  Dr. Miyamoto says nothing about an electrolyte abnormality, cardiac ischemia, or acute coronary syndrome.

This information was concealed from Valley Surgical Center and the physicians working with it.  The Coroner's Investigation should focus on these material facts and followed up on their significant implications.  The facts speak for themselves, and the undeniable fact is that Paula Rojeski engaged in a reckless hiding of her severe heart condition from Valley Surgical Center and her doctors, which if known, would have resulted in a materially different course of her medical care and treatment.

Further these facts clearly indicate that those with a commercial interest have submitted false reports initiating, misleading and obstructing the investigation into the death of Ms. Rojeski for the past 15 months resulting in great public harm and panic.  It is the duty of the Coroner's Office and LAPD to bring these criminals seeking to profit from the unfortunate death of Ms. Rojeski to justice.

My clients have been severely victimized and tarnished by this investigation. Please bring this investigation into my clients to a close and issue a statement absolving them of any wrongdoing or liability.  In any event, we again request that you please provide us a meeting to discuss the numerous findings we have provided to the Coroner's Office over the last several months.

Very truly yours,

CENTURION LAW GROUP, P.C.

Konrad L. Trope

# EXHIBIT "1"

# EXHIBIT "1"

STATE AND CONSUMER SERVICES AGENCY – *Department of Consumer Affairs*                                    EDMUND G. BROWN JR., *Governor*



**MEDICAL BOARD OF CALIFORNIA**
**ENFORCEMENT PROGRAM**
Valencia District Office
27202 Turnberry Lane, Ste 280
Valencia, CA 91355
(661) 295-3397  Fax (661) 295-3030
www.mbc.ca.gov



April 4, 2012

*Certified copy*
*mailed 4/4/2012*
*CBt*

Mission Internal Medical Group
Michael Miyamoto, M.D.
26800 Crown Valley Parkway, Ste. 120
Mission Viejo, CA 92691

Dear Custodian of Records:

The Medical Board of California is a regulatory law enforcement agency requesting medical records for confidential review.  In accordance with the enclosed Authorization for Release of Medical Information form, please forward a **certified** copy of the **complete** medical records for *Paula Marie Rojeski (DOB: 12/15/55)* to my attention at the above address by *May 4, 2012*. Please complete the Declaration of Custodian of Records and return it with the complete medical records.

Medical records include, but are not limited to: progress notes, doctors' orders, nursing notes, x-ray films and reports, CT scans, EKG tracings, fetal monitor strips, admission/discharge summaries, operative reports, progress notes, consultation reports, laboratory reports, photographs, billing records, medication logs, prescribing records, History and Physical Examination records, anesthesia reports, pathology reports, consent forms, correspondence, phone messages and any writings relevant to a patient's treatment.

**PURSUANT TO BUSINESS AND PROFESSIONS CODE SECTIONS 2225(d) and 2225.5 (referenced on the back side of this Compliance Advisory), FAILURE TO PRODUCE THE COMPLETE MEDICAL RECORDS BY *May 4, 2012* MAY RESULT IN A CITATION AND  FINE OR ASSESSMENT OF CIVIL PENALTIES OF $1,000.00 PER DAY.**

If you have any questions regarding this request, please contact me at the above number in time to ensure receipt of the complete medical records prior to the due date listed above to avoid the imposition of civil penalties.  Thank you for your cooperation in this matter.

Sincerely,

Rashya Henderson
Investigator

Enclosures:   Authorization for Release of Medical Information
              Declaration of Custodian of Records

ENF-31 (REV. 08/10) [Side 1 of 2]

DK
MM

STATE AND CONSUMER SERVICES AGENCY – *Department of Consumer Affairs*                                                    EDMUND G. BROWN JR., *Governor*



### MEDICAL BOARD OF CALIFORNIA
### ENFORCEMENT PROGRAM
Valencia District Office
27202 Turnberry Lane, Ste 280
Valencia, CA 91355
(661) 295-3397  Fax (661) 295-3030
www.mbc.ca.gov



April 4, 2012

Mission Internal Medical Group
Michael Miyamoto, M.D.
26800 Crown Valley Parkway, Ste. 120
Mission Viejo, CA 92691

*Certified Copy Mailed 4/4/2012 CBt*

Dear Custodian of Records:

The Medical Board of California is a regulatory law enforcement agency requesting medical records for confidential review.  In accordance with the enclosed Authorization for Release of Medical Information form, please forward a **certified** copy of the **complete** medical records for **Paula Marie Rojeski (DOB: 12/15/55)** to my attention at the above address by *May 4, 2012*. Please complete the Declaration of Custodian of Records and return it with the complete medical records.

Medical records include, but are not limited to: progress notes, doctors' orders, nursing notes, x-ray films and reports, CT scans, EKG tracings, fetal monitor strips, admission/discharge summaries, operative reports, progress notes, consultation reports, laboratory reports, photographs, billing records, medication logs, prescrib̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶tory and Physical Examination records, anesthe̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶pathology repo̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ phone messages and any writin̶ ̶ ̶ ̶

**PURSUANT TO BUSINESS**
(referenced on the back side o̶
**COMPLETE MEDICAL R̶**
**AND  FINE OR ASSESSME̶**

If you have any questions re̶g̶
to ensure receipt of the comp̶
imposition of civil penalties.

Sincerely,

*Rashya Henderson*
Rashya Henderson
Investigator

Enclosures:    Authorization
Declaration of Custodian of Records

ENF-31 (REV. 08/10) [Side 1 of 2]

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Medical Board of California
Enforcement Program
27202 Turnberry Lane #28̶
Valencia, CA  91355

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X *R Mendez*              ☐ Agent
                          ☐ Addressee

B. Received by ( Printed Name )    C. Date of Delivery
*R Mendez*                         4/11/15

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

3. Service Type
☑ Certified Mail      ☐ Express Mail
☐ Registered          ☐ Return Receipt for Merchandise
☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)   7009-3410-0001-8285-1777

PS Form 3811, February 2004          Domestic Return Receipt          102595-02-M-1540

---

## BUSINESS AND PROFESSIONS CODE

2225. (d) Where documents are lawfully requested from licensees in accordance with this section by the Attorney General or his or her agents or deputies, or investigators of the board or the Board of Podiatric Medicine, they shall be provided within 15 business days of receipt of the request, unless the licensee is unable to provide the documents within this time period for good cause, including, but not limited to, physical inability to access the records in the time allowed due to illness or travel. Failure to produce requested documents or copies thereof, after being informed of the required deadline, shall constitute unprofessional conduct. The board may use its authority to cite and fine a physician and surgeon for any violation of this section. This remedy is in addition to any other authority of the board to sanction a licensee for a delay in producing requested records.

2225.5. (a) (1) A licensee who fails or refuses to comply with a request for the certified medical records of a patient, that is accompanied by that patient's written authorization for release of records to the board, within 15 days of receiving the request and authorization, shall pay to the board a civil penalty of one thousand dollars ($1,000) per day for each day that the documents have not been produced after the 15th day, unless the licensee is unable to provide the documents within this time period for good cause. (2) A health care facility shall comply with a request for the certified medical records of a patient that is accompanied by that patient's written authorization for release of records to the board together with a notice citing this section and describing the penalties for failure to comply with this section. Failure to provide the authorizing patient's certified medical records to the board within 30 days of receiving the request, authorization, and notice shall subject the health care facility to a civil penalty, payable to the board, of up to one thousand dollars ($1,000) per day for each day that the documents have not been produced after the 30th day, up to ten thousand dollars ($10,000), unless the health care facility is unable to provide the documents within this time period for good cause. This paragraph shall not require health care facilities to assist the board in obtaining the patient's authorization. The board shall pay the reasonable costs of copying the certified medical records. (b) (1) A licensee who fails or refuses to comply with a court order, issued in the enforcement of a subpoena, mandating the release of records to the board shall pay to the board a civil penalty of one thousand dollars ($1,000) per day for each day that the documents have not been produced after the date by which the court order requires the documents to be produced, unless it is determined that the order is unlawful or invalid. Any statute of limitations applicable to the filing of an accusation by the board shall be tolled during the period the licensee is out of compliance with the court order and during any related appeals. (2) Any licensee who fails or refuses to comply with a court order, issued in the enforcement of a subpoena, mandating the release of records to the board is guilty of a misdemeanor punishable by a fine payable to the board not to exceed five thousand dollars ($5,000). The fine shall be added to the licensee's renewal fee if it is not paid by the next succeeding renewal date. Any statute of limitations applicable to the filing of an accusation by the board shall be tolled during the period the licensee is out of compliance with the court order and during any related appeals. (3) A health care facility that fails or refuses to comply with a court order, issued in the enforcement of a subpoena, mandating the release of patient records to the board, that is accompanied by a notice citing this section and describing the penalties for failure to comply with this section, shall pay to the board a civil penalty of up to one thousand dollars ($1,000) per day for each day that the documents have not been produced, up to ten thousand dollars ($10,000), after the date by which the court order requires the documents to be produced, unless it is determined that the order is unlawful or invalid. Any statute of limitations applicable to the filing of an accusation by the board against a licensee shall be tolled during the period the health care facility is out of compliance with the court order and during any related appeals. (4) Any health care facility that fails or refuses to comply with a court order, issued in the enforcement of a subpoena, mandating the release of records to the board is guilty of a misdemeanor punishable by a fine payable to the board not to exceed five thousand dollars ($5,000). Any statute of limitations applicable to the filing of an accusation by the board against a licensee shall be tolled during the period the health care facility is out of compliance with the court order and during any related appeals. (c) Multiple acts by a licensee in violation of subdivision (b) shall be punishable by a fine not to exceed five thousand dollars ($5,000) or by imprisonment in a county jail not exceeding six months, or by both that fine and imprisonment. Multiple acts by a health care facility in violation of subdivision (b) shall be punishable by a fine not to exceed five thousand dollars ($5,000) and shall be reported to the State Department of Health Services and shall be considered as grounds for disciplinary action with respect to licensure, including suspension or revocation of the license or certificate. (d) A failure or refusal of a licensee to comply with a court order, issued in the enforcement of a subpoena, mandating the release of records to the board constitutes unprofessional conduct and is grounds for suspension or revocation of his or her license. (e) Imposition of the civil penalties authorized by this section shall be in accordance with the Administrative Procedure Act (Chapter 5 (commencing with Section 11500) of Division 3 of Title 2 of the Government Code). (f) For purposes of this section, "certified medical records" means a copy of the patient's medical records authenticated by the licensee or health care facility, as appropriate, on a form prescribed by the board. (g) For purposes of this section, a "health care facility" means a clinic or health facility licensed or exempt from licensure pursuant to Division 2 (commencing with Section 1200) of the Health and Safety Code.

ENF-31 (REV. 08/10) |Side 2 of 2|

STATE OF CALIFORNIA – STATE AND CONSUMER SERVICES AGENCY                    ARNOLD SCHWARZENEGGER, Governor





Consumer
Affairs

# MEDICAL BOARD OF CALIFORNIA
### ENFORCEMENT PROGRAM
27202 Turnberry Lane, Suite 280
Valencia, CA. 91355
(661) 295-3397

## DECLARATION OF CUSTODIAN OF RECORDS

Patient: _____          Record No.: _____

Business Facility: _____          Phone: _____

Address: _____   City: _____   Zip: _____

---

### CERTIFICATION OF RECORDS

To the best of my knowledge, the copied documents, records and other things enclosed herewith were and are prepared and maintained in the ordinary course of business by authorized persons or personnel of this business or facility at or near the time of the acts, conditions or events described by such records. The enclosed records of the business or facility are a true copy of the following records described in the patient authorization or subpoena duces tecum (check one only):

☐     the complete records consisting of _____ pages;

☐     the complete records for the period beginning _____ and ending
                                                    (Date)

        _____ only, consisting of _____ pages;
              (Date)

☐     the complete records except that the business or facility does not have the following:

        _____

        The copied records consist of _____ pages.

---

### CERTIFICATION OF NO RECORDS

☐     A thorough search of our files carried out under my direction and control revealed that this business or facility does not have the records described in the patient authorization or the subpoena duces tecum.

---

I, the undersigned, am the duly authorized Custodian of Records of the above named business or facility. I am familiar with the mode of preparation of, and have the authority to certify, the business or facility records. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____          _____
      Print name and title                              Signature

                                        _____
                                                        Date

MBC CASE NO. _____

ENF-22 (REV. 01/04)



**MEDICAL BOARD OF CALIFORNIA**
ENFORCEMENT PROGRAM

27202 Turnberry Ln, Ste 280
Valencia, CA 91355
(661) 295-3397  Fax (661) 295-3030
www.mbc.ca.gov



## AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION

| Patient Name<br>Paula Marie Rojeski | Date of Birth<br>12/15/1955 |
|---|---|
| Medical Record Number (If applicable) | Date of Death (If applicable)<br>9/8/2011 |
| Control Number<br>05-11-218583 | Social Security No. (Optional) |

I, the undersigned hereby authorize:

Physician / Facility: Mission Internal Medical Group/Michael Miyamoto, M.D.

Address:  26800 Crown Valley Parkway, Ste. 120

City / State / Zip Code:  Mission Viejo, CA 92691

Phone Number (s):  949-364-3388

Treatment Date (s):    any and all treatment records

to disclose medical records in the course of my diagnosis and treatment to the **Medical Board of California, Enforcement Program,** a "health oversight agency."  This disclosure of records authorized herein is required for official use including investigation and possible administrative proceedings regarding any violations of the laws of the State of California.  This authorization shall remain valid for three years from the date of signature. **A copy of this authorization shall be as valid as the original.**  I understand that I have a right to receive a copy of this authorization if requested by me. I understand that I have the right to revoke this authorization by sending written notification to the Medical Board of California at the above address.  My written revocation will be effective upon receipt by the Medical Board of California but will not be effective to the extent that such persons have acted in reliance upon this Authorization.  I understand that the recipient of my information is not a health plan or health care provider and the released information may no longer be protected by federal privacy regulations.

| Patient Signature: | Date: |
|---|---|
| or Legal Representative: _Michele C. Pelter, sister_<br>Relationship | Date: _3/30/2012_ |

NOTE:  Failure by a physician, podiatrist or health care provider to provide the requested records within 15 days, or a health care facility within 30 days, of receipt of this request and authorization may constitute violations of Sections 2225 and/or 2225.5 of the Medical Practice Act and may result in further action by the Board.  This release is compliant with the requirements of HIPAA and Civil Code Section 56.11.

ENF-27A (REV. 06/09) [Page 1 of 2]

**PROGRESS NOTES**
MISSION INTERNAL MEDICAL GROUP, INC.

| date | name Rojeski, Paula |
|---|---|
| SEP 0 6 2011   NP | Consult ref by Dr. Gee |
| | cardiac clearance had stress test. |
| AGE: 55. | 55♀ |
| HT: | planned lap-band 9/8/11 |
| WT: 189 | 2 episodes of palpitations. awoke in |
| | middle of night 8/11/11 |
| BP 120/80 | → ER w/u ⊖   no prior similar sx |
| HR 76. | no known heart dz |
| see med list | running 5ks until 3 y ago |
| NKDA | then gained weight   + exercise |
| | |
| PMH: | ROS: ⊖ bleeding, F/C, sob, HA; all others ⊖ |
| HTN | |
| on Rx x 1 | Exam: VS noted   Gen- pleasant & NAD   HEENT ⊖ |
| few weeks | Neck- no bruit, Tm   Lungs - CTA Ⓑ   Cor- JVP nl |
| o/w healthy | carotid brisk RRR no ⊕ m   al S₁ S₂ ⊖ S₃ S₄ |
| Laparoscopy long ago | Abd ⊖ HSM, bruit, mass   Ext- pulses = no LE edema   DP 2+ |
| Smoke tobacco →3½ | Skin- Norm   Neuro- grossly NF |
| ⊖ EtOH | EKG- SR with NSSTTWA   no A vs. 8/11/11 |
| | |
| FH: father | → palpitation episodes; ER w/u ⊖ 8/11 |
| w/o CABG | HTN   FH CAD |
| ↓ 84 | pre-op lap-band procedure |
| | → ok for lap-band procedure |
| | with fair clearance |
| | if palpitation sx recur → rhythm monitor |

DOB: 3/29/1941 (70 yr)
Gender: Female

Comments:

3/9/2011 3:37:20 PM

| | |
|---|---|
| P/PR: | 114/138 ms |
| QRS: | 88 ms |
| QT/QTc: | 376/403 ms |
| P/QRS/T Axis: | 44/11/123 deg |
| Heart Rate: | 59 BPM |

25 mm/s    10 mm/mV    Frequency Response [0.3-35] Hz    mission internal    P/N 9-0119-0000    Version 2.5.0

264



ROJESKI, PAULA
15-DEC-1955 (55 yr)
Female    Caucasian
Room:ED7
Loc:12    Option:30

Technician: RG
Test ind:

ID:000928696

| | | |
|---|---|---|
| Vent. rate | 79 | BPM |
| PR interval | 142 | ms |
| QRS duration | 80 | ms |
| QT/QTc | 360/412 | ms |
| P-R-T axes | 41    4 | 114 |

11-AUG-2011 21:54:02

MISSION REGIONAL MEDICAL CENTER

Normal sinus rhythm
ST and T wave abnormality, consider lateral ischemia
Leftward axis
Abnormal ECG
No previous ECGs available
Confirmed by EHRLICH, MD, STEPHEN (194), editor SIANEZ, TRACY (12) on 8/12/2011 12:34:13 PM

Referred by: Kenneth Kwon

Confirmed By: STEPHEN EHRLICH, MD

25mm/s    10mm/mV    100Hz    7.1.1    12SL 239    CID: 7

EID:12 EDT: 12:34 12-AUG-2011 ORDER: 0811-0099 ACCOUNT: AV001808597

Page 1 of 1

**Mission Hospital Medical Center – Justin Ekuan MD-Laboratory Director**
**Mission Hospital Laguna Beach – Justin Ekuan MD, C. Vanley MD, E. Miyamoto N**
PATIENT: PAULA M ROJESKI
MR#: AR00928696 DOB: 12/15/1955

| TEST NAME | 08/11/11 10:10PM | REF. RANG: |
|-----------|------------------|------------|
| WBC | 10.2 | 3.7-10.5 K/uL |
| RBC | 4.67 | 3.90-5.10 M/uL |
| HGB | 13.4 | 11.0-16.0 g/dL |
| HCT | 39.2 | 34.0-45.0 % |
| MCV | 83.9 | 79.0-95.0 fL |
| MCH | 28.7 | 27.0-33.0 pg |
| MCHC | 34.2 | 32.0-35.5 g/dL |
| RDW | 13.9 | 11.7-14.4 % |
| PLT | 275 | 160-370 K/uL |
| MPV | 10.4 | 9.4-12.4 fL |
| NEUTROPHILS | 56.8 | 34.0-71.0 % |
| LYMPHOCYTES | 30.4 | 19.5-52.0 % |
| MONOCYTES | 9.4 | 4.7-12.5 % |
| EOSOPHILS | 2.8 | 0.0-5.8 % |
| BASOPHILS | 0.3 | 0.0-1.2 % |
| IG | 0.3 | 0.0-0.4 % |
| ABS NEUTS | 5.78 | 1.69-6.11 K/uL |
| ABS LYMPHS | 3.10 | 0.79-4.11 K/uL |
| ABS MONOS | 0.96 | 0.12-1.04 K/uL |
| ABS EOS | 0.29 H | 0.00-0.28 K/uL |
| ABS BASOS | 0.03 | 0.00-0.07 K/uL |
| ABS IG | 0.03 | 0.00-0.04 K/uL |

Mission Hospital Medical Center - Justin Ekuan MD-Laboratory Director
Mission Hospital Laguna Beach - Justin Ekuan MD, C. Vanley MD, E. Miyamoto M
PATIENT: PAULA M ROJESKI
MR#: AR00928696 DOB: 12/15/1955

| TEST NAME | 08/11/11 10:10PM | REF. RANGE |
|---|---|---|
| NA | 141 | 136-144 mmol/L |
| K | 3.7 | 3.6-5.1 mmol/L |
| CL | 111 | 101-111 mmol/L |
| CO2 | 25 | 22-32 mmol/L |
| ANION GAP | 9 L | 10-20 mmol/L |
| GLU | 130 H | 65-105 mg/dL |
| BUN | 14 | 7-17 mg/dL |
| CREAT | 1.02 H | 0.44-1.00 mg/dL |
| eGFR | 56 L(1) | >60 |
| CA | 9.8 | 8.9-10.3 mg/dL |
| MG | 2.0 | 1.8-2.5 mg/dL |

COMMENTS:
(1)  eGFR has not been validated for ages >70.
If African American, multiply by 1.21

eGFR <60 mL/min/1.73m2   Suggests Chronic Kidney Disease
                         if persisting longer than 3 months.
eGFR <25 mL/min/1.73m2   Suggests kidney failure.

----------------CKD Staging (NKF Guidelines)---------------
Stage        Description                      eGFR
1            Kidney damage w/norm or incr GFR  >=90
2            Kidney damage w/mildly incr GFR   60-89
3            Moderately decr GFR               30-59
4            Severely decr GFR                 15-29
5            Kidney failure (or dialysis)       <15

MISSION HOSPITAL (949) 364-1400
CHOC CHILDREN'S AT MISSION HOSPITAL (949) 347-8400
27700 Medical Center Road • Mission Viejo, CA 92691-9965
MISSION HOSPITAL LAGUNA BEACH (949) 499-1311
31872 Coast Highway • Laguna Beach, CA 92651
A Ministry of the Sisters of St. Joseph of Orange

PATIENT: PAULA M ROJESKI
MR#: AR00928696 DOB: 12/15/1955

------------------------------------------------------------------------

| | |
|---|---|
| DOCUMENT TYPE:     Radiology | DICTATED BY:     Sorenson, Steven |
| SENDING APP:       MEDITECH | |
| FACILITY:          Mission Hospital | Observation Date: 08/11/2011 10:28 PM |
| ACCOUNT NUMBER:    AV0018085697 | SIGNED BY: |
| EXTERN DOC NUMBER: ISRAD20110812-0265 | STATUS:          Signed |

------------------------------------------------------------------------


RADIOLOGY


Report Status:  Signed


PATIENT:  ROJESKI,PAULA M
UNIT NUMBER:  AR00928696
ACCOUNT NUMBER:  AV0018085697
ORDERING PHY:  Kwon, Kenneth MD
ATTENDING PHY:
STATUS/LOC:   DEP ER/ER
ORDER NO:  0811-0289
REPORT NO:  0812-0265



EXAM:  RAD Chest CXR Portable AP
_____



DATE OF DICTATION:    08/11/2011
TIME OF DICTATION:    2228 HOURS


HISTORY:       Chest pain.


FINDINGS:
Comparison:       None


Normal heart size and pulmonary vascularity.  Clear lungs.  Negative for
infiltrate or effusion.  Normal hilar-mediastinal contours.  Skeletal
structures within normal limits for age.


IMPRESSION:
NEGATIVE CHEST.

MISSION HOSPITAL (949) 364-1400
CHOC CHILDREN'S AT MISSION HOSPITAL (949) 347-8400
27700 Medical Center Road • Mission Viejo, CA 92691-9965
MISSION HOSPITAL LAGUNA BEACH (949) 499-1311
31872 Coast Highway • Laguna Beach, CA 92651
A Ministry of the Sisters of St. Joseph of Orange

PATIENT: PAULA M ROJESKI
MR#: AR00928696 DOB: 12/15/1955

<<Signature on File>>
_____

Reported By: Sorenson, Steven MD
Signed By:  Sorenson,Steven MD


Technologist:  BERKOWITZ,GREG
Dictated Date (Time):  08/11/11 (2228)
Signed Date (Time):  08/12/11 (1411)
Transcribed Date (Time): 08/12/11 (1100)
Transcribed By:  DEWILSON

MISSION HOSPITAL (949) 364-1400
CHOC CHILDREN'S AT MISSION HOSPITAL (949) 347-8400
27700 Medical Center Road • Mission Viejo, CA 92691-9965
MISSION HOSPITAL LAGUNA BEACH (949) 499-1311
31872 Coast Highway • Laguna Beach, CA 92651
A Ministry of the Sisters of St. Joseph of Orange

PATIENT: PAULA M ROJESKI
MR#: AR00928696 DOB: 12/15/1955

---

| | | |
|---|---|---|
| DOCUMENT TYPE: | Transcribed Report | DICTATED BY: | Kwon, Kenneth T. |
| SENDING APP: | MEDITECH | | |
| FACILITY: | Mission Hospital | Observation Date: 08/11/2011 10:55 PM |
| ACCOUNT NUMBER: | AV0018085697 | SIGNED BY: | |
| EXTERN DOC NUMBER: MR20110812-0245 | STATUS: | Signed |

---

MISSION HOSPITAL (949) 364-1400
CHOC CHILDREN'S AT MISSION HOSPITAL (949) 347-8400
27700 Medical Center Road, Mission Viejo, CA 92691-9965
MISSION HOSPITAL LAGUNA BEACH (949) 499-1311
31872 Coast Highway, Laguna Beach, CA 92651
A Ministry of the Sisters of St. Joseph of Orange

PATIENT:    ROJESKI, PAULA M     UNIT#:  AR00928696
            ACCOUNT#: AV0018085697
DICT DR:    Kwon,Kenneth MD      AGE/SEX:  55/Female
SUPV DR:           DOB:  12/15/1955

PT LOC:  ER

---

H    P - EMERGENCY DEPARTMENT

JOB ID: 893980
PATIENT NAME: ROJESKI, PAULA M
PT ED LOCATION:  Mission Hospital

DATE OF SERVICE:  08/11/2011

TIME SEEN: 2200 hours

CHIEF COMPLAINT: Palpitations.

HISTORY OF PRESENT ILLNESS: This is a 55-year-old female who drove herself
here to the emergency department.  About 30 minutes prior to arrival, she was
apparently getting ready for bed when she developed palpitations. She felt
like her heart was racing. This lasted for about 10 minutes. She denies any

MISSION HOSPITAL (949) 364-1400
CHOC CHILDREN'S AT MISSION HOSPITAL (949) 347-8400
27700 Medical Center Road • Mission Viejo, CA 92691-9965
MISSION HOSPITAL LAGUNA BEACH (949) 499-1311
31872 Coast Highway • Laguna Beach, CA 92651
A Ministry of the Sisters of St. Joseph of Orange

PATIENT: PAULA M ROJESKI
MR#: AR00928696 DOB: 12/15/1955

associated chest pain, shortness of breath, nausea, vomiting, diaphoresis, lightheadedness or syncope. She says it resolved after about 10 or 15 minutes. Her only other complaint is she says she has had some tightness in her bilateral neck for the last several hours, which she felt was related to muscle pain. She is not on any caffeinated products. She has had no prior history of similar palpitations.

The patient denies any recent fevers, nausea, vomiting, diarrhea, abdominal pain, or urinary symptoms.

PAST MEDICAL HISTORY: Hypertension.

PRIMARY CARE DOCTOR: Dr. Karapetian.

PAST SURGICAL HISTORY: Hysterectomy.

CURRENT MEDICATIONS: Zestoretic.

ALLERGIES: None.

SOCIAL HISTORY: No smoking or alcohol use.

FAMILY HISTORY: Noncontributory.

REVIEW OF SYSTEMS: As stated as in HPI, otherwise all other review of systems is negative.

PHYSICAL EXAMINATION:

VITAL SIGNS: Blood pressure is 205/100, which is somewhat elevated, temperature 98.7, pulse rate 100, respirations 18, O2 saturation 98% on room air, which is normal. Repeat blood pressure without any intervention is 143/77.

GENERAL: The patient is alert, cooperative, in no apparent distress or discomfort.

HEENT: Normocephalic without trauma. Pupils equally round and reactive to

MISSION HOSPITAL (949) 364-1400
CHOC CHILDREN'S AT MISSION HOSPITAL (949) 347-8400
27700 Medical Center Road • Mission Viejo, CA 92691-9965
MISSION HOSPITAL LAGUNA BEACH (949) 499-1311
31872 Coast Highway • Laguna Beach, CA 92651
A Ministry of the Sisters of St. Joseph of Orange

PATIENT: PAULA M ROJESKI
MR#: AR00928696 DOB: 12/15/1955

light. Oropharynx clear without lesions. Mucous membranes moist.

NECK:  Supple. Without lymphadenopathy or meningismus.

RESPIRATORY:  Lungs clear to auscultation without rales or wheezes.

CARDIOVASCULAR: Heart - Regular rate and rhythm with no appreciable murmurs, rubs or gallops.

ABDOMEN:  Soft, nontender and nondistended with normoactive bowel sounds and without masses.

EXTREMITIES:  No peripheral clubbing, cyanosis or edema.

NEUROLOGIC:  Appropriately alert and oriented. Cranial nerves are grossly intact. Motor Strength is 5 over 5 in all extremities. Sensation is intact to light touch.

SKIN:  No rashes or lesions noted.

INITIAL IMPRESSION AND MEDICAL DECISION MAKING:

Patient with palpitations, which has self resolved. Need to consider possible transient arrhythmia, such as PVCs, PACs or SVT. Less likely would be like electrolyte abnormalities.  I doubt cardiac ischemia or acute coronary syndrome.

DIAGNOSTIC DATA:

EKG has normal sinus rhythm, rate of 79, intervals are normal. There are some flattened and inverted T waves in the lateral leads, leads V6, I and aVL. It is an abnormal EKG. There is no prior EKG for comparison at this time. Chest x-ray is negative. Blood tests show CBC which is normal. Electrolytes are only notable for elevated nonfasting glucose of 130. Cardiac panel is pending as is TSH. Coagulation studies are normal.

EMERGENCY DEPARTMENT COURSE:

MISSION HOSPITAL (949) 364-1400
CHOC CHILDREN'S AT MISSION HOSPITAL (949) 347-8400
27700 Medical Center Road • Mission Viejo, CA 92691-9965
MISSION HOSPITAL LAGUNA BEACH (949) 499-1311
31872 Coast Highway • Laguna Beach, CA 92651
A Ministry of the Sisters of St. Joseph of Orange

PATIENT: PAULA M ROJESKI
MR#: AR00928696 DOB: 12/15/1955

The patient was seen in ED bed 7.  She had an IV placed and blood drawn. She
was placed on a cardiac monitor. Rhythm strip showed normal sinus rhythm
without ectopy. She was watched in the ED for over an hour with no ectopy
noted.

Diagnostic tests to date have returned unremarkable. I am currently awaiting
the results of her TSH and the rest of her cardiac panel. Assuming that is
unremarkable, I do feel it is safe to discharge the patient home. She will
follow up with her primary care doctor, Dr. Karapetian, within the next two
days or return sooner if there is any worsening palpitations or any other
concerning symptoms.

CONDITION ON DISCHARGE: Good.

CLINICAL IMPRESSION:

Palpitations, resolved.

*
<Electronically signed by Kenneth Kwon MD>
08/13/11 1025
_____

Kenneth Kwon MD

Transcriptionist:  BCHAPLIN

CC:

**MISSION INTERNAL MEDICAL GROUP, INC.**
26800 CROWN VALLEY PKWY., #120
MISSION VIEJO, CA  92691

### MEDICATION FLOW SHEET

NAME _Rojeski, Paula_____ MR# _____

ALLERGIES _NKDA._____ Ph (714) 366-3763.

### DATE REVIEWED

| MEDICATION | 8-6-11 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Lisinopril | HOT 2 10/13 QD. | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| MEDICAL ASST. INITIALS | MP. | | | | | | | | |

DC – Discontinued         S – Stopped by patient

DMG195

274

# MISSION INTERNAL MEDICAL GROUP
## HEALTH QUESTIONNAIRE

NAME _Paula Rojeski_     AGE _55_     DATE _9/6/11_

## HISTORY OF PAST ILLNESS/INJURIES (HAVE YOU HAD?):

MEDICAL RECORD # _____

| | YES | NO | UNSURE |
|---|---|---|---|
| MEASLES | ☒ | ☐ | ☐ |
| MUMPS | ☒ | ☐ | ☐ |
| CHICKEN POX | ☒ | ☐ | ☐ |
| DIABETES | ☐ | ☒ | ☐ |
| STROKES | ☐ | ☒ | ☐ |
| CANCER | ☐ | ☒ | ☐ |
| RHEUMATIC FEVER OR HEART DISEASE | ☐ | ☒ | ☐ |
| TUBERCULOSIS | ☐ | ☒ | ☐ |
| SEXUALLY TRANSMITTED DISEASE | ☐ | ☒ | ☐ |
| CONGENITAL ABNORMALITIES | ☐ | ☒ | ☐ |
| OTHER SERIOUS DISEASES | ☐ | ☒ | ☐ |

LIST _____

| | YES | NO |
|---|---|---|
| HAVE YOU EVER BEEN HOSPITALIZED OR BEEN UNDER MEDICAL CARE FOR VERY LONG? | ☐ | ☐ |
| IF YES, FOR WHAT REASON? ____ | | |
| HAVE YOU HAD ANY HEAD INJURIES? | | ☐ |
| HAVE YOU EVER BEEN KNOCKED UNCONSCIOUS? | ☐ | ☐ |

**OPERATIONS:**

| | YES | NO |
|---|---|---|
| HAVE YOU HAD ANY SURGERY? | | ☐ |

PLEASE DESCRIBE _____

| FAMILY HISTORY | IF LIVING: AGE | IF LIVING: HEALTH | IF DECEASED: AGE | IF DECEASED: CAUSE |
|---|---|---|---|---|
| FATHER | | | 84 | Heart Failure |
| MOTHER | | | 81 | Lung Cancer |
| BROTHER / SISTER | 57 | Good | | |
| | | | | |
| HUSBAND / WIFE | | | | |
| SON / DAUGHTER | | | | |

| HAS ANY BLOOD RELATIVE EVER HAD? | YES | NO |
|---|---|---|
| CANCER | ✓ | |
| TUBERCULOSIS | | ✓ |
| DIABETES | | ✓ |
| HEART TROUBLE | ✓ | |
| HIGH BLOOD PRESSURE | ✓ | |
| STROKE | | ✓ |
| CONVULSIONS | | ✓ |
| SUICIDE OR SEVERE DEPRESSION | | ✓ |
| MENTAL ILLNESS | | ✓ |
| BLEEDING TENDENCY | | ✓ |
| GOUT OR OTHER ARTHRITIS | | ✓ |
| ALCOHOL OR DRUG PROBLEMS | | ✓ |

## SOCIAL HISTORY:   ☒ SINGLE   ☐ MARRIED   ☐ SEPARATED   ☐ DIVORCED   ☐ WIDOWED

| | YES | NO |
|---|---|---|
| DO YOU LIVE ALONE? | ☐ | ☒ |
| DO YOU HAVE DEPENDENTS AT HOME? | ☐ | ☒ |
| DO YOU EXERCISE REGULARLY? | ☒ | ☐ |
| DO YOU SMOKE? | ☐ | ☒ |
| HOW MUCH? | | |
| HAVE YOU *EVER* SMOKED? | ☐ | ☒ |
| HAVE YOU EVER FELT YOU SHOULD CUT DOWN ON YOUR DRINKING? | ☐ | ☒ |

| | YES | NO |
|---|---|---|
| HAVE PEOPLE EVER ANNOYED YOU BY CRITICIZING YOUR DRINKING? | ☐ | ☒ |

ARE YOU CURRENTLY EMPLOYED?
☒ FULL TIME   ☐ PART TIME   ☐ NOT EMPLOYED

WHAT IS YOUR JOB? _Buyer_

YEARS OF EDUCATION COMPLETED:? _17_

HOW MUCH *WORK TIME* HAVE YOU LOST DUE TO YOUR HEALTH?
PAST SIX MONTHS: _0_
PAST ONE YEAR: _0_
PAST FIVE YEARS: _0_

## SYSTEMIC REVIEW   (DO YOU CURRENTLY HAVE ANY OF THE FOLLOWING?):

| GENERAL | YES | NO |
|---|---|---|
| RECENT WEIGHT CHANGE? | ☒ | ☐ |

| SKIN: | YES | NO |
|---|---|---|
| JAUNDICE? | ☐ | ☒ |
| HIVES, ECZEMA OR RASH? | ☐ | ☒ |
| FREQUENT INFECTION OR BOILS? | ☐ | ☒ |
| ABNORMAL PIGMENTATION? | ☐ | ☒ |

| HEAD-EYES-EARS-NOSE-THROAT: | YES | NO |
|---|---|---|
| EYE DISEASE OR INJURY? | ☐ | ☒ |
| DO YOU WEAR GLASSES/CONTACTS? | ☒ | ☐ |
| DOUBLE VISION? | ☐ | ☒ |
| HEADACHES? | ☐ | ☒ |
| GLAUCOMA? | ☐ | ☒ |

| HEAD-EYES-NOSE-THROAT:(cont'd) | YES | NO |
|---|---|---|
| SNEEZING OR RUNNY NOSE | ☐ | ☒ |
| NOSE BLEEDS | ☐ | ☒ |
| CHRONIC SINUS TROUBLE | ☐ | ☒ |
| EAR DISEASE | ☐ | ☒ |
| IMPAIRED HEARING | ☐ | ☒ |
| ITCHING EYES OR NOSE | ☐ | ☒ |
| TRANSIENT EPISODES OF UNCONSCIOUSNESS | ☐ | ☒ |
| DIZZINESS | ☐ | ☒ |

| NECK: | YES | NO |
|---|---|---|
| STIFFNESS | ☐ | ☒ |
| THYROID TROUBLE | ☐ | ☒ |
| ENLARGED GLANDS | ☐ | ☒ |

(OVER PLEASE)

IMG01B

# EXHIBIT "16"

# EXHIBIT "16"



**CENTURION LAW GROUP, P.C.**
9107 WILSHIRE BLVD. SUITE 450
BEVERLY HILLS, CA 90210
TEL: (888) 942-9997
FAX: (888) 942-9997

December 6, 2012

Dr. Lakshmanan Sathyavagiswaran             Captain John Kades
Los Angeles County Coroner                  Office of the Coroner
1104 North Mission Road                     1104 North Mission Road
Los Angeles, California 90033               Los Angeles, California 90033

Detective Dan Myers, Serial No. 25735
Los Angeles Police Department
Robbery Homicide Division,
Homicide Special Section
100 W. 1st St., 5th Floor
Mail Stop 400-1
Los Angeles, CA 90012

      Re:    Paula Marie Rojeski
              Date of Death:  September 8, 2011
              Location of Death: 7300 Medical Center Dr., West Hills, California 91307
              Social Security No.: 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
              Coroner Case No. 2011-05916

Dear Dr. Sathyavagiswaran, Captain Kades and Detective Myers:

      Once again, our investigation has discovered significant evidence showing that Paula Rojeski may have been the cause of her own death on September 8, 2011.

      The attached documents subpoenaed from Dr. Robert Skversky and received on December 4, 2012, Exhibit 1, show that Ms. Paula Rojeski *knowingly* used Phentermine / Adipex long term <u>AFTER her Phen Fen heart injury,</u> recklessly endangering her life.   In fact, she went back to the same doctor she previously sued for more of the same type of drugs that had seriously injured her heart years earlier. The following will describe her self-destructive conduct:

    1. Phentermine should be used for the initiation of weight loss and is not intended for long term use.  However, the "Statement of Account" from Dr. Skversky, Exhibit 2, indicates Rojeski was provided 450 Phentermine / Adipex pills during 2009 -2010!  The package insert for Phentermine states:

        **"INDICATIONS AND USAGE"**

1

Dr. Lakshmanan Sathyavagiswaren
Captain John Kades
Detective Dan Myers
December 6, 2012
Page 2 of 5

**"Phentermine hydrochloride is indicated as a short-term (a few weeks) adjunct in a regimen of weight reduction"**

There was no indication for 450 pills. Rojeski was well aware of her heart injury secondary to the use of Phen Fen as she was a named plaintiff in the Phen Fen class action lawsuit claiming heart injury. Dr. Skversky was also aware of this as Rojeski had actually sued *him* in connection with the heart injury! Rojeski's use of Phentermine in excess of a year, knowing it was very dangerous for her, given her serious medication induced heart injury in the past, is reckless self-endangerment.

2. Phentermine package insert, Exhibit 3, states in bold type:

**"WARNINGS"**

**"Valvular Heart Disease: Serious regurgitant cardiac valvular disease, primarily affecting the mitral, aortic and/or tricuspid valves, has been reported in otherwise healthy persons who had taken a combination of phentermine with fenfluramine or dexfenfluramine for weight loss. The etiology of these valvulopathies has not been established and their course in individuals after the drugs are stopped is not known. The possibility of an association between valvular heart disease and the use of phentermine alone cannot be ruled out; there have been rare cases of valvular heart disease in patients who reportedly have taken phentermine alone."**

It defies logic why the lead plaintiff in the Phen Fen class action case with valvular heart injury secondary to Phen Fen would take Phentermine / Adipex given its same exact risk. Further, the Adipex package insert states:

**"The limited usefulness of agents of this class (see CLINICAL PHARMACOLOGY) should be measured against possible risk factors inherent in their use"**

Obviously, Rojeski was educated about the risks of this class of medications as she filed a lawsuit and obtained significant compensation for her heart injury attributable to Phen Fen. She knew that she had valvular heart injury and was predisposed to developing valvular heart injury; thus, her use of Phentermine was a knowing act of conscious and reckless disregard for her life.

3. Phentermine package insert, Exhibit 3, also states in bold type:

**"WARNINGS"**

2

Dr. Lakshmanan Sathyavagiswaren
Captain John Kades
Detective Dan Myers
December 6, 2012
Page 3 of 5

"**Phentermine hydrochloride tablets are indicated only as short-term monotherapy for the management of exogenous obesity. The safety and efficacy of combination therapy with phentermine and any other drug products for weight loss, including selective serotonin reuptake inhibitors (e.g., fluoxetine, sertraline, fluvoxamine, paroxetine), have not been established. Therefore, coadministration of these drug products for weight loss is not recommended.**"

Yet Rojeski used Lexapro and Celexa in combination with phentermine. Exhibits 4 and 5. Both Lexapro and Celexa are selective serotonin reuptake inhibitors which are specifically contraindicated with the use of phentermine due to safety issues; thus Rojeski used this unapproved combination of medications, again, in reckless disregard of her life.

4. Given the above, for Paula Rojeski to have gone back to Skversky in 2009 and 2010, was little short of psychotic. Her conduct demonstrates the irrational behavior of a desperate person who sought to lose weight at any cost with wanton disregard for her health and life. In fact, Rojeski signed the consent for Dr. Skversky, Exhibit 6, acknowledging that her treatment she was receiving was not in line with the drug labeling indications and could be "fatal":

"**RISKS OF PROPOSED TREATMENT**"

**I understand this authorization is given with the knowledge that the use of appetite suppressants for more than 12 weeks and in higher doses than the dose indicated in the labeling involves some risks and hazards. The more common include: nervousness, sleeplessness, headaches, dry mouth, weakness, tiredness, psychological problems, medication allergies, high blood pressure, rapid heart beat and heart irregularities. These and other risks could, on occasion, be serious or fatal.**

5. Showing further irresponsible disregard for her life, Rojeski concealed the use of Phentermine / Adipex in her patient information package that she filled on May 20, 2011 when she was evaluated for the LapBand procedure. Exhibit 7. In the September 7, 2012 letter we sent you, we detailed over 10 separate instances where Paula Rojeski concealed her Phen Fen injury. We are astounded that she not only concealed the Phen Fen heart injury but also the material and significant recent long term use of Phentermine / Adipex in addition to Celexa and Lexapro prescribed by the very same doctor she sued in her Phen Fen lawsuit!

6. Paula Rojeski was placed on antihypertensive medications prior to her LapBand surgery. Given the large quantities of Phentermine / Adipex

3

279

Dr. Lakshmanan Sathyavagiswaren
Captain John Kades
Detective Dan Myers
December 6, 2012
Page 4 of 5

provided by Dr. Skversky and Rojeski's active concealment of this, with 450 documented pills at her disposal, it is very likely she was continuing to take Phentermine close to the time of her death on September 8, 2011. Continued use of Phentermine would also explain her admission to the Emergency Room on August 11, 2011 for chest pain, heart palpitations, abnormal EKG and high blood pressure which she again actively concealed from her treating physicians working with Valley Surgical Center. Her concealment of the ER admission from the doctors working with Valley Surgical Center was detailed in our letter to you dated November 21, 2012.

The details in the letters we have provided you on September 7, 2012, October 3, 2012, October 8, 2012, October 25, 2012, November 6, 2012, November 13, 2012, November 16, 2012 and November 21, 2012 show that my clients are in no way responsible for the death of Ms. Rojeski. Instead, Ms. Rojeski's failure to be honest about her medical history and pattern of abusing weight loss drugs, even drugs that had seriously injured her in the past, inevitably led to her own unfortunate demise.

Our letters to you have also conclusively shown with undisputed evidence that the government's investigation has been subverted by those with a commercial interest. These individuals have actively initiated, misled and obstructed the investigation of this case resulting in great public harm and injustice. Again we request that you pursue those responsible who have interfered with this investigation and/or provided false statements to the government.

Ms. Rojeski's sister, Michele Pelter, and her attorneys knew all about Dr. Skversky's treatment before we became aware of it. Included in Exhibit 8 is the authorization for the release of Dr. Skversky's records signed by Pelter on September 10, 2012. We were not aware Dr. Skversky had treated Ms. Rojeski until September 4, 2012, and we never told Pelter or her attorneys about this discovery until weeks later. We did not obtain Skversky's records until December 4, 2012.

Since they already had Rojeski's medical records, Pelter and her attorneys were fully aware of Rojeski's concealment of her Phen Fen heart injury and her reckless use of Phentermine even after she developed the heart injury. Yet Pelter continues her lawsuit against Valley Surgical Center anyway!

Further, Pelter and her attorneys, while clearly knowing of your continuing investigation into the death of Paula Rojeski, are obstructing justice for personal gain. We are confident that they have not disclosed to you the material information we have brought to your attention here. Ms. Pelter, like many plaintiffs, chose to bring her lawsuit against the potential defendant with the deepest pockets, not the one who is most likely responsible for her loss. As you know, two independent certified handwriting experts have declared under the penalty of perjury that the signature on Rojeski's Trust with Pelter as the beneficiary appears to have been forged. Pelter has cashed checks in excess

4

Dr. Lakshmanan Sathyavagiswaren
Captain John Kades
Detective Dan Myers
December 6, 2012
Page 5 of 5

of $25,000 after Rojeski's death using the Trust and stands to gain much more in her position as the administrator of Rojeski's estate.

As we have repeatedly related to you, my clients have been irreparably harmed and again we request that you bring this investigation into my clients to a close and issue a statement absolving them of any wrongdoing or liability.

We strongly feel that a meeting is necessary to discuss the thousands of pages critical information we have diligently researched and provided to Coroner's Office and Los Angeles Police Department. Our intent is only to discuss the information we have submitted ensuring that it is clearly conveyed. Thus, this should not in any way affect the seal on the case.

If our request is again denied, we again respectfully request a meeting prior to the release of the autopsy report to ensure there are no factual discrepancies. In short, my clients require an unequivocal exoneration from the allegations of misconduct that have been capriciously slapped against them since your investigation commenced nearly 17 months ago.

Very truly yours,

CENTURION LAW GROUP, P.C.

Konrad L. Trope

5

# EXHIBIT "1"

# EXHIBIT "1"

6