# Exhibit "6"

to Complaint filed March 29, 2013
Docket No. 1
(Rojeski Autopsy Report Received April 1, 2013)

COUNTY OF LOS ANGELES

DEPARTMENT OF CORONER

# 12

# AUTOPSY REPORT

I performed an autopsy on the body of ➡

No. 2011-05916

ROJESKI, PAULA

at _____ THE DEPARTMENT OF CORONER

Los Angeles, California _____ on September 12, 2011 at 08:55
                                    (Date)                (Time)

From the anatomic findings and pertinent history I ascribe the death to:

(A) Intra-abdominal hemorrhage

DUE TO OR AS A CONSEQUENCE OF

(B) Aortic perforation during laparoscopic gastric band surgery

DUE TO OR AS A CONSEQUENCE OF

(C) Obesity

DUE TO OR AS A CONSEQUENCE OF

(D) _____

OTHER CONDITIONS CONTRIBUTING BUT NOT RELATED TO THE IMMEDIATE CAUSE OF DEATH:

Atherosclerotic heart disease; cardiomegaly

*Anatomical Summary:*

This 55-year-old female reportedly underwent laparoscopic surgery including adjustable gastric banding on September 8, 2011, at Valley Surgical Center, and experienced cardiac arrest at the end of the surgery. Paramedics arrived to find her apneic and asystolic, and brought her to West Hills Medical Center, where resuscitative efforts were continued until she was pronounced dead that same day at 11:41.

1. 0.4cm penetrating defect of aorta near origin of inferior mesenteric artery
   - Corresponding overlying defect of posterior peritoneum, with adjacent soft tissue hemorrhage
   - Hemoperitoneum (1400cc measured)

2. Prosthetic band around proximal stomach
   - Abdominal incisions consistent with recent laparoscopy
   - Suture in diaphragm near esophageal hiatus
   - Small defect of right anterior liver edge
   - No esophageal, gastric or intestinal perforation

3. Resuscitative changes, including hemorrhage into mediastinum, bilateral lung hila, and left lung parenchyma (non-fatal)
   - Anterolateral fractures of left rib 3, and right ribs 2, 3, 4, 6 and 7
   - Abrasion of midline anterior chest

# **12** AUTOPSY REPORT

No. 2011-05916

ROJESKI, PAULA

Page ___2___

4. Pulmonary edema
   - Right lung 640 grams (normal: 360-570)
   - Left lung 550 grams (normal: 325-480)
   - Bilateral pleural effusions (right 100cc, left 250cc)

5. Coronary artery disease
   - Focal 80% stenosis of right coronary artery

6. Left ventricular hypertrophy
   - Heart 400 grams (normal for height: 161-382)

7. Obesity, 36 BMI

8. Right thyroid nodule, 1.8cm

9. Calcified splenic nodule, 2.5cm

10. Absent uterus

11. Post-mortem tissue procurement (bones and skin)


See separate toxicology and microscopy reports.

See Department of Coroner surgery and anesthesiology consultant reports.

# 12 **AUTOPSY REPORT**

No. 2011-05916

ROJESKI, PAULA

Page ___3___

**CIRCUMSTANCES:**
Please see Investigator's Report.

**EXTERNAL EXAMINATION:**
All diagrams and descriptions are made using the standard anatomic position.

The body is identified by toe tags and is that of an unembalmed, refrigerated, adult white female who appears about the reported age of 55 years. The body weighs 197 pounds, measures 62 inches and is normally developed.

Please see further below for description of injury.

There is a horizontal linear scar in the suprapubic region, approximately 5" across. There is a 1/2" scar on the left hand dorsum.

Examination of the skin reveals no jaundice. No burns are present. No tattoos are present. Rigor mortis cannot be assessed due to prior organ procurement. Livor mortis is fixed and posterior in regions not affected by organ procurement.

The head is normal in size and shape. The scalp hair is gray-blond in color. There is no temporal or vertex balding. Examination of the eyes reveals irides that appear to be brown in color and sclerae that are white. The conjunctivae are not congested. There are no petechial hemorrhages of the conjunctivae of the lids or the sclerae. There is no foam in the nares or oral cavity. Upper and lower teeth are present. Frenulae and oral mucosa are intact. No nasal fractures are palpated. Examination of the neck reveals no abnormal mobility, fingernail marks, abrasions, or contusions. No ligature furrow and no knot mark are present.

There is no chest deformity. There is no increased anterior-posterior diameter. The abdomen is protuberant. The genitalia

# **12** **AUTOPSY REPORT**

No. 2011-05916

ROJESKI, PAULA

Page ___4___

are those of an adult female.  The external genitalia and anus are unremarkable.  The extremities show no edema.

**CLOTHING:**
The body is not clothed, and clothing is not examined.

**EVIDENCE OF POST-MORTEM TISSUE PROCUREMENT**
There are 4 incisions from post-mortem procurement of bones of the extremities: bilateral incisions from anterior shoulders to the mid forearms, and bilateral incisions from lateral superior hip regions to medial feet.  There are multiple skin defects from post-mortem procurement of skin: partial thickness skin defects of anterior and posterior legs; full thickness skin defect of the back.

**EVIDENCE OF THERAPEUTIC INTERVENTION, AND EXTERNAL AND INTERNAL INJURY:**
The following are present and are in the proper position:
 Endotracheal tube
 Oral airway
 ECG lead pad

There is a 1/8" abrasion on the inner, mucosal surface of the lower lip.  There are multiple needle puncture defects in the right inguinal region.  There is a needle puncture defect on the left hand dorsum.  There is a contusion on the right hand dorsum.  There is a 2 x 1/2" orange vertical abrasion on the midline anterior chest, overlying the sternum.

There is hemorrhage into the mediastinum, bilateral lung hila, and the left lung parenchyma, estimated to comprise approximately 200cc in total.  There are anterolateral fractures of left rib 3, and right ribs 2, 3, 4, 6 and 7.

There are 4 incisions of the abdomen, consistent with recent laparoscopic surgery:
 - a 1/2" horizontal linear incision in the left upper
  quadrant epigastic region, with surrounding contusion

# **12**    **AUTOPSY REPORT**

No. 2011-05916

ROJESKI, PAULA

Page   5

- a 1/2" horizontal linear incision in the left upper
  quadrant, with surrounding contusion
- a 1 3/4" horizontal linear incision left of the umbilicus,
  starting 3/4" left of the umbilicus, located 26" from top
  of head, with overlying steri-strips
- a 9/16" horizontal linear incision in the right upper
  quadrant, with surrounding contusion, and with overlying
  steri-strips

All 4 abdomen incisions have corresponding defects of the
anterior peritoneum.

There is a prosthetic band, with "ALLERGAN" written on it,
around the proximal stomach.  Adjacent to the band, the gastric
serosa has multiple sutures on its anterior surface that draw it
into a fold.  There is a suture on the diaphragm near the
esophageal hiatus.  The infusion port connected to the
prosthetic band is located within the left anterior abdomen wall
near to the periumbilical incision.  There is no esophageal,
gastric or intestinal perforation.

There is a 0.4cm penetrating defect of the anterior aorta
immediately inferior to the origin of the inferior mesenteric
artery, and 4.3cm superior to the bifurcation of the common
iliac arteries.  There is hemorrhagic discoloration of the aorta
in the area adjacent to the defect.  There is a corresponding
2cm defect of the posterior peritoneum in the region overlying
the defect, with adjacent soft tissue hemorrhage.  There is a
large hemoperitoneum, with 1400cc of liquid and clotted blood
measured.

There is a 0.5 cm defect of the right anterior liver edge, with
adjacent apparent cautery effect on the rim of the defect.

# 12 **AUTOPSY REPORT**

No. 2011-05916

ROJESKI, PAULA

Page ___6___

**INITIAL INCISION:**
The body cavities are entered through the standard coronal incision and the standard Y-shaped incision. No foreign material is present in the mouth, upper airway, and trachea.

**NECK:**
The neck organs are removed en bloc with the tongue. The gingiva and oral mucosa show no evidence of trauma. There is no edema of the larynx. The hyoid bone, and the thyroid and cricoid cartilages of the larynx are intact and without fractures. No hemorrhage is present in the adjacent investing fascia, strap muscles, thyroid or visceral fascia. The tongue when sectioned shows no trauma.

**CHEST/ABDOMINAL CAVITY:**
There are 100cc of right pleural serosanguinous effusion, and 250cc of left pleural serosanguinous effusion. There are no pleural adhesions. The parietal pleurae are intact. The lungs are partly expanded.

Soft tissues of the thoracic and abdominal walls are well-preserved. The uterus is absent. There are adhesions involving the greater omentum, spleen and lower abdominal/suprapubic peritoneum. There are no purulent exudates.

**SYSTEMIC AND ORGAN REVIEW**
The following observations are limited to findings other than injuries that may be described above.

**MUSCULOSKELETAL SYSTEM:**
No abnormalities of the uninjured and un-harvested bony framework or muscles are identified.

# 12

## AUTOPSY REPORT

No. 2011-05916

ROJESKI, PAULA

Page ___7___

**CARDIOVASCULAR SYSTEM:**
Please see above description of injury.

The major branches of the aorta have a normal configuration.
The thoracic and abdominal aorta has minimal lipid streaking,
without ulceration or calcification. There is no tortuosity or
widening of the thoracic segment. There is no dilation of the
lower abdominal segment. There is no aneurysm. Within the
pericardial sac there is approximately 20cc of serous fluid.

The heart weighs 400 grams. It has a normal configuration. The
right ventricle is 0.5 cm thick, the interventricular septum is
1.7 cm thick, and the left ventricle is 1.7 cm thick. The
chambers are normally developed and are without mural
thrombosis. The cardiac valve leaflets are delicate and
pliable. No valve vegetations are present.

Circumferences of the valve rings are as follows:
    Tricuspid valve:  11.0cm
    Pulmonary valve:  6.7cm
    Mitral valve:  9.3cm
    Aortic valve:  6.6cm

There is no endocardial lesion. There are no infarcts or
lesions of the myocardium. There is no abnormality of the
apices of the papillary musculature. There are no defects of
the septum. The great vessels enter and leave in a normal
fashion. The coronary ostia are patent and located in normal
positions within their respective sinuses. The coronary artery
distribution is unremarkable, and the right coronary artery is
the dominant vessel.

# 12     AUTOPSY REPORT

No. 2011-05916

ROJESKI, PAULA

Page ___8___

Serial sectioning of the coronary arteries reveals focal atherosclerotic stenosis up to:

    80% RCA
    <10% LCA
    10% LAD
    20% LCX

There is no complete occlusion or acute thrombosis in the coronary arteries.

**RESPIRATORY SYSTEM:**
Please see above description of injury.

The right lung weighs 640 grams and the left lung weighs 550 grams. Scant secretions are found in the upper and lower respiratory passages. No foam or soot is present in the upper or lower airways. The mucosa is unremarkable. The lungs exhibit edema.

The visceral pleurae are smooth and intact. No thromboembolism is identified within the pulmonary vasculature. There is no evidence of pulmonary infarction.

**GASTROINTESTINAL SYSTEM:**
Please see above description of gastric banding.

The esophagus is intact. Esophageal varices are not present. The stomach is not distended. The stomach contains approximately 3-5 cc of light tan liquid. The mucosa is unremarkable. Portions of tablets and capsules cannot be discerned in the stomach. The external and in-situ appearance of the small intestine and colon are unremarkable. The small intestine and colon are opened to reveal an unremarkable mucosa. The appendix is present and unremarkable. The pancreas occupies a normal position, and exhibits no necrosis or trauma. There is no evidence of pancreatic fibrosis or of pancreatitis. The parenchyma is lobular and unremarkable. The pancreatic ducts are not ectatic and there is no parenchymal calcification.

# **12** **AUTOPSY REPORT**

No. 2011-05916

ROJESKI, PAULA

Page ___9___

**HEPATOBILIARY SYSTEM:**
Please see above description of injury.

The liver weighs 1920 grams, and is pale brown. The cut surface is pale and soft. There is no evidence of cirrhosis. The gallbladder is present, and its walls are thin and pliable. It contains approximately 10cc of bile and no calculi. The periportal lymph nodes are not enlarged.

**URINARY SYSTEM:**
The right kidney weighs 150 grams and the left kidney weighs 160 grams. The kidneys are normally situated and the capsules strip easily, revealing an unremarkable, finely granular surface. The corticomedullary demarcation is preserved. The pyramids are not remarkable. The proximal ureters are not dilated. The urinary bladder is unremarkable. It contains no urine.

**GENITAL SYSTEM:**
The uterus is absent. The bilateral ovaries and distal fallopian tubes are unremarkable. The vagina is unremarkable.

**HEMOLYMPHATIC SYSTEM:**
The spleen weighs 190 grams. The capsule is intact. The parenchyma is dark red and soft and unremarkable. There is a 2.5 x 2 x 1.7cm firm, calcified, well-circumscribed nodule in the hilum of the spleen, with a firm yellow cut surface. Lymph nodes throughout the body are small and inconspicuous. The uninjured bone is unremarkable. The bone marrow of the rib is unremarkable.

**ENDOCRINE SYSTEM:**
There is a 1.8 x 1.5 x 1.5cm well-circumscribed, soft, red-brown nodule in the right thyroid gland. There are multiple small pale tan nodules immediately inferior to the right thyroid and isthmus, up to 0.7cm in maximum dimension. The adrenal and pituitary glands are unremarkable. The parathyroid glands are not identified. The thymus is not identified.

# **12** AUTOPSY REPORT

No. 2011-05916

ROJESKI, PAULA

Page ___10___

**SPECIAL SENSES:**
The eyes are not dissected.  The middle and inner ear are not dissected.

**HEAD AND CENTRAL NERVOUS SYSTEM:**
There is no subcutaneous, subgaleal, or subperiosteal hemorrhage in the scalp.  The external periosteum and dura mater are stripped showing no fractures of the calvarium or base of the skull.  There are no tears of the dura mater.  There is no epidural, subdural or subarachnoid hemorrhage.

The brain weighs 1250 grams, and is pale.  The leptomeninges are thin and without purulent exudates.  A normal convolutionary pattern is observed.  Coronal sectioning demonstrates a uniformity of cortical gray thickness.  The cerebral hemispheres are symmetrical.  There is no softening, discoloration, or hemorrhage of the white matter.  The basal ganglia are intact.  Anatomic landmarks are preserved.  Cerebral contusions are not present.  There is no dilation or distortion of the ventricular system.  The pons, medulla, and cerebellum are unremarkable.  There is no evidence of uncal or cerebellar herniation.  Vessels at the base of the brain have a normal distribution.  There are no aneurysms.  The cerebral arteries show no evidence of atherosclerosis.

**SPINAL CORD:**
The cervical cord as seen through the foramen magnum is unremarkable.  The entire cord is not dissected.

**EVIDENCE COLLECTION:**
None.

# 12 | AUTOPSY REPORT

**No.** 2011-05916

ROJESKI, PAULA

Page ___11___

**HISTOLOGIC SECTIONS:**
Representative sections from various organs are preserved in two storage jars.  Sections initially submitted for histology are as follows:

    1 - liver edge defect
    2 - thyroid nodule, infrathyroid nodule

Additional microscopic sections of heart, lungs, kidneys, pancreas, adrenal and brain are subsequently reviewed on 10/24/2012.

**TOXICOLOGY:**
Samples of hemoperitoneum blood, liver, bile and vitreous are submitted to the laboratory for a C screen.

**SPECIAL PROCEDURES:**
None.

**PHOTOGRAPHY:**
No at scene photos are available for viewing prior to the autopsy.  Photographs are taken during the course of the autopsy (M. Molina and T. Morris).

**RADIOLOGY:**
None.

**WITNESSES:**
None.

**DIAGRAMS USED:**
Two diagram forms #20 are used during the performance of the autopsy.  Diagrams are not intended to be facsimiles nor are they drawn to scale.

# 12   AUTOPSY REPORT

No. 2011-05916

ROJESKI, PAULA

Page ___12___

**OPINION:**

This 55-year-old female underwent laparoscopic surgery that included adjustable gastric banding for obesity ("lap-band") on September 8, 2011, at Valley Surgical Center, and experienced cardiac arrest at the end of the surgery. Paramedics arrived to find her apneic and asystolic, and brought her to West Hills Medical Center, where resuscitative efforts were continued until she was pronounced dead that same day.

Significant gross autopsy findings included a 0.4cm penetrating defect of the abdominal aorta, with 1400cc of liquid and clotted blood measured in the peritoneal cavity. A prosthetic band was in place around the proximal stomach. There was a small defect of the liver edge, consistent with the site of the liver biopsy described in the operative report. There was a suture in the diaphragm near the esophageal hiatus. There was severe coronary artery disease, with focal 80% stenosis of the dominant right coronary artery. There were multiple non-fatal injuries consistent with resuscitative efforts, including rib fractures, and hemorrhages into the mediastinum, bilateral lung hila and left lung parenchyma. Post-mortem procurement of bone and skin did not involve incision into the thoracic or abdominal cavities. There were pleural effusions, and mild pulmonary edema. There was a thyroid nodule with an adjacent enlarged lymph node. Microscopic findings included a papillary thyroid carcinoma metastatic to a regional lymph node, thyroid inflammation, and steatohepatitis as well as mild myocardial fibrosis and mild chronic inflammation of the kidney. Toxicological analyses revealed non-toxic blood levels of bupivacaine, lidocaine and diphenhydramine.

Consultations were obtained from the Department of Coroner surgery and anesthesiology consultants. The surgery consultant report indicates that gross negligence with incompetence had a role in this death. The anesthesiology consultant report indicates that there was gross negligence on the part of the anesthesiologist, in that he failed to meet basic standards of anesthesia care, in particular: failure to adequately assess the

# **12** AUTOPSY REPORT

No. 2011-05916

ROJESKI, PAULA

Page ___13___

patient's condition during surgery, to communicate the patient's deteriorating condition to the surgeon, and to provide pain relief and amnesia while the patient was paralyzed during surgery.

In summary, the cause of death is intra-abdominal hemorrhage due to perforation of the aorta during laparoscopic surgery. The decedent's atherosclerotic heart disease and enlarged heart are significant conditions. The papillary thyroid carcinoma seen microscopically did not contribute to her death. The clinical circumstances, as outlined in the Department of Coroner anesthesiology consultant report, are consistent with the injury occurring early in the course of the surgery, indicating that prompt recognition of the problem may have prevented this death. The injury itself, together with the failure to detect the resulting hemorrhage and respond appropriately, constitute an extreme deviation from the standard of care on the part of both the surgeon and the anesthesiologist. Certifying the manner of death as homicide vs. accident would require knowledge of whether or not this death resulted from a conscious disregard for the patient's safety. The currently available information does not allow for a conclusion that the surgeon or anesthesiologist intentionally disregarded the patient's safety. The manner of death thus could not be determined.

_RD for Dr. Marinovich_                    12/31/12

Adrian Marinovich, MD, MPH                       Date
Fellow in Forensic Pathology

                                                 12/31/12

Raffi Djabourian, MD                             Date
Senior Deputy Medical Examiner

AMM:RD:amm
T-09/12/2011

<table>
<tr><td>

# 13
</td><td>

**ANESTHESIOLOGY CONSULT**
</td><td>

**2011-05916**
**Rojeski, Paula M.**
</td></tr>
</table>

REPORT OF SITE VISIT, 12/5/2011 TO VALLEY SURGICAL CENTER, 7320 West Woodlake Ave, Suite 320, West Hills, CA 91307 (left Coroner's at 0900, returned at 1100) PRESENT: Capt Kades, Forensic Fellow Dr. Adrian Moranovich, Anesthesiology Consultant Dr. Selma Calmes This visit was to address the question of safety features of the anesthesia machine used in this case: Was it possible for the $O_2$ to fail after the case started, as alleged in an anonymous letter? We were shown one of two ORs. This was a standard OR of adequate size. The anesthesia machine was a modern Ohmeda model, a Modulus SE, which has all standard fail-safe features. There is a pipeline gas setup for $O_2$ and $N_2O$. The pipeline gas source was from E tanks in a nearby tank room, where extra D tanks are also stored. Connections for the pipeline source were from the OR ceiling, to the anesthesiologist's left (head of OR table toward the window, away from the door). These were not connected to the machine at the time we visited. A panel for monitoring pipeline gas pressure is located at the central desk, as the main OR area is entered. All pipeline pressures were appropriate (48 psi) although no cases were going on. Note this pressure monitor does not measure how much gas is left in the tank; this is done by a separate pressure gauge on each tank and the tanks are remote from the anesthesiologist. The secondary gas supply at the anesthesia machine had 2 backup D cylinders of $O_2$ and 1 $N_2O$ D tank, as usual. The machine had standard pressure gauges for both. A service tag by "Gary Hull Anesthesia" was dated 12/4/11. Photos were taken by Captain Kades of the front and back of the machine and the monitors.

Given the presence of standard safety features in this model of an anesthesia machine, how could failure after a case starts occur? Possible scenarios follow:

1. If pipeline gas tanks were not turned on and the backup tanks on the machine were off, the machine should have alarmed before the case started, and the anesthesiologist should have recognized lack of $O_2$.

2. One pipeline E tank might have been open but was nearly empty. Anesthesiologist did not think to turn on a backup tank at the machine after the E tank ran out. Machine should have alarmed.

3. Anesthesiologist was working from a machine backup tank with a low pressure and it ran out. Pipeline tanks were not turned on. That could explain 10-20 mins of $O_2$ flow as the case began.

The machine should have alarmed in all these situations, warning the anesthesiologist that the $O_2$ supply was low/absent. There is no evidence that the patient was harmed by this episode. This could have happened and was not documented in this case. Whether or not harm occurred, an anesthesiologist is responsible to check the anesthesia machine and gas system before starting a case.

MONITORS: Monitors were a combined Ohmeda ET $CO_2$ and $SpO_2$ on the top shelf of the machine, a respiratory monitor for ventilation on the middle shelf and a separate, free-standing monitor that accepts multiple monitor modules such as BP, EKG, $SpO_2$ and probably ET $CO_2$. Its remoteness from the anesthesiologist makes it more difficult to read and also to troubleshoot. All monitors should be together for improved visualization. It is not known if any of these devices were used on the patient in question.

*Selma B. Calmes MD*

Selma H. Calmes, M.D.
Anesthesiology Consultant
SHC:ic
1/24/12

1/25/2012
Date (previously sub-
mitted, but file
lost)

County of Los Angeles   FORENSIC CONSULTANT'S REPORT   Department of Coroner

# 13

### ANESTHESIOLOGY CONSULT

**2011-05916**
**Rojeski, Paula M.**

Today, I reviewed pages 1-6 in the black notebook from the Centurian Law Group. The information does not change my opinion, recorded in 2 previous anesthesia consults on this case.

*Selma H. Calmes MD*

Selma H. Calmes, M.D.
Anesthesiology Consultant

1/16/12

Date

SHC:ic
11/16/12

**COUNTY OF LOS ANGELES**      **CONSULTATION REQUEST**      **DEPARTMENT OF CORONER**

**42**

2011-05916

Rojeski, Paula Marie

☐ Anesthesiology      ☐ Odontology      ☐ Sexual Assault

☐ Anthropology      ☐ Pulmonary Pathology      ☒ Surgery Dr. Azkova

☐ Electrophysiology      ☐ Pediatrics      ☐ Other_____

☐ Entomology      ☐ Radiology

Reason for Request  55 f died immediately post-op hip band. Perforated aorta near LMA. Is this due to error during laparoscopy? If so, simple or gross negligence?

Thanks,

Adrian Maronovich
3233430757

3 Nov 11
1157  Gen Surg

OP Note Ambiguous — Will Discuss Dr. Marinovich

7/2/12  Report attached.

7/11

COUNTY OF LOS ANGELES · **WORK SHEET** · DEPARTMENT OF CORONER

# 42

2011 - 05916
Rójeski, Paula

Page _____

DATE  11/10/11        **REMARKS**

9 NOV 2011   Gen Supe Opinion
12³⁵p

THIS CASE WAS FIRST REVIEWED ON 3 NOV 2011 WHERE
AN AMBIGUOUS OPERATIVE NOTE DID NOT ACCOUNT FOR A FATAL
INJURY DURING LAPAROSCOPIC BARIATRIC SURGERY.

I HAVE DISCUSSED THE CASE AND AUTOPSY FINDINGS WITH
DR'S DJABOURIAN AND MARINOVICH. THE CAUSE OF DEATH IS
HOMICIDE (FROM LAPAROSCOPIC SURGERY) AND THE MANNER
OF DEATH ACCIDENT. I ALSO REVIEWED AN ANONYMOUS LETTER
SENT HERE WHICH OUTLINES VARIOUS SHORTCOMINGS OF THE
"1-800-get-thin" SURGERY CENTERS.

MY OPINION AGREES WITH REPORTING THIS CASE TO
THE CALIFORNIA MEDICAL BOARD FOR GROSS NEGLIGENCE WITH
INCOMPETENCE. I SUGGEST THAT THE ANONYMOUS LETTER
TOO BE SUBMITTED TO THE BOARD.

FORENSIC CONSULTANTS REPORT

**13**

## SURGERY CONSULT

**2011-05916
Rojeski, Paula**

### General Surgical Opinion:

This case was first reviewed on November 3, 2011 where an ambiguous operative note did not account for a fatal aortic injury during laparoscopic bariatric surgery.

I have discussed the case and autopsy findings with Drs. Djabourian and Marinovich. The pending cause of death is hemorrhage (from laparoscopic surgery) and the likely manner of Death will be Accident. I also reviewed an anonymous letter sent here which outlines various shortcomings of the "1-800-get-thin" surgery centers.

This case was reviewed with Drs. Djabourian and Marinovich. The autopsy findings and pictures showed a puncture of the abdominal aorta at the level of the inferior mesenteric artery. The operative note describes problems with hypotension, but offers no proper evaluations (such as searching for pneumothorax or bleeding or air embolism or cardiac events.)

The manner of death is more appropriately undetermined at this time pending further investigation.

My opinion agree with reporting this case to the California Medical Board for gross negligence with incompetence. I suggest that the anonymous letter to be submitted to the Board.

_____
Denis C. Astarita, M.D. F.A.C.S
Surgery Consultant

21 JUNE 2012
_____
Date

DCA:ic
7/2/12

Case 2:13-cv-02265-DDP-AGR   Document 26-1   Filed 04/04/13   Page 20 of 71   Page ID #:810

# 13

### ANESTHESIOLOGY CONSULT

**2011-05916**
**Rojeski, Paula M.**

This 55 yo morbidly obese woman arrested at the end of a lap band placement (an incidental hiatal hernia was found at surgery and was also repaired, and the liver was biopsied) on 9/8/11 at Valley Surgical Center. She was declared dead after transfer to West Hills Hospital at 1141hrs. Multiple records were reviewed: the clinic's H&Ps dated 5/20/11 and 9/8/11, a Past Hx questionnaire filled out by the patient, a preop evaluation by another MD (internist?) on 6/4/11, cardiac studies (3 EKGs, stress ECHO, exercise tolerance test), a sleep study with BiPAP titration, the anesthesia preop evaluation, the anesthesia record, the OR record, a code sheet, paramedic records, dictated summaries by the receiving hospital ER staff, and the hospital code blue record. Also reviewed were a dictated progress note by the anesthesiologist, dictated op note by the surgeon, an external anesthesia "peer review" and a 1½ page anonymous letter to the coroner by staff who were apparently present during the procedure. The letter reports numerous violations of anesthesia practice, which will be discussed later.

At a preop evaluation visit on 6/4/11, the patient's weight was 182 lbs (84 kg) and she was 64" tall. BMI was 31.2, at the upper limit of criteria for obesity; she was not morbidly obese. She had an extensive preop workup. Hypertension (205/119) was found on 5/20/11, and lisinopril/HCTZ prescribed. Cardiac workup included 3 EKGs with varying readings (sinus bradycardia, minimally abnormal/normal variation on 6/4/11, possible LVH, consider ischemia, borderline EKG on 6/18/11, and SR, minor ST-T changes on 9/6/11). An ECHO and a stress ECHO were done on 6/18/11. The EKG during stress showed ischemia but the myocardium performed normally on ECHO. She had no clinical symptoms during stress. A sleep study with BiPAP titration on 7/8/11 documented moderate OSA, with significant hypoxemia during sleep and improvement with BiPAP. There is no record that she was put on BiPAP after the sleep study. An abdominal ultrasound on 6/4/11 showed hepatomegaly with fatty infiltration. Lab studies were normal. Lisinopril/HCTZ was her only medicine; there were no allergies. Past surgeries were an abdominal hysterectomy and T&A.

The anesthesia preop evaluation was reasonably readable and complete; OSA was noted but not any treatment/any plan for her postop respiratory care, as would be expected for a patient with OSA. ASA PS was 3; a strong case could be made for a PS 4, based on her OSA and cardiac studies.

The hand-written anesthesia record is nearly unreadable, even using a magnifying glass. It is meticulously filled out; for example the patient's temperature was recorded every 15 mins. The pattern of VS strongly suggests hypovolemia, most likely from intra-abdominal blood loss. The anesthesia record notes "pt is dry (dehydrated) preop before op," with no explanation/possible etiology of dehydration. There was no obvious medical reason for her to be dehydrated preop. Metoprolol 2 (mg?) IV was given before induction. This is an unusual,low dose for this beta-blocker pre-induction. Versed 1 mg, fentanyl 50 ugm and 200 mg propofol IV were given for induction, and then 2 L/min O$_2$ and isoflurane 1% were used after intubation. Succinylcholine 120 mg was used for intubation and rorcuronium 10mg + 20 mg was used for maintenance relaxation.

ANESTHESIOLOGY CONSULT & REPORT                    Department of Coroner

# 13

**ANESTHESIOLOGY CONSULT**

**2011-05916
Rojeski, Paula M.**

**Page 2**

Pre-induction VS were BP 198/90, HR 89, RR 16, T 97.8° and Sp $O_2$ 98% ($FiO_2$ not noted). Induction began at 0855. BP dropped after induction, with a precipitous BP drop to 80/50 at 0925. Boluses of epinephrine and neosynephrine were recorded as given then. (This is not easily readable on the anesthesia record.) HR stepped up from 80/min to 120/min and higher for the rest of the case. The inhalation anesthetic isoflurane was stopped at 0945, and circuit gas flow was increased, to remove isoflurane from the system. No further anesthetic drugs appear to have been given for the remaining 1 ½ hrs of surgery, on review of the anesthesia record. If there was cerebral perfusion during this time (we can anticipate that cerebral flow was present for at least some part of the next 1½ hrs even though she was in a steep head-up position, which works against adequate cerebral blood flow when BP is low), she had to be feeling pain and was conscious but paralyzed as she probably bled to death. If the patient could not tolerate inhaled anesthetics, ketamine (which supports circulation and gives analgesia and amnesia) could have been used.

At the end of the case, muscle relaxants were reversed. She was breathing on her own and NM transmission was normal, but she appeared weak. PEA was recorded at the end of the case. A code record began at 1055. The hand-writing appears to be the anesthesiologist's; this is an unusual practice as nursing staff should do charting while the anesthesiologist manages the code. This raises the concern that the record was filled out after-the-fact. Single doses of the standard resuscitation meds were given: atropine (recorded last, but apparently given first), $NaHCO_3$, $CaCl_2$ and epinephrine. This code sheet has no column for rhythm, making it impossible to evaluate whether treatment was correct for the rhythm. This is the most critical factor for success of CPR and is routinely evaluated in hospitals.

Paramedics arrived at 1102 and found asystole, dilated and fixed pupils, apnea and a GCS of 3. BG was 250. After 2 doses of epinephrine and 1 amp of $NaHCO_3$, paramedics took her to West Hills Hospital. There, the patient was still in asystole, in respiratory distress, apneic, diaphoretic and was bleeding from the incision sites. She failed to respond to ACLS and was declared dead at 1141.

<u>COMMENTS ON THE LETTER</u>: This describes 5 problems with the anesthesia care; it appears to be written by people familiar with OR and anesthesia routines, such as scrub nurses or OR techs. The allegations explain many aspects of the patient's condition and outcome. All items are very serious deviations from the standard of care, especially #1-4.

FORENSIC CONSULTANT'S REPORT

Department of Coroner

# 13

**ANESTHESIOLOGY CONSULT**

**2011-05916**
**Rojeski, Paula M.**

**Page 3**

1. The $O_2$ tanks were not turned on before the case started, and there was no $O_2$ flow at one point about 10-20 mins after starting. (COMMENT: This means that the machine was not checked before starting the case, a CMS requirement. This raises the concern that other serious machine issues could have been missed, such as vaporizer leaks.
2. The anesthesiologist was selecting the best vital signs to record. (COMMENT: He appears to not be paying attention to the patient's actual status, which was deteriorating markedly.)
3. The surgeon expressed concern about the patient at several points and asked the anesthesiologist if the patient was OK. Also, monitor alarms kept going off, but the anesthesiologist reassured the surgeon and stated the machines were malfunctioning "as they always do." (COMMENT: The monitor problem most likely was the result of the patient's deteriorating status as she bled into the abdomen. The alarms were probably due to the patient's low blood pressure.)
4. IV fluids were running onto the floor instead of into the patient; this was found by the surgeon at the end of the case. (COMMENT: This does not help the patient, who was bleeding out from the aortic injury.)
5. The time of the code was inaccurate, implying it took place earlier, and it took the surgeon to start CPR and call 911, not the anesthesiologist.

Given the tragic outcome of this case and the apparent knowledge of the letter's authors, I believe there is merit to these written allegations.

AUTOPSY: A 0.4 cm penetrating defect of the abdominal aorta near the origin of the inferior mesenteric artery, and 1400 cc blood and fluid were found in the peritoneal cavity. This is 34% of the patient's estimated blood volume (EBV = 4.2 L), a significant loss, and probably there had been more. There was also pulmonary edema, bilateral pleural effusions, LVH, and partial (focal) occlusion (80%) of the dominant RCA were also found.

TOXICOLOGY: Bupivacaine 3.2 ugm/ml, diphenhydramine <0.50 ug/ml and lidocaine 1.0 ug/ml were present in intraperitoneal blood. That level of bupivacaine is high enough to at least cause symptoms of local anesthetic toxicity (dizziness, ear ringing), and lower levels have been reported in patients with seizures after overdose. Bupivacaine in the femoral blood sample was lower, < 0.5 ug/ml, a non-toxic level.

FORENSIC CONSULTANTS REPORT                                    Department of Coroner

# 13

**ANESTHESIOLOGY CONSULT**

**2011-05916**
**Rojeski, Paula M.**

**Page 4**

IMPRESSION: Anesthesia care was an extreme departure from the accepted standard of care and is, most likely, directly responsible for this patient's death. Injury to major blood vessels is a known risk in laparoscopic surgery, most commonly from placement of the trocars. The injury could conceivably been repaired if the surgeon had been informed promptly that the patient appeared to be bleeding intra-abdominally. The aorta could have been cross-clamped, *and* aggressive fluid resuscitation could be done while the patient was transferred to another facility for aortic repair. (A suitable hospital with vascular surgeons was close by.) The anesthesiologist was unaware of what was going on with the patient, blaming the monitors and failing to take effective actions as the patient bled to death. Strangely, the anesthesiologist realized the patient could not tolerate the anesthetic agent (it was turned off at 0945) but yet told the surgeon all was well. This patient was probably awake and feeling pain as she proceeded along the path to her death over the next 1 1/2 hours. The surgeon had some responsibility in that, somehow, the large volume of intraperitoneal blood was missed. It appears he was suspicious that all was not well because he kept asking if the patient was OK.

A list of failed standards related to anesthesia care follows:

1. Failed to check the anesthesia machine preinduction to insure that the patient would receive $O_2$ while anesthetized. The $O_2$ tanks could have been empty, not just turned off. Other machine defects could have been missed.
2. Failed to believe monitor data and to confirm, using other means (observation of skin perfusion, feeling for a pulse, listening to intensity of heart sounds, checking Hgb/ABGs), what was going on with the patient. If a monitor was the problem, these other methods could confirm the patient was at least alive, and then the monitor problem could be solved, after confirming that the patient was OK.
3. Failed to understand and able to troubleshoot standard monitors.
4. Failed to communicate the patient's deteriorating condition to the surgeon.
5. Failure to provide an adequate route for IV fluids (the IV line was not intact and fluid administered was going on to the floor and not reaching the patient). The op note by the surgeon reported that a second IV was started at some point. Although 5 or 6 L NS was recorded as given IV (the surgical op note said 3 L IV fluids were given), most probably did not go to the patient. She only made 300 cc UO during surgery, a very small amount for the IV fluid given and an Estimated Blood Loss (EBL) of < 50 cc.
6. Failure to take action to resuscitate promptly.
7. Failure to provide pain relief and amnesia during surgery. This is a most egregious error.

All items listed are basic functions and obligations of an anesthesiologist. This case can be considered grossly negligent anesthesia care.

_Selma H. Calmes, MD_
Selma H. Calmes, M.D.
Anesthesiology Consultant

_1/13/2012_
Date

SHC:ic
1/6/12

# Exhibit "A"

to Dr. Sedrak Declaration filed April 3, 2013
Docket No. 23
(Rojeski Autopsy Report Received January 15, 2013)

COUNTY OF LOS ANGELES

**CASE REPORT**

DEPARTMENT OF CORONER

# 1

| APPARENT MODE | **ACCIDENT** | | CASE NO |
|---|---|---|---|
| SPECIAL CIRCUMSTANCES | | | 2011-05916 |
| | | | CRYPT |
| | | | 15 |

| LAST, FIRST MIDDLE | | AKA | |
|---|---|---|---|
| **ROJESKI, PAULA MARIE** | | **ROSESKI, PAULA** | # |

| ADDRESS | | | CITY | | STATE | ZIP |
|---|---|---|---|---|---|---|
| 32 CELESTINE CIRCLE | | | LADERA RANCH | | CA | 92694 |

| SEX | RACE APPEARS | DOB | AGE | HGT | WGT | EYES | HAIR | TEETH | FACIAL HAIR | ID VIEW | CONDITION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| FEMALE | CAUCASIAN | 12/15/1955 | 55 | 62 in. | 197 lbs. | BROWN | GRAY | ALL NATURAL TEETH | | Yes | FAIR |

| MARK TYPE | MARK LOCATION | MARK DESCRIPTION |
|---|---|---|
| | | NONE NOTED |

| | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| | | | CA | |
| Rel | PHONE | NOTIFIED BY | | |
| SSN | DL ID | STATE | PENDING BY | DATE | TIME |

| ID METHOD |
|---|
| CALIFORNIA DRIVER'S LICENSE |

| LA# | MAIN # | CII # | FBI # | MILITARY # | POB |
|---|---|---|---|---|---|

| IDENTIFIED BY NAME (PRINT) | RELATIONSHIP | PHONE | DATE | TIME |
|---|---|---|---|---|
| | | | 9/8/2011 | |

| PLACE OF DEATH / PLACE FOUND | ADDRESS OR LOCATION | CITY | ZIP |
|---|---|---|---|
| HOSPITAL | 7300 MEDICAL CENTER DRIVE | WEST HILLS | 91307 |
| WEST HILLS MEDICAL CENTER | | | |

| PLACE OF INJURY | AT WORK | DATE | TIME | LOCATION OR ADDRESS | ZIP |
|---|---|---|---|---|---|
| VALLEY SURGICAL CENTER | No | 9/8/2011 | 10:54 | 7320 WOODLAKE AVE, WEST HILLS, CA | 91367 |

| DOD | TIME | FOUND OR PRONOUNCED BY |
|---|---|---|
| 9/8/2011 | 11:41 | DR. SPENCER |

| OTHER AGENCY INV OFFICER | PHONE | REPORT NO | NOTIFIED BY | NO |
|---|---|---|---|---|

| TRANSPORTED BY | TO | DATE | TIME |
|---|---|---|---|
| JOHN KILLEN | LOS ANGELES FSC | | 9/9/2011 20:30 |

| FINGERPRINTS? | Yes | CLOTHING | Yes | PA RPT | No | MORTUARY | |
|---|---|---|---|---|---|---|---|
| MED. EV. | No | INVEST. PHOTO # | 1 | SEAL TYPE | | HOSP RPT | Yes |
| PHYS. EV | No | EVIDENCE LOG | No | PROPERTY? | Yes | HOSP CHART | Yes |
| SUICIDE NOTE | No | GSR NO | | RCPT NO. | 253650 | FF NO | AF00643720 |

| SYNOPSIS |
|---|
| DECEDENT WAS UNDER ANESTHESIA FOLLOWING LAP BAND SURGERY. WHEN STAFF TRIED TO BRING HER OUT OF IT, SHE WENT INTO CARDIAC ARREST. 911 WAS CALLED. SHE WAS TAKEN TO THE HOSPITAL WHERE DEATH WAS PRONOUNCED SHORTLY AFTER ADMISSION. NO TRAUMA NOTED. HX OBESITY. NO OTHER KNOWN MEDICAL PROBLEMS. NO RECORD OF DRUG OR ALCOHOL ABUSE. |

| DENNIS CROW | | DATE | 9/11/2011 | REVIEWED BY | DATE |
|---|---|---|---|---|---|
| 019012 | D. Crow | | | | |
| | INVESTIGATOR | TIME | 14:54 | | TIME |

FORM #3 NARRATIVE TO FOLLOW? ☑



**County of Los Angeles, Department of Coroner**
**Investigator's Narrative**



Case Number:  2011-05916                     Decedent: ROJESKI, PAULA

## Information Sources:

I reviewed West Hills MC records, PH# (818) 676-4999, PF# AF00643720.

## Investigation:

Milton Roldan RN reported this case on 9-8-11 at 1223 hr's. The case was brought into the FSC on 9-9-11 at 2030 hr's. Lt. MacWillie assigned this case to me on 9-11-11 at 1350 hr's. The decedent has a history of obesity. She does not have any other known/reported medical problems. She does not have a record of drug or alcohol abuse. On 9-8-11 she was at the Valley Surgical Center PH# (818) 719-9170 for a lap band procedure. The procedure was completed without reported complications. At about 1054 hr's, when the medical staff attempted to bring her out of the anesthesia, she went into cardiac arrest. She was intubated and CPR was initiated. 9-1-1 was called. LAFD RA# 84 paramedics responded. The decedent was transported to the hospital. Dr. Spencer pronounced death on 9-8-11 at 1141 hr's. No trauma noted. (See hospital records for details of condition and treatment).

## Location:

Death was pronounced at the West Hills MC 7300 Medical Center Drive West Hills 91307.

## Informant/Witness Statements:

I did not take an informant statement for this report.

## Scene Description:

I did not visit a scene for this report.

## Evidence:

I did not collect evidence for this report.

## Body Examination:

The decedent is a heavy-set, 55 year old, White female.  Evidence of harvesting noted.

## Identification:

CDL# N0849745 identified the decedent.

## Next of Kin Notification:

Hospital staff notified ▮▮▮▮▮▮▮▮(sister ▮▮▮▮▮▮▮▮▮▮▮e case notes).

## Tissue Donation:

See One Legacy forms.

## Autopsy Notification:

None requested.

_D. CROW_

DENNIS CROW

_SUPERVISOR_

9-11-11

Date of Report

COUNTY OF LOS ANGELES

DEPARTMENT OF CORONER

# 12 AUTOPSY REPORT

I performed an autopsy on the body of 

No. 2011-05916

ROJESKI, PAULA

at _____ THE DEPARTMENT OF CORONER

Los Angeles, California _____ on September 12, 2011 at 08:55
(Date)          (Time)

From the anatomic findings and pertinent history I ascribe the death to:

(A)  Intra-abdominal hemorrhage

DUE TO OR AS A CONSEQUENCE OF

(B)  Aortic perforation during laparoscopic gastric band surgery

DUE TO OR AS A CONSEQUENCE OF

(C)  Obesity

DUE TO OR AS A CONSEQUENCE OF

(D)

OTHER CONDITIONS CONTRIBUTING BUT NOT RELATED TO THE IMMEDIATE CAUSE OF DEATH

  Atherosclerotic heart disease; cardiomegaly

*Anatomical Summary:*

This 55-year-old female reportedly underwent laparoscopic surgery including adjustable gastric banding on September 8, 2011, at Valley Surgical Center, and experienced cardiac arrest at the end of the surgery. Paramedics arrived to find her apneic and asystolic, and brought her to West Hills Medical Center, where resuscitative efforts were continued until she was pronounced dead that same day at 11:41.

1.  0.4cm penetrating defect of aorta near origin of inferior mesenteric artery
    - Corresponding overlying defect of posterior peritoneum, with adjacent soft tissue hemorrhage
    - Hemoperitoneum (1400cc measured)

2.  Prosthetic band around proximal stomach
    - Abdominal incisions consistent with recent laparoscopy
    - Suture in diaphragm near esophageal hiatus
    - Small defect of right anterior liver edge
    - No esophageal, gastric or intestinal perforation

3.  Resuscitative changes, including hemorrhage into mediastinum, bilateral lung hila, and left lung parenchyma (non-fatal)
    - Anterolateral fractures of left rib 3, and right ribs 2, 3, 4, 6 and 7
    - Abrasion of midline anterior chest

# 12

## AUTOPSY REPORT

No. 2011-05916

ROJESKI, PAULA

Page ___2___

4. Pulmonary edema
   - Right lung 640 grams (normal: 360-570)
   - Left lung 550 grams (normal: 325-480)
   - Bilateral pleural effusions (right 100cc, left 250cc)

5. Coronary artery disease
   - Focal 80% stenosis of right coronary artery

6. Left ventricular hypertrophy
   - Heart 400 grams (normal for height: 161-382)

7. Obesity, 36 BMI

8. Right thyroid nodule, 1.8cm

9. Calcified splenic nodule, 2.5cm

10. Absent uterus

11. Post-mortem tissue procurement (bones and skin)


See separate toxicology and microscopy reports.

See Department of Coroner surgery and anesthesiology consultant reports.

# 12

# AUTOPSY REPORT

No. 2011-05916

ROJESKI, PAULA

Page ___3___

**CIRCUMSTANCES:**
Please see Investigator's Report.

**EXTERNAL EXAMINATION:**
All diagrams and descriptions are made using the standard anatomic position.

The body is identified by toe tags and is that of an unembalmed, refrigerated, adult white female who appears about the reported age of 55 years. The body weighs 197 pounds, measures 62 inches and is normally developed.

Please see further below for description of injury.

There is a horizontal linear scar in the suprapubic region, approximately 5" across. There is a 1/2" scar on the left hand dorsum.

Examination of the skin reveals no jaundice. No burns are present. No tattoos are present. Rigor mortis cannot be assessed due to prior organ procurement. Livor mortis is fixed and posterior in regions not affected by organ procurement.

The head is normal in size and shape. The scalp hair is gray-blond in color. There is no temporal or vertex balding. Examination of the eyes reveals irides that appear to be brown in color and sclerae that are white. The conjunctivae are not congested. There are no petechial hemorrhages of the conjunctivae of the lids or the sclerae. There is no foam in the nares or oral cavity. Upper and lower teeth are present. Frenulae and oral mucosa are intact. No nasal fractures are palpated. Examination of the neck reveals no abnormal mobility, fingernail marks, abrasions, or contusions. No ligature furrow and no knot mark are present.

There is no chest deformity. There is no increased anterior-posterior diameter. The abdomen is protuberant. The genitalia

# **AUTOPSY REPORT**

**12**

No. 2011-05916

ROJESKI, PAULA

Page ___4___

are those of an adult female.  The external genitalia and anus are unremarkable.  The extremities show no edema.

**CLOTHING:**
The body is not clothed, and clothing is not examined.

**EVIDENCE OF POST-MORTEM TISSUE PROCUREMENT**
There are 4 incisions from post-mortem procurement of bones of the extremities: bilateral incisions from anterior shoulders to the mid forearms, and bilateral incisions from lateral superior hip regions to medial feet.  There are multiple skin defects from post-mortem procurement of skin: partial thickness skin defects of anterior and posterior legs; full thickness skin defect of the back.

**EVIDENCE OF THERAPEUTIC INTERVENTION, AND EXTERNAL AND INTERNAL INJURY:**
The following are present and are in the proper position:
    Endotracheal tube
    Oral airway
    ECG lead pad

There is a 1/8" abrasion on the inner, mucosal surface of the lower lip.  There are multiple needle puncture defects in the right inguinal region.  There is a needle puncture defect on the left hand dorsum.  There is a contusion on the right hand dorsum.  There is a 2 x 1/2" orange vertical abrasion on the midline anterior chest, overlying the sternum.

There is hemorrhage into the mediastinum, bilateral lung hila, and the left lung parenchyma, estimated to comprise approximately 200cc in total.  There are anterolateral fractures of left rib 3, and right ribs 2, 3, 4, 6 and 7.

There are 4 incisions of the abdomen, consistent with recent laparoscopic surgery:
  - a 1/2" horizontal linear incision in the left upper
    quadrant epigastic region, with surrounding contusion

# **AUTOPSY REPORT**

**12**

No. 2011-05916

ROJESKI, PAULA

Page ___5___

- a 1/2" horizontal linear incision in the left upper quadrant, with surrounding contusion
- a 1 3/4" horizontal linear incision left of the umbilicus, starting 3/4" left of the umbilicus, located 26" from top of head, with overlying steri-strips
- a 9/16" horizontal linear incision in the right upper quadrant, with surrounding contusion, and with overlying steri-strips

All 4 abdomen incisions have corresponding defects of the anterior peritoneum.

There is a prosthetic band, with "ALLERGAN" written on it, around the proximal stomach. Adjacent to the band, the gastric serosa has multiple sutures on its anterior surface that draw it into a fold. There is a suture on the diaphragm near the esophageal hiatus. The infusion port connected to the prosthetic band is located within the left anterior abdomen wall near to the periumbilical incision. There is no esophageal, gastric or intestinal perforation.

There is a 0.4cm penetrating defect of the anterior aorta immediately inferior to the origin of the inferior mesenteric artery, and 4.3cm superior to the bifurcation of the common iliac arteries. There is hemorrhagic discoloration of the aorta in the area adjacent to the defect. There is a corresponding 2cm defect of the posterior peritoneum in the region overlying the defect, with adjacent soft tissue hemorrhage. There is a large hemoperitoneum, with 1400cc of liquid and clotted blood measured.

There is a 0.5 cm defect of the right anterior liver edge, with adjacent apparent cautery effect on the rim of the defect.

# **12** **AUTOPSY REPORT**

No. 2011-05916

ROJESKI, PAULA

Page ___6___

**INITIAL INCISION:**
The body cavities are entered through the standard coronal incision and the standard Y-shaped incision.  No foreign material is present in the mouth, upper airway, and trachea.

**NECK:**
The neck organs are removed en bloc with the tongue.  The gingiva and oral mucosa show no evidence of trauma.  There is no edema of the larynx.  The hyoid bone, and the thyroid and cricoid cartilages of the larynx are intact and without fractures.  No hemorrhage is present in the adjacent investing fascia, strap muscles, thyroid or visceral fascia.  The tongue when sectioned shows no trauma.

**CHEST/ABDOMINAL CAVITY:**
There are 100cc of right pleural serosanguinous effusion, and 250cc of left pleural serosanguinous effusion.  There are no pleural adhesions.  The parietal pleurae are intact.  The lungs are partly expanded.

Soft tissues of the thoracic and abdominal walls are well-preserved.  The uterus is absent.  There are adhesions involving the greater omentum, spleen and lower abdominal/suprapubic peritoneum.  There are no purulent exudates.

**SYSTEMIC AND ORGAN REVIEW**
The following observations are limited to findings other than injuries that may be described above.

**MUSCULOSKELETAL SYSTEM:**
No abnormalities of the uninjured and un-harvested bony framework or muscles are identified.

# **12** **AUTOPSY REPORT**

No. 2011-05916

ROJESKI, PAULA

Page ___7___

**CARDIOVASCULAR SYSTEM:**
Please see above description of injury.

The major branches of the aorta have a normal configuration.
The thoracic and abdominal aorta has minimal lipid streaking,
without ulceration or calcification.  There is no tortuosity or
widening of the thoracic segment.  There is no dilation of the
lower abdominal segment.  There is no aneurysm.  Within the
pericardial sac there is approximately 20cc of serous fluid.

The heart weighs 400 grams.  It has a normal configuration.  The
right ventricle is 0.5 cm thick, the interventricular septum is
1.7 cm thick, and the left ventricle is 1.7 cm thick.  The
chambers are normally developed and are without mural
thrombosis.  The cardiac valve leaflets are delicate and
pliable.  No valve vegetations are present.

Circumferences of the valve rings are as follows:
        Tricuspid valve:  11.0cm
        Pulmonary valve:  6.7cm
        Mitral valve:  9.3cm
        Aortic valve:  6.6cm

There is no endocardial lesion.  There are no infarcts or
lesions of the myocardium.  There is no abnormality of the
apices of the papillary musculature.  There are no defects of
the septum.  The great vessels enter and leave in a normal
fashion.  The coronary ostia are patent and located in normal
positions within their respective sinuses. The coronary artery
distribution is unremarkable, and the right coronary artery is
the dominant vessel.

# 12 **AUTOPSY REPORT**

No. 2011-05916

ROJESKI, PAULA

Page ___8___

Serial sectioning of the coronary arteries reveals focal atherosclerotic stenosis up to:

    80% RCA
    <10% LCA
    10% LAD
    20% LCX

There is no complete occlusion or acute thrombosis in the coronary arteries.

**RESPIRATORY SYSTEM:**
Please see above description of injury.

The right lung weighs 640 grams and the left lung weighs 550 grams.  Scant secretions are found in the upper and lower respiratory passages.  No foam or soot is present in the upper or lower airways.  The mucosa is unremarkable.  The lungs exhibit edema.

The visceral pleurae are smooth and intact.  No thromboembolism is identified within the pulmonary vasculature.  There is no evidence of pulmonary infarction.

**GASTROINTESTINAL SYSTEM:**
Please see above description of gastric banding.

The esophagus is intact.  Esophageal varices are not present. The stomach is not distended.  The stomach contains approximately 3-5 cc of light tan liquid.  The mucosa is unremarkable.  Portions of tablets and capsules cannot be discerned in the stomach.  The external and in-situ appearance of the small intestine and colon are unremarkable.  The small intestine and colon are opened to reveal an unremarkable mucosa. The appendix is present and unremarkable.  The pancreas occupies a normal position, and exhibits no necrosis or trauma.  There is no evidence of pancreatic fibrosis or of pancreatitis.  The parenchyma is lobular and unremarkable.  The pancreatic ducts are not ectatic and there is no parenchymal calcification.

# 12 AUTOPSY REPORT

No. 2011-05916

ROJESKI, PAULA

Page    9

**HEPATOBILIARY SYSTEM:**
Please see above description of injury.

The liver weighs 1920 grams, and is pale brown.  The cut surface
is pale and soft.  There is no evidence of cirrhosis.  The
gallbladder is present, and its walls are thin and pliable.  It
contains approximately 10cc of bile and no calculi.  The
periportal lymph nodes are not enlarged.

**URINARY SYSTEM:**
The right kidney weighs 150 grams and the left kidney weighs 160
grams.  The kidneys are normally situated and the capsules strip
easily, revealing an unremarkable, finely granular surface.  The
corticomedullary demarcation is preserved.  The pyramids are not
remarkable.  The proximal ureters are not dilated.  The urinary
bladder is unremarkable.  It contains no urine.

**GENITAL SYSTEM:**
The uterus is absent. The bilateral ovaries and distal fallopian
tubes are unremarkable.  The vagina is unremarkable.

**HEMOLYMPHATIC SYSTEM:**
The spleen weighs 190 grams.  The capsule is intact.  The
parenchyma is dark red and soft and unremarkable.  There is a
2.5 x 2 x 1.7cm firm, calcified, well-circumscribed nodule in
the hilum of the spleen, with a firm yellow cut surface.  Lymph
nodes throughout the body are small and inconspicuous.  The
uninjured bone is unremarkable.  The bone marrow of the rib is
unremarkable.

**ENDOCRINE SYSTEM:**
There is a 1.8 x 1.5 x 1.5cm well-circumscribed, soft, red-brown
nodule in the right thyroid gland.  There are multiple small
pale tan nodules immediately inferior to the right thyroid and
isthmus, up to 0.7cm in maximum dimension.  The adrenal and
pituitary glands are unremarkable.  The parathyroid glands are
not identified.  The thymus is not identified.

# **12** **AUTOPSY REPORT**

No. 2011-05916

ROJESKI, PAULA

Page ___ 10 ___

**SPECIAL SENSES:**
The eyes are not dissected.  The middle and inner ear are not dissected.

**HEAD AND CENTRAL NERVOUS SYSTEM:**
There is no subcutaneous, subgaleal, or subperiosteal hemorrhage in the scalp.  The external periosteum and dura mater are stripped showing no fractures of the calvarium or base of the skull.  There are no tears of the dura mater.  There is no epidural, subdural or subarachnoid hemorrhage.

The brain weighs 1250 grams, and is pale.  The leptomeninges are thin and without purulent exudates.  A normal convolutionary pattern is observed.  Coronal sectioning demonstrates a uniformity of cortical gray thickness.  The cerebral hemispheres are symmetrical.  There is no softening, discoloration, or hemorrhage of the white matter.  The basal ganglia are intact. Anatomic landmarks are preserved.  Cerebral contusions are not present.  There is no dilation or distortion of the ventricular system.  The pons, medulla, and cerebellum are unremarkable. There is no evidence of uncal or cerebellar herniation.  Vessels at the base of the brain have a normal distribution.  There are no aneurysms.  The cerebral arteries show no evidence of atherosclerosis.

**SPINAL CORD:**
The cervical cord as seen through the foramen magnum is unremarkable.  The entire cord is not dissected.

**EVIDENCE COLLECTION:**
None.

<table>
<tr><td>**12**</td><td>**AUTOPSY REPORT**</td><td>No. 2011-05916<br><br>ROJESKI, PAULA</td></tr>
</table>

Page ___11___

**HISTOLOGIC SECTIONS:**
Representative sections from various organs are preserved in two storage jars.  Sections initially submitted for histology are as follows:
     1 – liver edge defect
     2 – thyroid nodule, infrathyroid nodule

Additional microscopic sections of heart, lungs, kidneys, pancreas, adrenal and brain are subsequently reviewed on 10/24/2012.

**TOXICOLOGY:**
Samples of hemoperitoneum blood, liver, bile and vitreous are submitted to the laboratory for a C screen.

**SPECIAL PROCEDURES:**
None.

**PHOTOGRAPHY:**
No at scene photos are available for viewing prior to the autopsy.  Photographs are taken during the course of the autopsy (M. Molina and T. Morris).

**RADIOLOGY:**
None.

**WITNESSES:**
None.

**DIAGRAMS USED:**
Two diagram forms #20 are used during the performance of the autopsy.  Diagrams are not intended to be facsimiles nor are they drawn to scale.

| **12** | **AUTOPSY REPORT** | No. 2011-05916 ROJESKI, PAULA |

Page ___12___

**OPINION:**

This 55-year-old female underwent laparoscopic surgery that included adjustable gastric banding for obesity ("lap-band") on September 8, 2011, at Valley Surgical Center, and experienced cardiac arrest at the end of the surgery. Paramedics arrived to find her apneic and asystolic, and brought her to West Hills Medical Center, where resuscitative efforts were continued until she was pronounced dead that same day.

Significant gross autopsy findings included a 0.4cm penetrating defect of the abdominal aorta, with 1400cc of liquid and clotted blood measured in the peritoneal cavity. A prosthetic band was in place around the proximal stomach. There was a small defect of the liver edge, consistent with the site of the liver biopsy described in the operative report. There was a suture in the diaphragm near the esophageal hiatus. There was severe coronary artery disease, with focal 80% stenosis of the dominant right coronary artery. There were multiple non-fatal injuries consistent with resuscitative efforts, including rib fractures, and hemorrhages into the mediastinum, bilateral lung hila and left lung parenchyma. Post-mortem procurement of bone and skin did not involve incision into the thoracic or abdominal cavities. There were pleural effusions, and mild pulmonary edema. There was a thyroid nodule with an adjacent enlarged lymph node. Microscopic findings included a papillary thyroid carcinoma metastatic to a regional lymph node, thyroid inflammation, and steatohepatitis as well as mild myocardial fibrosis and mild chronic inflammation of the kidney. Toxicological analyses revealed non-toxic blood levels of bupivacaine, lidocaine and diphenhydramine.

Consultations were obtained from the Department of Coroner surgery and anesthesiology consultants. The surgery consultant report indicates that gross negligence with incompetence had a role in this death. The anesthesiology consultant report indicates that there was gross negligence on the part of the anesthesiologist, in that he failed to meet basic standards of anesthesia care, in particular: failure to adequately assess the

## AUTOPSY REPORT

**12**

No. 2011-05916

ROJESKI, PAULA

Page ___13___

patient's condition during surgery, to communicate the patient's deteriorating condition to the surgeon, and to provide pain relief and amnesia while the patient was paralyzed during surgery.

In summary, the cause of death is intra-abdominal hemorrhage due to perforation of the aorta during laparoscopic surgery. The decedent's atherosclerotic heart disease and enlarged heart are significant conditions. The papillary thyroid carcinoma seen microscopically did not contribute to her death. The clinical circumstances, as outlined in the Department of Coroner anesthesiology consultant report, are consistent with the injury occurring early in the course of the surgery, indicating that prompt recognition of the problem may have prevented this death. The injury itself, together with the failure to detect the resulting hemorrhage and respond appropriately, constitute an extreme deviation from the standard of care on the part of both the surgeon and the anesthesiologist. Certifying the manner of death as homicide vs. accident would require knowledge of whether or not this death resulted from a conscious disregard for the patient's safety. The currently available information does not allow for a conclusion that the surgeon or anesthesiologist intentionally disregarded the patient's safety. The manner of death thus could not be determined.

_RD for Dr. Marinovich_                    12/31/12

_____        Date
Adrian Marinovich, MD, MPH
Fellow in Forensic Pathology

_____        12/31/12

_____        Date
Raffi Djabourian, MD
Senior Deputy Medical Examiner

AMM:RD:amm
T-09/12/2011

COUNTY OF LOS ANGELES                                                                    DEPARTMENT OF CORONER

## 12b

# SUPPLEMENTAL REPORT

An autopsy was performed on the body of
the DEPARTMENT OF CORONER



No. 2011-05916

Rojeski, Paula

at _____

Los Angeles, California _____ on September 12, 2011 at 08:55 _____
                                        (Date)                  (Time)

From the anatomic findings and pertinent history I ascribe the death to:

(A)   Intra-abdominal hemorrhage
DUE TO OR AS A CONSEQUENCE OF

(B)   Aortic perforation during laparoscopic gastric band surgery
DUE TO OR AS A CONSEQUENCE OF

(C)   Obesity
DUE TO OR AS A CONSEQUENCE OF

(D)   _____
OTHER CONDITIONS CONTRIBUTING BUT NOT RELATED TO THE IMMEDIATE CAUSE OF DEATH:

      Atherosclerotic heart disease; cardiomegaly

**Supplemental Autopsy Report Opinion**

This supplemental report / addendum opinion is a result of additional information and review of various reports. This includes correspondence forwarded to the Los Angeles County Department of Coroner, including outside physician reviews of the initial Department of Coroner Autopsy report for Paula Marie Rojeski, 2011-05916. The outside physicians' specialties and date of consult are as follows:

1. Surgery, 01/24/2013
2. Anesthesiology, 01/28/2013
3. Pathology, 01/28/2013
4. Pathology, 01/31/2013
5. Surgery, 02/07/2013
6. Pathology, 02/12/2013
7. Internal Medicine, 03/07/2013

As background, the brief timeline of correspondence and other contact with an outside attorney's office (Centurion Law Group) is provided as follows. Eight binders and associated letters were received by this Senior Deputy Medical Examiner, Dr. Djabourian from 10/3/2012 to 12/6/2012. The extensive material was reviewed prior to finalization of the initial Department of Coroner autopsy report on 12/31/2012. Some of the material in the binders was relevant to cause and manner of death determination, other material including deposition materials, did not appear to have direct bearing to cause and manner of death determination. On 1/15/2013, a meeting with the law group was arranged to include lead attorney Mr. Konrad Trope Esq., Dr. Sedrak, and other associate attorneys. From the Department of Coroner were Assistant Chief Ed Winter, Captain John Kades, Dr. Christopher Rogers –Chief of Forensic Medicine, and myself Dr. Raffi Djabourian-Senior Deputy Medical Examiner. The cause and manner of death findings were discussed and a copy of the initial autopsy report was provided, noting that there was a discretionary internal Department of Coroner security hold on the report release (as opposed to an external law enforcement  agency security hold which had been previously released). Seven reports from the outside physicians were received from 1/24/2013 to 3/7/2013 and a reassessment of Department of Coroner reports was initiated by our department, as would be the case when any new information comes to light either prior to or after a Coroner case has been finalized, for the sake of due diligence.

# **SUPPLEMENTAL REPORT**

**12b**

No.  2011-05916

Rojeski, Paula

Page ___2___

Additional internal review included a supplemental anesthesiology consultation report by Dr. Selma Calmes, a review discussion with Dr. Denis Astarita of his surgical consultation report, and review of an additional Coroner requested anesthesiology consultation by Dr. Earl Strum, dated 3/7/2013.

As a result of the above factors, the **following changes to the opinion in the initial autopsy** report are rendered:

1.   Opinion, Lines 4  to 11 of paragraph 3 :

"The anesthesiology consultant report indicates that there was gross negligence on the part of the anesthesiologist, in that he failed to meet basic standards of anesthesia care, in particular: failure to adequately assess the patient's condition during surgery, to communicate the patient's deteriorating condition to the surgeon, and to provide pain relief and amnesia while the patient was paralyzed during surgery" ***should be changed to***
"The supplemental anesthesiology consult by Dr. Calmes indicates that the anesthesiologist did not meet the standard of care because he failed to identify the problem and inform the surgeon of the patient's deterioration. The anesthesiology consultation report by Dr. Strum indicates that the anesthesia care for the decedent was 'below the standard of care and considered negligent'.  Though Dr. Strum states there was poor management in the care, he stops short of considering this gross negligence."

2.   Opinion, Lines 5 to 13 of paragraph 4:

"The clinical circumstances, as outlined in the Department of Coroner anesthesiology consultant report, are consistent with the injury occurring early in the course of the surgery, indicating that prompt recognition of the problem may have prevented this death. The injury itself, together with the failure to detect the resulting hemorrhage and respond appropriately, constitute an extreme deviation from the standard of care on the part of both the surgeon and the anesthesiologist" ***should be changed to***
"Dr. Calmes' supplemental anesthesiology consultation report indicates that this was a salvageable injury, that is, regardless of the injury to the aorta, proper care such as vascular surgery could have saved this patient's life. Dr. Strum's anesthesiology consultation indicates that the anesthesiologist's failure to communicate with staff including the surgeon prevented the patient from receiving an earlier intervention."

3.   Opinion,  Lines 16 to 19 of paragraph 4:

"The currently available information does not allow for a conclusion that the surgeon or anesthesiologist intentionally disregarded the patient's safety.  The manner of death thus could not be determined" ***should be changed to***
"The currently available information does not allow for a definite conclusion whether or not the surgeon or anesthesiologist intentionally disregarded the patient's safety (neglect). There are, however, significant lapses in diagnosis and judgment that at least constitute simple negligence and may constitute gross negligence or incompetence by the physicians.  If any future investigations clarify that there definitely was or was not a conscious disregard for patient safety, the manner of death can be revised to homicide or accident, respectively. As of now, the manner of death is undetermined, as this death does not strictly conform to any one particular manner of death."

4.   Opinion, new paragraph 5:

Comments regarding select aspects of the outside physician reviews:

# **12b**

# SUPPLEMENTAL REPORT

No. 2011-05916

Rojeski, Paula

Page ___3___

a. Cause of death:  In the 02/07/2013 surgery report there is an implication that "the stress of surgery and/or the anesthetic drugs" caused sudden cardiac arrest and the aortic injury was CPR related.  The autopsy report above is clear as to what the CPR injuries are and what the surgical complications are. Heart disease is listed as a contributory factor, however but for the surgical injury, the heart would not have given out when it did.

b. Manner of death:  Manner of death determinations vary based on local law enforcement jurisdiction, customs and history of the medical examiner/coroner, and training.  Even more so than the cause of death, they are opinions and are defined in various ways.  For example, homicide may be defined as death at the hands of another; death by intentional act; a willful act (or omission) committed by another contributing to death; a volitional act committed by another  to cause fear, harm, or death; or extreme medical negligence.

c. Procurement:  There was no lack of chain of custody as indicated in the 01/24/13 surgery report.  One Legacy procurement agency followed proper documentation and procurement consisted of only bones of the extremities with a specific comment the pelvic bones were not recovered due to Department of Coroner restrictions.  Also, skin was only recovered from the legs and back, and tissues from the chest and abdomen were not recovered.

d. Error in length of surgery:  Dr. Calmes anesthesiology consultation erroneously indicated the length of surgery from 0915 to 1115. The 1115 time was the end of anesthesia management, not the end of surgery, which was 0945.  I did not recognize that error in my autopsy report.  My conclusions which may have rested upon that error have been addressed as above in this supplemental report.

_____
Raffi Djabourian, MD
Senior Deputy Medical Examiner                    Date   4/1/2013

RD:mtm/f

75A798P—Rev 2/91

County of Los Angeles                **FORENSIC CONSULTANT'S REPORT**                Department of Coroner

| **13** | **SURGERY CONSULT** | **2011-05916**<br>**Rojeski, Paula** |

### General Surgical Opinion:

This case was first reviewed on November 3, 2011 where an ambiguous operative note did not account for a fatal aortic injury during laparoscopic bariatric surgery.

I have discussed the case and autopsy findings with Drs. Djabourian and Marinovich. The pending cause of death is hemorrhage (from laparoscopic surgery) and the likely manner of Death will be Accident.  I also reviewed an anonymous letter sent here which outlines various shortcomings of the "1-800-get-thin" surgery centers.

This case was reviewed with Drs. Djabourian and Marinovich.  The autopsy findings and pictures showed a puncture of the abdominal aorta at the level of the inferior mesenteric artery.  The operative note describes problems with hypotension, but offers no proper evaluations (such as searching for pneumothorax or bleeding or air embolism or cardiac events.)

The manner of death is more appropriately undetermined at this time pending further investigation.

My opinion agree with reporting this case to the California Medical Board for gross negligence with incompetence.  I suggest that the anonymous letter to be submitted to the Board.


Denis C. Astarita, M.D. F.A.C.S             21 JUNE 2012
Surgery Consultant                          Date


DCA:ic
7/2/12

County of Los Angeles | **FORENSIC CONSULTANT'S REPORT** | Department of Coroner

| 13 | **ANESTHESIOLOGY CONSULT** | **2011-05916**<br>**Rojeski, Paula M.** |
|---|---|---|

This 55 yo morbidly obese woman arrested at the end of a lap band placement (an incidental hiatal hernia was found at surgery and was also repaired, and the liver was biopsied) on 9/8/11 at Valley Surgical Center. She was declared dead after transfer to West Hills Hospital at 1141hrs. Multiple records were reviewed: the clinic's H&Ps dated 5/20/11 and 9/8/11, a Past Hx questionnaire filled out by the patient, a preop evaluation by another MD (internist?) on 6/4/11, cardiac studies (3 EKGs, stress ECHO, exercise tolerance test), a sleep study with BiPAP titration, the anesthesia preop evaluation, the anesthesia record, the OR record, a code sheet, paramedic records, dictated summaries by the receiving hospital ER staff, and the hospital code blue record. Also reviewed were a dictated progress note by the anesthesiologist, dictated op note by the surgeon, an external anesthesia "peer review" and a 1½ page anonymous letter to the coroner by staff who were apparently present during the procedure. The letter reports numerous violations of anesthesia practice, which will be discussed later.

At a preop evaluation visit on 6/4/11, the patient's weight was 182 lbs (84 kg) and she was 64" tall. BMI was 31.2, at the upper limit of criteria for obesity; she was not morbidly obese. She had an extensive preop workup. Hypertension (205/119) was noted on 5/20/11, and lisinopril/HCTZ prescribed. Cardiac workup included 3 EKGs with varying readings (sinus bradycardia, minimally abnormal/normal variation on 6/4/11, possible LVH, consider ischemia, borderline EKG on 6/18/11, and SR, minor ST-T changes on 9/6/11). An ECHO and a stress ECHO were done on 6/18/11. The EKG during stress showed ischemia but the myocardium performed normally on ECHO. She had no clinical symptoms during stress. A sleep study with BiPAP titration on 7/8/11 documented moderate OSA, with significant hypoxemia during sleep and improvement with BiPAP. There is no record that she was put on BiPAP after the sleep study. An abdominal ultrasound on 6/4/11 showed hepatomegaly with fatty infiltration. Lab studies were normal. Lisinopril/HCTZ was her only medicine; there were no allergies. Past surgeries were an abdominal hysterectomy and T&A.

The anesthesia preop evaluation was reasonably readable and complete; OSA was noted but not any treatment/any plan for her postop respiratory care, as would be expected for a patient with OSA. ASA PS was 3; a strong case could be made for a PS 4, based on her OSA and cardiac studies.

The hand-written anesthesia record is nearly unreadable, even using a magnifying glass. It is meticulously filled out; for example the patient's temperature was recorded every 15 mins. The pattern of VS strongly suggests hypovolemia, most likely from intra-abdominal blood loss. The anesthesia record notes "pt is dry (dehydrated) preop before op," with no explanation/possible etiology of dehydration. There was no obvious medical reason for her to be dehydrated preop. Metoprolol 2 (mg?) IV was given before induction. This is an unusual,low dose for this beta-blocker pre-induction. Versed 1 mg, fentanyl 50 ugm and 200 mg propofol IV were given for induction, and then 2 L/min O₂ and isoflurane 1% were used after intubation. Succinylcholine 120 mg was used for intubation and rorcuronium 10mg + 20 mg was used for maintenance relaxation.

**FORENSIC CONSULTANT'S REPORT**

# 13

**ANESTHESIOLOGY CONSULT**

**2011-05916**
**Rojeski, Paula M.**

**Page 2**

Pre-induction VS were BP 198/90, HR 89, RR 16, T 97.8° and Sp $O_2$ 98% ($FiO_2$ not noted). Induction began at 0855. BP dropped after induction, with a precipitous BP drop to 80/50 at 0925. Boluses of epinephrine and neosynephrine were recorded as given then. (This is not easily readable on the anesthesia record.) HR stepped up from 80/min to 120/min and higher for the rest of the case. The inhalation anesthetic isoflurane was stopped at 0945, and circuit gas flow was increased, to remove isoflurane from the system. No further anesthetic drugs appear to have been given for the remaining 1 ½ hrs of surgery, on review of the anesthesia record. If there was cerebral perfusion during this time (we can anticipate that cerebral flow was present for at least some part of the next 1½ hrs even though she was in a steep head-up position, which works against adequate cerebral blood flow when BP is low), she had to be feeling pain and was conscious but paralyzed as she probably bled to death. If the patient could not tolerate inhaled anesthetics, ketamine (which supports circulation and gives analgesia and amnesia) could have been used.

At the end of the case, muscle relaxants were reversed. She was breathing on her own and NM transmission was normal, but she appeared weak. PEA was recorded at the end of the case. A code record began at 1055. The hand-writing appears to be the anesthesiologist's; this is an unusual practice as nursing staff should do charting while the anesthesiologist manages the code. This raises the concern that the record was filled out after-the-fact. Single doses of the standard resuscitation meds were given: atropine (recorded last, but apparently given first), $NaHCO_3$, $CaCl_2$ and epinephrine. This code sheet has no column for rhythm, making it impossible to evaluate whether treatment was correct for the rhythm. This is the most critical factor for success of CPR and is routinely evaluated in hospitals.

Paramedics arrived at 1102 and found asystole, dilated and fixed pupils, apnea and a GCS of 3. BG was 250. After 2 doses of epinephrine and 1 amp of $NaHCO_3$, paramedics took her to West Hills Hospital. There, the patient was still in asystole, in respiratory distress, apneic, diaphoretic and was bleeding from the incision sites. She failed to respond to ACLS and was declared dead at 1141.

<u>COMMENTS ON THE LETTER</u>: This describes 5 problems with the anesthesia care; it appears to be written by people familiar with OR and anesthesia routines, such as scrub nurses or OR techs. The allegations explain many aspects of the patient's condition and outcome. All items are very serious deviations from the standard of care, especially #1-4.

County of Los Angeles   **FORENSIC CONSULTANT'S REPORT**   Department of Coroner

| 13 | **ANESTHESIOLOGY CONSULT** | **2011-05916**<br>**Rojeski, Paula M.**<br><br>**Page 3** |

1. The $O_2$ tanks were not turned on before the case started, and there was no $O_2$ flow at one point about 10-20 mins after starting. (COMMENT: This means that the machine was not checked before starting the case, a CMS requirement. This raises the concern that other serious machine issues could have been missed, such as vaporizer leaks.)

2. The anesthesiologist was selecting the best vital signs to record. (COMMENT: He appears to not be paying attention to the patient's actual status, which was deteriorating markedly.)

3. The surgeon expressed concern about the patient at several points and asked the anesthesiologist if the patient was OK. Also, monitor alarms kept going off, but the anesthesiologist reassured the surgeon and stated the machines were malfunctioning "as they always do." (COMMENT: The monitor problem most likely was the result of the patient's deteriorating status as she bled into the abdomen. The alarms were probably due to the patient's low blood pressure.)

4. IV fluids were running onto the floor instead of into the patient; this was found by the surgeon at the end of the case. (COMMENT: This does not help the patient, who was bleeding out from the aortic injury.)

5. The time of the code was inaccurate, implying it took place earlier, and it took the surgeon to start CPR and call 911, not the anesthesiologist.

Given the tragic outcome of this case and the apparent knowledge of the letter's authors, I believe there is merit to these written allegations.

AUTOPSY: A 0.4 cm penetrating defect of the abdominal aorta near the origin of the inferior mesenteric artery, and 1400 cc blood and fluid were found in the peritoneal cavity. This is 34% of the patient's estimated blood volume (EBV = 4.2 L), a significant loss, and probably there had been more. There was also pulmonary edema, bilateral pleural effusions, LVH, and partial (focal) occlusion (80%) of the dominant RCA were also found.

TOXICOLOGY: Bupivacaine 3.2 ugm/ml, diphenhydramine <0.50 ug/ml and lidocaine 1.0 ug/ml were present in intraperitoneal blood. That level of bupivacaine is high enough to at least cause symptoms of local anesthetic toxicity (dizziness, ear ringing), and lower levels have been reported in patients with seizures after overdose. Bupivacaine in the femoral blood sample was lower, < 0.5 ug/ml, a non-toxic level.

County of Los Angeles

**FORENSIC CONSULTANT'S REPORT**

Department of Coroner

| | |
|---|---|
| **13** | **ANESTHESIOLOGY CONSULT** |

**2011-05916**
**Rojeski, Paula M.**

**Page 4**

IMPRESSION:  Anesthesia care was an extreme departure from the accepted standard of care and is, most likely, directly responsible for this patient's death.  Injury to major blood vessels is a known risk in laparoscopic surgery, most commonly from placement of the trocars.  The injury could conceivably been repaired if the surgeon had been informed promptly that the patient appeared to be bleeding intra-abdominally.  The aorta could have been cross-clamped, and aggressive fluid resuscitation could be done while the patient was transferred to another facility for aortic repair. (A suitable hospital with vascular surgeons was close by.)  The anesthesiologist was unaware of what was going on with the patient, blaming the monitors and failing to take effective actions as the patient bled to death.   Strangely, the anesthesiologist realized the patient could not tolerate the anesthetic agent (it was turned off at 0945) but yet told the surgeon all was well.   This patient was probably awake and feeling pain as she proceeded along the path to her death over the next 1 1/2 hours.  The surgeon had some responsibility in that, somehow, the large volume of intraperitoneal blood was missed.  It appears he was suspicious that all was not well because he kept asking if the patient was OK.

A list of failed standards related to anesthesia care follows:

1. Failed to check the anesthesia machine preinduction to insure that the patient would receive $O_2$ while anesthetized.  The $O_2$ tanks could have been empty, not just turned off.  Other machine defects could have been missed.
2. Failed to believe monitor data and to confirm, using other means (observation of skin perfusion, feeling for a pulse, listening to intensity of heart sounds, checking Hgb/ABGs), what was going on with the patient.  If a monitor was the problem, these other methods could confirm the patient was at least alive, and then the monitor problem could be solved, after confirming that the patient was OK.
3. Failed to understand and able to troubleshoot standard monitors.
4. Failed to communicate the patient's deteriorating condition to the surgeon.
5. Failure to provide an adequate route for IV fluids (the IV line was not intact and fluid administered was going on to the floor and not reaching the patient).  The op note by the surgeon reported that a second IV was started at some point.  Although 5 or 6 L NS was recorded as given IV (the surgical op note said 3 L IV fluids were given), most probably did not go to the patient.  She only made 300 cc UO during surgery, a very small amount for the IV fluid given and an Estimated Blood Loss (EBL) of < 50 cc.
6. Failure to take action to resuscitate promptly.
7. Failure to provide pain relief and amnesia during surgery.  This is a most egregious error.

All items listed are basic functions and obligations of an anesthesiologist.  This case can be considered grossly negligent anesthesia care.

_Selma H. Calmes, 7uD_
Selma H. Calmes, M.D.
Anesthesiology Consultant

_1/13/2012_
Date

SHC:ic
1/6/12

County of Los Angeles                **FORENSIC CONSULTANT'S REPORT**                Department of Coroner

| 13 | SUPPLEMENTAL ANESTHESIOLOGY CONSULT | 2011-05916 Rojeski, Paula |
|---|---|---|

This is a re-evaluation of my consultations on this case and supersedes previous consultations. This re-evaluation included review of the following documents:

1. Consultant A, pathologist, consult dated 1-24-13
2. Consultant B, anesthesiologist, consult dated 1-28-13
3. Consultant C, pathologist, consult dated 1-28-13
4. Consultant D, pathologist, consult dated 1-31-13
5. Consultant E, surgeon, consult dated 2-7-13
6. Consultant F, pathologist, consult dated 2-12-13
7. Consultant G, medicine and critical care, consult undated
8. My Anesthesiology consultation signed 1-13-12
9. My Anesthesiology consultation signed 1-25-12
10. Medical records of patient Paula Rojeski, as follows:
    The Valley Surgical Center's H&Ps dated 5-20-11 and 9-8-13, a Past History questionnaire filled out by the patient, a preop evaluation by an MD (not the anesthesiologist) on 6-4-11, cardiac studies (3 EKGs, stress ECHO, exercise tolerance test), a sleep study with BiPAP titration, the anesthesia preop evaluation, the anesthesia record, the OR records, and a code blue hospital record. Also reviewed was a dictated progress note by the anesthesiologist, a dictated operative note by the surgeon, and an "external" anesthesia peer review.
11. A consultation by a second anesthesiologist was not reviewed before writing this final consultation.

The patient was a 55 year old obese woman who arrested during recovery from a lap band placement on 9-8-11. She also had a hiatal hernia and a liver biopsy. The procedures were at Valley Surgical Center; she was transferred by paramedics to West Hills Hospital where she was declared dead.

At a preop evaluation visit on 6-4-11, the patient's weight was 182 lbs (83.6 kg) and she was 64" tall. BMI was 32.1, the upper limit of criteria for obesity. She was not morbidly obese. Hypertension (205/119) was found and lisinopril/HCTZ prescribed. Cardiac workup included 3 EKGs with varying readings (sinus bradycardia, minimally abnormal/normal variation on 6-4-11, possible LVH, consider ischemia, borderline EKG on 6-18-11 and SR, minor ST-T changes on 9-6-11). An ECHO and a stress ECHO were done on 6-18-11. The EKG during stress showed ischemia but the myocardium performed normally on ECHO. She had no clinical symptoms during stress. A sleep study with BiPAP titration on 7-8-11 documented moderate OSA with significant hypoxemia during sleep and improvement with BiPAP. There is no record she was put on BiPAP after the sleep study. A testimonial letter from the MD who did the sleep study was in material sent from Mr. Trope's office. This stated that the patient was using CPAP nightly and her sleep apnea was thus "cured." However, when treated sleep apnea patients come for surgery and are exposed to various anesthetic drugs such as narcotics, apnea often occurs in the recovery period and the patients die if not carefully observed and treated. The recommendation, based on careful studies, is that CPAP be used during the recovery period to avoid this hazard. (American Society of Anesthesiologists' Task Force on Perioperative Management of Patients with Obstructive Sleep Apnea. Practice Guidelines for Perioperative Management of Patients with Obstructive Sleep Apnea. Anesth 2006; 104:1081-93.) There was no evidence of such a plan in this case.

An abdominal ultrasound on 6-4-11 showed hepatomegaly with fatty infiltration. Lab studies were normal. Lisinopril/HCTZ was her only medicine. There were no allergies. Past surgeries were abdominal hysterectomy and a T&A.

The anesthesia record is meticulously filled out but difficult to read. Preinduction vital signs were BP 198/90, HR 89, RR 16, T 97.9° and $SpO_2$ 98% ($FiO_2$ not recorded). Induction began at 0855 with midazolam, metoprolol and fentanyl and then isoflurane and $O_2$ by inhalation once the patient was intubated . Anesthesia began at 0855, and surgery began at 0915. Surgery ended at 0945 and anesthesia ended at 1115.

County of Los Angeles

**FORENSIC CONSULTANT'S REPORT**

Department of Coroner

# 13

**SUPPLEMENTAL
ANESTHESIOLOGY CONSULT**

**2011-05916
Rojeski, Paula**

Page 2

Apparently, she was not moved from the OR to a Post-Anesthesia Care Unit (PACU) for recovery, the usual procedure after surgery, but was recovered in the operating room by the anesthesiologist.

BP dropped after induction to 80/65, HR 80. A vasoactive drug must have been given about 0930 because HR stepped up suddenly above 120/min. Multiple injections of vasopressors (epinephrine) were used to maintain blood pressure during the case.

HR continued at 130-135/min from 1000 to 1100 when BP started to fall. This pattern of vital signs is that of hypovolemia (fast HR, falling BP) and is characteristic of uncompensated blood loss. The patient finally could not compensate any more for the on-going blood loss, and she arrested. When the paramedics arrived at 1102, she was in asystole, pupils were dilated and fixed, she was diaphoretic and had apnea and bleeding from the incision sites. She could not be resuscitated at the hospital. Six liters of normal saline was recorded as given in the OR by the anesthesiologist, with urine output only 300. Other numbers (3 and 5 L) for IV fluid administered were in the records.

AUTOPSY: A 0.4 cm penetrating defect of the abdominal aorta near the origin of the inferior mesenteric artery, and 1400 cc blood and fluid were found in the peritoneal cavity. This is 34% of the patient's estimated blood volume (EBV, calculated using the usual formula for EBV, 6% of an obese female's body weight), a significant loss, and probably there had been more. There was also pulmonary edema, bilateral pleural effusions, LVH and partial (focal) occlusion (80%) of the dominant RCA were also found. Weight at autopsy was 197 lbs, a 6.8 kg gain.

TOXICOLOGY: Bupivacaine 3.2 ugm/ml, diphenhydramine <0.50 ugm and lidocaine 1.0 ug/ml were present in intraperitoneal blood. That level of bupivacaine is high enough to possibly cause local anesthetic toxicity (dizziness, ear ringing), and lower levels have been reported in patients with seizures after overdose. Bupivacaine in the femoral blood sample was lower, <0.5 ugm/ml, a non-toxic level.

SITE VISIT: A group of involved coroner staff went to the clinic on 12/5/2011 and inspected the OR where the event occurred more than 3 months previously. Because of the time gap, there was no way to insure that the equipment seen was the equipment used, especially after the group saw the Ohmeda respiratory monitor was labeled with a "Beverly Hills" (the location of the other surgical facility for this company) sticker. None of our observations that day can be considered accurate for the day of the Rojeski event.

IMPRESSION: This was a salvageable injury. Injury to abdominal blood vessels, usually when trocars are placed, is well known to occur during laparoscopy. If the surgeon is alerted, repair is possible, even as resuscitation is occurring. Part of an anesthesiologist's job is to inform the surgeon that a patient appears to be losing blood inside the abdomen. Transfer to another hospital would be needed in this out-patient setting, and a hospital capable of vascular surgery was nearby. The anesthesiologist did not meet the standard of care because he failed to identify the problem and inform the surgeon of the patient's deterioration.

Selma H. Calmes MD
Selma H. Calmes, M.D.
Anesthesiology Consultant

4/1/2013
Date

SHC:ksp
4/1/13

County of Los Angeles | **FORENSIC CONSULTANT'S REPORT** | Department of Coroner

## 13

**ANESTHESIOLOGY CONSULT**

**2011-05916**
**Rojeski, Paula M.**

Today, I reviewed pages 1-6 in the black notebook from the Centurian Law Group. The information does not change my opinion, recorded in 2 previous anesthesia consults on this case.

_Selma H. Calmes MD_

Selma H. Calmes, M.D.
Anesthesiology Consultant

_11/16/12_

Date

SHC:ic
11/16/12

County of Los Angeles          **FORENSIC CONSULTANT'S REPORT**          Department of Coroner

<table>
<tr><td>13</td><td>**ANESTHESIOLOGY CONSULT**</td><td>**2011-05916**<br>**Rojeski, Paula M.**</td></tr>
</table>

<u>REPORT OF SITE VISIT</u>, 12/5/2011 TO VALLEY SURGICAL CENTER, 7320 West Woodlake Ave, Suite 320, West Hills, CA 91307 (left Coroner's at 0900, returned at 1100) PRESENT: Capt Kades, Forensic Fellow Dr. Adrian Moranovich, Anesthesiology Consultant Dr. Selma Calmes This visit was to address the question of safety features of the anesthesia machine used in this case: Was it possible for the $O_2$ to fail after the case started, as alleged in an anonymous letter? We were shown one of two ORs. This was a standard OR of adequate size. The anesthesia machine was a modern Ohmeda model, a Modulus SE, which has all standard fail-safe features. There is a pipeline gas setup for $O_2$ and $N_2O$. The pipeline gas source was from E tanks in a nearby tank room, where extra D tanks are also stored. Connections for the pipeline source were from the OR ceiling, to the anesthesiologist's left (head of OR table toward the window, away from the door).  These were not connected to the machine at the time we visited. A panel for monitoring pipeline gas pressure is located at the central desk, as the main OR area is entered.  All pipeline pressures were appropriate (48 psi) although no cases were going on.  Note this pressure monitor does not measure how much gas is left in the tank; this is done by a separate pressure gauge on each tank and the tanks are remote from the anesthesiologist. The secondary gas supply at the anesthesia machine had 2 backup D cylinders of $O_2$ and 1 $N_2O$ D tank, as usual.  The machine had standard pressure gauges for both.  A service tag by "Gary Hull Anesthesia" was dated 12/4/11.  Photos were taken by Captain Kades of the front and back of the machine and the monitors.

Given the presence of standard safety features in this model of an anesthesia machine, how could failure after a case starts occur?  Possible scenarios follow:

1. If pipeline gas tanks were not turned on and the backup tanks on the machine were off, the machine should have alarmed before the case started, and the anesthesiologist should have recognized lack of $O_2$.
2. One pipeline E tank might have been open but was nearly empty.  Anesthesiologist did not think to turn on a backup tank at the machine after the E tank ran out.  Machine should have alarmed.
3. Anesthesiologist was working from a machine backup tank with a low pressure and it ran out.  Pipeline tanks were not turned on.  That could explain 10-20 mins of $O_2$ flow as the case began.

The machine should have alarmed in all these situations, warning the anesthesiologist that the $O_2$ supply was low/absent.  There is no evidence that the patient was harmed by this episode. This could have happened and was not documented in this case.  Whether or not harm occurred, an anesthesiologist is responsible to check the anesthesia machine and gas system before starting a case.

MONITORS:  Monitors were a combined Ohmeda ET $CO_2$ and $SpO_2$ on the top shelf of the machine, a respiratory monitor for ventilation on the middle shelf and a separate, free-standing monitor that accepts multiple monitor modules such as BP, EKG, $SpO_2$ and probably ET $CO_2$. Its remoteness from the anesthesiologist makes it more difficult to read and also to troubleshoot. All monitors should be together for improved visualization.  It is not known if any of these devices were used on the patient in question.

*Selma H. Calmes MD*
Selma H. Calmes, M.D.
Anesthesiology Consultant
SHC:ic
1/24/12

1/25/2012
Date     *( previously sub-*
*mitted, but file*
*lost)*

COUNTY OF LOS ANGELES                     **MICROSCOPIC REPORT**                     DEPARTMENT OF CORONER

# 14

I performed a microscopic examination on
10/24/2012

at   THE DEPARTMENT OF CORONER

Los Angeles, California

2011-05916
Rojeski, Paula

## Microscopic description

Heart:  There is mild perivascular fibrosis with minimal interstitial myocardial fibrosis.  There is mild scattered myocyte nucleus hypertrophy.  No acute inflammatory infiltrates are seen. There is no hemorrhage, necrosis, or significant epicardial or endocardial lesions.

Lungs:  Bronchioles show no significant inflammatory infiltrates.  Alveoli show no acute inflammatory exudates or emphysematous changes.  No significant interstitial changes are noted.  Congestion is not prominent.  No advanced pulmonary hypertensive changes are seen.  Rare areas of increased alveolar macrophages are present, though no hemosiderin or foreign bodies are noted.

Kidneys:  No acute inflammatory changes are noted.  Glomeruli show occasional sclerosis.  Interstitium shows a few areas of tubular atrophy with chronic inflammation.

Pancreas:  Postmortem autolysis, without inflammation.

Adrenal:  Unremarkable.

CNS:  No inflammatory infiltrates of meninges are noted and no chronic cerebellar ischemic changes are present.


Slide Key:  1-2/5 Heart   3/5 Lungs   4/5 Pancreas, kidney   5/5 Cerebellum, medulla

Note:  See also microscopic report signed 12/13/2011.


Diagnosis:
--Mild myocardial fibrosis, mainly perivascular and mild myocyte hypertrophy, heart
--Mild chronic interstitial nephritis with occasional glomerulosclerosis, kidney


Raffi S. Djabourian, M.D.
Senior Deputy Medical Examiner

10/24/12
Date:

COUNTY OF LOS ANGELES        **MICROSCOPIC REPORT**        DEPARTMENT OF CORONER

# 14

I performed a microscopic examination on ➡

at    THE DEPARTMENT OF CORONER

Los Angeles, California

2011-05916

ROJESKI, PAULA

---

Microscopic description:

Liver (slide 1): Macrosteatosis.  Focal lobular necrosis with neutrophilic infiltrates mixed with lymphocytes. Focal centrilobular necrosis, predominantly adjacent to apparent cautery artifact consistent with biopsy site. Minimal portal lymphocytic inflammation.

Thyroid (slide 2): Colloid follicle. Capsule with lymphocytic infiltration and focal Hurthle cell change.

Peri-thyroid lymph node (slide 2):  Lymph node with papillary thyroid carcinoma (malignant).

(Slides 1 and 2 were reviewed in consultation with Dr. Parakrama Chandrasoma on December 12, 2011.)
(Slide 2 was reviewed in consultation with Dr. Pedro Ortiz-Colom on October 21, 2011.)

Diagnosis:

1. Papillary thyroid carcinoma metastatic to regional lymph node (malignant)
2. Thyroid changes suggestive of Hashimoto's thyroiditis
3. Steatohepatitis


Adrian Marinovich, MD, MPH
Fellow in Forensic Pathology

12/13/2011
Date

Raffi Djabourian, MD
Deputy Medical Examiner

12/13/11
Date

76M350 (Rev. 1/93) P1/93

**MEDICAL REPORT**

COUNTY OF LOS ANGELES — DEPARTMENT OF CORONER

**15**

AUTOPSY CLASS: ☐ A ☒ B ☐ C ☐ Examination Only D

☐ FAMILY OBJECTION TO AUTOPSY

Date: 9/12/11  Time: 0855  Dr. MARINOVICH/Dijabourian (Print)

FINAL ON: 12/31/12  By: Djabourian (Print)

APPROXI-MATE INTERVAL BETWEEN ONSET AND DEATH

DEATH WAS CAUSED BY: (Enter only one cause per line for A, B, C, and D)

IMMEDIATE CAUSE:

(A) Intra-abdominal hemorrhage — Hrs

DUE TO, OR AS A CONSEQUENCE OF:

(B) Aortic perforation during laparoscopic gastric band surgery — Hrs

DUE TO, OR AS A CONSEQUENCE OF:

(C) Obesity — Yrs

DUE TO, OR AS A CONSEQUENCE OF:

(D)

OTHER CONDITIONS CONTRIBUTING BUT NOT RELATED TO THE IMMEDIATE CAUSE OF DEATH.

Atherosclerotic heart disease, cardiomegaly

☐ NATURAL  ☐ SUICIDE  ☐ HOMICIDE
☐ ACCIDENT  ☒ COULD NOT BE DETERMINED

12/31/12

If other than natural causes, HOW DID INJURY OCCUR? Complications of laparoscopic banding surgery with unresolved patient safety issues

WAS OPERATION PERFORMED FOR ANY CONDITION STATED ABOVE: ☒ YES ☐ NO

TYPE OF SURGERY: Laparoscopic band surgery  DATE: 9/8/2011

☒ ORGAN PROCUREMENT  ☒ TECHNICIAN: L. Bivens
☐ skin, bones
PREGNANCY IN LAST YEAR  ☐ YES  ☒ NO  ☐ UNK  ☐ NOT APPLICABLE

☐ WITNESS TO AUTOPSY  ☐ EVIDENCE RECOVERED AT AUTOPSY
Item Description:

---

Age: 55  Gender: Male / Female

**PRIOR EXAMINATION REVIEW BY DME**

☒ BODY TAG  ☐ CLOTHING
☐ X-RAY (No. _____ )  ☐ FLUORO
☐ SPECIAL PROCESSING TAG  ☒ MED. RECORDS (West Hills)
☐ AT SCENE PHOTOS (No. _____ )

**CASE CIRCUMSTANCES**

☐ EMBALMED
☐ DECOMPOSED
☐ >24 HRS IN HOSPITAL
☒ OTHER: Procurement  (Reason)

**TYPING SPECIMEN**

TYPING SPECIMEN TAKEN BY: _____
SOURCE: _____

**TOXICOLOGY SPECIMEN**

COLLECTED BY: Marinovich / Djabourian
☐ HEART BLOOD  ☐ STOMACH CONTENTS
☐ FEMORAL BLOOD  ☒ VITREOUS
TECHNIQUE:
☐ _____ BLOOD  ☐ SPLEEN
☒ Abdomen BLOOD  ☐ KIDNEY
☒ BILE  ☐ _____
☒ LIVER  ☐ _____
☐ URINE  ☐ _____

URINE GLUCOSE DIPSTICK RESULT: 4+  3+  2+  1+  0
TOX SPECIMEN RECONCILIATION BY: PD

**HISTOLOGY**

☒ Regular (No. 2 )  ☐ Oversize (No. _____ )
Histopath Cut: ☒ Autopsy  ☐ Lab # 2

**TOXICOLOGY REQUESTS**

FORM 3A: ☐ YES  ☒ NO
☐ NO TOXICOLOGY REQUESTED
SCREEN ☒ C  ☐ H  ☐ T  ☐ S  ☐ D
☐ ALCOHOL ONLY
☐ CARBON MONOXIDE
☐ OTHER (Specify drug and tissue)
_____
_____
_____

**REQUESTED MATERIAL ON PENDING CASES**

☐ POLICE REPORT  ☒ MED HISTORY (Valley Care)
☐ TOX FOR COD  ☒ HISTOLOGY
☒ TOX FOR R/O  ☐ INVESTIGATIONS
☐ MICROBIOLOGY  ☐ EYE PATH. CONS.
☐ RADIOLOGY CONS.
☒ CONSULT ON: Surgery, anesthesia  MD
☐ BRAIN SUBMITTED
☐ NEURO CONSULT  ☐ DME TO CUT
☐ CRIMINALISTICS
☐ GSR  ☐ SEXUAL ASSAULT  ☐ OTHER

---

RESIDENT _____  DME _____

**WHITE** - File Copy  **CANARY** - Forensic Lab  **PINK** - Certification  **GOLDENROD** - DME  (Rev. 04-09)

COUNTY OF LOS ANGELES — **AUTOPSY CHECK SHEET** — DEPARTMENT OF CORONER

# 16

2011-05916
E JUFSKY, PARLA
LCC                                    15

*2 cm defect post periton midline umb reg on w/adjacent hem*

**EXTERNAL EXAM**
Sex F
Race W
Age 55
Height 62
Weight 197
Hair gr/61
Eyes br
Sclera ✓
Teeth upr+lo
Mouth ∅ fr
Tongue ∅ fr
Nose ∅ fr
Chest see #20
Breasts ✓
Abdomen see #20
Scar suprapubic transverse
Genitals ✓
Edema ∅
Skin see #20
Decubitus ∅
**HEART Wt.** 400
Pericardium 20 cc ser   RV 0.5
Hypertrophy LVH   Septum 1.7
Dilation ∅   LV 1.7
Muscle ✓   Septum
Valves ✓          RCA 80    T 11.0
Coronaries        LCA<10    P 6.7
**AORTA** min sth    LAD 10    M 9.3
**VESSELS** ✓      LCX 20    A 6.6
**LUNGS Wt.**
R 640              0.4
L 550          defect aorta
Adhesions ∅    imm
Fluid 250 L, 400 R   inf to 1mA
Atelectasis ∅    4.3 sup to
Oedema +
Congestion ~tr abr  live to fre
Consolidation R punch w/cuts hem
Bronchi ✓        hem L
Nodes ∅   @ s/e hilar pleural
                 hem
**PHARYNX** ✓
**TRACHEA** ✓
**THYROID** 1.3 × 1.5 × 1.5  ⊕ nod, mult.  +uodrestin hem
**THYMUS** ∅
**LARYNX** ✓
**HYOID** ~ +
**ABDOMINAL WALL FAT**
        + abds adhesion, spleen, suprapubic

**PERITONEUM**
Fluid 1400 cc blood (1cg felot)
Adhesions +_a.m
**LIVER Wt.** 1930
Capsule ~ → 0.5 cm defect
Lobules ✓      w/app cautery
Fibros ∅         effect
GB + ,1cc      not @ edge
Calculus ∅
Bile ducts ~ int
**SPLEEN Wt.** 190   2.5 × 2 × 1.7
Color ✓      cale. par. hilar
Consistency soft    nod
Capsule ✓
Malpigment ✓
**PANCREAS** ✓
**ADRENALS** ✓ × 2
**KIDNEYS Wt.**
R 150
L 160
Capsule ✓
Cortex ✓
Vessels ✓
Pelvis ✓
Ureters ✓    ⊕DTX
**BLADDER** ✓   ✓ ser ine
**GENITALIA**
~~Prostate~~
~~Testes~~
Uterus absent
Tubes +
Ovaries + × 2
**OESOPHAGUS**  LAP BAND "ALLERGAN" glt
**STOMACH** —                      @ sto.
Contents 3.5 cc pale tan liq   w/food
**DUOD. & SM. INT.** ✓ ∅ w/f
**APPENDIX** ✓
**LARGE INT.** ∅ w/f , ✓
**ABDOM. NODES** ∅
**SKELETON** s/p breast
Spine ✓
Marrow ✓ rd
Rib Cage # not lvt ⊕ 2,3,4,6,7
Long bones ∅ op    (L 3
Pelvis
  } m w/thick
  mFr on ⊕
  thn can nod up to 0.7

**SCALP** ✓
**CALVARIUM** ✓
**BRAIN Wt.** 1250
Dura ✓
Fluid ✓
Ventricles ✓
Vessels ✓
Middle ears ∅ d
Other
**PITUITARY** ✓

**SPINAL CORD** ∅ d

**TOXICOLOGY SPECIMENS**
abdo blood, b.le, Crm, Lithe

**SECTIONS FOR**
**HISTOPATHOLOGY**
1 - liver cap defect
2 - thy nod, intra thy
                    nod

**MICROBIOLOGY** ∅

**DIAGRAMS** #20 × 2
**X-RAYS** ∅

**OTHER PROCEDURES** ∅
  serrpd
  cut
  abs.
**GROSS IMPRESSIONS**
  perineal  see #12
  suture
  rn diaphragm

Date 9/12/11          Time 09:00          Deputy Medical Examiner

3/05)

COUNTY OF LOS ANGELES

DEPARTMENT OF CORONER



(Rev. 7/09)

Date

Deputy Medical Examiner                    M.D.

DEPARTMENT OF CORONER
COUNTY OF LOS ANGELES

**20**
2 of 2

2011-05915
FOJESKI, PAULA
ACC

Surg cut



½ w/cut

½ w/cut

1¾ w/ste. strp

¾ w/plumb
umb 3
36 TOH

9 lb w/ste. strp w/cut

Date 9/12/11

Deputy Medical Examiner _____ M.D.

(Rev. 7/09)



Department of Coroner, County of Los Angeles

# FORENSIC SCIENCE LABORATORIES
### Laboratory Analysis Summary Report



☑ **PendingTox**

**To:**      Dr. Djabourian
**Deputy Medical Examiner**

The following results have been technically and administratively reviewed and are the opinions and interpretations of the Analyst:

**Coroner Case Number:** 2011-05916   **Decedent:** ROJESKI, PAULA MARIE

| SPECIMEN | SERVICE | DRUG | RESULT | ANALYST |
|---|---|---|---|---|
| **Blood, Abdominal** | | | | |
| | Alcohol | Ethanol | Negative | M. Schuchardt |
| | Bases | Bupivicaine | 3.2  ug/mL | E. Fu |
| | Bases | Diphenhydramine | < 0.50  ug/mL | E. Fu |
| | Bases | Lidocaine | 1.0  ug/mL | E. Fu |
| | ELISA | Barbiturates | ND | J. Lintemoot |
| | ELISA | Cocaine and Metabolites | ND | J. Lintemoot |
| | ELISA | Fentanyl | ND | J. Lintemoot |
| | ELISA | Opiates: Codeine & Morphine | ND | J. Lintemoot |
| | ELISA | Opiates: Hydrocodone & Hydromorphone | ND | J. Lintemoot |
| | ELISA | Phencyclidine | ND | J. Lintemoot |
| | MDA | Methylenedioxyamphetamine | ND | O. Pleitez |
| | MDMA | Methylenedioxymethamphetamine | ND | O. Pleitez |
| | Methamphetamine | Amphetamine | ND | O. Pleitez |
| | Methamphetamine | Ephedrine | Present | O. Pleitez |
| | Methamphetamine | Methamphetamine | ND | O. Pleitez |
| **Blood, Harvest Femoral** | | | | |
| | Bases | Bupivicaine | < 0.50  ug/mL | E. Fu |
| | Bases | Diphenhydramine | < 0.20  ug/mL | E. Fu |
| | Bases | Lidocaine | 1.5  ng/mL | E. Fu |

---

| **Legend:** | | | | | |
|---|---|---|---|---|---|
| | | mg/dL | Milligram per Deciliter | QNS | Quantity Not Sufficient |
| g | Grams | mg/L | Milligram per Liter | TNP | Test Not Performed |
| g% | Gram Percent | ND | Not Detected | ug | Micrograms |
| Inc. | Inconclusive | ng/g | Nanograms per Gram | ug/g | Micrograms per Gram |
| mg | Milligrams | ng/mL | Nanograms per Milliliter | ug/mL | Microgram per Milliliter |

In accordance with the Department's Evidence Retention Policy, the blood specimen(s) will be retained for one-year and all other specimens for six-months from Autopsy.

Administratively reviewed by:    _signature_

**Daniel T. Anderson,** M.S., FTS-ABFT, D-ABC
**Supervising Criminalist II**
**TOXICOLOGY**

_am 10/19/11 ND_

# Keck Medical Center of USC

EARL STRUM, M.D.
*Chief of Anesthesiology*
*Department of Anesthesiology*

*Keck Hospital of USC*
*USC Norris Cancer Hospital*

March 7, 2013

Lakshmanan Sathyvavgiswaran M.D.
Chief Medical Examiner/Coroner
1104 N. Mission Rd.
Los Angeles, Ca. 90033

Dear Dr. Sathyvavgiswaran,

Thank you for giving me the opportunity to consult on this interesting case. The review is enclosed. Please let me know when you would like to discuss the case. If you have questions, please do not hesitate to call me at the number above or at (818) 523-9609.

Thank You,

Earl Strum M.D.



# Case Review

Earl Strum M. D.

On September 8, 2011 the patient, PR, a 55-year old female (Height 64 inches/Weight 186 pounds) BMI 36.2 with a history of hypertension, was scheduled for a laparoscopic band placement surgery with a liver biopsy.

**Past medical history**: Hypertension, Obesity, and moderate sleep apnea (diagnosed 7/8/11 CPAP polysomnography test)

**Medication:** Hydrochlorthiazide/Lisinopril 10/12.5

**Past surgical history:** Hysterectomy, EGD, Tonsillectomy, all without complications.

**Allergies:** NKDA

**Social history:** No smoking or drug history.

**Pre-Op Physical Examination (September 8 2011 at 7:45AM):** BP 113/68, pulse 67, RR 18, Temp 97.8 Lungs CTA.

**Airway** – Unremarkable.

**Labs:** Glucose 92

**EKG:** Sinus Bradycardia (6-04 2011)

**Classification:** ASA III

**Nutritional Status:** NPO since 9/7/11 at 1800

**Anesthetic Plan:** Plan was for a general anesthetic

**Other pertinent information**   On 9/6/11, PR was given clearance for surgery by

Dr. Michael Miyamoto, a cardiologist of the Mission Internal Medicine Group.

**Review:** On 9/8/11 the anesthetic start time was recorded as 08:55 AM.  The pre-anesthetic vital signs revealed a BP of 198/92 mmHg, pulse of 89, RR 16, and $O_2$ sat of 98%.  Standard ASA (American Society of Anesthesiology) monitors were utilized. These included blood pressure, pulse oximeter, end tidal $CO_2$, and temperature monitoring. There is documentation on the anesthetic record that the chart was

3

reviewed, patient identified, anesthesia machine was checked, and pressure points padded. The patient underwent a general endotracheal anesthetic. Agents used during the induction were propofol, isoflurane, succinylcholine, glycopyrrolate, and rocuronium. The drugs and dosages appropriate for the anesthetic. The recorded start time for surgery was 09:15 AM and the end time 09:45AM.  At  9:15 AM, the blood pressure was  approximately 135/70 mmHg with a heart rate of 85. The trochars were inserted and the abdomen was insufflated with $CO_2$. At 9:20AM the blood pressure dropped to 80/50 mmHg with a heart rate of 125. At approximately this time, Dr. Chau had an issue maintaining the patient's blood pressure.  He administered 50 mg of ephedrine in titrated doses. He then administered epinephrine in order to maintain the blood pressure. During the actual surgery, Dr. Gee questioned the adequacy of the blood pressure, (as noted in the operative note) however the anesthesiologist said that he would take care of it.  At 9:30AM the blood pressure increased to 112/60mmHg with a heart rate of 120. The surgery proceeded to completion at 9:45AM.  At the completion of the surgery 9:45 AM Dr. Chau gave Neostigmine and glycopyrrolate  and  assessed the patient for extubation. He found the patient to be spontaneously ventilating, *awake* , with a train or four that was 4/4 twitches. However Dr Chau did not feel the patient was ready for extubation since there was still muscle weakness.  Therefore Dr. Chau elected to wait and not extubate the patient .The blood pressures in the anesthetic record from 09:30 AM and on show a systolic blood pressure of 110-130 mmHg with a diastolic blood pressure of 65mmHg, and a heart rate of 125, up until 10:55 AM when the patient was reported to have pulseless electrical activity (PEA), and a Code Blue was

4

called by the surgeon Dr. Gee. The EMS was called and the patient was subsequently

transferred to West Hills Hospital between 11:10 AM and 11:18AM by the LA Fire

Department.  The code and resuscitation efforts were continued at West Hills

Emergency Room from 11:20 AM to 11:41AM at which time the patient was

pronounced dead by Dr. Spencer the emergency room physician.

**Laboratory Analysis Summary Report:** Fentanyl   ND (not detected) 10-17

2011

**Autopsy report:** Significant findings were a 0.4 cm penetrating defect of the

anterior aorta immediately inferior to the origin of the inferior mesenteric artery

and 4.3 cm superior to the bifurcation of the common iliac arteries. There was a

corresponding 2 cm defect of the posterior peritoneum in the region overlying the

defect with adjacent soft tissue hemorrhage. There was a large hemoperitoneum

with 1400 milliliters of liquid and clotted blood measured.  Other significant

findings in the autopsy report were pulmonary edema.  The right lung weighed 640

grams while the left lung weighed 550 grams.   Bilateral pleural effusions were

evident – the right side was 100 milliliters and the left side was larger, at 250

milliliters.

**Discussion:** In regard to the anesthetic management for the laparoscopic band

placement for patient PR on September 8, 2011, there are multiple issues to

address. The surgery itself began at 9:15 AM and ended at 9:45 AM, The actual

surgery was 30 minutes. The time that elapsed from the end of surgery until the

5

code was called at 10:55AM was one hour and 10 minutes. This is an unusually long period of time needed for a patient to take to wake up. Dr. Chau indicated in his progress note that he was waiting for the patient to get stronger in order to extubate. He also noted that the patient was *awake* and breathing spontaneously with a systolic blood pressure of 110 to 130 mmHg and an oxygen saturation of 95%. Dr. Chau also noted that he had difficulty in maintaining blood pressure during the case and therefore needed to give epinephrine in order to maintain the blood pressure. He also indicated that he started a second IV in order to help maintain blood pressure during the case. Then from the period of 9:45AM until 10:55 AM, Dr. Chau was maintaining the patient's blood pressure with doses of epinephrine. There is no documentation of any communication with the surgeon regarding the need to maintain the patient on inotropic agents such as epinephrine to support the blood pressure at any point until 10:55AM when a code blue was called.

In the last paragraph of the surgeon's operative report, Dr. Gee documented that towards the end of the surgical procedure Dr. Chau was having difficulty getting a blood pressure reading. They put the patient in Trendelenburg position and Dr. Chau continued to administer medications and a blood pressure was obtained. Dr. Gee states that he was called back shortly because Dr. Chau could not get a blood pressure reading. The patient had no pulses at this time although he had a rhythm on the EKG, and a presumptive diagnosis of PEA (pulseless electrical activity) was made. A Code Blue was called and resuscitative efforts began.

In my review of this case, the major issues are the perforation of the aorta and Dr. Chau's lack of recognition that the pt was bleeding, which is a rare but well

known cause of hypotension during laparoscopic procedures .Dr Chau also failed to communicate these symptoms to the surgeon during of this case. He should have disclosed that he was having trouble maintaining the blood pressure and that he needed to resort to the use of inotropic agents in order to maintain the patients blood pressure. In a typical laparoscopic band surgery, it would be extremely unusual to resort to the use of medications such as epinephrine in order to support the blood pressure unless there is another medical issue or surgical complication occurring . The need to use a medication such as epinephrine should have alerted the anesthesiologist that the patient was having a problem. The anesthesiologist would be expected to communicate this abnormal situation to the surgeon. The fact that Dr. Chau was treating a low blood pressure with epinephrine for 70 minutes after the case had ended and did not communicate this to the surgeon or call for additional help is below the standard of care and is considered negligent. It is my opinion that this death was attributable to unrecognized bleeding from the aorta that occurred during the procedure. Puncture of the aorta during laparoscopic band placement is a rare occurrence[1-2]; therefore not recognizing this complication immediately may be understandable. However, not recognizing that there was major problem with the patient when epinephrine was required for a prolonged period of time and not considering any other differential diagnoses such as bleeding, heart failure, or myocardial infarction falls below the standard of care. If any of these scenarios were considered, additional interventions and help would be required and not asking for that is negligent. Although the management of this situation is poor I stop short of calling this *gross* negligence; because this is a rare

complication of this procedure and the anesthesiologist was treating the symptoms of the complication by treating the low blood pressure and keeping the patient intubated and not ignoring the situation. There is no documentation that the anesthesiologist was not in attendance with the patient. He was treating the patient by supporting the blood pressure and waiting for the patient to regain enough muscle strength in order to be able to extubate. Since patient s who have bariatric surgery by definition are obese they have risk factors associated with this condition such as  as being difficult to intubate, sleep apnea, and obesity hypoventilation syndrome.  These factors do necessitate waiting longer for the obese patient to fully recover from anesthesia before  extubating, since reintubating these patients could pose much more risk. Although Dr Chau's reasoning and management was erroneous, I believe the above to be the reason Dr Chau was waiting that extended period of time after the surgery; this is why I am not calling this event gross negligence as not recognizing a rare complication should not  be called gross negligence. My issues with the anesthesiologist, Dr Chau, are lack of critical thinking, lack of differential diagnosis, and the lack of  communication between the anesthesiologist and the rest of the surgical team.  The anesthesiologist's failure to communicate this problem to other providers such as the surgeon and the nursing staff prevented this patient from receiving an earlier intervention, which falls below the standard of care and is considered negligent.

Other issues are lack of fentanyl in the toxicology report even though it is recorded in the anesthetic record. The intravenous fluid leaking could explain this and the apparent bucking. A patient bucking during the surgical procedure is a sign

8

of light anesthesia, not a sign that the patient is in cardiac distress. I found Dr. Chau's documentation of pulses positive at 9:30AM and 10:15AM interesting since he was also using a pulse oximeter and the readings were above 91% at those times and it is unusual to document in that fashion. As for the issues in the anonymous allegations it is very difficult to assess without actually being on site.

One other area of concern is the pre operative blood pressure the morning of surgery being 113/68 mmHg; pulse of 67 at 7:45AM Sep 8, 2011 and at 9:00AM it was 198/92 mmHg; pulse of 89. I do not believe this contributed to the patient's mortality however this should have been taken into consideration when a patient is having an elective procedure and possibly delay the surgery until corrected. In summary there are serious issues with the anesthetic management of this case, the most troublesome is the lack of communication by the anesthesiologist regarding the patients circulatory status and the need to support blood pressure for an extended period of time with epinephrine. Lack of critical thinking and not considering a differential diagnostic list are factors I considered to be below the standard of care and are negligent and not what the practice of anesthesiology should be.

1- Abdominal access complications in laparoscopic surgery Philips PA, Amaral JF Journal of the American College of Surgeons - April 2001 (Vol. 192, Issue 4)□

2- J Gynecol Endosc Surg. 2009 Jan-Jun; 1(1): 4–11.




# INVESTIGATOR'S CASE ASSIGNMENT FORM

## COUNTY OF LOS ANGELES
## DEPARTMENT OF CORONER

| | |
|---|---|
| **Coroner's Case Number:** | 2011-05916 |
| **Incoming Mode:** | ACCIDENT |
| **Investigation Type:** | FORENSIC SCIENCE CENTER |
| **Mortuary Name:** | |
| **Decedent's Name:** | ROJESKI, PAULA |
| **Decedent Birth Date and Age:** | 12/15/1955    55 |
| **Sex:** | FEMALE |
| **Race:** | CAUCASIAN |
| **Date and Time of Death:** | 09/08/2011    11:41 |
| **Death Place:** | HOSPITAL |
| **Hospital Name:** | WEST HILLS MEDICAL CENTER |
| **Death Address:** | 7300 MEDICAL CENTER DRIVE |
| **Death City:** | WEST HILLS |
| **DeathZip** | 91307 |
| **Scene Phone #:** | |
| **Name of Caller:** | MILTON ROLDAN-RN |
| **Police Agency:** | |
| **Investigating Officer:** | |
| **Describe Terminal Episode:** | DECEDENT WAS TRANSPORTED INTO HOSPITAL ER BY PARAMEDICS IN FULL ARREST FROM 7320 NORTH WOODLAKE AVENUE IN WEST HILLS, AFTER APPARENTLY ARRESTING WHILE HAVING LAPBAND PROCEDURE. NO KNOWN MEDICAL HISTORY. 230 LBS. ORDERED IN BY DR. YOUNG-DUTY DOCTOR. |
| **Special Handling Information:** | |
| **NOK Notified:** | Yes |
| **NOK Name:** | |
| **NOK Phone:** | |
| **Investigator's Name:** | UNASSIGNED |
| **Date and Time of Call:** | 09/08/2011    12:23 |
| **DME:** | |
| **Cause A:** | |

**COUNTY OF LOS ANGELES**
**DEPARTMENT OF CORONER**

**HOSPITAL AND NURSING CARE FACILITY REPORT**

**1104 NORTH MISSION ROAD**
**LOS ANGELES, CALIF. 90033**

## 18

CC# 2011 - 05916

**TO REPORT A DEATH** — PHONE (323) 343-0711 FAX (323) 222-7041
COMPLETE ALL LINES, USE INK. IF UNKNOWN OR NOT APPLICABLE, SO STATE.

West Hills Hospital & Medical Center
NAME OF FACILITY

ADDRESS 7300 Medical Center Dr. A.    HOSPITAL PHONE # (818) 676-4000

NAME OF DECEDENT Rojeski, Paula

HOW IDENTIFIED ID Band from Surg. Center    DOB 12/13/55    AGE 55    SEX F    RACE _____

DATE OF DEATH 9/8/11    TIME 1141

PRONOUNCED BY Dr. Spencer    MEDICAL RECORD OR PATIENT FILE # _____

**ORGAN/TISSUE DONATION INFORMATION**
WAS THE NEXT-OF-KIN APPROACHED REGARDING ORGAN/TISSUE DONATION?
NO [✓]   YES [ ]   IF YES WHAT WAS THEIR RESPONSE? _____

DATE ADMITTED 9/8/11    TIME 1120

[ ] SELF   [✓] AMBULANCE (Name or R.A.#) 96

FROM 7300 N Woodlake Ave
(STATE WHETHER HOME, HOSPITAL OR OTHER)   GIVE ADDRESS    (IF HOSPITAL ATTACH THEIR HISTORY)

ADMITTED BY: Spencer ER M D With M.D.    PRIMARY ATTENDING PHYSICIAN Gee    M.D.

OFFICE PHONE # _____    OFFICE PHONE # Valley Surgical Center

INJURIES 9/8/11    10:54    PLACE Valley Surgical Center    CAUSE Post Surgical?
        DATE        TIME        7320 Woodlake        (TRAFFIC, FALL, ETC.)

DESCRIBE INJURIES:    Woodland Hill Ca
(Full arrest P. Surgery)    West    91367
                        (818) 719-9170

CLINICAL HISTORY:

    N K = not Known.


    S/P Lap Band. 9/8/11

SURGICAL PROCEDURES: STATE TYPE, DATE, TIME AND RESULTS OF ANY OPERATION OR AMPUTATION PERFORMED


WAS A BULLET OR OTHER FOREIGN OBJECTS RECOVERED?    SPECIFY _____
LABORATORY: REPORT ON PATHOLOGY SPECIMENS TAKEN _____    DATE & TIME _____
LABORATORY PHONE NUMBER _____
MICROBIOLOGY CULTURE RESULTS: ____ NO ____ YES (ATTACH REPORT)
TOXICOLOGY SCREEN: ____ NO ____ YES (ATTACH RESULTS)
RADIOLOGICAL STUDIES: ____ NO ____ YES (ATTACH RESULTS)

REMARKS: ESPECIALLY SYMPTOMS PRECEDING AND DURING TERMINAL EPISODE


IN MY OPINION, THE CAUSE OF DEATH IS: S/P Lap Band, Brought By
BY paramedics to With ER    M.D. -OR- _____
                                            NURSE/HOSPITAL ADMINISTRATOR

OFFICE PHONE # _____    OFFICE PHONE # _____

7GH#55 (REV. 6/02)

1. THE BODY WILL NOT BE REMOVED BY THE CORONER WITHOUT THIS COMPLETED REPORT AND COPIES OF ALL CHARTS.
2. ALL ADMISSION BLOOD SAMPLES/SPECIMENS NEED TO ACCOMPANY THE REMAINS.