BARRETT S. LITT, SBN 45527
E-Mail: blitt@kmbllaw.com
DAVID MCLANE, SBN 124952
KAYE, MCLANE, BEDNARSKI & LITT, LLP
234 Colorado Blvd., Suite 230
Pasadena, California 91101
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

KONRAD L. TROPE, SBN 133214
E-Mail: ktrope@centurionlawgroup.com
MARK S. FAULKNER, SBN 102679
CENTURION LAW GROUP, P.C.
9107 Wilshire Boulevard, Suite 450
Beverly Hills, California  90210
Telephone:  (888) 942-9997
Facsimile: (888) 942-9997

ATTORNEYS FOR PLAINTIFF
VALLEY SURGICAL CENTER, LLC

FILED
CLERK, U.S. DISTRICT COURT

MAY - 9 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                         DEPUTY

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VALLEY SURGICAL CENTER, LLC, a California Limited Liability Company, <br><br> Plaintiff, <br><br> vs. <br><br> COUNTY OF LOS ANGELES, a government entity,  LAKSHMANAN SATHYAVAGISWARAN, M.D., an individual, ADRIAN MARINOVICH, M.D., an individual, RAFFI DJABOURIAN, M.D. , an individual, DENIS C. ASTARITA, M.D. , an individual, SELMA CALMES, M.D., an individual, JOHN KADES, an individual, ED WINTER, an individual, and DOES 1-10, <br><br> Defendants. | Case No. CV 13-2265-DDP (AGRx) <br> [Hon. Dean D. Pregerson] <br><br> **FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF:** <br><br> 1.  VIOLATIONS OF CONSTITUTIONAL RIGHTS UNDER 42 U.S.C. §1983 <br> 2.  VIOLATIONS OF CONSTITUTIONAL RIGHTS UNDER 42 U.S.C. §1983 - *MONELL* AND SUPERVISORY LIABILITY <br> 3.  VIOLATIONS OF STATE LAW <br> 4.  INJUNCTIVE RELIEF <br> 5.  DECLARATORY RELIEF <br><br> **DEMAND FOR JURY TRIAL** |

# I.     INTRODUCTION AND SUMMARY

## A.     OVERVIEW.

1.     For the past twenty months, the Los Angeles County Coroner's Office ("Coroner's Office") has been pursuing what can fairly be described as a vendetta against Valley Surgical Center, LLC ("Valley"), arising out of its investigation into the death of Paula Rojeski after weight loss surgery at Valley.  The Coroner's Office has systematically engaged in conduct violating Valley's constitutional rights. The Coroner's Office and its representatives have fabricated and falsified the available and known evidence regarding the Rojeski surgical procedure. They misrepresented the cause of death by contending that the fabricated evidence demonstrates that the surgical procedure caused the death. The Coroner's Office has forwarded such fabricated evidence to the LAPD Robbery-Homicide Division and to the next of kin of Paula Rojeski. In violation of the Coroner's Office own Security Hold, it deliberately leaked aspects of the investigation to the media. A Coroner's Office representative repeated such fabrications at a public forum in direct violation of a Security Hold by referring to the supposed facts she found, and presenting false facts readily identifiable as a reference to the Rojeski death at Valley. The Coroner's Office retaliated against Valley's exercise of its right to free speech and petition of the government.

2.     Far from being an impartial investigative body seeking the truth, the Coroner's Office has demonstrated a clear bias against Valley.  This disqualifies it from having any further role in any investigation of the Rojeski death, and disqualifies it from having the presumption of trustworthiness that normally attaches to a governmental report. This bias has been manifested by, *inter alia*, (1) using a principal investigator who is a strident advocate of banning ambulatory surgery centers from performing weight loss surgery, and who was the person whose initial report fabricated and falsified the surgical evidence on which the

1

1   Coroner has systematically relied; (2) placing a supposed "security hold" (the legal

2   basis of which has never been explained) on its investigation to justify not

3   communicating its report to Valley while simultaneously communicating it to

4   others, including the Rojeski family; (3) threatening to release the original autopsy

5   report which it showed to Valley on January 23, 2013 – the investigation of which

6   to date had taken 20 months – if Valley or anyone else were to publicly disclose or

7   complain of the wrongful actions of the Coroner's Office; (4) releasing an

8   Amended Autopsy Report on April 1, 2013, (Exhibit "15") in retaliation once

9   Valley petitioned the Court on March 29, 2013, (5) relying on the unverified

10   allegations of an anonymous source; (6) obtaining access to Valley's surgical

11   offices by presenting a subpoena demanding access for which it did not have  the

12   legal authority represented in the subpoena; and 7) in an extraordinary departure

13   from accepted practice, rushing out its autopsy report one day after Valley filed

14   suit protesting the Coroner's Office's conduct in order to ensure that it went public

15   and, in doing so, publishing facts that it knew to be false even while purporting to

16   distance itself from them, and continuing to adopt other facts although it knew or

17   should have known they were false.

18        3.      The Coroner's Office's actions (not all of which are recounted above)

19   have resulted in numerous violations of Valley's constitutional rights and state

20   laws, and the liberty and property interests protected by these state laws, including

21   violations of due process based on the deliberate falsification of evidence in the

22   Original Autopsy Report shown Valley on January 15, 2013, and use of that report

23   to trigger a criminal investigation; continuation of the falsifications in the

24   Amended Autopsy Report dated April 1, 2013; recommending disciplinary

25   proceedings; and jeopardizing Valley's accreditation.  In addition, the Coroner's

26   Office has intimidated and chilled Valley's exercise of its rights to free speech, to

27   petition the government, and to access the courts, violated its right to be free from

28

1   unreasonable search and seizure, deprived it of procedural and substantive due

2   process of law, and deprived it of equal protection of the law.  Defendants have

3   engaged in a systematic campaign lasting over a year resulting in the deprivation of

4   Valley's constitutional rights and threatened its very existence in doing so.

5         4.     There is a grave likelihood that Valley's very existence will be fatally

6   destroyed if this Court does not act. Valley has already been severely damaged by

7   the conduct at issue in this case – its business has dramatically declined due to the

8   cloud over its head because of the implication that Ms. Rojeski died due to

9   Valley's actions.  It has spent large sums of money (including attorneys and expert

10   consultants) defending itself against the fabricated evidence and other conduct of

11   the Coroner's Office. If this false and fraudulent report is allowed to stand as a

12   valid and proper government document, Valley will likely have its accreditation

13   and certification withdrawn by The Joint Commission, which accredits health care

14   facilities in California.

15   **B.   THE ROLE OF DR. SELMA CALMES AND RETALIATION FOR**

16   **      VALLEY'S OBJECTIONS TO IT.**

17         5.     On numerous occasions, Valley was met with retaliation when it

18   complained about the Coroner's conduct of the investigation, particularly when

19   Valley complained about the bias of  Anesthesiology consultant Selma Calmes.

20   Valley had protested Dr. Calmes' prejudice in two separate letters dated March 23,

21   2011 and December 1, 2011. (Exhibit 1).  In two written responses dated April 6,

22   2011and December 2, 2011 respectively, the Coroner's Office insisted that the

23   heavily biased Dr. Selma Calmes act as its anesthesia expert.  (Exhibit 2).

24         6.     Valley was the subject of illegal searches and seizures on December 5,

25   2011 – shortly after it sent the December 1, 2011 letter (Ex. 1) to the Coroner –

26   through the use of an unlawful subpoena to allow Dr. Calmes to come on Valley's

27   premises after Valley indicated it was unwilling to have her do so due to her bias.

28

1        7.     After the December 1, 2011, letter Valley sent to the Coroner (Ex. 1),

2 the Coroner "circled around" Selma Calmes to force her onto the premises of

3 Valley to conduct an illegal search and seizure. The Coroner's Office, in response

4 to Valley's protest against Selma Calmes' participation in the Coroner's

5 investigation, and Valley's refusal to allow her to participate in an inspection of its

6 premises, fabricated an illegal subpoena. This subpoena was used as if it were a

7 search warrant to demand and obtain access to Valley's premises on December 5,

8 2011, for Coroner's representatives, including Calmes. (Exhibit 3)

9        8.     Subsequently, Valley Surgical's counsel sent two letters dated

10 February 3, 2012 and March 12, 2012 to the Coroner protesting false allegations

11 regarding the Rojeski death. (Exhibits 16 and 17, respectively) Shortly thereafter,

12 on April 6, 2012, there were deliberate leaks of a homicide referral to the LAPD by

13 the Coroner's Office. On information and belief, these leaks were retaliations for

14 Valley's protests of the Coroner's Office's actions. Valley confirmed with

15 Detective Dan Myers of the LAPD Robbery/Homicide division that Exhibits 16

16 and 17 – its protest letters described earlier in this paragraph – were withheld and

17 not provided to the LAPD by the Coroner's Office in violation of the Coroner's

18 legal directive. (Exhibit 18 – Valley Surgical Counsel Dan Chambers email to

19 Detective Myers April 20, 2012)

20        9.     On September 7, 2012, Valley sent a comprehensive memo to the

21 Coroner's Office, with extensive exhibits, explaining that Paula Rojeski's past

22 medical history included a significant and material history of concealed heart

23 damage secondary to the drug Fen Phen, and providing extensive documentation,

24 facts that, to Valley's understanding, the Coroner's Office was unaware of and had

25 not investigated. (Exhibit 4). Only two weeks later, on September 21, 2012,

26 Selma Calmes made false statements in her official capacity as the Coroner's

27 representative regarding the autopsy investigation in speeches to the public, in

28

1    direct violation of the "security hold".  In both the Original and Supplemental

2    autopsy reports, Dr. Calmes made false assertions. On information and belief,

3    Calmes' statements were, in part, a retaliation for Valley's protests and its

4    disclosure of Paula Rojeski's past medical history.

5    **C.    BOTH THE CORONER'S ORIGINAL AND SUPPLEMENTAL REPORTS**

6    **WERE BASED ON FALSE AND FABRICATED EVIDENCE.**

7    10.    For many months, the Coroner's Office worked on a report regarding

8    the Rojeski death. It prepared a Report, which (or the contents of which) was

9    disclosed at least to relatives of Paula Rojeski and the LAPD, and which was

10   leaked to the press. That Report is referred to hereafter as the "Original Report"

11   and was completed no later than January 2013. On information and belief, the

12   Original Report or its contents was also supplied to other governmental agencies.

13   11.    In January 2013, Valley learned that the Original Report or its

14   contents had been provided to the family of Paula Rojeski while the Coroner's

15   Office had refused to provide it to Valley. Valley protested, and eventually the

16   Coroner's Office provided it a copy of the Original Report. Valley presented an

17   extensive critique of the Report, pointed out its numerous false and unsupported

18   allegations, and provided numerous reports from seven (7) highly regarded

19   physicians (Exhibits 7-10, 12-14) calling into question the very basic foundation of

20   the Report, including the statements from Selma Calmes that the surgery lasted two

21   hours with anesthesia provided for only half an hour of that, and the patient died

22   while still in surgery, without anesthesia, in pain, awake and bleeding to death, all

23   of which  were blatantly false.

24   12.    In the course of its investigation, the Coroner's Office used evidence

25   it knew was false, including false times during which the surgery took place and a

26   false "Anonymous letter" which made fabricated claims regarding Valley's

27   misconduct.  Not only did the Anonymous letter contain false allegations, but the

28

5

1 Coroner's Office falsely labeled it anonymous although it was aware who authored

2 the letter. Valley had provided the Coroner's Office substantial information

3 discrediting the author's letter and the allegations it contained. (Exhibits 16 and 17

4 – Dan Chambers letters to the Coroner dated February 3, 2012, and March 12,

5 2012;   Exhibit 19, Valley Counsel Konrad Trope November 6, 2012 letter to the

6 Coroner.)  In 20 months of investigation, the Coroner could not verify any of the

7 fabricated claims.  The Coroner forwarded the same fabricated evidence to the

8 LAPD Robbery-Homicide Division and to the next of kin of Paula Rojeski, but not

9 the information discrediting it.  In violation of the Coroner's Office own Security

10 Hold, it leaked aspects of the previously unreleased autopsy report and

11 investigation to the media. A Coroner's Office representative, at a public forum,

12 referred to the supposed facts she found and presented false facts readily

13 identifiable as a reference to the Rojeski death at Valley.

14   13. Defendants' conduct has resulted in a seriously flawed, retaliatory,

15 and internally inconsistent Autopsy Report which has been universally condemned

16 by medical experts, and which will continue to inflict unconstitutional injuries and

17 damages to Valley in violation of 42 U.S.C. §1983.

18   14. The Coroner's repeated threats to release the original autopsy report

19 brought Valley to file the original complaint in this action, and to provide *ex parte*

20 notice to the Coroner's Office on March 29 that it would seek a TRO on April 1.

21 The Coroner's Office rushed out an amended version of the Autopsy Report

22 (hereafter "Amended Autopsy Report" or "Amended Report", attached as  Exhibit

23 15) on April 1, 2013, before the *ex parte* application for a Temporary Restraining

24 Order to restrain the Coroner from taking further action regarding the Rojeski

25 autopsy and investigation was filed. The Amended Report was a dramatic

26 departure from normal and accepted practice for Coroner's Reports in numerous

27

28

1   respects, and continued to promulgate false, fabricated, and/or unsubstantiated

2   evidence and conclusions, including but not limited to:

3       a.   while purporting to provide a new Report that corrected previous errors, it

4            published the Original Report with those errors;

5       b.   it left in its Supplemental Report consults that continued to adopt and

6            were based on the previous acknowledged errors;

7       c.   while purporting to withdraw Dr. Calmes' previous anesthesiology reports

8            because they were flawed, it published them;

9       d.   Dr. Calmes' new anesthesiology consult not only contained information

10           never referenced by her in her previous reports, but relied on a new set of

11           false information not previously relied on, and provided negative opinions

12           and conclusions based on that false information while withdrawing her

13           egregious errors regarding the time and length of surgery in addition to the

14           "anonymous" letter without explaining how it occurred;

15      e.   The Supplemental Report states that "Dr. Calmes' anesthesiology

16           consultation erroneously indicated the length of surgery 0915 to 1115"

17           and further states that Dr. Djabourian originally "did not recognize that

18           error." That "error" was a false statement made, at minimum, with a

19           reckless disregard for the truth and reiterated and/or relied upon by not

20           only Dr. Djabourian, but also by Drs. Marinovich and Astarita, neither of

21           whom acknowledged or corrected the error, thereby effectively relying on

22           it with reckless disregard for the truth it even after it was acknowledged as

23           an error. Dr. Calmes herself, while stating that her April 1 consult

24           "superseded" her previous consults did not even acknowledge the error,

25           again in reckless disregard for the truth.  These and other failures

26           subjected, and continue to subject, Valley to a criminal homicide

27           investigation and to allegations of criminal conduct. In light of the fact

28

                                          7

1      that this false assertion regarding the time of death and the discredited

2      Anonymous letter were the cornerstones of the Coroner's original

3      conclusion that the manner of death could not be determined, and leaving

4      open the possibility of homicide as the manner of death, the Coroner's

5      continuing assertion in the Supplemental Report that the manner of death

6      could not be determined constitutes a deliberate false statement, or a

7      statement made with reckless disregard for the truth.

8     f.  Dr. Calmes and the other contributors of the Amended Report have now

9        fabricated new "facts" to maintain the same conclusions as the Original

10       Report.  The Original Report failed to recognize the existence of these

11       newly invented facts which again are flatly contradicted by the record.

12       The Coroner's Office promised Valley during the January 15, 2013

13       meeting and in subsequent conversations that Valley would be afforded an

14       opportunity to review any new report to ensure accuracy.  Given that the

15       Coroner's Office admits that its contributors to the Original Autopsy

16       report made egregious errors and subsequently had to recant, it shocks the

17       conscience that the Coroner's Office engaged in the identical pattern of

18       retaliation and falsification of facts, reneged on its promise to Valley, and

19       released the Amended Report, claiming have "acted reasonably" and

20       "within its normal and customary practice pursuant to its statutory duties",

21       but in reality was in a rush to release it and do maximum damage to

22       Valley in obvious retaliation to Valley's  petitioning of the Court.

23    g. the additional anesthesiology consult of Dr. Strum, dated 3/7/13, similarly

24       asserted false and unsubstantiated facts which were not asserted in the

25       Original Autopsy Report and provided negative opinions and conclusions

26       based on that false information;

27

28

h.  the Supplemental Report left unchanged the surgery consult of Dr. Astarita that had claimed, without reference to any facts regarding the surgery, that there was gross negligence with incompetence, which consult appears to have been based on the withdrawn false facts in the earlier Calmes reports.  It is certainly not based on any identified surgical mistakes (particularly since, even if the aortic injury occurred during surgery – which is not established as there are other equally plausible explanations that cannot be ruled out – injuries to major blood vessels such as the aorta are known complications of laparascopic surgery, and are not the basis of a conclusion of negligence);

i.  although the new anesthesiology consults did not support a conclusion greater than negligence (and even those conclusions were based on false facts), Dr. Astarita, the Coroner's surgical consultant, provided no true facts demonstrating any sub-standard practice at all attributed to the surgeon while claiming that there might have been "gross negligence" and "incompetence": this which evidences complete disregard for the truth or any established standards for expressing such opinions;

j.  leaving aside Dr. Astarita, the consults or reports other than his were based on false information and provided no foundation for adverse conclusions.  Further, Dr. Astarita's comment regarding the transient hypotension as a basis for growth negligence was clearly refuted by the expert opinions of  Dr. Sedrak ( Exhibit 7, p.13 "The transient hypotension of 80155 at 9:25 a.m. was not indicative of any problems, and it was an anticipated and appropriate response to induction medications and anesthesia gasl/paralytic"),  Dr. Hronek (Exhibit 8, p.2 "The transient hypotension of 80/55 at 9:25 a.m. was not indicative of any problems, and it was a common response to induction of general

1    anesthesia, given its transient nature and quick resolution"), Dr. Wecht

2    (Exhibit 10 "After the surgery was completed, the patient's systolic blood

3    pressure was stable.") and Dr. Zarrabi (Exhibit 14 "Yet, the Autopsy

4    Report states that the surgery continued for 1 hour following 9:45a.m. The

5    Anesthesia Consult makes the additional error of stating that blood

6    pressure was not stable, when the record demonstrates the blood pressure

7    was relatively stable. These conclusions are without support in the

8    medical records. These are major errors resulting in incorrect conclusions

9    throughout the Autopsy Report."   Most importantly, Dr. Astarita's report,

10   as presented in the Amended Report, is dated June 21, 2012 which

11   predates all of Independent Expert reports provided by Valley to the

12   Coroner's Office by at least 6 months.  Even though Dr. Astarita's report

13   is based on fabricated "facts" which the Coroner's Office has recanted in

14   the Amended Report, Dr. Astarita's report has not been amended or

15   supplemented in any way.  It was presented unaltered in its June 21, 2012

16   form in the Amended Autopsy Report which was hastily released on April

17   1, 2013, in retaliation to Valley petitioning the Court;

18       k.  the Supplemental Autopsy Report thus recklessly indicates, without any

19           basis to do so, that there was at least "simple negligence" and that the

20           doctors' conduct "may constitute gross negligence";

21       l.  the Supplemental Autopsy Report falsely and recklessly classifies the

22           manner of death as "undetermined" when in fact all available evidence

23           demonstrated that the manner of death was "accident";

24       m.  by classifying the manner of death as undetermined, and falsely and

25           without any basis including the potential of "gross negligence" and

26           "incompetence", the Coroner's Office knowingly and falsely suggested

27           the possibility that the manner of death was homicide;

28

                                    10

n.  The Coroner's Office claims that Dr. Calmes has discarded her reliance on the Anonymous letter in the Amended Autopsy Report; however, the Amended Report continues to rely on Drs. Astarita and Marinovich whose reports were not amended, and are based on the Anonymous letter. Further, in the Amended Report Dr. Strum goes so far as to attempt to Validate the Anonymous letter, as did the Original Report. The Anonymous letter contains false and unsubstantiated claims, and is not the type of document relied upon under normal or accepted Coroner practice;

o.  the Anonymous letter is falsely and fraudulently presented as "anonymous", as the Coroner's Office knows the author's identity and further knows that the author is unreliable, has made demonstrably false statements, and has altered the false assertions made in the letter;

p.  the only example in the Supplemental Autopsy Report explaining the meaning of manner of death is "homicide", thereby further unjustifiably planting the idea that the Rojeski death could have been homicide; and

q.  the continuing suggestion of Dr. Astarita that the matter be referred to the California Medical Board with the possibility of homicide being left open is completely unsupported, based on false information, and reflects an intent to inflict the maximum harm on Valley and those associated with it.

15.   The release of the Amended Autopsy Report was a deliberate effort to avoid an order from this Court barring its publication pending further proceedings, and constitutes retaliation against Valley's exercise of its 1st Amendment right to petition the Coroner and the Court regarding the Coroner's fabrications in the Autopsy. As indicated above, that Report contains many of the same fabrications, has inconsistent statements where two of the authors did not retract false statements withdrawn by two others, and provides newly falsified evidence to justify continuing opinions of sub-standard practice in the Rojeski death.

16.    On information and belief, the Coroner's office has been the subject of intense pressure and scrutiny from other governmental agencies to assign fault against Valley. On information and belief, it has also considered doing so necessary to protect itself and Selma Calmes. As a result of these and other considerations not presently known to Plaintiff, the Coroner's Office has, as explained above, recklessly made adverse accusations against Valley based on false, fabricated and/or unsubstantiated evidence. On information and belief, the drive to paint Valley in a negative light was so great that the Coroner's Office misrepresented to this Court on April 4, 2013, in open court, that the report was released in the ordinary course of business. There was clearly nothing "ordinary" about the way this report was created and released because two (2) of the original signatories of the Report, Dr. Astarita and Dr. Marinovich, have glaringly not signed the amended report nor corrected their claims in any way.

17.    Extraordinarily, the two co-authors who did sign the Report, dated their revisions for April 1, 2013, the same day the Report was issued. The April 1, 2013, Report was not issued in the ordinary course of business, but rather was a realization against Valley's noticing a Temporary Restraining Order and in retaliation of its prior 1st Amendment petitions to the government. As explained above, the April 1, 2013, Report relied on false and fabricated evidence (some newly asserted, some previously asserted), just as the Original Autopsy Report did. It contained retractions of facts by two (2) of its authors, but not two (2) of its other authors. It was internally inconsistent, contradictory, and false for the purpose and with the intent of punishing Valley for having complained to the government about the false investigation surrounding Paula Rojeski's death.

    **D.    SUMMARY OF CLAIMS AND RELIEF SOUGHT.**

18.    By this Complaint, Valley seeks both damages and injunctive relief because the Amended Autopsy of April 1, 2013, remains a continuing, false

12

1    official document regarding the cause and manner of Paula Rojeski's death which

2    has resulted in irreparable injury to Valley, and which this Court should restrain in

3    order to prevent a repeated and ongoing unconstitutional retaliation against Valley.

4    There is a grave likelihood that Valley's very existence will be fatally destroyed if

5    this Court does not act. Valley has already been severely damaged by the conduct

6    at issue in this case – its business has dramatically declined due to the cloud over

7    its head because of the implication that Ms. Rojeski died due to Valley's actions,

8    and it has spent large sums of money (including attorneys and expert consultants)

9    defending itself against the fabricated evidence and other conduct of the Coroner's

10   Office.  If this false report is allowed to remain an official government document,

11   Valley will likely have its accreditation and certification withdrawn by The Joint

12   Commission and other accreditation agencies which accredit health care facilities

13   in California.  Without that accreditation, Valley will be forced to close its doors.

14   Further, as a result of the Coroner's Office's false, fabricated and unsubstantiated

15   claims in its Supplement Autopsy Report, the Los Angeles Police Department

16   continues to have an open investigation on whether the Rojeski death was the

17   result of criminal wrongdoing, i.e., some form of homicide.

18         19.    Valley Surgical Center, LLC ("Valley") seeks injunctive relief and

19   damages against the Coroner's Office, its agents and employees and outside

20   retained consultants, from continuing to make the April 1, 2013, Autopsy Report

21   (Exhibit "15") an official government document and findings of the Coroner's

22   Office regarding Paula Rojeski's death.

23         20.    The Defendants' conduct violated Plaintiff's rights under the First,

24   Fourth, Fifth and Fourteenth Amendments (and their California analogues) –

25   including depriving them of the following statutes:

26            a.   Violate its due process right to a governmental investigation not

27               based on false and/or fabricated evidence;

28

1         b.   Violate its due process right to an unbiased governmental

2            investigation not based on false and/or fabricated evidence;

3         c.   Violate its due process right not to have exculpatory evidence

4            destroyed in bad faith;

5         d.   Violate its First Amendment and due process rights to petition the

6            government and to have access to the courts;

7         e.   Violate its First Amendment rights to engage in lawful speech without

8            being retaliated against for doing so;

9         f.   Violate its First Amendment rights to engage in lawful speech without

10            having its right to do so infringed upon and chilled by the actions of

11            governmental agents or employees;

12         g.   Violate its due process rights to petition the government and to have

13            access to the courts;

14         h.   Violate its Fourth Amendment right not to be subjected to an unlawful

15            search and seizure;

16         i.   Violate its equal protection and/or due process right not to be singled

17            out for irrational and/or arbitrary discriminatory treatment.

18      21.      Defendants' conduct also violated, *inter alia*, (1) Cal. Gov't Code

19 §27491.4 (coroner must act in accordance with medico-legal practice); (2) Cal.

20 Gov't Code §27491.5 (coroner's report must be in accordance with facts

21 ascertained from inquiry, autopsy and other scientific findings); (3) Cal. Gov't

22 Code §27491.45 and Cal. Health & Safety Code §7151.2 (regarding appropriate

23 organ harvesting); (4) Civil Code §815.6 (violation of mandatory duty), (5) Cal.

24 Civil Code §52.1 (use of threats, intimidation or coercion to interfere and attempt

25 to interfere with exercise of rights secured by Federal or State Constitution or law)

26 as well as violations of the Article I, §13 (due process) of the California

27

28

                             14

1   Constitution and possibly other California analogues to the United States

2   Constitution.

3   **II.    PARTIES**

4        22.    Plaintiff Valley Surgical Center, LLC, is a California limited liability

5   company with a principal place of business in the County of Los Angeles.

6        23.    Defendant County of Los Angeles is a government entity operating

7   under the laws of the State of California.  Defendant County of Los Angeles

8   oversees the Department of the Coroner (hereinafter collectively referred to as the

9   "Coroner's Office").  The Coroner's Office is a governmental entity operating

10  under the laws of the State of California and also operating under the regulations of

11  the County of Los Angeles.

12        24.    Defendant Lakshmanan Sathyavagiswaran, M.D. is an individual

13  employed by the County of Los Angeles officially listed as the Interim Head of the

14  Los Angeles County's Department of the Coroner ("Sathyavagiswaran"). He is

15  being sued in his individual and official capacities.

16        25.    Defendant Adrian Marinovich, M.D. is an individual who was

17  employed by the County of Los Angeles ("Marinovich").  He is being sued in his

18  individual capacity.

19        26.    Defendant Raffi Djabourian, M.D. is an individual employed by the

20  County of Los Angeles as Senior Deputy Medical Examiner ("Djabourian").  He is

21  being sued in his individual capacity.

22        27.    Plaintiff is informed, believes, and thereon alleges that Defendant

23  Denis C. Astarita, M.D. is an individual retained by the Coroner's Office as an

24  outside consultant with the title of Deputy Medical Examiner ("Astarita").  He is

25  being sued in his individual capacity.

26        28.    Plaintiff is informed, believes, and thereon alleges that Defendant

27  Selma Calmes, M.D. is an individual retained by the Coroner's Office as an

28

15

1   outside consultant with the title of Deputy Medical Examiner ("Calmes"). She is

2   being sued in her individual capacity.

3         19.   Plaintiff is informed and believes, and thereon alleges that Defendant

4   John Kades is an individual employed by the County of Los Angeles as a Deputy

5   Coroner, with the rank of Captain within the Investigations Division of the

6   Department of the Coroner ("Kades").  He is being sued in his individual capacity.

7         29.   Plaintiff is informed and believes and thereon alleges that Defendant

8   Ed Winter is an individual employed by the County of Los Angeles as the

9   Assistant Chief Investigator, Operations Bureau, of the Department of the Coroner

10   ("Winter").  He is being sued in his individual capacity.

11         30.   Plaintiff is uncertain as to the identity or capacity of the other

12   Defendants included herein as DOES 1 through 10, inclusive, and therefore sues

13   these Defendants by fictitious names.  Plaintiff is informed and believes, and

14   thereon alleges that said Defendants, DOES 1 through 10, inclusive, and each of

15   these, are liable to Plaintiff on the facts herein alleged and will seek leave of this

16   Court to amend this Complaint when true names are ascertained.

17         31.   Plaintiff is informed and believes, and thereon alleges that, at all times

18   herein mentioned, each of these Defendants was an agent, or employee of each of

19   the other co-Defendants and, in doing the things herein alleged, was acting in the

20   scope of his or her authority as such agent with the permission and consent of each

21   of the other co-Defendants.

22         32.   Plaintiff is informed and believes, and thereon alleges, that, at all

23   times herein mentioned, each of the Defendants was the agent and/or employee

24   and/or co-conspirator of each of the remaining Defendants, and in doing the things

25   hereinafter alleged, was acting within the scope of such agency, employment

26   and/or conspiracy, and with the permission and consent of other co-Defendants.

27

28
                                          16

1  All acts alleged herein are alleged as part of a conspiracy to violate Plaintiff's

2  rights.

3  **III.   JURISDICTION, VENUE AND DIVISION ASSIGNMENT**

4          33.     The jurisdiction of this court over the subject matter of this action is

5  predicated upon 28 U.S.C. §§1331 and 1343.

6          34.     Venue is proper under 28 U.S.C. §1391(b)(2), and assignment to the

7  Western Division of this Court is proper, because a substantial part of the events or

8  omissions giving rise to the claims herein occurred in Los Angeles County,

9  California.

10         35.     Plaintiff's federal claims arise under the United States Constitution, in

11  particular the First, Fourth, Fifth, and the Fourteenth Amendments.  In addition,

12  Plaintiff's federal claims arise under federal law including, but not limited to, the

13  federal Civil Rights Act, Title 42, United States Code §1983.  The acts and

14  omissions of Defendants and others, as alleged herein, were committed by

15  Defendants and others, and each of them, under color and pretense of the

16  Constitution, statutes, ordinances, rules, regulations, practices, customs, patterns,

17  and usages of the State of California and/or of the counties referenced herein.

18  Supplemental jurisdiction for the state claims is appropriate pursuant to 28 U.S.C.

19  §1367(b).

20  **IV.   THE FACTS.**

21       A.   THE BARIATRIC SURGERY AND THE FAILURE BY THE CORONER TO
22             PRESERVE EVIDENCE

23         36.     On September 8, 2011, Paula Rojeski, a 55 year old female,

24  underwent laparoscopic surgery at Valley Surgical Center for placement of an

25  adjustable gastric band to treat her longstanding obesity.   As demonstrated by the

26  Anesthesia Record from the Rojeski surgery contained in the Figures below, the

27

28

1  surgery lasted for 30 minutes, with a start time of 9:15 a.m. and a finish time of

2  9:45 a.m.  When the attending surgeon closed the patient, there were no

3  indications of bleeding or complications.

4

**Anesthesia Record**

Procedure _Lap Band_          Date _9/8/11_   Allergies _NKDA_                  ✓1

| OR TIMES | | D-Patient Identified | TYPE OF ANESTHESIA: |
|---|---|---|---|
| START | FINISH | D-Chart Reviewed | GENERAL: ☐Intravenous  ☐Inhalation |
| ANESTH 855 | ANESTH 1115 | ☐-Consent signed | MAC: ☐Nasal O2  ☐Mask O2  ☐Oral/Nasal Airway |
| OP 915 | OP 945 | ☐-NPO Since  ☐AM/PM | REGIONAL: ☐ Spinal  ☐Epidural  ☐Axillary  ☐Bier Block |
| | | ☐-Time Out Conducted | PREANESTHETIC VITAL SIGNS: |
| | | ☐-Pneumatic Comp to LE | BP: ___ P ___ R ___ Temp ___ O2 SAT ___ |

**OPERATING ROOM RECORD**

Age: 55  Sex: F  Allergies: NKDA

Type of Anesthesia: [ X ] General [ ] MAC [ ] Local [ ] Spinal [ ] Epidural [ ] Block

| Patient in Room | Anesthesia Start | Anesthesia End | Surgery Start | Surgery End |
|---|---|---|---|---|
| 0855 | 0855 | 1115 | 0915 | 0945 |

Surgeon: GEE

Anesthesia Provider:                          Assistant: Ci iN N

37.    From 9:45 a.m. until approximately 10:55 a.m., the patient recovered

from the anesthesia.[1]  The anesthesiologist was available and continued to monitor

the patient after the surgery ended. (The anesthesiologist remained by the patient's

side and continued to observe the patient until 11:15 a.m. which is the reason that

the Operating Room Record reflects that the anesthesiologist ended his monitoring

at 11:15 and the patient was turned over to LA City Firemen for transport to the

hospital). At approximately 10:55 a.m., the patient suffered PEA (pulseless

electrical activity) and cardiac arrest.  The surgeon at Valley Surgical Center

initiated CPR and promptly called 911.

38.    LA City Firemen responded and initiated their own vigorous CPR on

the deceased.  The significant resuscitative trauma and injuries included

[1] The anesthesiologist stayed with the patient, which is why the records show 11:15 a.m. for the "Anesthesia End" time.  However, the administration of anesthesia ceased at 9:45 a.m. the same time as the conclusion of the surgery.

18

1  anterolateral fractures of the left rib 3, and right ribs 2, 3, 4, 5, 6, and 7.  There

2  were also resuscitative injuries resulting in abrasions of the midline anterior chest.

3       39.    Prior to the initiation of resuscitation, there was no blood coming from

4  the laparoscopic incisions.  However, following the resuscitation efforts from LA

5  City Firemen, which broke her ribs, damaged her lungs, and caused hemorrhage

6  into the mediastinum, the LA City Firemen also observed blood coming from the

7  laparoscopic incisions.  The firemen then transported the patient to West Hills

8  Medical Center at 11:15 a.m., where the patient was pronounced dead at 11:41

9  a.m.

10       40.    The Coroner's Office was informed of the death at 12:17 p.m. on

11  September 8, 2011, and the case was accepted by Coroner's Representative Hiath

12  with the Coroner's Reference No. 2011 1-05916.

13       41.    Following the patient's death, there was extensive post-mortem tissue

14  and bone procurement by OneLegacy, Inc. ("OneLegacy"), a tissue procurement

15  company.  The deceased's sister, Michele Pelter, gave authorization over the phone

16  to OneLegacy, Inc. to harvest the heart, skin, and bones from the deceased.  The

17  authorization was given at 7:55 a.m. on September 9, 2011, the day following the

18  surgery, but prior to the autopsy.  Unfortunately, the Coroner did nothing to

19  prevent the deceased's organs from being harvested, which interfered with the

20  death investigation by failing to preserve exculpatory evidence, the value of which

21  was known at the time.  The Coroner did not even observe the harvesting.

22       42.    On September 12, 2011, the Los Angeles County Coroner's Office

23  conducted an autopsy of Ms. Rojeski's body.  The Coroner's Report states that

24  "skin and bones, legs, arms, and back" were harvested from the patient's body

25  before the autopsy. The organ procurement was so extensive that the pathologist

26  wrote in the Coroner's Report, "Rigor mortis cannot be assessed due to prior organ

27

28

19

1   procurement."   *See* Coroner's Rojeski Jauary 15, 2013, original Report, attached

2   hereto as Exhibit 6.

3       43.    The Coroner's Office knew that the deceased had suffered from PEA

4   (pulseless electrical activity), which is frequently caused from a pulmonary

5   embolism resulting from dislodging of blood clots from the lower extremities.

6   When the paramedics arrived to transport Ms. Rojeski to the hospital, they knew

7   about her PEA condition and her medical records accompanied her to the hospital.

8   Indeed, the Hospital Emergency Room report and the report from the harvesting

9   company all confirm Ms. Rojeski's PEA condition.

10      44.    Despite this knowledge, the Coroner's Office allowed OneLegacy

11  organ procurement, without supervision, to extensively harvest bones from the

12  lower extremities prior to autopsy destroying any opportunity of discovering

13  possible blood clots in the lower extremities which may have led to a pulmonary

14  embolism.  Such potentially exculpatory evidence was consciously and recklessly

15  disregarded by the Coroner's Office by its allowing OneLegacy to harvest

16  Rojeski's body for organs and tissue without significant limitations.  Such

17  evidence, which is now destroyed, cannot be obtained by other means.  Therefore

18  the Coroner should have denied harvesting of tissue from the lower extremities.

19  Further, the Coroner should have also denied harvesting of the heart and lungs as

20  well, but did not.

21      45.    Instead, the Coroner's Office did not observe the harvesting of the

22  tissues and bones or substantially or significantly limit in any way the harvesting

23  procedure.  Nor did the Coroner's Office limit in any way the alteration and

24  disruption of the deceased's body from the skin and bones from the harvesting, as

25  mandated by *California Health & Safety Code* §7151.2 and *Cal. Gov't Code*

26  §27491.45. The Coroner's Office merely requested that OneLegacy's "recovery

27  avoids operations site."

28

46.     Following the completion of the autopsy, the Coroner's office also failed to embalm the body of the deceased, despite having the statutory authority to do so under Cal. *Gov't.* §27471.  Thus, the Coroner's Office allowed destruction of the heart valves which it incorrectly interpreted as normal at autopsy.  As ample evidence shows, Ms. Rojeski had calcification of the heart valves and moderate aortic regurgitation as evidenced by radiographic imaging.  Again the value of this exculpatory evidence was known at the time of destruction of evidence.

47.     Rather than embalm the body and protect evidence which could not be recovered by other means in this case where the cause of death was unknown, the Coroner's Office instead chose to do a shoddy autopsy which missed the significant fact that the heart valves were damaged, and allowed burial with decomposition of the body.

48.     Any attempt to exhume Mrs. Rojeski's body for a re-examination would be utterly useless, thereby permanently depriving Valley of this evidence.

49.     Such spoliation of evidence, owing to the unsupervised tissue harvesting, and failure to embalm the body, constitutes multiple violations of law enforcement's duty to preserve evidence that might be expected to be exculpatory, as well as play a significant role in any investigation.

50.     The value of this evidence was known at the time of its destruction as being essential to Valley and its medical staff regarding any cause of death or criminal investigation.  The failure to collect and preserve such evidence materially affects the possibility of homicide charging recommendations and/or decisions.  The failure to collect and preserve evidence substantially affects the Coroner's recommendations for further disciplinary action by the California Medical Board against Valley and its medical staff, and it significantly affected the outcome of both the original January 15, 2013, Rojeski Autopsy Report and the amended April 1, 2013, Autopsy Report.  (Exhibit 15).

51.     Prejudice has accrued form the foregoing failure to preserve evidence as that evidence would have further confirmed that Plaintiff's explanation of the circumstances of death are correct, and would have further undermined any suggestion that the death qualifies as a homicide or was the result of gross negligence by Valley.  It is especially prejudicial to Valley because the Coroner's Office refuses to rule out homicide as the cause of death, and also recommends that Valley and two members of its medical staff be referred to the California Medical Board for disciplinary proceedings.

**B.     THE ANONYMOUS LETTER AND ILLEGAL SEARCH OF VALLEY SURGICAL CENTER**

52.     On October 17, 2011, the Coroner's Office received an "anonymous letter" from an individual claiming that, during the September 8, 2011 surgery: (1) oxygen tanks were empty, (2) fluids leaked on the floor, (3) the anesthesiologist recorded false information, (4) the monitoring equipment was broken, and (5) the times of the cardiac arrest were falsified[2] (the "Anonymous letter").

53.     In late November, the Coroner's Office announced that it wanted to inspect the premises of Valley and, in particular, inspect Valley's anesthesia equipment and other medical equipment.  Valley then learned that the Coroner's Office had retained Selma Calmes, M.D., as its Anesthesia Consultant for the Rojeski case, and that she would be accompanying the Coroner's team to the inspection of Valley's facilities.

54.     On or about December 1, 2011, prior to the Coroner's site inspection, Valley's counsel, Robert Silverman, sent a letter to the Coroner's Office protesting

---

[2] Nevertheless, nowhere in the Rojeski Original Report was there any verification of any of these allegations.  In fact, Valley refuted all of the allegations in the Anonymous letter as Valley provided full and complete surgical logs, medical records, and equipment maintenance logs to the Coroner's Office which disproved most, if not all, of the allegations in the Anonymous letter.

22

1    Dr. Calmes as the Consulting Anesthesiologist for the Rojeski investigation.  *See*

2    December 1, 2011 letter from Robert Silverman to Coroner's Office, attached

3    hereto as Exhibit 1.  The letter noted that Dr. Calmes had a publicly documented

4    professional bias against ambulatory surgery centers.  *See Id.*  Dr. Calmes publicly

5    stated in a previous autopsy report issued by the Coroner's Office in January, 2011

6    that she considered any ambulatory outpatient facility to be an inappropriate

7    platform for gastric banding procedures for patients with sleep apnea. *See* Exhibit 1

8    attached hereto and incorporated herein.[3]  Despite her obvious bias, the Coroner's

9    Office refused to utilize a different anesthesiology consultant and insisted that the

10   inspection would go forward with Dr. Calmes in attendance.  *See* December 2,

11   2011 letter from County Counsel to Robert Silverman attached hereto and

12   incorporated herein as Exhibit 2.

13          55.    In response to Valley's protest of the use of Dr. Calmes and its

14   December 1 letter to the Coroner, the Coroner's Office issued an illegal

15   Administrative Subpoena on December 5, 2011, signed by John Kades, Deputy

16   Coroner, which improperly demanded that Valley consent to a search of its

17   premises and equipment. *See* Exhibit 3.  The Administrative Subpoena was issued

18   without any judicial adjudication or judicial review and, thus, was illegal on its

19   face in terms of compelling a search of Valley's premises by Dr. Calmes, or other

20   representatives of the Coroner's Office. The Coroner's Office's administrative

21   subpoena power is limited to subpoenas for witnesses and for the witness to

22

23          _____

24          [3] In that January 2011 autopsy report, Dr. Calmes cites to outdated guidelines
     issued by the American Society of Anesthesiologists in 2006.  The overwhelming
25   majority of scientific literature published since 2006 on this topic approves and endorses
     gastric banding procedures in an outpatient setting.  Thus, Dr. Calmes not only had a
26   publicly documented bias against Valley, but had relied on outdated scientific data to
     support her biased position.  *See* Exhibit 2 attached hereto and incorporated herein.  This
27   fact was called to the Coroner's attention in a March, 2011 letter from Valley's attorney,
     Robert Silverman.
28

1   produce books and records for inspection. Search of premises is not authorized by

2   statute, and the general rule for searches of premises, even those being searched

3   pursuant to administrative regulatory authority, is that a warrant issued by a

4   judicial officer is required.

5        56.     The Coroner's Office appeared on December 5, 2011 at Valley's

6   facilities with this unauthorized and unlawful subpoena compelling Valley to allow

7   the Coroner's Office and "its duly appointed deputies" to access the anesthesia

8   equipment used on Ms. Rojeski.

9        57.     The Coroner's Office admitted at the time of the inspection that they

10  issued the subpoena to compel Valley to allow Dr. Calmes onto the premises.[4]  *See*

11  Exhibit 3 attached hereto and incorporated herein.

12       58.     Because of the close nexus in time between Valley protesting Dr.

13  Calmes appointment to the Rojeski investigation on December 1, 2011, and the

14  issuance of the illegal Administrative Subpoena on December 5, 2011 compelling

15  Valley, under threat of criminal contempt prosecution, to allow Dr. Calmes onto its

16  premises, Plaintiff alleges, on information and belief, that this action was in

17  retaliation for Valley's lawful exercise of its First Amendment right to petition the

18  government and object to Dr. Calmes' participation, and that Valley's prior

19  complaint regarding Dr. Calmes was a motivating factor in unlawfully presenting

20  the administrative subpoena to search Valley's premises.

21       59.     At the inspection, Valley Surgical showed the Coroner's

22  representatives its records demonstrating the Anonymous letter was false:

23            a.  there had been no defect in the equipment;

24            b.  the oxygen system functioned correctly at the time of surgery;

25            c.  the equipment had been serviced only 10 days earlier without

26                incident, and;

27

28

24

1    d. two surgeries took place at the facility in the same operating room

2         only 45 minutes after the Rojeski surgery without incident, utilizing

3         the same equipment and oxygen system.

4    **C.   THE CORONER'S OFFICE BREACHED ITS OWN SECURITY HOLD ON**

5    **THE INVESTIGATION.**

6    60.   For the next four months, Valley heard nothing from the Coroner's

7    Office. Whenever Valley asked about the status of the investigation, the Coroner's

8    Office replied that there was a "Security Hold" on the investigation, and nothing

9    could be released or discussed until the investigation was completed.

10   61.   During the same four months, Valley discovered that an ex-employee

11   had filed a "whistleblower" lawsuit against Valley, in which the whistleblower

12   admitted to having made a written complaint to the Coroner's Office regarding the

13   circumstances of Rojeski's death.  Valley sent two letters dated February 3, 2012

14   and March 13, 2012 detailing the falsity of the allegations in the initial

15   whistleblower complaint and the falsity and material factual changes to the

16   allegations in the amended whistleblower complaint (exhibits x and y).  Valley

17   responded not only to the complaint, but also provided the Coroner's Office with

18   information that refuted and disproved the allegations in the Whistleblower

19   complaint and the Whistleblower's subsequent amended complaint.  In the

20   amended complaint, the plaintiff/Whistleblower significantly and substantially

21   changed and revised the allegations concerning Rojeski's death. Valley requested

22   the opportunity to discuss the alleged complaints with the Coroner's Office.

23   However, the Coroner's Office, again, declined to meet with Valley's

24   representatives replying that there was a "Security Hold" on the investigation, and

25   nothing could be discussed until the investigation was completed. It has since come

26   to light that the author of the Anonymous Report was this disgruntled employee

27

28   [4] The issuance of an administrative subpoena to compel a "search" is illegal.

1   and that the Coroner's Office was in fact aware of her identity and nonetheless

2   promulgated this letter both in the Original and Supplemental Reports. By doing

3   so, the Coroner's Office has a) repeated  information that it knew or should have

4   known was false, b) failed to provide the information in its possession discrediting

5   these allegations (including that she was in litigation against Valley and had

6   substantially altered her original allegations in her lawsuit), and c) falsely stated

7   that the letter was anonymous after it knew the author's identity.

8        62.   On or about April 6, 2012, several major news outlets, including the

9   Los Angeles Times and the Orange County Register, published a story that the

10  Coroner's Office had referred the Rojeski investigation to the Los Angeles Police

11  Department Robbery-Homicide Division.  Thus, despite the Coroner's  "Security

12  Hold" on the investigation, the Coroner leaked its LAPD investigative referral to

13  the news media. Valley's counsel spoke with Detective Dan Myers of the LAPD

14  Robbery-Homicide division, who confirmed the Coroner's Office referral and that

15  the Coroner's Office had not forwarded to the LAPD Valley's two letters dated

16  February 3, 2012 and March 13, 2012, referenced above, which showed that the

17  allegations regarding the death of Rojeski in both versions of the Whistleblower

18  complaint were false. This was in violation of the Coroner's legal directive in

19  Government Code §27491.1, which states that the Coroner's report to law

20  enforcement must include "information received by the Coroner relating to the

21  death." Because, as was explained *supra*, the Supplemental Report was based on

22  verifiably false evidence, the LAPD's homicide investigation has remained open

23  after the release of the Supplemental Autopsy Report, and Valley unjustifiably

24  continues to be the subject of suspected homicide in the Rojeski death.

25       63.   Despite an active investigation and a Security Hold on the

26  investigation, Plaintiff Valley is informed and believes, and thereon alleges that

27  Defendant Calmes breached the Security Hold during an active investigation when

28

26

1  she gave a presentation on September 21, 2012 titled "Ambulatory Surgery

2  Disasters" at Hotel Nikko in San Francisco. Calmes, appearing under the title of

3  "Los Angeles County Coroner/Medical Examiner," violated the Coroner's Security

4  Hold by discussing two Lap Band deaths where she was the appointed Anesthesia

5  Consultant to the Coroner's Office.  The Coroner's Office has confirmed that on

6  August 7, 2012, The Los Angeles Police Department (LAPD) issued a letter to the

7  Coroner indicating that it continues to investigate the death of Paula Rojeski. As a

8  result, and due to the purported "sensitivity of the investigation", the LAPD

9  requested a 60-day hold on the release of the Coroner's findings.  The Coroner has

10  further confirmed that it refused communications with Valley due to the "security

11  hold".  However, Dr. Calmes, acting as the agent of the Coroner's Office and

12  under the color of law, knowingly violated the security hold with her public

13  fraudulent speech on September 21, 2012 which was well within the 60 day

14  security hold the Coroner's Office admits the LAPD imposed on August 7, 2012.

15  Calmes' retaliatory and false public speech was in direct response to Valley

16  complaining to the Coroner's Office in a written letter dated September 7, 2012,

17  that it had done a poor job investigating the death of Paula Rojeski and had not

18  uncovered Rojeski's serious and material history of heart damage secondary to the

19  drug Fen-Phen. (Ex. 4)

20      64.    Her charts and slides intentionally and openly criticized surgery

21  centers working with 1 800 GET THIN, which include Plaintiff Valley.  She

22  violated the Security Hold on the Rojeski investigation by intentionally disclosing

23  unconfirmed information regarding the Rojeski death and repeating her discredited

24  professional opinions regarding bariatric surgeries in ambulatory surgery centers.

25  In fact, she even put up a billboard of 1 800 GET THIN's advertising in her speech

26  and related that there were two related Lap Band deaths.  Obviously, one of those

27

28

27

1  two deaths was the death of Paula Rojeski and, as of September 2012, this matter

2  was still under investigation and the Coroner's Security Hold.  *See* Exhibit 5.

3      65.    Approximately two weeks before that speech, Valley submitted a

4  written letter with medical records to the Coroner's Office demonstrating how

5  Paula Rojeski had a prior, undisclosed history of prescription weight loss

6  medication use, including Fen-Phen and that she had admitted in court documents

7  to having suffered significant cardiac damage.  *See* Exhibit 4. Valley's presentation

8  of this evidence to the Coroner's Office called into the question the entire

9  methodology of the Rojeski investigation in general with lack of any investigation

10 into her past medical history. The close nexus in time between Valley's September

11 8th letter to the Coroner's Office and Defendant Calmes speech, in her official

12 capacity as Deputy Medical Examiner for the Coroner's Office, suggests that the

13 later action was partly in retaliation for Valley's exercise of its First Amendment

14 rights, and Valley so alleges on information and belief.

15 **D.    PLAINTIFF VALLEY CONDUCTS ITS OWN INVESTIGATION INTO**

16 **PAULA ROJESKI**

17     66.    In September, 2012, Paula Rojeski's estate filed a wrongful death

18 action against Valley and its medical staff.  By this time, the Coroner's

19 Investigation had been pending for 12 months without any report, or indication

20 when a report would be issued.

21     67.    Valley uncovered a series of medical records which showed Ms.

22 Rojeski had a severely compromised, but undisclosed heart condition from her use

23 of Fen-Phen and other weight loss medications during the years 2001-2002, and

24 again during 2009-2010.  In addition, Valley uncovered documents showing that

25 Ms. Rojeski was a lead plaintiff in a civil lawsuit against the makers of Fen-Phen

26 where she admitted to having suffered severe cardiac damage from Fen-Phen

27 usage. *See* Exhibit 4.

28

68.     Not less than ten times in statements to Valley Medical personnel, the deceased stated she had <u>no prior heart damage</u> when, in fact, she had filed a lawsuit in 2003 entitled *Paula Rojeski v. Wyeth, et. al.,* Orange County Superior court Case No. 03CC00687, in which she claimed <u>severe heart injury</u> from her use of Fen Phen in 2001 and 2002.  Ms. Rojeski also concealed from Valley Medical personnel that she commenced taking the prescription weight loss medication, Phentermine, in 2009. *See* Exhibit 16. In fact, she obtained the Phentermine in 2009, from the same physician from whom she had obtained the Fen Phen in 2002. *Id.*

69.     Ms. Rojeski also concealed that she had gone to the emergency room at Saddleback Medical Center in Lake Forest, California, on August 11, 2011, only 28 days prior to her September 8, 2011 surgery, with malignant blood pressure of 205/150, radiating pain in her neck and shoulders, heart palpitations, and an abnormal EKG. *See* Exhibit 15. Valley provided these previously undisclosed and concealed records to the Coroner's Office in Fall 2012, several months before the Rojeski Final Report was completed.

70.     With her weakened heart from the prior Fen-Phen usage, Ms. Rojeski was not a good candidate for laparoscopic surgery because she had a compromised heart, and could not sustain events during surgery which would not have affected a healthy patient. *See* Declaration and expert report attached thereto of Dr. Terry Simpson, attached hereto as Exhibit 12.  Dr. Simpson's report states that Ms. Rojeski likely died after surgery because of her undisclosed injury.

71.     All of this uncovered information, which had been concealed from Valley and its medical staff by Ms. Rojeski, was addressed and documented in a series of letters to the Coroner's Office.  The letters were dated September 7, 2012 (Ex. 4), October 3, 2012 (Ex. 20), October 8, 2012 (Ex. 21), October 25, 2012 (Ex. 22), November 6, 2012 (Ex. 19), November 13, 2012 (Ex. 23), November 16, 2012

1   (Ex. 24), November 21, 2012 (Ex. 25), December 6, 2012 (Ex. 26), and December

2   10, 2012 (Ex. 27). The letters attached more than 1,000 pages of Paula Rojeski's

3   medical records (not included among the exhibits), and other relevant documents.

4   Despite this volume of information, the Original and Supplemental Autopsy

5   Reports make no reference to this material, all of which paints a very different

6   picture of the death than that presented by the Coroner.

7        **E.   VALLEY SURGICAL'S REVIEW OF THE ORIGINAL CORONER'S**

8        **REPORT.**

9        72.    While sending the various letters, Valley repeatedly asked to meet

10  with the Coroner's Office to review the evidence that Valley had presented

11  regarding Ms. Rojeski.  The Coroner's Office, claiming that there was a Security

12  Hold on the investigation, rebuffed Valley's requests.

13       73.    In January 2013, Valley's Counsel, Centurion, heard through legal

14  representatives of Ms. Rojeski's estate that the Coroner had shared the findings of

15  its autopsy report concerning Ms. Rojeski's with representatives of Ms. Rojeski's

16  estate.  Valley then immediately renewed its demand for a meeting with the

17  Coroner's Office.

18       74.    On January 15, 2013, more than 16 months following Ms. Rojeski's

19  death, the Coroner's Office met with Valley's representatives.  After admitting to

20  having revealed the contents of the Rojeski original Report to Rojeski's estate

21  representative, the Coroner's Assistant Chief Investigator, Ed Winter, agreed to

22  release a copy of what he called the Rojeski Final Report to Valley's legal counsel

23  who were in attendance. *See* Exhibit 6.

24       75.    The Coroner's representatives stated that Valley had one week in

25  which to review the Rojeski Final Report. However, Ed Winter emphasized that

26  the Rojeski Final Report would not be modified or revised. He stated that, at best,

27  the Coroner's Office might issue a supplemental report.

28

1    76.    At the conclusion of the meeting, Investigator Winter stated that the

2  Rojeski Final Report was being released to Valley's legal counsel under an

3  understanding of confidentiality. Winter further elaborated by saying that, if

4  anyone from Valley released or disclosed the Rojeski Final Report to any third

5  party, the Coroner's Office would then immediately release and distribute the

6  Rojeski Final Report to the public. Defendant Winter additionally stated "I don't

7  want to hear about this in any report from any source." Winter's statements were

8  reasonably interpreted by Valley and its legal representatives as a threat and

9  intimidation against Valley presenting any complaints about the Coroner's

10  investigation or any complaints about the Rojeski Final Autopsy Report to any

11  government agency or judicial forum outside of the Coroner's Office. As a result,

12  Valley has felt constrained from filing complaints regarding the Coroner's Office's

13  violations of its rights, including filing administrative tort claims under Govt. Code

14  § 910.[5]

15    77.    The Rojeski Original Report stated the mode of death for the deceased

16  was "undetermined."  (Exhibit 6.).  More specifically:

17      a.  the Coroner's Office could not rule out that the death was a homicide;

18      b.  the Coroner's Office found the attending Anesthesiologist, Dr. Demming

19          Chau, and the attending Surgeon, Dr. Julius Gee, were grossly negligent

20          and that they both should be referred over for further disciplinary

21          proceedings by the California Medical Board;

22

23
_____

24      [5] Prior to filing this case, Valley's legal representatives had only shown the report

25  to the seven retained experts for purposes of refuting the conclusions contained in the
    Rojeski Original Report of gross negligence and sub-standard care.  As a result of the

26  statements by Ed Winter, Valley's legal representatives had refrained from filing any
    public complaint regarding Valley's allegations of violations of its rights by the

27  Coroner's Office as Valley has feared, and continued to fear, that the Coroner's Office

28  would retaliate by officially releasing the Rojeski Original Report in its current form with

31

1      c. the Coroner's Office found (without any factual substantiation) that

2            Valley did not comport itself within the bounds of the standards of due

3            care.

4      78.    The Rojeski original Report contains a separate opinion by Dr. Selma

5  Calmes, who was retained as a Consulting Anesthesiologist by the Coroner's

6  Office. Her factual findings erroneously declare on page 2 starting at line 5:

7      "The inhalation anesthetic isoflurane was stopped at 0945, and circuit gas

8  flow was increased, to remove isoflurane from the system. **No further anesthetic**

9  **drugs appear to have been given for the remaining 1 1/2 hrs of surgery**, on

10  review of the anesthesia record." (Emphasis added).

11      79.    To the contrary, the medical and surgical records clearly state that the

12  surgery ended at 9:45 a.m., the same time the anesthesia was stopped.  There was

13  no "remaining 1-1/2 hours of surgery" without anesthesia.  Calmes thus

14  erroneously claims that the patient was therefore awake during the last hour of her

15  surgery, though paralyzed while bleeding to death with the surgeon standing there.

16  This is erroneous because the patient was closed up at 9:45 a.m. and then placed in

17  recovery and thus there was no need to be administering any more anesthesia.  The

18  surgeon had completed his task and closed up Ms. Rojeski approximately 75

19  minutes before she went into cardiac arrest.

20      80.    Dr. Calmes complained that she was unable to read the records and

21  that the "hand-written anesthesia record is nearly unreadable, even using a

22  magnifying glass." However, the records supplied to the LA Coroner's Office

23  were in no manner illegible and are reproduced in sufficient clarity as shown

24      below.

25      **<u>FIGURE 1</u>**

26

27  all of its false findings and conclusions. As it turns out, those fears have been shown to be

28  well taken.

**Anesthesia Record**

81.     The records unquestionably indicate the times of the surgery and anesthesiologist's supervision which the Coroner's Consultant has ignored. Instead, the Consultant fabricated and falsified facts that were patently contradicted by the medical records.  Moreover, if the records were so illegible, then Dr. Calmes and the rest of the authors of the Rojeski Final Report should never have been so adamant and confident in their findings and conclusions.

82.     The Anesthesia Record unambiguously specifies the start time of the surgery as 9:15 a.m. and end time of the surgery as 9:45 a.m., and the writing is both clear and legible in direct contravention of the claim from the consultant.

83.     The Operating Room Record completed by the nurse also clearly specifies the start and end time of surgery:

**FIGURE 2**



**OPERATING ROOM RECORD**

33

1         Given the unambiguous medical records, the factual findings from the

2    Anesthesia Consult cannot be supported.

3         84.    Dr. Calmes stated in her portion of the Rojeski Original Report:

4              "If there was cerebral perfusion during this time (we can anticipate

5              that cerebral flow was present for at least some part of the next 1 1/2 hrs

6              even though she was in a steep head-up position, which works against

7              adequate cerebral blood flow when BP is low), **she had to be feeling pain**

8              **and was conscious but paralyzed as she probably bled to death**.

9         85.    Dr. Calmes, without any justification or confirmation whatsoever,

10   and, with complete disregard for the medical records and surgical logs,  went on to

11   say:

12             "Strangely the anesthesiologist realized the patient could not tolerate

13             the anesthetic agent (it was turned off at 0945) but told the surgeon all was

14             well.  This patient was probably awake and feeling pain as she proceeded

15             along the path to her death over the next 1 ½ hours." (Emphasis added).

16        86.    However, the undisputed medical records, as shown from the

17   excerpts above in Figures 1 and 2 clearly demonstrated (1) anesthesia was initiated

18   at 8:55 a.m. (2) surgery commenced at 9:15 a.m. and (3) surgery ended at 9:45 a.m.

19   The patient was not awake and paralyzed for 1 ½ hours of surgery, feeling pain and

20   bleeding to death as Calmes falsely and outrageously proclaims.  There is no

21   evidentiary basis for these false statements in the Final Autopsy Report.  This

22   reckless conduct was done as part of Coroner's Office's concerted effort to harm

23   Valley by instilling terror and outrage in anyone reading the report.

24       **F.**    **OTHER MEDICAL EXAMINERS BLINDLY ADOPTED DR. CALMES'**

25             **ERRONEOUS FINDINGS IN THE ORIGINAL REPORT.**

26

27        87.    The Coroner's pathologists performing the autopsy, Dr. Adrian

28   Marinovich and Dr. Raffi Djabourian, stated at page 12-13 of their Report:

1            "The anesthesiology consultant report indicates that there was gross

2          negligence on the part of the anesthesiologist, in that he failed to meet basic

3          standards of anesthesia care, in particular: failure to adequately assess the

4          patient's condition during surgery, to communicate the patient's

5          deteriorating condition to the surgeon, **and to provide pain relief and**

6          **amnesia while the patient was paralyzed during surgery."** (Emphasis

7          added).

8        88.    Thus, the pathologists assigned to the Rojeski investigation decided to

9 blindly rely upon and entirely premise their own allegedly independent findings

10 and conclusions on Dr. Calmes' false factual statements and inaccurate

11 conclusions.

12       89.    The repeating of the erroneous findings and conclusions by Dr.

13 Calmes was continued by others within the Coroner's Office who were assigned to

14 investigate the Rojeski matter in the Original Report. The portion of the Rojeski

15 Original Report authored by Drs. Marinovich and Djabourian states:

16            "Certifying the manner of death as homicide vs. accident would

17          require knowledge of whether or not this death resulted from a conscious

18          disregard for the patient's safety.  The currently available information does

19          not allow for a conclusion that the surgeon or anesthesiologist intentionally

20          disregarded the patient's safety.  The manner of death thus could not be

21          determined."

22       90.    The statement is internally inconsistent and illogical.  Since there is no

23 evidence of intentional disregard of the patient's safety or any "knowledge" that

24 would indicate a homicide, the only possible explanation for the patient's death is

25 that it was an accident.

26       91.    The Surgical Consultant retained by the Coroner's Office for the

27 Rojeski original Report, Dr. Denis Astarita, stated in the Original Report that "the

28

1    likely manner of Death will be Accident."   His Report is unchanged in the

2    Supplemental Report. Thus, even Dr. Astarita's Report, does not support the

3    classification of the death as "undetermined" (despite his elsewhere stating, in an

4    obvious attempt to label Valley, without support, as potentially guilty of homicide

5    by stating that the case should be reported to the California Medical Board for

6    "gross negligence with incompetence." The Coroner's Office exhibits bad faith and

7    a reckless disregard for the truth by avoiding the obvious appropriate conclusion

8    that the manner of death was an accident.  Strikingly, Dr. Astarita's handwritten

9    surgical opinion dated November 9, 2011 and included in the Original Autopsy

10   Report is missing from the Amended Autopsy Report of April 1, 2013.  This

11   omitted handwritten opinion states "the likely manner of death accident" and

12   makes no reference to an undetermined cause of death.  We are informed and

13   believe that the Coroner's Office has deliberately omitted this handwritten report

14   from the Amended Autopsy Report to mislead the public and the Court as to the

15   cause of death and to keep an illegitimate homicide investigation active by labeling

16   the cause of death as "undetermined".

17        92.    The findings from Drs. Marinovich and Djabourian in the Original

18   Autopsy Report are also based on the receipt by the Coroner's Office of the

19   Anonymous Letter.  The Anesthesia Consult, withdrawn in the Supplemental

20   Report, recites in detail information from the Anonymous Letter. While withdrawn

21   by Dr. Calmes, it was not withdrawn by Dr. Astarita..

22        93.    Furthermore, on the basis of the gross negligence conclusion, the

23   Rojeski Original and Supplemental Reports call for referral of Valley's medical

24   staff to the California Medical Board for further disciplinary proceedings.  This

25   conclusion of gross negligence and the call for further disciplinary proceedings are

26   without any evidentiary foundation in either the Original or Supplemental Reports.

27

28