BARRETT S. LITT, SBN 45527
E-Mail: blitt@kmbllaw.com
DAVID MCLANE, SBN 124952
KAYE, MCLANE, BEDNARSKI & LITT, LLP
234 Colorado Blvd., Suite 230
Pasadena, California 91101
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

KONRAD L. TROPE, SBN 133214
E-Mail: ktrope@centurionlawgroup.com
MARK S. FAULKNER, SBN 102679
E-Mail: mfaulkner@centurionlawgroup.com
CENTURION LAW GROUP, P.C.
9107 WILSHIRE BLVD., STE. 450
BEVERLY HILLS, CA 90210
Telephone/Facsimile: 888-942-9997

Attorneys for Plaintiff Valley Surgical Center, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VALLEY SURGICAL CENTER, LLC, a California Limited Liability Company,<br><br>    Plaintiff,<br><br>    vs.<br><br>COUNTY OF LOS ANGELES, a government entity, LAKSHMANAN SATHYAVAGISWARAN, M.D., an individual, ADRIAN MARINOVICH, M.D., an individual, RAFFI DJABOURIAN, M.D., an individual, DENIS C. ASTARITA, M.D., an individual, SELMA CALMES, M.D., an individual, JOHN KADES, an individual, ED WINTER, an individual, and DOES 1-10,<br><br>    Defendants. | Case No. 2:13-CV-02265-DDP (AGRx)<br><br>[Before the Hon. Alicia Rosenberg, Magistrate Judge]<br><br>DECLARATION OF KONRAD L. TROPE IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL FURTHER DISCOVERY RESPONSES FROM DEFENDANTS<br><br>Courtroom: 3<br><br>Initial Compl. Filed:   March 29, 2013<br><br>1st Am. Compl. Filed:  May 9, 2013<br><br>Rule 16 Sched. Conf.:  TBA |

**DECLARATION OF KONRAD L. TROPE**

I, Konrad L. Trope, am over the age of 18 and am a resident of Los Angeles County, and I am counsel for Plaintiff Valley Surgical Center, LLC in the above-referenced matter. Accordingly, I could and would competently testify thereto regarding the following:

1. Between May 17, 2013 and May 23, 2013, my office served subpoenas to the following agencies: Attorney General of California; California Department of Insurance; California Medical Board; FBI; FDA; the Joint Commission; and the Los Angeles Police Department. Although the U.S. Department of Health and Human Services was one of the parties to whom a subpoena was issued, it was withdrawn before service was completed.

2. These subpoenas were inadvertently served before discovery had commenced in this matter under the Federal Rules of Civil Procedure, and unfortunately, without notice to Defendants.

3. All of the subpoenas were withdrawn on May 31, 2013, before any responsive documents were due.

4. The only documents that were produced in response to the subpoenas were documents produced by the California Medical Board. Copies of such documents were provided to Defendants, and Defendants were informed that no other documents had been produced to any of the subpoenas. Moreover, the documents produced by the California Medical Board were all publicly available.

5. Defendants were subsequently notified that the subpoenas had been served in error and that all of the subpoenas had been recalled or cancelled without prejudice to re-serve such subpoenas.

6. On July 24, Defendants served subpoenas to the following entities: Federal Bureau of Investigations; Dept. of Health and Human Services; Food and Drug Administration; Medical Board of California; US Department of Justice;

1

Attorney General, State of California; and The Joint Commission ("third party agencies").

7. It is worth noting that the document requests in the subpoenas issued by the Defendants were identical to those contained in the first set of subpoenas issued by Plaintiff and later recalled. Thus Defendants should be estopped from claiming that the documents sought by Plaintiff concerning Defendants' communications with these various third party agencies are somehow privileged. Defendants are seeking those same documents directly from the same third party agencies upon which Defendants have served subpoenas.

8. The due date for production was August 20, 2013.

9. I have not received any notice that the subpoenas issued by the Defendants were withdrawn by Defendants.

10. I have not received any other subpoenas served by Defendants to the above mentioned third party agencies.

11. Within the last 24 hours, Plaintiff has discovered a recorded lecture, presented by Defendant Calmes at the UCLA Medical School in August 2012. This lecture was not produced by Defendant Calmes, despite representation that all responsive documents had been produced concerning statements made by Defendant Calmes. I have reviewed the lecture, and the relevant portions are transcribed below. However, in sum, Defendant Calmes revealed that there was an ongoing investigation into "a number of deaths" at the 1-800-GET-THIN outpatient centers, and described the situation as "very scandalous". Defendants Calmes went on to say that that the investigation ranged from "northern California to Afganistan" and that there would be "astonishment and a lot of legal action" when the investigation was done.

12. At the time these statements by Defendant Calmes were made (August 2012), Plaintiff had been informed that that there was a "security hold" in place,

which Plaintiff was told and understood to mean that the investigation was confidential.

13. This lecture and statements made by Defendant Calmes further underscores the need for the discovery of the documents sought by Plaintiff, which have been withheld by Defendants under the guise of various privileges.

14. Plaintiff's First Amended Complaint (Dkt. #42) alleges, *inter alia*, that Defendants systematically engaged in conduct violating Plaintiff's constitutional rights, including the fabrication and falsification of evidence regarding the investigation conducted by Defendants into Rojeski's death. Plaintiff has alleged that not only were employees and representatives of the Coroner's Office unduly prejudiced against Valley, but that the Coroner's Office was subjected to improper and illegal pressure by other governmental agencies to assign fault against Valley. The statements made by Defendant Calmes in August 2012, support Valley's allegations that the Coroner's Office was not only prejudiced against Valley, but that it was in close communication with other governmental agencies and was cooperating and acceding to improper pressure and suggestions from these government agencies. This is demonstrated by Defendant Calmes's comments that the investigation spanned from "northern California to Afghanistan" and that there would be "a lot of legal action" when the investigation was done. An investigation by the Coroner's Office would only focus on Ms. Rojeski and her treatment at the clinic where she had her lap band procedure, which is located in West Hills, a suburb of Los Angeles. An investigation involving Northern California and Afghanistan could only come from Dr. Calmes having communicated with an outside agency such as the U.S. Attorney's Office. Dr. Calmes made these remarks in August 2012. The LA Times revealed a federal investigation into the West Hills facility in October 2012. For further details, see the attached two declarations from Dr. Michael Sedrak, listed as Exhibits 21 and 22.

15. It appears that based on Defendant Calmes statements, she had been in communications with other governmental agencies outside of the Coroner's Office, and that the ultimate goal of those agencies was to take action against Valley, and other surgical centers that were perceived to be affiliated with it. Attached hereto and incorporated herein is a partial transcription of the statements made by Defendant Calmes during this lecture. The full audio lecture can be found at: http://www.anes.ucla.edu/nucleus3.24/video.php?itemid=489&catid=29 The lecture included slides as part of her presentation.  These statements, which accompanied certain slides, show that Dr. Calmes, in direct violation of the "confidential security hold" imposed by Defendants concerning the investigation, clearly violated that security hold. Moreover, her statements, made at UCLA, in Los Angeles County where Plaintiff operates its facility, showed bias and abuse of authority in conducting the Rojeski investigation. See below:

*Introduction*

*Harvey:  Good morning everyone, welcome to our grand rounds program. It's my pleasure to introduce Dr. Selma Calmes as our guest speaker.  Dr. Calmes is a professor of pediatric anesthesia at UCLA for many years and subsequently was Chief of Anesthesia at Olive View and more recently, has been working for the L.A. County Coroner's Office.  One hopes that the anesthesiologist is the, uh, a vital person in the morgue as opposed to a non-vital, non-vital being in the morgue.  You'll probably hear about some, uh, misadventures in anesthesia this morning. Thank you.*

*Dr. Calmes: Thank you, Harvey.  Um, just one small correction of – I was not a professor of pediatric anesthesiology.  I was the first pediatric anesthesiologist at UCLA, which was quite an adventure. Uh, today we are going to look at this question of what might an anesthesiologist do in a morgue, and I know this sounds very bizarre, but there is a lot for us to learn. And I took the job of anesthesia consultant at the Coroner's in 2007 thinking it would be a nice part-time job, and*

*it's a very overwhelming full-time activity, so you'll learn some more about that in just a minute.*

*Slide 24*

*I'm also not going to say very much about, um, this company. Now, if you're new to L.A., and I, um, think we have new residents, you may not be aware of the 1-800-Get-Thin company, um, which did lap bands in, um, the outpatient setting and had a number of deaths. And it's a very scandalous situation. Um, and it – there's still investigation going on and the investigation is ranging from northern California to Afghanistan. And when it's finally done, there's going to be quite a bit of, um, astonishment and a lot of legal action, so I can't speak much about that area.*

*Slide 51*

*I've never seen quite so many problematic physicians as in this study, and it's primarily at the surgeon level. There is one anesthesiologist who had a problem. I want to point out that a new AQI program will miss some anesthesia deaths and, um, it exposes the evil outside of academic medical centers. We have a very sequestered, and I want to say perfect, but it's not quite perfect, but, um, it's a very different world than what's out there. And, so we need to be involved in improving that, is what I think, and it's one of the things that keeps me going. And then it also makes clear the challenges for the California Medical Board. People who they end up, um, trying to discipline are very clever, um, hide things, um, threaten to sue, and, um, so it's, um, really a challenge and again I would recommend those have experience to participate in the Medical Board's expert review program, to help them. It's a public service.*

*Slide 52*

*I have now a view of anesthesia practice in the community and, uh, I can tell you that preop evaluations are unbelievably short, like two minutes. Nobody seemed to have a preop clinic, and, um, airway evaluations are certainly inadequate – only*

1  *two of 43 patients had a real airway exam and most often it was only a*
2  *Mallempatti, and that's a very insensitive measure for difficulty of*
3  *intubation. Important info was often missing, missing from the chart, like intake*
4  *and output, and, uh, entitled $CO_2$. Nobody measures temperature and one of the*
5  *cases was a possible hypothermia. Um, very few people seem to monitor*
6  *neuromuscular transmission and few reverse neuromuscular blockers, and this has*
7  *been confirmed in a recent published study on this. Some MD's in the sample*
8  *don't really act like physicians, like after your patient dies, there should be some*
9  *note from you, which acknowledge - describes the situation and, uh, that was not*
10 *present as much as it should have been. And this is a really interesting, um, pearl –*
11 *in many hospitals, ER physicians run OR codes, and I couldn't believe this. I could*
12 *see this if it was a weekend and you were the only anesthesiologist in house and*
13 *the patient was bleeding and you needed help with blood and the management had*
14 *the code, but it's a routine. They get called during the middle of the day when the*
15 *anesthesia staff is in place to run the code. And it just, it's simply not suitable. It*
16 *shows that the anesthesiologists may not be ACLS certified, may not be competent*
17 *to do a code, and so on, and, um, so that's a very depressing thing.*
18 *60:45*
   *I really agree with you very much, and the other area of concern is all the little*
20 *stray clinics that are out there that are, um, causing a lot of deaths. It's, um, very*
21 *scary and patients are ignorant about what needs to be done for safety, so.*

22    16.   In addition, Defendants claim that they produced all non-privileged e-
23          mails but then claimed that they had no "phone logs" evidencing such
24          communications. However, phone bills would show much of the same
25          information as a phone log and Defendants have glaringly not produced
26          nor made any mention of phone bills, even though phone bills are within
27          the category of responsive documents.

28

6

17. Attached hereto as **Exhibit 20** is a true and correct copy of Order to Compel Discovery issued by Administrate Law Judge Vincente Nafarrete, in the Matter of the Accusation Against Michael Omidi.

18. Attached hereto as **Exhibit 21** is a true and correct copy of the Declaration of Michael Sedrak, M.D., in support of Plaintiff's Motion to Compel Further Discovery Responses. I referenced this Declaration in Paragraph 14 above. This declaration describes how the Coroner's Office allowed Dr. Sedrak to review documents in April 2013, which now it says cannot be released or reviewed.

19. Attached hereto as **Exhibit 22** is a true and correct copy of the Declaration of Michael Sedrak, M.D. re Disclosure of Federal Investigation to Selma Calmes. I referenced this Declaration in Paragraph 14 above. This declaration describes how Dr. Calmes, an author to the Rojeski report issued by the Coroner's Office was privy to information in a confidential federal investigation, which she used as a basis for forming her factually unsupportable erroneous conclusions in the Rojeski report.

20. Attached hereto as Exhibit 23 is a true and correct copy of an e-mail from Craig Harvey of the Coroner's Office, dated April 1, 2013, in which he states that I can now view the various underlying documents that support the Coroner's Report regarding Rojeski. That report was released on April 1, 2013. So any claims of privilege by the Coroner's Office regarding these documents are specious and should be rejected.

I declare the foregoing to be true and correct under penalty of perjury under the laws of the state of California.

Executed this 26th day of August, 2013 at Beverly Hills, California.

__/s/ Konrad L. Trope_____
Konrad L. Trope

7