**O**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

VALLEY SURGICAL CENTER LLC.,  )   Case No. CV 13-02265 DDP (AGRx)
a California Limited          )
Liability Company,           )
                             )
                Plaintiff,   )   **ORDER GRANTING DEFENDANTS' MOTION**
                             )   **TO DISMISS IN PART AND DENYING IN**
     v.                      )   **PART**
                             )
COUNTY OF LOS ANGELES, a     )
government entity, et al.,    )
                             )   [Dkt. 210]
                Defendants.  )
_____)

     Presently before the Court is Defendants County of Los Angeles (the "County"), Lakshamanan Sathyavagiswaran, Adrian Marinovich, Raffi Djabourian, Denis C. Astarita, Selma Calmes, John Kades, and Ed Winter (collectively, "Defendants")'s Motion to Dismiss Valley Surgical Center, LLC. ("Valley")'s Second Amended Complaint ("SAC"). Having considered the parties' submissions and heard oral argument, the Court adopts the following order.

**I.   BACKGROUND**

     This case arises out of an investigation conducted by the Los Angeles County Coroner's Office (the "Coroner's Office") into the death of Paula Rojeski ("Rojeski"). On September 8, 2011, Rojeski, a 55 year old woman, underwent laparoscopic surgery at Valley for

the placement of an adjustable gastric Lap-Band to treat longstanding obesity. (SAC ¶ 12.) The surgery lasted approximately 30 minutes. (Id.) At the end of surgery, the surgeon closed the incisions, seeing no indications of bleeding or cardiac complications. (Id.) At 10:55 a.m., approximately 70 minutes after the procedure was completed, Rojeski suffered pulseless electrical activity ("PEA") and cardiac arrest. (Id.)

Valley alleges that within 24 hours of her death, Rojeski's sister authorized two separate agencies to harvest Rojeski's organs and body parts. (Id. ¶ 15.) The first agency, One Legacy, removed the bones in Rojeski's limbs as well as the skin from her abdomen and back. (Id.) The second agency, Doheny Eye & Tissue, removed Rojeski's heart valves and pericardium on September 9, 2011, the day after the procedure. (Id.) On September 9, 2011, after the organ and tissue harvesting was completed the Coroner's Office took possession of Rojeski's body. (Id. ¶ 16.) The Coroner's Office performed an autopsy on September 12, 2011. (Id.) Valley contends that Defendants Djabourian and Marinovich were present and that Defendant Sathyavagiswaran directed and controlled the autopsy, including the permission to harvest organs and tissue. (Id. ¶ 16.) Valley further contends that the Coroner's Office failed to supervise, monitor or limit the harvesting as required under Coroner protocols and instead only requested that the "recovery avoid[s] operation site." (Id. ¶ 50.) The autopsy showed that Rojeski suffered a 4 mm perforation of her lower abdomen aorta. (Id. ¶ 17.) While Defendants Djabourian and Marinovich did not state their opinion as to what caused the aortic perforation, Valley asserts that the likely causes were "(a) a negligently

misguided surgical instrument which caused [] Rojeski to bleed into retroperitinum for 60 minutes during her recovery followed by cardiac arrest; or (b) a perforation from vigorous cardiac massage from the paramedics following cardiac arrest." (Id.). Valley argues that although both possible causes of the aortic perforation show that Rojeski's death was caused by an accident, Defendants Sathavagiswaran, Winter, Kades, Djabourian, Astarita, and Calmes attempted to attribute Rojeski's death to homicide for most of the investigation (Id. ¶¶ 17-18.) Following the autopsy, Rojeski's body was released to her sister and was buried on September 13, 2011. (Id. ¶ 16.)

On October 17, 2011, the Coroner's Office received an anonymous letter alleging that during Rojeski's surgery: (1) oxygen tanks were empty; (2) anesthetic fluids leaked onto the floor; (3) the anesthesiologist recorded false information; (4) the monitoring equipment was broken; and (5) that Rojeski suffered cardiac arrest much earlier than reported. (Id. ¶ 19.) Valley argues that the letter was written by Dyanne Deule ("Deule") and that Deule informed the Coroner's Office that she was not present during the surgery and had no proof of the allegations contained in the letter.[1] (Id. ¶ 20.) Valley further argues that Defendants interviewed nurses who were present during Rojeski's surgery in April 2012, and they informed the Defendants that nothing stated in

---

[1] On January 17, 2012 Deule filed a lawsuit against Valley. (SAC ¶ 26.) Deule alleged that she was subjected to employment retaliation after complaining about Valley's medical services. (Id.) Deule admitted that she had complained to the Coroner's Office regarding Rojeski and claimed Valley retaliated against her in response. (Id.)

the letter occurred during the procedure. (Id.)  Valley contends
that this shows that the anonymous letter was false.

In late November 2011, Defendant Kades informed Valley that
the Coroner's Office wished to inspect Valley's premises with an
anesthesia consultant, Defendant Calmes.  (Id. ¶ 21.)  On December
1, 2011 Valley responded to the Coroner's Office, protesting the
assignment of Defendant Calmes as the anesthesia consultant, citing
"her lack of professional competence and personal and competitive
bias against Valley and surgical centers." (Id.; SAC Ex. 1.)
Valley contends that on December 5, 2011, in retaliation for its
protest regarding Calmes, Defendant Kades, under the supervision of
Defendants Sathyavagiswaran and Winter, issued a Coroner's
subpoena.  (Id. ¶ 21.)  The subpoena sought medical records of
Rojeski as well as an inspection of Valley's premises.  (Id. ¶ 22.)
Valley alleges that Defendants used the subpoena to unlawfully
compel a search.  (Id.)  Valley further alleges that Defendants
Winter and Kades admitted at the inspection that their sole purpose
in issuing the subpoena was to force Valley to allow Defendant
Calmes onto Valley property.  (Id. ¶ 23.)  During the search,
Valley contends that Defendants became aware of evidence
demonstrating that the anonymous letter was false.  (Id. ¶ 25.)

Valley contends that Defendants leaked the information to the
media despite the security hold on the case.  (Id. at 28)  Valley
alleges that despite a security hold on the Rojeski case, on April
6, 2012 media outlets published stories that the Coroner's Office
had referred Rojeski's case to the Los Angeles Police Department
(the "LAPD") Robbery-Homicide division.  (Id. ¶ 27.)  Valley
further asserts that on May 11, 2012 news outlets reported that

1 LAPD homicide detectives were assigned to investigate the Rojeski
2 death to determine whether a crime had been committed. (Id.)
3 Valley contacted the LAPD and was informed that Valley was under
4 criminal investigation for homicide. (Id. ¶ 28.)

5     On August 7, 2012, the LAPD informed the Coroner's Office that
6 it was continuing to investigate Rojeski's death. (Id. ¶ 38.)
7 Valley alleges that the LAPD requested a 60-day security hold on
8 the case and that the Coroner's Office refused to communicate with
9 Valley as a result. (Id.) Despite the LAPD security hold, Valley
10 alleges that Defendant Calmes, with the assistance of Defendants
11 Sathyavagiswaran, Winter, Kades, Djabourian, and Marinovich, gave
12 two retaliatory presentations. (Id.) Calmes' first presentation,
13 "What's an Anesthesiologist Doing at the Morgue," took place on
14 August 8, 2012. (Id. ¶ 39.) During this presentation Calmes
15 allegedly stated that there were "a number of deaths" at 1-800-GET-
16 THIN centers, which included Valley, and that the investigations
17 were ongoing. (Id. ¶ 41.) The second, "Ambulatory Surgery
18 Disasters" took place on September 21, 2012. (Id.) At this
19 presentation, Calmes made similar allegations regarding surgery
20 centers affiliated with 1-800-GET-THIN. (Id. ¶ 42.) Valley
21 contends that Calmes acted under color of state law and violated
22 the security hold in these presentations. (Id.)

23     Valley alleges that two weeks before the September 21, 2012
24 presentation it submitted another letter, protesting the Coroner's
25 investigation. (Id. ¶ 43.) Valley included information regarding
26 Rojeski's medical history, including records that demonstrated that
27 Rojeki had a history of using prescription weight loss medication
28

which caused her significant cardiac damage.[2]  (Id.)  Despite

providing this information to Defendants, Valley contends that

Defendants refused to investigate Rojeski's medical history and

instead continued their attempts to blame Valley for Rojeski's

death.  (Id. ¶ 35.)

On January 15, 2013 the Coroner's Office agreed to meet with

Valley.  (Id. ¶ 44.)  Defendant Winter allegedly admitted to

revealing the contents of the autopsy report to Rojeski's sister

and agreed to release a copy of the final report to Valley's

counsel.  (Id.)  The report found: that homicide could not be ruled

out as cause of death, that the attending surgeon and

anesthesiologist were grossly negligent and should be referred to

the California Medical Board, and that Valley departed from the

standard of care based on the anonymous letter.  (Id. ¶ 45.)

Additionally, the report contained a separate opinion by Defendant

Calmes that erroneously stated that anesthesia was not given for

the last hour and a half of Rojeski's surgery.  (Id. ¶ 60.) Valley

alleges that Calmes' opinion was clearly contradicted by the

operating records, which showed that surgery ended much earlier and

that anesthesia had been administered for the entire length of

surgery.  (Id. ¶¶ 61-63.)  Valley further alleges that Calmes based

---

[2] Valley contends that after conducting an independent investigation it discovered that Rojeski was a lead plaintiff in a lawsuit against the manufacturer of the weight loss medication she had been taking since 2001.  (SAC ¶¶ 29-30.)  According to Valley, the filings in that case demonstrate that Rojeski suffered abnormal echocardiography showing aortic regurgitation and heart valve damage.  (Id. ¶ 30.) Valley maintains that Rojeski never disclosed any of this information nor did she inform Valley that on August 11, 2011 she visited the emergency room complaining or radiating pain in her neck and shoulders, heart palpitations and an abnormal EKG.  (Id. ¶ 33.)  Valley asserts that Rojeski's medical history did not make her a good candidate for laparoscopic surgery.  (Id.)

her entire portion of the report on the anonymous letter.  (<u>Id.</u> ¶ 64.)  Valley contends that the other pathologists who contributed to the report relied on Calmes' findings, despite knowing they were false.  (<u>Id.</u> ¶ 67-70.)  After Valley received a copy of the report it retained seven experts to review it.  (<u>Id.</u> ¶ 46.)  Valley's experts criticized the report's reliance on the anonymous letter and concluded that the Rojeski's death was the result of an accident, not homicide.  (<u>Id.</u> ¶¶ 46-47.)  Valley also alleges that the report failed to mention that the organ, bone and tissue harvesting rendered the autopsy and the doctor's conclusions unreliable.  (<u>Id.</u> ¶ 48.)

On April 1, 2013, the Coroner's Office issued a supplemental autopsy report.  (<u>Id.</u> ¶ 71.) Valley alleges that the supplemental report only partially retracted the errors in the original report, and that it was internally inconsistent and a deliberate misrepresentation of the facts surrounding Rojeski's death.  (<u>Id.</u> ¶¶ 71-78.) Valley further alleges that the supplemental report continued to rely on the anonymous letter and included the original report without explaining the errors it contained.  (<u>Id.</u> ¶ 73.)

Valley has filed a SAC for violation of civil rights under 42 U.S.C. section 1983 against the individual defendants, violations of civil rights under 42 U.S.C. section 1983 against the Los Angeles County Coroner and Defendant Sathyavagiswaran in his official capacity, violation of California Civil Code section 52.1, defamation, intentional interference with prospective economic advantage, and negligent interference with prospective economic advantage. Defendants now move to dismiss Valley's SAC for failure to state a claim.

## II.   LEGAL STANDARD

A complaint will survive a motion to dismiss when it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  When considering a Rule 12(b)(6) motion, a court must "accept as true all allegations of material fact and must construe those facts in the light most favorable to the plaintiff." <u>Resnick v. Hayes</u>, 213 F.3d 443, 447 (9th Cir. 2000).  Although a complaint need not include "detailed factual allegations," it must offer "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." <u>Iqbal</u>, 556 U.S. at 678.  Conclusory allegations or allegations that are no more than a statement of a legal conclusion "are not entitled to the assumption of truth." <u>Id.</u> at 679.  In other words, a pleading that merely offers "labels and conclusions," a "formulaic recitation of the elements," or "naked assertions" will not be sufficient to state a claim upon which relief can be granted.  <u>Id.</u> at 678 (citations and internal quotation marks omitted).

"When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." <u>Id.</u> at 679. Plaintiffs must allege "plausible grounds to infer" that their claims rise "above the speculative level." <u>Twombly</u>, 550 U.S. at 555. "Determining whether a complaint states a plausible claim for relief" is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." <u>Iqbal</u>, 556 U.S. at 679.

# III. ANALYSIS

A.   Fourth Amendment Claim

After Rojeski's death, the Coroner issued a subpoena that sought medical records and an inspection of certain medical equipment. (SAC 22). The Coroner did not request that Valley bring medical equipment to the Coroner's office, but rather inspected and seized certain equipment at Valley's facility. (SAC 23.) Valley asserts that this inspection constituted an unlawful search in violation of the Fourth Amendment. (Id.)

The parties appear to agree that the Coroner has the power to subpoena witnesses and to compel those witnesses to produce "any books, records, documents, or other things under the control of the witness which, in the opinion of the coroner, are necessary to the conduct of the inquest . . . ." Cal. Gov't Code Sec. 27498(a). The crux of Valley's argument appears to be that although the Coroner could subpoena Valley to produce the medical equipment, he could not inspect the equipment at Valley's office without first obtaining an inspection warrant pursuant to California Code of Civil Procedure Sec. 1822.50-1822.57.[3] (Opp. at 8.) That framework, however, is not applicable to the Coroner's investigation at issue here. Section 1822.50 defines an inspection warrant as a signed order directing an official to conduct an inspection "relating to building, fire, safety, plumbing, electrical, health, labor, or zoning" laws and regulations. Cal. Code Civ. Pro 1822.50. Valley does not assert, nor does it appear, that a Coroner's investigation falls into any of these categories.

---

[3] The court considers the Coroner's investigation as administrative in nature.

1   California courts have recognized the existence of two
2   different sets of rules regarding administrative searches, one
3   concerning regulatory schemes of general application and another
4   regarding specific, licensed industries.  People v. Firstenberg,
5   155, 92 Cal.App.3d 570, 578-579 (1979).  The administrative warrant
6   scheme of which Section 1822.50 is a part was established to govern
7   situations regarding the former.  Id.  Coroner's inspections,
8   however, are not the product of general regulations akin to fire or
9   housing inspections, but rather are specifically tailored to
10  determine the circumstances, manner, and cause of death of a
11  particular decedent.  See Camara v. Municipal Court of City and
12  County of San Francisco, 387 U.S. 523 (1967); See v. City of
13  Seattle, 387 U.S. 541 (1967); Cal. Gov't Code Sec. 27498(a).  The
14  cases cited by Valley, too, are inapposite.

15  Valley's argument, therefore, depends solely on a narrow
16  reading of Government Code Section 27498(a) that would permit the
17  Coroner to subpoena "other things," including medical equipment,
18  "forthwith or at such time and place as the coroner appoints," but
19  not permit the coroner to inspect such equipment on-site.  Notably,
20  Valley does not appear to argue for such an interpretation, and
21  neither party has addressed the issue directly.  Instead, the
22  parties dispute whether the individual Defendants are entitled to
23  qualified immunity from Valley's Fourth Amendment claim.  Because
24  Valley has provided no authority, and indeed no real argument, for
25  a constrained reading of Section 27498(a) that would not include an
26  administrative search power, the court concludes that a reasonable
27  officer could well have believed Section 27498(a) to include such
28  authority.  Accordingly, the individual Defendants are entitled to

1   qualified immunity.  See Ashcroft v. Al-Kidd, 131 S.Ct. 2074, 2083

2   (2011); Pearson v. Callahan, 555 U.S. 223, 231 (2009).

3        B.    Retaliation Claims

4        The SAC alleges that Defendants retaliated against Valley for

5   its objections to Defendant Calmes' involvement and for its

6   criticism of the investigation and autopsy report.  Valley alleges

7   that retaliatory acts included the search described above,

8   Defendant Calmes' two public presentations, the leaking of the

9   existence of a homicide investigation, and the issuance of a flawed

10  supplemental autopsy report.  (Opp. at 17.)

11       "To allege a First Amendment retaliation claim under § 1983 a

12  plaintiff must show: '(1) he engaged in constitutionally protected

13  activity; (2) as a result, he was subjected to adverse action by

14  the defendant that would chill a person of ordinary firmness from

15  continuing to engage in the protected activity; and (3) there was a

16  substantial causal relationship between the constitutionally

17  protected activity and the adverse action.'" Gallardo v. Hanford

18  Joint Union School Dist. No. 12-cv-1612 GSA, 2015 WL 641657 (E.D.

19  Cal. Feb. 13, 2015) (quoting Pinard v. Clatskanie School Dist. 6J,

20  467 F.3d 755, 770 (9th Cir.2006); see also Ford v. City of Yakima,

21  706 F.3d 1188, 1193 (9th Cir. 2013).

22       Defendants raise a threshold plausibility challenge to

23  Valley's allegations, focused largely on the motivation element of

24  the retaliation claims.  The court agrees that certain of Valley's

25  allegations are, at best, conceivable, rather than plausible.  See

26  Iqbal, 556 U.S. at 680.  Valley alleges, for example, that

27  Defendants issued the supplemental autopsy report in retaliation

28  for Valley's critique of the original report.  (Opp. at 24-25.)

The "obvious alternative explanation," however, is that Defendants made changes to the report because it considered Valley's critique. Valley, having asked that Defendants amend the report, cannot now plausibly claim retaliation simply because Defendants did not adopt Valley's position in its entirety.

Nor does the SAC address the deficiencies highlighted by the court in its prior dismissal of claims regarding Defendant Calmes' two public presentations. Valley does not adequately allege how Calmes' references to deaths at ambulatory surgery centers like Valley was plausibly motived by a desire to chill protected activity. Valley argues that "the timing and nature" of Calmes' speeches are sufficient to support an inference of retaliatory motive. The court disagrees. Valley alleges that Calmes' first speech in August 2012 was given in retaliation for Valley's letter objecting to Dr. Calmes' involvement on December 1, 2011, over eight months earlier. Although Valley argues that gaps of even eleven months can support an inference of retaliation, that argument is not persuasive. First, the cases Valley cites are employment cases. See,, e.g., Coszalter v. City of Salem, 320 F.3d 968, 977-978 (9t Cir. 2003). Second, as even those cases acknowledge, "a specified time period cannot be a mechanically applied criterion," as the gap supporting an inference will vary with the circumstances. Id. at 978. Valley's conclusory assertion that "the presentation criticizing Valley was clearly retaliatory, based on the circumstances" is not convincing in light of the eight-month separation and relative opacity of Calmes' remarks. While the issue is a closer one with respect to Calmes' second presentation, which followed a second Valley protest letter by two

12

weeks, the circumstances of the presentation do not support an inference of retaliation.  Calmes did not single Valley out, but rather referred to a group of 1-800-GET-THIN centers and made reference to an investigation that was already public knowledge. The nature of the speech, therefore, does not support the allegation that Calmes acted with the intent to dissuade Valley from criticizing the Rojeski investigation.

Other of Valley's allegations regarding retaliation, however, are sufficient to survive a Motion to Dismiss.  Valley alleges that Defendants retaliated by "inciting a false homicide investigation" and leaking the existence of that investigation to the press in April, 2012, just over four months after Valley's initial protest letter.  The timing of this alleged adverse action might support an inference of retaliatory motive, although the issue is a close one. However, Valley also makes numerous allegations regarding the medical evidence.  In short, the SAC alleges that Defendants had sufficient information to know that homicide was not a potential cause of Rojeski's death.  Assuming that to be true, as the court must at this juncture, Defendants' actions could be explained by retaliatory animus.

The administrative search discussed at length, above, occurred on December 5, just four days after Valley objected to Dr. Calmes. Although the court has rejected Valley's arguments regarding the lack of an administrative warrant, other facts regarding the search do support a retaliation claim.  In addition to the timing of the search, the SAC alleges that Defendants Winter and Kades stated at the time of the search that the only reason they issued the subpoena was to "compel Valley to allow Dr. Calmes onto the

1    premises." (SAC p. 23.) Given that the purpose of Valley's

2    December 1 letter was primarily to object to Dr. Calmes' very

3    involvement in the investigation, it is unclear whether Defendants

4    would otherwise have issued a subpoena to guarantee her access to

5    Valley's facilities.

6        Accordingly, Valley's retaliation claims regarding the

7    administrative search and the leaking of the existence of a

8    homicide investigation premised on an obviously flawed report

9    survive.

10       C.   _Monell_ Claims

11       Valley argues that its _Monell_ claim is premised on Defendant

12   Sathyavagiswaran's acts as a final policy maker and ratifier of his

13   subordinates' actions, and on the existence of a custom or

14   practice.  To the extent Defendants argue that there are no

15   constitutional violations, the motion must fail, for the reasons

16   discussed above regarding Valley's retaliation claims.  Further,

17   the SAC alleges that Sathyavagiswaran personally instructed

18   Defendant Kades to search Valley's premises because of his close

19   personal friendship with Defendant Calmes. (SAC p. 86.)  That act,

20   undertaken as the final policymaker, could support a _Monell_ claim.

21       The remainder of Valley's _Monell_ allegations, however, are

22   conclusory, and are not entitled to the presumption of truth.

23   Perhaps cognizant of this deficiency, Valley's ratification

24   argument consists of a single sentence asserting, without

25   explanation, that "Sathyavagiswaran ratified his subordinate's

26   unconstitutional actions." (Opp. 28.)  References to several

27   paragraphs of the factual allegations of the SAC, which do not

28   mention Sathyavagiswaran, do little to sustain Valley's

14

1  ratification claim.  Valley's conclusory custom and practice

2  allegation fares no better, and is supported only by Valley's brief

3  argument that the acts alleged here somehow constitute an

4  unspecified "custom or usage of which Defendant Sathyavagiswaran

5  must have been aware."

6       Accordingly, Valley's <u>Monell</u> allegation regarding

7  Sathyavagiswaran's personal acts as final policymaker are

8  adequately pled.  The remainder of the <u>Monell</u> claims are dismissed

9  with prejudice.

10      D. State law claims

11      Defendants raise several arguments regarding Valley's state

12  law claims.  The factual predicate for those claims, however, is

13  somewhat uncertain.  Valley appears to acknowledge that it did not

14  timely present certain facts underpinning its claims to the state.

15  Valley further appears to acknowledge that, absent leave to amend

16  to allege delayed discovery or equitable tolling, certain claims

17  for damages may be barred, and requests leave to amend.  Valley's

18  request is granted.  The court will reserve discussion of state law

19  claims until such time as the scope of those claims has been

20  determined.

21  **IV.  CONCLUSION**

22      For the reasons stated above, Defendants' Motion is GRANTED in

23  part and DENIED in part.  Plaintiff's Fourth Amendment claim is

24  DISMISSED, with prejudice.  Plaintiff's retaliation claims

25  regarding Defendant Calmes' presentations and the amended autopsy

26  report are DISMISSED, with prejudice.  Plaintiff's <u>Monell</u> claims

27  regarding custom, usage, or practice and ratification are

28  DISMISSED, with prejudice.  Plaintiff shall file an amended

complaint consistent with this Order and addressing the state law issues within fourteen days of the date of this Order.

IT IS SO ORDERED.

Dated: March 31, 2016

                                        DEAN D. PREGERSON
                                        United States District Judge