O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VALLEY SURGICAL CENTER LLC., a California Limited Liability Company,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>COUNTY OF LOS ANGELES, a government entity, et al.,<br><br>　　　　　Defendants. | Case No. CV 13-02265 DDP (AGRx)<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING MOTION TO STRIKE**<br><br>[Dkt. 241] |

　　　Presently before the court is Defendants' Motion to Dismiss and Motion to Strike. Having considered the submissions of the parties and heard oral argument, the court grants the motion to dismiss, denies the motion to strike, and adopts the following Order.

**I. Background**

　　　As explained in further detail in this Court's prior Orders, this case arises out of an investigation conducted by the Los Angeles County Coroner's Office (the "Coroner's Office") into the death of Paula Rojeski ("Rojeski"). On September 8, 2011, Rojeski

died after undergoing laparoscopic Lap-Band surgery at Plaintiff Valley Surgical Center LLC ("Valley")'s facility. The Coroner's Office performed an autopsy on September 12, 2011, which showed that Rojeski died from a perforation of the aorta. Valley alleges that although the autopsy results indicated accidental perforation, Defendants Sathavagiswaran, Winter, Kades, Djabourian, Astarita, and Calmes attempted to attribute Rojeski's death to homicide.

In late November 2011, Defendant Kades informed Valley that the Coroner's Office wished to inspect Valley's premises with an anesthesia consultant, Defendant Calmes. On December 1, 2011 Valley responded to the Coroner's Office and protested the assignment of Defendant Calmes as the anesthesia consultant, citing "her lack of professional competence personal and professional biased (sic) against Valley and surgical centers." (Third Amended Complaint ("TAC") ¶23.) Valley alleges that, in retaliation for Valley's protest, Defendants "initiated a false homicide investigation and a campaign of harassment and abuse to 'shut down' Valley." (TAC ¶ 24.)

On December 5, 2011, Defendant Kades, under the supervision of Defendants Sathyavagiswaran and Winter, issued a Coroner's subpoena. The subpoena sought Rojeski's medical records as well as an inspection of Valley's premises. Valley alleges that Defendants Winter and Kades admitted at the inspection that their sole purpose in issuing the subpoena was to force Valley to allow Defendant Calmes onto Valley property, even though Defendants knew the search was unlawful.

Valley contends that although Defendants had no reason to suspect homicide as the cause of Rojeski's death, Defendants

2

nevertheless "created a false homicide investigation and leaked information regarding its false homicide investigation to the media, . . . despite a security hold." (TAC ¶ 32.) Specifically, on April 6, 2012, media outlets reported that the Coroner's Office had referred Rojeski's case to the Los Angeles Police Department Robbery-Homicide Division. (Id.) The media also reported on May 11, 2012 that homicide detectives had been assigned to determine whether a crime had been committed. (Id.)

On August 8, 2012, Calmes made a public speech titled "What's an Anesthesiologist Doing at the Morgue?" (TAC ¶ 34.) During this presentation, Calmes allegedly "made a false public speech about Valley in order to chill and prevent further protests about Valley regarding her, the incompetent investigation, and the use of false evidence." (Id..) On September 21, 2012, Calmes gave another public presentation, titled "Ambulatory Surgery Disasters." (TAC ¶ 37.) Calmes allegedly "stated there were 'a number of deaths' at 1-800-GET-THIN outpatient centers, which included Valley, and described it as a 'very scandalous situation.'" (Id.)

On January 15, 2013 the Coroner's Office agreed to meet with Valley and to release a copy of the final autopsy report to Valley's counsel. The report found that the mode of death was "undetermined," and could be the result of homicide. The report further concluded that the attending surgeon and anesthesiologist were grossly negligent and should be referred to the California Medical Board, and that Valley departed from the standard of care.

Valley's experts criticized the autopsy report. On April 1, 2013, the Coroner's Office released the report, along with a new supplement. The supplement continued to maintain that homicide

3

could not be ruled out as a cause of Rojeski's death.  Valley alleges that there was no scientific basis not to rule out homicide, and that the public report included other falsehoods.  (TAC ¶ 52.)

On May 10, 2013, Valley made a tort claim to the County Clerk for the County of Los Angeles based upon Defendants' alleged wrongful acts, described above.  (TAC ¶ 59.)  The claim was denied, and Valley filed the instant action.  Valley's TAC alleges six claims, including four state law tort claims.  Defendants now move to dismiss the state law claims and to strike certain allegations from the TAC.

**II. Legal Standard**

A complaint will survive a motion to dismiss when it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  When considering a Rule 12(b)(6) motion, a court must "accept as true all allegations of material fact and must construe those facts in the light most favorable to the plaintiff." Resnick v. Hayes, 213 F.3d 443, 447 (9th Cir. 2000).  Although a complaint need not include "detailed factual allegations," it must offer "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678.  Conclusory allegations or allegations that are no more than a statement of a legal conclusion "are not entitled to the assumption of truth." Id. at 679.  In other words, a pleading that merely offers "labels and conclusions," a "formulaic recitation of the elements," or "naked assertions" will not be sufficient to state a claim upon which

1  relief can be granted.  Id. at 678 (citations and internal
2  quotation marks omitted).
3      "When there are well-pleaded factual allegations, a court
4  should assume their veracity and then determine whether they
5  plausibly give rise to an entitlement of relief." Id. at 679.
6  Plaintiffs must allege "plausible grounds to infer" that their
7  claims rise "above the speculative level." Twombly, 550 U.S. at
8  555. "Determining whether a complaint states a plausible claim for
9  relief" is a "context-specific task that requires the reviewing
10 court to draw on its judicial experience and common sense." Iqbal,
11 556 U.S. at 679.
12     Under Federal Rule of Civil Procedure 12(f), the "court may
13 strike from a pleading . . . any redundant, immaterial,
14 impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).
15 Immaterial matter is that which has no bearing on the claims for
16 relief or the defenses being pled.  Whittlestone, Inc. v. Handi-
17 Craft Co., 618 F.3d 970, 974 (9th Cir. 2010).  Impertinent matter
18 consists of statements that do not pertain and are not necessary to
19 the issues in question.  Id.  The court has the discretion to
20 strike an entire pleading or portions thereof.  MGA Entm't, Inc. v.
21 Mattel, Inc., No. CV 05-2727 NM (RNBx), 2005 WL 5894689, at *4
22 (C.D. Cal. Aug. 26, 2005).  Generally, motions to strike are
23 "disfavored," and "courts are reluctant to determine disputed or
24 substantial questions of law on a motion to strike." Whittlestone,
25 618 F.3d at 1165-66; see also Miller v. Fuhu, Inc., No. 2:14-cv-
26 06119-CAS (ASx), 2014 WL 4748299, at *1, (C.D. Cal. Sept. 22,
27 2014).  In considering a motion to strike, the court views the
28 pleadings in the light most favorable to the non-moving party.  See

In re 2TheMart.com Secs. Litig., 114 F. Supp. 2d 955, 965 (C.D. Cal. 2000)). Grounds for a motion to strike must be readily apparent from the face of the pleadings or from materials that may be judicially noticed. Fantasy, Inc. v. Fogerty, 984 F.2d 1524, 1528 (9th Cir. 1993) rev'd on other grounds, 510 U.S. 517 (1994).

**III. Discussion**

    A.   Timeliness

Under California's Tort Claims Act, a plaintiff may not assert state law causes of action against a public entity or public employee without first presenting all claims for money or damages to the entity or employee. Mangold v. California Public Utilities Commission, 67 F.3d 1470, 1477 (9th Cir. 1995); Via v. City of Fairfield, 833 F.Supp.2d 1189, 1197 (E.D. Cal. 2011); State v. Superior Court, 32 Cal.4th 1234, 1239 (2004). Claims must be submitted to the public entity within six months of the accrual of the cause of action. Cal. Government Code § 911.2(a).

Here, the administrative search of Valley's premises, the alleged leaks to the media, and Defendant Calmes' public speeches all occurred more than six months before Valley presented its claims on May 10, 2013. Defendants contend that any claims based on those acts are, therefore, barred as untimely.

The date of accrual for purposes of the Tort Claims Act is the same as which a cause of action is deemed to have accrued for statute of limitations purposes. Cal. Government Code. § 901. A cause of action generally accrues when all of the elements are complete. See, e.g., Garber v. City of Clovis, 698 F.Supp.2d 1204, 1212 (E.D. Cal. 2010). The "discovery rule," however, postpones the accrual of a cause of action until a plaintiff discovers, or

1  has reason to discover, the cause of action. Id. "A plaintiff
2  discovers the cause of action when she at least suspects a factual
3  basis . . . for its elements." DeVore v. California Highway
4  Patrol, 221 Cal. App. 4th 454, 465 (2013) (citing Norgart v. Upjohn
5  Co., 21 Cal.4th 383, 397 (1999)). "A plaintiff has reason to
6  discover the cause of action when she has notice or information of
7  circumstances that would put a reasonable person on inquiry." Id.
8      Here, Valley asserts that it did not know, and could not have
9  known, that it had suffered harm until the Coroner's Office shared
10 the autopsy report on January 15, 2013, within the six months Tort
11 Claims Act filing period. Valley further argues that it did not
12 know "several facts" until it subsequently retained independent
13 experts to review the autopsy report. Valley also contends that it
14 did not learn about Calmes' speeches until January 2013, within the
15 claims period.
16     Valley's arguments are inconsistent with its own allegations.
17 It asserts that it "reasonably assumed and had no reason to doubt
18 that the Coroner's Office . . . would conduct a lawful and
19 legitimate investigation[] until the obviously flawed autopsy
20 report was produced . . ., revealing for the first time that the
21 Coroner's Office had initiated a false homicide investigation and
22 that it had no basis to disclose to anyone, including the press, it
23 was conducting a homicide investigation." (Opposition at 17:4-
24 10.). That argument, however, is inconsistent with Valley's
25 underlying premise that Defendants retaliated against it for
26 protesting Defendant Calmes' involvement in the first instance.
27 Indeed, Valley questioned Calmes' competence and biases before
28 Defendants ever issued the Coroner's subpoena, let alone conducted

the inspection of Valley's premises. Valley cannot credibly argue now that it had no idea that the Coroner's Office inspection caused it harm when Valley itself pointed out the impropriety of the search before the search ever took place. Among the harms alleged in the TAC is "disruption of [Valley's] business from the pretextual search and seizure." (TAC ¶¶ 69, 80.) That element was complete as of the day of the search, regardless of the contents of the subsequent autopsy report.

Harms resulting from leaks to the media were similarly known at or near the time they occurred. Valley does not claim that it only learned of the media reports later, within the Tort Claims Act filing period. To the contrary, the TAC indicates that Valley was aware of the media reports, which allegedly resulted from and necessarily postdated the alleged leaks, in April or May of 2012. (TAC ¶¶ 32-33.) Although the TAC does not specifically delineate which of the alleged harms are attributable to which of the allegedly wrongful acts, leaks to the media about the existence of a homicide investigation are certainly related to alleged harms such as "damages to [Valley's] reputation" and "loss of business." (TAC ¶¶ 69, 80.) Regardless of what the autopsy report subsequently stated, those harms were suffered by, and known to, Valley well before it learned of the report's contents eight months later.

Similar logic applies to Valley's claims reagarding Calmes' two presentations. Although Valley alleges that it did not learn of Calmes' speeches until January 2013, the TAC also alleges that

8

the speeches were made in public.[1]  (TAC ¶¶ 34-35, 37-38.)  It is unclear, however, how Calmes' speeches could, on the one hand, have been disseminated widely enough to cause Valley a loss of reputation or other harm without, at the same time, being notorious enough to put Valley on notice.  Further, "the discovery rule does not operate to delay accrual of a cause of action 'beyond the point at which [the] factual basis became accessible to plaintiff to the same degree as it was accessible to every other member of the public.'"  NBCUniversal Media, LLC v. Superior Court, 225 Cal. App. 4th 1222, 1234 (2014) (quoting Shively v. Bozanich, 31 Cal.4th 1230, 1253 (2003).  Indeed, the California Supreme Court has limited application of the discovery rule even when an allegedly defamatory publication was given only a limited public release.  See Hebrew Academy of San Francisco v. Goldman, 42 Cal. 4th 883, 888, 894-95 (2007) (declining to apply discovery rule to statements contained in fewer than ten copies of interview transcripts located in private institutions, research libraries, and one public library).  Here, there is no allegation that Calmes' presentations were made in any secretive manner or in confidence.  To the contrary, the presentations are alleged to have been harmful precisely because they were made in public.  Accordingly, the discovery rule does not apply.

    In the alternative, Valley contends that Defendants should be equitably estopped from raising a Tort Claims Act timeliness argument.  (Opposition at 17.)  "The elements of equitable estoppel

---

[1] Aside from restating the allegation in the TAC regarding Valley's actual knowledge, Valley's opposition does not address Defendants' argument regarding the speeches.

9

are (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." Schafer v. City of Los Angeles, 237 Cal. App. 4th 1250, 1261(2015)(internal quotation marks omitted).  Valley asserts that Defendants should be estopped because they "reasonably assured Valley that the Coroner's Office, as a government office, would conduct a lawful and legitimate investigation into the death of Rojeski.  This caused Valley to believe that it would not be necessary to file a lawsuit, until the completion of the autopsy report."  (Opp. at 17:25-28; TAC ¶ 61.)  As discussed above, however, the harms the TAC appears to attribute to the wrongful acts at issue accrued well before, and independent of, the issuance of the autopsy report.  Even assuming Valley's allegation about Defendants' representations to be true, the information relating to the acts in question was either known or available to Valley well before the Coroner's Office shared the autopsy report.

     The harms suffered by Valley as a result of the Coroner's Office's investigation, leaks to the media, and Defendant Calmes' public comments about Valley were either known to Valley or discoverable more than six months prior to Valley's presentation of its claims to the County.  Claims based upon those act therefore accrued outside of the Tort Claims Act filing period, and are time-barred.

     B.    Absolute Privilege

1    There is no dispute that Valley's claims regarding the autopsy
2 report fall within the Tort Claims Act's six-month limitation
3 period.  Defendants argue, however, that the autopsy reports are
4 subject to a litigation privilege under California Civil Code
5 Section 47(b).  That statute provides that a publication or
6 broadcast made in any legislative, judicial or "any other official
7 proceeding authorized by law" is privileged.  Cal. Civil Code §
8 47(b).  Courts have explained that Section 47(b) establishes an
9 "absolute privilege" that bars tort liability for all causes of
10 action except malicious prosecution.  See Hagberg v. California
11 Federal Bank FSB, 32 Cal.4th 350, 360 (2004).  As the Hagberg court
12 explained, this bar "serves the important public policy of assuring
13 free access to . . . official proceedings . . . . [T]he effective
14 administration of justice . . . would be threatened by permitting
15 tort liability for communications connected with judicial or other
16 official proceedings.  Hence, without respect to the good faith or
17 malice of the person who made the statement, or whether the
18 statement ostensibly was made in the interest of justice, courts
19 have applied the privilege to . . . communications made during all
20 kinds of truth-seeking proceedings: judicial, quasi-judicial,
21 legislative and other official proceedings."  Id. (internal
22 quotation and citation omitted).
23    Valley responds that the Section 47(b) privilege only applies
24 if serious a communication is made where litigation is seriously
25 considered, relying heavily upon Action Apartments Assoc. v. City
26 of Santa Monica, 41 Cal.4th 1232 (2007).  (Opp. at 12).  Action
27 Apartments addressed the absolute privilege in the context of a
28 landlord pursuing eviction proceedings against a tenant.  The court

concluded that the landlord's communication was only entitled to protection if connected with, or logically related to, litigation "that is contemplated in good faith and under serious consideration." Action Apartments Assoc. v. City of Santa Monica, 41 Cal.4th 1232, 1251 (2007). Even malicious communications, however, "when made in good faith anticipation, are protected as part of the price paid for affording litigants the utmost freedom of access to the courts." Id.

Valley's argument appears to be that the autopsy report could not have been made in connection with litigation because the Coroner's Office is not responsible for investigating "the probability of a crime much less the feasibility of instating a criminal proceeding." (Opp. at 12:28-13:1.) To the extent Valley suggests that a Coroner's Office investigation is not an "official investigation authorized by law" or otherwise a "truth-seeking proceeding," the argument has no merit. The Coroner has a duty to "inquire into and determine the circumstances, manner, and cause of all violent, sudden, or unusual deaths . . . ." Cal. Gov. Code § 27491. The Coroner also bears a duty to, if she determines that "a person has died under circumstances that afford a reasonable ground to suspect that the person's death has been occasioned by the act of another by criminal means," immediately notify law enforcement of that fact. Cal. Gov. Code § 27491.1. Autopsy reports therefore are made in the course of proceedings authorized by law and have the requisite logical connection to potential homicide proceedings to fall under Section 47(b).

Valley also relies upon Marsh v. San Diego County, 432 F.Supp.2d 1035 (S.D. Cal. 2006). There, the plaintiff alleged that

doctors conspired to alter a death certificate to cover up their own errors. Marsh, 432 F.Supp.2d at 1042. On a motion to dismiss, the court declined to extend the Section 47(b) privilege to the doctors' reports, reasoning that the privilege only applies to communications, not to tortious conduct. Id. at 1057. Valley's reliance on Marsh is misplaced. First, the distinction between communications and conduct in the Marsh court's relatively brief discussion of the Section 47(b) issue is not well delineated. Second, the case upon which the Marsh court relied, Kimmel v. Goland, 51 Cal.3d 202 (1990), in elaborating upon the communications versus conduct distinction, explained that the Section 47(b) privilege applies to "torts arising from statements or publications," and not from "noncommunicative conduct." Kimmel, 51 Cal.3d at 211.

    In Kimmel, for example, owners of mobile homes secretly recorded phone calls with managers of the mobile home park in anticipation of litigation. The owners later tried to avoid tort liability for the secret recording by invoking the Section 47(b) privilege. Kimmel, 51 Cal.3d at 205. The Kimmel court reasoned that the privilege did not apply because the owners' potential liability arose not out of the publication or broadcast of any of the recorded calls, but rather from the act of recording the calls in the first place. As the court explained, such conduct was analogous to burglarizing an office to pilfer evidence relevant to upcoming legal proceedings. Though taken in connection with litigation, such conduct does not further the policy underlying the Section 47(b) privilege and is not worthy of protection. Id. at 212. Here, unlike the non-communicative conduct alleged in Kimmel,

the alleged harms arise from Defendants' reports made in the course of an official Coroner's Office investigation.

Lastly, the Marsh court itself later recognized, notwithstanding its earlier conclusion, the Kimmel court's distinction between communicative acts and non-communicative conduct. Marsh v. County of San Diego, S.D. Cal. No. 05-CV-1568-JLS(LSP), Order Granting Defendants Motions for Summary Judgment (Dkt. 195) at 32-33. The Marsh court ultimately determined that the Section 47(b) privilege did apply to the doctors' reports. Id. Here, similarly, Defendants' communications in the Coroner's report are entitled to an absolute privilege under Section 47(b), and therefore cannot serve as the basis for Valley's state law tort claims.[2]

C. Motion to Strike

Although the scope of Defendants' Motion to Strike is not clear to the court, as Defendants have not identified particular language they seek to have stricken from the TAC, Defendants appear to object generally to allegations in the TAC that refer to certain emails from Defendants. Defendants assert that those emails are privileged, but acknowledge that a state court has already disagreed in the context of a separate proceeding, and ordered the emails produced. Nevertheless, Defendants assert that references to the emails must be stricken because no federal court has yet had occasion to determine whether other, federal privileges apply to

---

[2] This court need not address arguments specific to Valley's intentional interference claim regarding Allergan, as that claim appears to be predicated entirely on allegations that, for the reasons described above, are either time-barred or subject to Section 47(b).

the messages. Notably, however, Defendants do not ask that this court make any rulings regarding the applicability of federal privileges at this stage, and have not sought a protective order or otherwise sought to limit distribution of the information at issue, which appears to have been described in other public filings in this matter as well. In light of these facts, and given courts' general reluctance to decide disputed questions on a motion to strike, Defendants' motion is denied, without prejudice. See Whittlestone, 618 F.3d at 1165-66.

**IV. Conclusion**

For the reasons stated above, Defendants' Motion to Dismiss is GRANTED. The Motion to Strike is DENIED, without prejudice.


IT IS SO ORDERED.


Dated: December 1, 2016

DEAN D. PREGERSON
United States District Judge