UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VALLEY SURGICAL CENTER LLC., a California Limited Liability Company, | Case No. CV 13-02265 DDP (AGRx) |
| Plaintiff, | **ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** |
| v. | [Dkts 483, 492] |
| COUNTY OF LOS ANGELES, a government entity, et al., | |
| Defendants. | |

Presently before the court are two motions for summary judgment, one filed by Defendant Selma Calmes and the other filed by Defendants Lakshmanan Sathyavagiswaran, Adrian Marinovich, Raffi Djabourian, Denis C. Astarita, John Kades, and Ed Winter. Having considered the submissions of the parties and heard oral argument, the court grants the motions and adopts the following Order.

**I.   Legal Standard**

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). All reasonable inferences from the evidence must be drawn in favor of the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 242 (1986). If the moving party does not bear the burden of proof at trial, it is entitled to summary judgment if it can demonstrate that "there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 323.

Once the moving party meets its burden, the burden shifts to the nonmoving party opposing the motion, who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. There is no genuine issue of fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

1    It is not the court's task "to scour the record in search of a
2 genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275,
3 1278 (9th Cir. 1996). Counsel have an obligation to lay out their
4 support clearly. Carmen v. San Francisco Sch. Dist., 237 F.3d
5 1026, 1031 (9th Cir. 2001). The court "need not examine the entire
6 file for evidence establishing a genuine issue of fact, where the
7 evidence is not set forth in the opposition papers with adequate
8 references so that it could conveniently be found." Id.
9 **II.  Discussion**
10    A.   Background
11    This matter has been litigated extensively, and the parties
12 are familiar with the factual background. As explained in detail
13 in this Court's prior Orders, this case arises out of an
14 investigation conducted by the Los Angeles County Coroner's Office
15 (the "Coroner's Office") into the death of Paula Rojeski
16 ("Rojeski"). Although many of the facts are in dispute, the
17 parties agree that on September 8, 2011, Rojeski died after
18 undergoing laparoscopic Lap-Band surgery at Plaintiff Valley
19 Surgical Center LLC ("Valley")'s facility. The Coroner's Office
20 performed an autopsy on September 12, 2011, which revealed a
21 perforation of Rojeski's aorta. Valley alleges that although
22 Defendants had no reason to suspect homicide as the cause of
23 Rojeski's death, Defendants nevertheless "created a false homicide
24 investigation and leaked information regarding [the Coroner's
25 Office's] false homicide investigation to the media . . . ," thus
26 violating Valley's constitutional rights. (Third Amended Complaint
27 ("TAC") ¶ 32.) Defendants now move for summary judgment.
28    B.   Factual Basis of Plaintiff's Constitutional Claims

3

1    Defendants challenge the legal basis of Plaintiff's various

2  constitutional claims, and also argue that summary judgment is

3  warranted because Plaintiff has not put forth any facts to support

4  its theories of constitutional harm.  Before this Court can address

5  the question whether Defendants' conduct violated a constitutional

6  right, the court must first determine whether there is a triable

7  issue of fact as to what that underlying conduct was.  See, e.g.,

8  United States v. Sandoval-Lopez, 122 F.3d 797, 802 n.9 (9th Cir.

9  1997) ("We avoid constitutional questions when an alternative basis

10  for disposing of the case presents itself.").

11    Plaintiff's arguments are predicated on the assertion, largely

12  unsupported by citation to the record, that Defendants "created a

13  false Autopsy Report claiming an extreme departure from the

14  standard of care, which is the medico-legal term for homicide, and

15  a false homicide investigation which was designed to and did 'shut

16  [Valley] down.'" (Opp. to Calmes MSJ at 4:26-28; Opp. to County MSJ

17  at 4:21-23.)  Plaintiff also makes frequent references to a "false

18  homicide determination" throughout its oppositions to Defendants'

19  motions.

20    The evidentiary support for Plaintiff's assertions is unclear

21  to the court.  The court notes that neither of Plaintiff's

22  memoranda in opposition to the instant motions includes a statement

23  or recitation of the relevant facts.  Instead, in an apparent

24  attempt to circumvent the local rules of this district, Plaintiff

25  refers to the "Declaration of the Statement of the Facts by

26  Declarant Brian Oxman."  The Oxman declaration, prepared by a non-

27  attorney "litigation coordinator," in turn recounts 23 pages of

28  "facts" that, although purportedly within Oxman's personal

4

knowledge, are, in many cases, characterizations of what "the record shows."  (Dkt. 553.)  See C.D. Cal. L.R. 11-6. Notwithstanding threshold questions about the admissibility of the Oxman declaration, the court proceeds to examine Plaintiff's factual contentions.

### 1.  Homicide Determination

Plaintiff's Third Amended Complaint and oppositions to the instant motions are replete with references to a false homicide determination.  Defendants argue, however, that there is no evidence that any Defendant ever made a homicide determination, false or otherwise.  It appears that Plaintiff relies upon paragraph 22 of the Oxman Declaration to establish that Defendants did, in fact, determine that Rojeski's death resulted from a homicide.  (Opp. to County motion at 6:25.)  The Oxman Declaration quotes and cites to an exhibit that Plaintiffs represent was obtained from a criminal matter before another judge of this district.  That exhibit consists of a declaration by Roger Jon Diamond, an attorney with no apparent connection to this matter, who purports to attach an excerpted portion of a Food and Drug Administration "Report of Investigation."  That excerpt states that "[Defendant] Ed Winter . . . advised [FDA agents] Hadley and []Kelley that Mrs. Paula Rojeski's death will be ruled a homicide." (Oxman Decl. ¶ 22 (citing Madison Decl., Ex. 13.)).

Even assuming that the Oxman Declaration is admissible, there is no basis to admit Winter's statement that Rojeski's death "will be ruled a homicide."  There is no declaration or testimony from the FDA agents to whom Winter allegedly made the statement, nor is there any indication from the Oxman or any other declaration as to

5

who authored the FDA report, how Diamond came to possess it, or whether it is authentic.[1]

Furthermore, and more fundamentally, even if Winter's statement were admitted, it does not establish that Defendants concluded that Rojeski's death was a homicide. Indeed, notwithstanding Winter's supposed statement that the Coroner's Office intended, at some point in the future, to determine that Rojeski's death was a homicide, there is no evidence that such a determination was ever made. Even the initial autopsy report, which was supplemented before it was ever released, stated, "Certifying the manner of death as homicide vs. accident would require knowledge of whether or not this death resulted from a conscious disregard for the patient's safety. The currently available information does not allow for [such] a conclusion . . . . The manner of death thus could not be determined." (Madison Decl., Ex. 1 at 15.) The amended supplemental report, which was ultimately released, clarified further, "If any future investigations clarify that there definitely was or was not a conscious disregard for patient safety, the manner can be revised to homicide or accident, respectively. As of now, the manner of death is undetermined . . . ." (Id. at 17.) Thus, even considering Winter's inadmissible statement, there is no evidence that Defendants ever explicitly concluded that Rojeski's death was a homicide.

---

[1] The court notes that Plaintiff's counsel, in a response to Defendants' objections, attempts to authenticate the report with the declaration of counsel from a separate criminal proceeding, who in turn purports to quote a statement from an Assistant United States Attorney involved in those criminal proceedings.

1    Plaintiffs appear to suggest that, notwithstanding the lack of

2  any evidence that any Defendant made a determination of "homicide,"

3  Defendants <u>effectively</u> made a homicide determination by "calling

4  the Rojeski death an extreme departure from the standard of care,

5  which is the medico-legal term for homicide . . . ."  (Opp. to

6  County MSJ at 9:27-28.)  Plaintiff does not provide any citation to

7  support either of the two components of its assertion.

8    With respect to the first part, that Defendants called

9  Rojeski's death "an extreme departure from the standard of care,"

10  the assertion is repeated in the Oxman declaration, without further

11  citation or attribution.  (Oxman Decl., Ex. 21.)  Although the

12  court's own review reveals that the initial autopsy report does

13  recognize an "extreme deviation from the standard of care," the

14  final, publicly released report specifically deleted that

15  conclusion, stating instead that "significant lapses in diagnosis

16  in judgment [] at least constitute simple negligence and may

17  constitute gross negligence or incompetence by the physicians,"

18  before continuing to explain, as stated above, that there was

19  insufficient evidence to support a homicide determination.

20  (Madison Decl., Ex. 1 at 15,17.)

21    Furthermore, even if the final autopsy report had made a

22  finding of extreme deviation from the standard of care, and

23  notwithstanding the report's explicit refusal to reach a homicide

24  conclusion, Plaintiff cites to no support for the second part of

25  the "effective homicide determination" argument, that "extreme

26  deviation" is the "medico legal" equivalent of homicide.  In an

27  uncited footnote, the Oxman Declaration does cite what appears to

28  be some sort of academic article written by Defendant Lakshmanan,

in which Defendant Lakshmanan observes, "More severe than gross negligence is extreme medical negligence. This is one of the criteria that defines medical homicide." (Oxman Decl., n. 1.) Even if admissible, however, this opinion hardly establishes that Defendants effectively determined Rojeski's death to be a homicide. As discussed above, the report explicitly disclaimed such a conclusion. Furthermore, even assuming that the initial report's reference to an "extreme deviation from the standard of care" is equivalent to a finding of "extreme medical negligence," the final report specifically deleted that conclusion. Lastly, Dr. Lakshmanan's article states only that extreme negligence is "<u>one of</u> the criteria that defines medical homicide." (<u>Id.</u> (emphasis added)) The court is not aware of any evidence in the record regarding the remaining criteria or whether satisfaction of a single criterion would constitute "homicide" in the "medico legal" sense.

        2.    Shutdown

In addition to the supposed homicide determination, Plaintiff points to Defendants' alleged wrongful "shutdown" of Valley's business as a basis for Plaintiff's constitutional claims. Plaintiff again fails, in most instances, to cite to any evidence in the record of such a "shutdown." There appears to be no evidence in the record that Defendants took any action to officially close down Valley's business, such as by revoking a permit or license. In some cases, however, other arbitrary government action may rise to the level of a constitutional violation where it is undertaken "for the purpose of harassment and interference," including for the purpose of forcing someone out of

business.  <u>Benigni v. City of Hemet</u>, 879 F.2d 473, 478 (9th Cir. 1988).  Apparently pursuing such a theory, Plaintiff, to the extent it does cite to the record, again relies solely upon the Oxman declaration for evidentiary support.

Paragraphs 25 and 27 of the Oxman Declaration, cited by Plaintiff, attribute Valley's shutdown to the "false homicide determination."  As discussed above, there is no evidence of such a determination.  In paragraph 22 of his declaration, however, Oxman takes a slightly different position.  Although continuing to reference a "determination of homicide," Oxman also states that a representative of Allergan, Inc., the manufacturer of the LapBand product that Valley implanted in Rojeski and other patients, told Oxman that Allergan would not sell LapBand products to Valley because of Defendants' investigation.  (Oxman Decl. ¶ 22:20-22.) Although the court is skeptical that any reasonable trier of fact could conclude that the mere initiation of a homicide investigation in the wake of a patient death could constitute "arbitrary" or "harassing" conduct, the court need not reach that question because there is no admissible evidence that Defendants' conduct had any effect on Allergan's decision to stop dealing with Valley.  Oxman's recitation of what an Allegan representative told him is obvious hearsay, to which no exception applies.  There is simply no admissible evidence that Defendants did anything to "shut Valley down," officially or otherwise.

**III. Conclusion**

Plaintiff alleges that Defendants violated Plaintiff's constitutional rights by making a false homicide determination and by shutting down Plaintiff's business.  On the record before the

9

1  court, however, no trier of fact could conclude that either of

2  those factual predicates occurred.  Accordingly, Defendants'

3  motions for summary judgment are GRANTED.

4

5

6

7

8

9

10

11  IT IS SO ORDERED.

12

   Dated:  October 29, 2019

13
                                DEAN D. PREGERSON
                                United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28